# 11

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA
### DOMESTIC RELATIONS DIVISION

IN RE THE MARRIAGE OF:         )
HOPE DUNCAN HARBIN       )
                             )
AND                      )    **CASE NO. DR-2001-1310**
                             )
MICHAEL G. HARBIN, JR.     )
Wife and Husband.

### RE-NOTICE OF TAKING DEPOSITION DUCES TECUM

TO:   **MICHAEL G. HARBIN, JR.**
       c/o Floyd Minor
       MINOR & OLSZEWSKI, LLC
       P.O. Box 164
       Montgomery, AL 36101-0164

Please take notice that on April 2, 2002, beginning at 9:00 a.m., at the law offices of

Copeland, Franco, Screws & Gill, P.A., 444 South Perry Street, Montgomery, Alabama, the

Wife, Hope Duncan Harbin, will take the deposition of the Husband, Michael G. Harbin, Jr.,

upon oral examination before an officer authorized by law to administer oaths, and the said

depositions will continue from day to date until completed. That the Husband is hereby

requested to produce for inspection and copying at the time and place of said deposition the

following documentation.

That the Husband shall, pursuant to Rule 30(b)(5), *Alabama Rules of Civil Procedure*,

produce and permit the Wife and her counsel to inspect and to copy each of the following

documents which are in the Husband's possession, custody or control, or in the possession,

custody or control of any business entity in which the Husband has an interest and which are, or

can be made, available to the Husband by any person or business entity.

These requests are continuing in character so as to require you to file supplemental

EXHIBIT
# 11

responses if you obtain further or different information before trial.

     1.    Copies of any and all documents related to M&M Properties, LLC, including but not limited to the following:

         A.    1998 income tax return and depreciation schedule

         B.    1999 income tax return and depreciation schedule

         C.    2000 incomes tax return and depreciation schedule

         D.    Copy of the LLC Agreement

         E.    A detail of the transactions creating M&M Properties, LLC explaining how M&M Properties acquired the land and building and from whom M&M Properties acquired the land and building, including but not limited to sales contracts, closing statements, and all other relevant documents regarding the acquiring of the land and building by M&M Properties, LLC.

     2.    Copies of any and all documents related to RESIA, including but not limited to the following:

         A.    1996 tax returns

         B.    1997 tax returns

         C.    1998 tax returns

         D.    1999 tax returns

         E.    2000 tax returns

     3.    Copies of any and all documents relating to Harbin's, Inc., including but not limited to the following:

         A.    1998 tax return and depreciation schedule

         B.    1999 tax return and depreciation schedule

C.    2000 tax return and depreciation schedule

4.    Copies of any and all 1041s filed on behalf of the Estate of Michael G. Harbin, Sr.

5.    A detailed list of all assets distributed out of the Estate of Michael G. Harbin, Sr., for the benefit of Michael Harbin and a detailed explanation as to the whereabouts of said assets and/or the current form of said assets.

6.    Copies of any and all of the internally prepared financial statements for Harbin-Stern Bros., LLC at December 31, 2001, and for the twelve (12) month period ending December 31, 2001.

7.    Copies of the actual deposit slips and copies of the items making up the amounts included in the deposits for the following deposits into the personal account of Michael Harbin:

> February 8, 2000 deposit in the amount of $8,391.50
> February 17, 2000 deposit in the amount of $10,000.00
> February 17, 2000 deposit in the amount of $240.94
> March 9, 2000 deposit in the amount of $3,737.53
> March 15, 2000 deposit in the amount of $2,500.00
> March 22, 2000 deposit in the amount of $18,224.00
> March 30, 2000 deposit in the amount of $1,335.14
> April 10, 2000 deposit in the amount of $1,429.22
> April 17, 2000 deposit in the amount of $22,309.20
> April 24, 2000 deposit in the amount of $6,711.00
> May 4, 2000 deposit in the amount of $2,739.36
> May 25, 2000 deposit in the amount of $4,264.94
> June 7, 2000 deposit in the amount of $1,524.85
> July 13, 2000 deposit in the amount of $812.79
> July 13, 2000 deposit in the amount of $71.92
> July 28, 2000 deposit in the amount of $36.77
> August 4, 2000 deposit in the amount of $1,415.00
> August 18, 2000 deposit in the amount of $71.92
> September 6, 2000 deposit in the amount of $68,894.00
> October 2, 2000 deposit in the amount of $75.00
> October 10, 2000 deposit in the amount of $292.53
> October 11, 2000 deposit in the amount of $2,713.00
> November 8, 2000 deposit in the amount of $116.65
> November 9, 2000 deposit in the amount of $8,215.00
> December 13, 2000 deposit in the amount of $150.21

December 22, 2000 deposit in the amount of $2,850.63
December 27, 2000 deposit in the amount of $1,000.00
January 2, 2001 deposit in the amount of $10,000.00
January 4, 2001 deposit in the amount of $3,924.16
January 5, 2001 deposit in the amount of $250.00
January 12, 2001 deposit in the amount of $3,000.00
January 17, 2001 deposit in the amount of $16,800.00
January 26, 2001 deposit in the amount of $84.00
February 13, 2001 deposit in the amount of $1,002.15
February 16, 2001 deposit in the amount of $3,000.17
February 26, 2001 deposit in the amount of $12,581.62
March 2, 2001 deposit in the amount of $300.79
March 7, 2001 deposit in the amount of $676.00
March 8, 2001 deposit in the amount of $4,700.00
March 12, 2001 deposit in the amount of $4,981.00
March 14, 2001 deposit in the amount of $1,352.00
April 3, 2001 deposit in the amount of $3,500.00
April 6, 2001 deposit in the amount of $815.75
April 6, 2001 deposit in the amount of $8.09
April 10, 2001 deposit in the amount of $818.50
May 14, 2001 deposit in the amount of $30.74
June 5, 2001 deposit in the amount of $543.20
June 8, 2001 deposit in the amount of $147,736.85
July 13, 2001 deposit in the amount of $648.27
July 16, 2001 deposit in the amount of $211.75
July 20, 2001 deposit in the amount of $147,736.85
August 3, 2001 deposit in the amount of $10,481.00
August 17, 2001 deposit in the amount of $240.00
August 24, 2001 deposit in the amount of $2,703.05
August 28, 2001 deposit in the amount of $15,000.00
September 5, 2001 deposit in the amount of $7,400.00
September 9. 2001 deposit in the amount of $14,000.00
October 12, 2001 deposit in the amount of $4,452.35
October 16, 2001 deposit in the amount of $400.00
October 17, 2001 deposit in the amount of $25.00
November 9, 2001 deposit in the amount of $20,150.00
January 11, 2002 deposit in the amount of $1,000.00

**JOHN A. HENIG, JR. (HEN019)**
*Attorney for Hope Duncan Harbin*

**OF COUNSEL:**
**COPELAND, FRANCO, SCREWS & GILL, P.A.**
P.O. Box 347
Montgomery, AL 36102-0347
(334) 834-1180

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon the following listed persons by placing a copy of the same in the United States mail, postage prepaid and properly addressed, this the 12th day of March, 2002.

Floyd Minor, Esq.
MINOR & OLSZEWSKI, L.L.C.
P.O. Box 164
Montgomery, AL 36101-0164

Of Counsel

Deposition of Michael Harbin (Vol. II)                                April 2, 2002

## Page 202

1 Q.  And for what purpose was that?

2 A.  This money was to be earmarked for a

3     $300,000 project that we had, and we stuck

4     it in a separate account, my account, so

5     that we wouldn't have the money in our

6     operating account so that we would spend it.

7     It had to be -- We segregated it.

8 Q.  "We" deposited it into your account.  Who is

9     the we that deposited it into your account?

10 A.  Well, me.  I did.

11 Q.  Okay.  So we is you.

12 A.  We, me.

13 Q.  Did you discuss depositing it into this

14     personal account with anybody at

15     Harbin's-Stern Brothers?

16 A.  Yes.

17 Q.  With whom?

18 A.  Mike Behrman.

19 Q.  And he approved that.

20 A.  Sure.

21 Q.  And your AmSouth account is an account that

22     earns interest, does it not?

23 A.  Yes, sir.

## Page 203

1 Q.  When you wrote the check back out, did you

2     repay Harbin-Stern Brothers the interest

3     that was earned on the money while it was in

4     your account?

5 A.  No, I did not calculate that.

6 Q.  That was a deposit at a posting date of June

7     the 8th.  Again on July the 20th, the next

8     month, there appears to be another deposit

9     of 147,700 and some-odd dollars again drawn

10     on an Alfa check to Harbin's; is that

11     correct?

12 A.  Yes, sir.

13 Q.  And is that a --

14 A.  Yes, sir.

15 Q.  -- the same explanation as before?

16 A.  Yes, sir.

17 Q.  And is that a check that you discussed with

18     Michael Behrman before depositing it into

19     your personal account?

20 A.  Yes, sir.

21 Q.  And had his approval and understanding.

22 A.  Correct.

23 Q.  And did you again just pay back to

## Page 204

1     Harbin-Stern Brothers the exact amount and

2     not calculate the interest that was earned

3     on it?

4 A.  That's correct.

5 Q.  What is this cash in that occurred with the

6     same deposit?

7 A.  I don't think that's mine because up here

8     you can see there's no cash in.

9 Q.  Right.

10 A.  That's somebody else's.

11 Q.  Okay.  That's not part of your account.

12 A.  No, sir.

13 Q.  Again, Harbin-Stern Brothers in December of

14     '01 is writing you a check in the amount of

15     4,452, and I assume -- and this time it's

16     some-odd cents.  Is this again repayment of

17     the monies you advanced Harbin-Stern

18     Brothers?

19 A.  No, sir, that's a gross payroll check.

20 Q.  Okay.  This is a check from a Fred Winham or

21     Winharm, d/b/a Florida Antique Mall.

22 A.  Yes, sir.

23 Q.  What is he purchasing from you?

## Page 205

1 A.  He purchased a player piano.

2 Q.  Was this part of the antiques that was in

3     the separate business or was this --

4 A.  No, sir.  This was a player piano that I

5     acquired ten, twelve years ago, and I sold

6     it on eBay.

7 Q.  Tell me of this check from Richard and

8     Margaret Brown.

9 A.  That was for furniture from that Eclectic

10     Imports.

11 Q.  And the next check is from John Goodwyn

12     Gallion to Hope Harbin.

13 A.  Yes, sir.

14 Q.  And it's deposited into your personal

15     account?

16 A.  Yes, sir.

17 Q.  Did Hope endorse that check?

18 A.  She would have had to.  I'm --

19 Q.  Next is a check from Principal Life

20     Insurance Company to you on September 1 of

21     2000 in the amount of $45,000.  Tell me of

22     that check.

23 A.  That's my 401(k) money.



Page 198

1      Harbin in the amount of $10,000.
2  A.  Yes, sir.
3  Q.  And what was that for, please?
4  A.  I needed money to pay the bills around the
5      house.
6  Q.  That's your testimony as to the reason for
7      drawing it August the 28th of '01.
8  A.  I'm reasonably sure. You have my bank
9      statements, so without being able to
10     compare, I can't give you a definitive
11     answer.
12 Q.  Mr. Harbin, explain the deposit on September
13     the 5th of '01 to me, please.
14 A.  $5,000, payment on 401(k) note, cash in of
15     2,400, total of 7,400.
16 Q.  What is the payment on the 401(k) note?
17 A.  That's the 401(k) money that I borrowed to
18     put into the company.
19 Q.  From whom did you borrow it?
20 A.  My 401(k), my retirement money.
21 Q.  So Harbin's, Inc., which in September of '01
22     was a dormant corporation, correct --
23 A.  Explain dormant.

Page 199

1  Q.  I mean, it had no activity, no business
2      activity whatsoever, Harbin's, Inc.
3  A.  That's correct.
4  Q.  -- had a bank account that had at least
5      $5,000 in it.
6  A.  That's correct.
7  Q.  Do you know what the bank balance is in
8      Harbin's, Inc., today?
9  A.  I do not. This account has been -- This
10     account has been renamed Harbin-Stern
11     Brothers. I think we're just still using
12     the same checks.
13 Q.  With Sterling Bank?
14 A.  That's correct.
15     The -- Our credit card charges from
16     American Express for the company goes into
17     Sterling Bank.
18 Q.  All right. But why is Harbin's, Inc.,
19     writing Michael Harbin a check for $5,000?
20 A.  Like I said, Harbin's, Inc. -- this account
21     has been renamed Harbin-Stern Brothers, and
22     we're still using the old checks without
23     buying new ones.

Page 200

1  Q.  Even if it was Harbin-Stern Brothers, why
2      would they be repaying you?
3  A.  For the money that I put into the company.
4  Q.  Again, this is part of the repayment of the
5      43,000?
6  A.  Yes, sir. Payment on 401(k) note.
7  Q.  Okay. And the cash, $2,400 cash.
8  A.  That was a refund of a -- of a -- for lack
9      of a better word, of a pyramid scheme that
10     was brought up from Mobile to Montgomery.
11     And I had given 2,400 or $2,500 to an
12     individual, and subsequently the thing went
13     bust, but we were able to refund all our
14     money.
15 Q.  Is that Jackie Parks' stepfather or the guy
16     who's married to Jackie Parks' mother?
17 A.  Huh?
18 Q.  Is he involved in this?
19 A.  No. Winton Blount got me involved in this.
20 Q.  Winton Blount.
21     Did Winton Blount hand you $2,400 in
22     cash?
23 A.  No.

Page 201

1  Q.  Who handed you $2,400 in cash?
2  A.  It came out of Texas. The name of the
3      organization was Life Without Debt, and it
4      was headquartered in Texas. And the money
5      came to me from Life Without Debt in Texas
6      in cash.
7  Q.  Twenty-four $100 bills?
8  A.  Exactly, taped and wrapped.
9  Q.  Through the U.S. Mail?
10 A.  Through the U.S. Express Mail.
11 Q.  Okay. The next check is a deposit. The
12     check is from Alfa Financial Corporation, a
13     check in the amount of 147,000 some-odd
14     dollars that's deposited into your personal
15     bank account.
16 A.  Uh-huh (positive response).
17 Q.  The check is made to Harbin's. Is that a
18     check that is in payment of a debt from Alfa
19     to Harbin's-Stern Brothers?
20 A.  Yes, sir.
21 Q.  And it's deposited into your personal
22     account?
23 A.  That's correct.

---

**Page 206**

1  Q.  That's the money you pulled out of your
2      401(k) plan and put in the company, and they
3      were repaying you.
4  A.  Yes, sir.
5  Q.  April 17th, 2000, there's a check from
6      Retail Enhancement Services, Inc., in the
7      amount of $22,309.20, and it says a 1999 tax
8      distribution?
9  A.  Yes, sir.
10 Q.  What is that?  Is that a tax refund or --
11 A.  That's to cover the income tax due on the
12     profit.
13 Q.  So '99 was a profitable year for Retail
14     Enhancement?
15 A.  Yes, sir.
16 Q.  There's a SouthTrust Bank check dated
17     February the 8th of 2000 in the amount of
18     $8,000.  Are those loan proceeds?
19 A.  I don't recall.
20 Q.  Is there any other reason that SouthTrust
21     Bank would have been writing a check to the
22     order of Michael G. Harbin, Jr., $8,000?
23 A.  Does that say name of remitter?  I can't

---

**Page 207**

1      read it.
2  Q.  I think it might, but I can't read it
3      either.  That's why I asked you what it
4      could be.
5  A.  I don't recall.  I had a -- I don't recall.
6  Q.  There's a check here from Matt Rainer.  Is
7      that a rental check?
8  A.  Yes, sir.
9  Q.  Who is Revest?
10 A.  They're a company in Atlanta.
11 Q.  What do they do?
12 A.  They buy and sell Steelcase furniture.
13 Q.  Why would their check made payable to
14     Harbin's, Inc., be deposited into your
15     account, your personal account?
16 A.  I believe that was a refund for work that we
17     did with them in '99.
18 Q.  Which Harbin's, Inc., did.
19 A.  Yes, sir.
20 Q.  And it was income that Harbin's, Inc., had
21     earned in '99.
22 A.  Correct.  Well, I guess you could classify
23     it as income.

---

**Page 208**

1  Q.  Again, then, why would it be deposited into
2      your personal account and not into the
3      corporate account?
4  A.  Because Harbin's, Inc., was pretty much
5      dormant in '99 -- after '99.
6  Q.  But still had some payments that it
7      received.
8  A.  Correct.
9  Q.  And you used those as your own because you
10     were -- you and your sister were the sole
11     stockholders of Harbin's, Inc.
12 A.  Correct.
13 Q.  And so when a check came, rather than
14     deposit it into a dormant checking account,
15     you just put it in your own account.
16 A.  It would appear so.
17 Q.  Do you know how it was treated for income
18     tax purposes?
19 A.  I don't.
20 Q.  Do you know whether or not it's reflected on
21     your personal income tax return?
22 A.  I don't.
23 Q.  Do you have any recollection of having

---

**Page 209**

1      reflected it on your personal return?
2  A.  I don't.
3  Q.  That's all part of a transaction dated March
4      9th of 2000, correct?
5  A.  Yes, sir.
6  Q.  On February the 17th of 2000, Retail
7      Enhancement Services, Inc., is writing you a
8      check for $10,000.
9  A.  Yes, sir.
10 Q.  And what was that for?
11 A.  I believe that was just an advance.
12 Q.  Do you recall ever repaying it?
13 A.  I don't.
14 Q.  Did you ever treat that as income?
15 A.  I don't recall.
16 Q.  You don't recall whether or not you treated
17     it as income or whether or not you did not
18     treat it as income?  Which is it?
19 A.  I didn't handle the payroll processing of
20     our company, so -- and without my tax
21     returns in front of me, I wouldn't --
22 Q.  Well, let me ask you this, Mr. Harbin.
23 A.  All right.

---

Deposition of Michael Harbin (Vol. II)  ·  April 2, 2002

Page 266

1  Q.  No, no.  My question was, if you had listed
2      such a site, would you recall that?
3  A.  If I had listed a site, I would think I'd be
4      able to recall it.
5  Q.  And it's your testimony that you have --
6      that you just -- to your knowledge, you've
7      never listed any sites in your favorites
8      section.
9  A.  Not that I recall, no.
10 Q.  And if you can't recall one, you certainly
11     would be able to recall multiple
12     pornographic sites listed in your favorites
13     section, would you not?
14 A.  Say that again, please.
15 Q.  You would be able, would you not, to recall
16     if you had multiple pornographic sites under
17     your favorites category?
18 A.  If I had recorded multiple sites, would I be
19     able to recall that.
20 Q.  Yes.
21 A.  In my favorites section.
22 Q.  Right.
23 A.  If I recorded those.

Page 267

1  Q.  Yes.
2  A.  Yes, I would be able to recall that.
3  Q.  Okay.  And you have no recollection of ever
4      having done so.
5  A.  No, sir.
6  Q.  What sites are currently listed in your
7      favorites on your computer?
8  A.  Fidelity, AmSouth, Colonial, Bloomberg, CNN,
9      eBay, BellSouth, Delta.com, Detroit Hummer,
10     Allan's Red Hummer Page, Colonial Web Biz,
11     Monster.com -- excuse me, Movingmonster.
12     That's to follow mortgage rates.
13     Theweatherchannel.com, Garrett Realty.com.
14 Q.  Excuse me.  Garrett Realty, those are the
15     people who handle the condominium rentals
16     for you at the beach?
17 A.  Yes, sir.
18         That's the primary ones that come off
19     the top of my head.  My finance ones are at
20     the top.
21 Q.  Right.
22 A.  Steelcase.com.
23 Q.  That's your business?

Page 268

1  A.  Business.
2  Q.  Steelcase is your main line.
3  A.  Line.
4  Q.  Do you have a franchise for Steelcase?
5  A.  No, sir.  They don't have franchises, just
6      to answer that.
7  Q.  They don't have them.  Okay.  That was
8      almost a business question for which we
9      needed to call Henry, but --
10 A.  Those are the immediate ones that pop out in
11     my head.
12 Q.  And those are because those -- you keep on
13     your favorites section sites that you go to
14     and visit on a regular basis.
15 A.  That's correct.
16 Q.  That are either business related or with the
17     weather --
18 A.  Right.
19 Q.  -- or things that you have a direct interest
20     in; i.e., Hummers.
21 A.  Correct.
22 Q.  And those would be the only sites that you
23     would have under your favorites heading on

Page 269

1      the Internet?
2  A.  Those are all that I recall right now.  I
3      have some more, but I don't -- There are
4      some more Hummer sites.  I think there's
5      Humvee.net.
6  Q.  But all related to things that you have a
7      personal and daily interest in.
8  A.  That's correct.
9  Q.  And a very keen interest in, otherwise you
10     wouldn't save them, correct?
11 A.  Some are keen, yes.
12 Q.  Have you ever on occasion -- on any occasion
13     printed out pornographic material from the
14     Internet?
15 A.  No, sir, not that I recall.  I have a
16     printer.
17 Q.  Now, the pornographic sites that you have
18     visited on the Internet, what type
19     pornography is found on those sites?
20 A.  Adult, like Playboy-type stuff.
21 Q.  Well, it is females primarily or is it male
22     and female or what type sites are these?
23 A.  It's female.

# DEPOSITION OF MICHAEL G. HARBIN, JR.

## VOLUME II

### April 2, 2002

*Page 174 to Page 319*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone:  (334) 263-4455

Deposition of Michael Harbin    ( I. II)                                April 2, 2002

---

**Page 174**

```
1              IN THE CIRCUIT COURT
2                      FOR
3           MONTGOMERY COUNTY, ALABAMA
4           DOMESTIC RELATIONS DIVISION
5
       IN RE:  THE MARRIAGE OF
6
       HOPE DUNCAN HARBIN
7
8      and                 CIVIL ACTION NO.
                            DR-2001-1310
9
       MICHAEL G. HARBIN, JR.,
10
              Husband & Wife.
11
12         * * * * * * * * * * * *
13                VOLUME II
14         * * * * * * * * * * * *
15         DEPOSITION OF MICHAEL G. HARBIN, JR.,
16  taken pursuant to stipulation and agreement before
17  Gina L. Haislip, Registered Professional Reporter
18  and Commissioner for the State of Alabama at Large,
19  in the Law Offices Copeland, Franco, Screws & Gill,
20  444 South Perry Street, Montgomery, Alabama, on
21  Tuesday, April 2, 2002, commencing at approximately
22  9:00 a.m.
23         * * * * * * * * * * * *
```

---

**Page 176**

```
1
2                     EXHIBITS
3
     NUMBER        DESCRIPTION              PAGE
4
5    EX 35  - 2000 M & M Properties tax return .. 179
6    EX 36  - Warranty deed from Harbin's Inc.
                to M & M Properties, L.L.C. ........ 180
7
     EX 37  - 1997 Retail Enhancement Services
8              tax return ........................ 181
9    EX 38  - 1998 Retail Enhancement Services
                tax return ..................... 181
10
     EX 39  - 2000 Retail Enhancement Services
11             tax return ........................ 181
12   EX 40  - 1997 Harbin's, Inc. tax return ..... 183
13   EX 41  - 2000 Harbin's, Inc. tax return ..... 183
14   EX 42  - Documentation on deposits ......... 184
15   EX 43  - 9/13/01 Customer Reprint of the
                Fidelity Investments statements .... 185
16
     EX 44  - 2001 Fidelity Investments
17             statement ........................ 185
18  (Originals of EX 37 - EX 41 returned to Mr. Minor.)
19
20         * * * * * * * * * * * *
21
22
23
```

---

**Page 175**

```
1
2                 APPEARANCES
3
4
5   ON BEHALF OF THE WIFE:
6   John A. Henig, Esq.
     COPELAND, FRANCO, SCREWS & GILL, P.A.
7   Attorneys at Law
     444 South Perry Street
8   Montgomery, Alabama
9   D. Mitch Henry, Esq.
     WEBSTER, HENRY & LYONS
10  Attorneys at Law
     Suite B
11  418 Scott Street
     Montgomery, Alabama
12
13  ON BEHALF OF THE HUSBAND:
14  J. Floyd Minor, Esq.
     MINOR & OLSZEWSKI, L.L.C.
15  Attorneys at Law
     458 South Lawrence Street
16  Montgomery, Alabama
17  ALSO PRESENT:
18  Ms. Harbin
19
          * * * * * * * * * * * *
20
                   INDEX
21
    EXAMINATION                    PAGE
22
    By Mr. Henig ................................ 178
23
```

---

**Page 177**

```
1                  STIPULATION
2       It is hereby stipulated and agreed by and
3   between counsel representing the parties that
4   Volume II of the deposition of
5         MICHAEL G. HARBIN, JR.
6   is taken pursuant to the Alabama Rules of Civil
7   Procedure and that said deposition may be taken
8   before Gina L. Haislip, Registered Professional
9   Reporter, and Commissioner for the State of Alabama
10  at Large, without the formality of a commission,
11  that objections to questions other than objections
12  as to the form of the question need not be made at
13  this time but may be reserved for a ruling at such
14  time as the said deposition may be offered in
15  evidence or used for any other purpose by either
16  party provided for by the Statute.
17      It is further stipulated and agreed by and
18  between counsel representing the parties in this
19  case that the filing of said deposition is hereby
20  waived and may be introduced at the trial of this
21  case or used in any other manner by either party
22  hereto provided for by the Statute regardless of
23  the waiving of the filing of the same.
```

---

Page 178

1    It is further stipulated and agreed by and
2  between the parties hereto and the witness that the
3  signature of the witness to this deposition is
4  hereby waived.
5              * * * * * * * * * * * *
6         MICHAEL G. HARBIN, JR.
7         The witness, having previously been
8  duly sworn to speak the truth, the whole truth, and
9  nothing but the truth testified further as follows:
10             EXAMINATION
11  BY MR. HENIG:
12  Q.  Michael, you're still under oath, and we're
13     continuing your deposition that was
14     originally taken January 24th, 2002.  Okay?
15  A.  (Witness nodded in the affirmative).
16  Q.  I didn't realize it had been that long.
17     Mr. Harbin, did you receive a copy of
18     the Re-Notice for the taking of your
19     deposition?
20         MR. HENIG:  Come on in, Mitch.
21         (Brief recess.)
22  Q.  (Mr. Henig continuing)  Did you receive a
23     copy of the Re-Notice of the taking of your

Page 179

1     deposition, Mr. Harbin?
2  A.  I did.
3  Q.  And in response, have you got some documents
4     for me today?
5  A.  I do.
6  Q.  Good.  May I have those.
7  A.  Yes, sir.
8         MR. MINOR:  Do you want to go by
9            your letter?
10         MR. HENIG:  Let's just see what
11            we've got.
12         MR. MINOR:  You had pared down
13            your list in the letter, I
14            think.  M & M Properties,
15            L.L.C. tax returns was the
16            first one.
17  A.  Here is the tax -- There's a tax return.
18         (Exhibit Number 35 marked for
19            identification.)
20  Q.  Mr. Harbin, you've brought with you what
21     I've marked as Exhibit Thirty-five, and
22     that's the M & M Properties, L.L.C. tax
23     return.

Page 180

1  A.  Yes, sir.
2  Q.  Okay.  What else have you got?
3  A.  I've got the warranty deed.
4         MR. MINOR:  Just go down this list
5            here.
6         THE WITNESS:  Okay.
7         (Exhibit Number 36 marked for
8            identification.)
9  Q.  Thirty-six is a copy of the M & M
10     Properties, L.L.C., warranty deed from
11     Harbin's, Inc., to M & M Properties, L.L.C.,
12     correct?
13  A.  Correct.
14  Q.  What else do you have there?
15  A.  I've got -- On item two, I've got Retail's
16     tax returns from 2000, '98, and '97.
17  Q.  All right.  Retail Enhancement Services,
18     Inc.?
19  A.  And those are my originals.
20         MR. HENIG:  Gina is really good at
21            taking care of them.
22         THE WITNESS:  Okay.
23         MR. HENIG:  I'm going to mark as

Page 181

1         Exhibit Thirty-seven the '97
2         return.  Exhibit Thirty-eight
3         is the '98 return.  Exhibit
4         Thirty-nine I believe is going
5         to be the 2000 return.  Okay.
6         (Exhibit Numbers 37, 38 & 39
7            marked for identification.)
8  A.  Tax returns for Harbin's, Inc., '97.
9  Q.  Yeah.  With the depreciation schedules.
10     Those are the main things we were looking
11     for.
12  A.  Yeah.  And I called the accounting firm, and
13     they were digging those up for me.
14  Q.  You don't have the depreciation schedules
15     today?
16  A.  No, sir.
17  Q.  Will you provide those to either Mr. Henry
18     or Mr. Minor and they can provide them to
19     me?
20  A.  Yes, sir.
21         MR. MINOR:  If they locate them.
22         THE WITNESS:  Yeah.
23  A.  I've got '97 Harbin's tax return and 2000.

Page 182

```
 1   Q.   Let me ask you something --
 2   A.   Okay.
 3   Q.   -- real quick before I mark those,
 4        Mr. Harbin.  You were the principal
 5        stockholder in Retail Enhancement Services,
 6        Inc., were you not?
 7   A.   Uh-huh (positive response).
 8   Q.   And you owned what percent of the stock?
 9        Help refresh my recollection.
10   A.   I believe it was 54%.  I'd have to flip
11        through there to be totally accurate with
12        that.
13   Q.   This was a Subchapter S Corporation so that
14        these flowed through --
15   A.   To the shareholders.
16   Q.   -- to you personally.
17   A.   Yes, sir.
18   Q.   Were you personally guaranteed on the
19        obligations of the corporation?
20   A.   I was.
21   Q.   Were the other shareholders?
22   A.   No.
23   Q.   You were the only one who anybody
```

Page 183

```
 1        required --
 2   A.   Correct.
 3   Q.   -- a personal guarantee?
 4        All right.  What else?
 5   A.   That's Harbin's '97, '98, -- '97 and 2000
 6        return.
 7             MR. HENIG:  '97, then, we'll mark
 8             as Exhibit Forty and the 2000
 9             return we'll mark as Exhibit
10             Forty-one.  Okay.
11             (Exhibit Numbers 40 & 41 marked
12             for identification.)
13   Q.   And you did not bring with you the
14        depreciation schedules.
15   A.   No.  No, sir.
16   Q.   You don't have those in your possession.
17   A.   I don't.  I asked -- No, I do not.
18   Q.   And you've asked your accountants --
19   A.   To furnish those.
20   Q.   -- to furnish those.
21   A.   Yes, sir.
22   Q.   Did your accountants indicate that they had
23        those schedules?
```

Page 184

```
 1   A.   Last night when I was talking to them, they
 2        were trying to locate them.
 3   Q.   Okay.  They didn't tell you of any reason
 4        they would have destroyed those depreciation
 5        schedules, did they?
 6   A.   Oh, no, sir.
 7   Q.   Anything else that you brought with you?
 8   A.   Deposits.
 9             MR. HENIG:  I'll mark that as
10             Exhibit Forty-two.
11             (Exhibit Number 42 marked for
12             identification.)
13             MR. MINOR:  Now, attached to the
14             back of that is the Fidelity
15             statement.  That's in addition
16             to the deposits.
17             MR. HENIG:  I'll take that out.
18             MR. MINOR:  So pull that.  We need
19             to make that a separate
20             exhibit.  You're marking as
21             Forty-two a composite exhibit?
22             MR. HENIG:  Right, that Mr. Harbin
23             has furnished indicating the
```

Page 185

```
 1        deposits that we had inquired
 2        about.
 3   Q.   I'll ask you some questions about that, but
 4        let me finish marking these.
 5        Mr. Harbin, your attorney furnished to
 6        me a customer reprint of the Fidelity
 7        Investments accounts, and I'm going to mark
 8        that as Exhibit Forty-three.
 9             (Exhibit Number 43 marked for
10             identification.)
11   Q.   And that is -- that is a reprint that is
12        dated 9/13 of '01.  So sometime in the fall
13        it was ordered.  And it's for the years, I
14        believe, '98, '99, and 2000.  I'll ask you
15        if you recognize what I've marked as Exhibit
16        Forty-three.
17   A.   I do.
18             (Exhibit Number 44 marked for
19             identification.)
20   Q.   And I had requested the 2001 information for
21        the same Fidelity account, and I'll ask you
22        if what I have marked as Exhibit Forty-four
23        is what you've furnished in response to that
```

Deposition of Michael Harbin (Vol. II)                                    April 2, 2002

1     request.
2  A.  2001 tax reporting statement, yes.
3  Q.  Do you, however, have the 2001 report that
4      is identical to those reports in Exhibit
5      Forty-three?  What you furnished in
6      Forty-four is not the same as in
7      Forty-three.  It's not the same information.
8  A.  This is for '99?
9  Q.  Yeah.
10         MR. MINOR:  Go on through.  It's
11             for more than that.
12  Q.  It's '98, '99, and 2000.  And I think it has
13      all of your deposits, withdrawals.  It's
14      more of a daily or monthly activity report,
15      and this is a cumulative report.
16  A.  Okay.
17  Q.  And I'm asking you do you have somewhere
18      your 2001 Fidelity report that is identical
19      to those reports in Exhibit Forty-three?
20  A.  Yes, sir, I do somewhere.
21  Q.  Okay.  And if you would, please furnish that
22      to Mr. Minor so that he can furnish it to
23      me.

1  A.  I will.
2  Q.  Mr. Harbin, I'm going to go through some of
3      these deposits.  These are deposits that
4      were made into your personal checking
5      account; is that correct?
6  A.  Yes, sir.
7  Q.  And that is an account that was in your name
8      only.
9  A.  Correct.
10  Q.  And if I recall, isn't that an account that
11      you had when you started working at AmSouth
12      Bank?
13  A.  Yes, sir.
14  Q.  Okay.  The first deposit slip here is a
15      State of Alabama Department of Revenue check
16      that's issued in October of 2000 in the
17      amount of $1,933.  Is that a tax return -- a
18      tax refund check?
19  A.  I believe, yes, sir.
20  Q.  Do you have a copy of this where you can
21      look on with me?
22  A.  I do not.  I would say that's an income tax
23      refund, income tax refund, yes, sir.

1  Q.  And that is a refund check that's made
2      payable to both you and your wife, Hope
3      Harbin; is that correct?
4  A.  Yes, sir.
5  Q.  From the joint tax return.
6  A.  Yes, sir.
7  Q.  The second check on the very first page,
8      tell us what that is.
9  A.  It's an income tax refund, $265.
10  Q.  Why were there two checks issued for the tax
11      refund?  Are there two different tax
12      returns?  They're issued on the same date,
13      State of Alabama, one in the amount of $265
14      and one in the amount of $1,933.
15  A.  No, sir.  There was one tax return.
16  Q.  And yet you would agree with me there are
17      two separate checks?
18  A.  Two separate checks, both the same --
19  Q.  And issued in sequence?
20  A.  Yes, sir.
21  Q.  Who is Mark Phillips?
22  A.  He was a renter in my father's house.
23  Q.  That's the house that you testified your

1      sister owned, you handled the rental
2      arrangements, and you would split the rent
3      50-50; is that correct?
4  A.  Yes, sir.
5  Q.  The next one that I wanted to ask you about
6      is an AmSouth -- a check written to AmSouth
7      on an account at SouthTrust Bank that's
8      listed in your name only; is that correct?
9  A.  Yes, sir.
10  Q.  Is that account at SouthTrust still in
11      existence?
12  A.  Yes, sir.
13  Q.  Have you furnished us the bank statements on
14      it?
15  A.  It's the equity line.
16  Q.  The equity line?
17  A.  Yes, sir.
18  Q.  And this is an equity line on the Augusta
19      Avenue home?
20  A.  Yes, sir.
21  Q.  You haven't furnished us the canceled checks
22      on that equity line.
23  A.  I gave you the reprint of --

Haislip, Ragan, Green, Starkie & Watson, P.C.                    (334) 263-4455

**Page 190**

1  Q. You gave us a reprint of the withdrawals
2     that had been made on the --
3  A. And the payments.
4  Q. -- on the equity line. And the payments
5     that you had been made on it?
6  A. Yes, sir.
7        MR. MINOR: Uh-huh (positive
8          response).
9  Q. Do you have a checking account that goes
10    with the equity line?
11 A. Yes, sir, but they don't --
12 Q. This check that we're looking at to AmSouth
13    Bank in the amount of $12,581.62 is check
14    number 144, which would indicate there had
15    been at least 143 checks before it.
16 A. I don't know what the starting number was.
17       MR. MINOR: I object. I don't
18         know what sequential number
19         they start wtih.
20 Q. You certainly don't recall that SouthTrust
21    gave you a checking account that started
22    with number 143, do you, or 144?
23       MR. MINOR: They could have

**Page 191**

1        started with 100.
2  Q. Could have, clearly.
3  A. They could have.
4  Q. But that would clearly indicate to you that
5     other checks have been written on there.
6  A. Oh, sure, yes. Some other checks have been
7     written on there.
8  Q. And do you have those monthly statements?
9  A. No, sir, I do not.
10 Q. Do you have them anywhere in your
11    possession?
12 A. I don't.
13 Q. So either one of two things. You would have
14    to get them from SouthTrust or we would have
15    to subpoena them.
16 A. I asked SouthTrust to give me the reprint of
17    the activity, which y'all requested, and
18    that's what I got.
19       MR. MINOR: We've given you that.
20       MR. HENIG: I know the reprint,
21         but it doesn't tell me to whom
22         the checks were written or
23         anything else.

**Page 192**

1        THE WITNESS: Well, I could ask
2          them to get that up.
3  Q. Do you remember the nature of this
4     withdrawal or the purpose of the withdrawal?
5  A. I believe it was a note that I paid to
6     Sterling Bank. I had an unsecured note over
7     there.
8  Q. Was that a joint note or an individual note?
9  A. I believe it was an individual.
10 Q. In your name only?
11 A. Yes, sir.
12 Q. Next deposit is a deposit from Retail
13    Enhancement Services. That's the
14    corporation --
15 A. Uh-huh (positive response).
16 Q. -- that you just testified about, the
17    Subchapter S that you were a majority owner.
18 A. Uh-huh (positive response).
19 Q. Fidelity Investments.
20 A. Yes, sir.
21 Q. This is a check for 7,600?
22 A. Yes, sir.
23 Q. And it's stubbed at the bottom --

**Page 193**

1  A. Inventory --
2  Q. -- inventory reimbursements?
3  A. -- reimbursements, yes, sir.
4  Q. It's drawn on AmSouth, but the account
5     holder's name is unclear. Who was the
6     account holder?
7  A. This was Eclectic Imports, the furniture
8     company that Hope, myself, Jackie Parks, and
9     Lee Parks had together.
10 Q. And you were writing a check from Michael
11    Harbin to Michael Harbin.
12 A. Correct.
13 Q. Next check that's deposited is a United
14    States income tax refund -- refund check
15    issued in both your name and Hope's name?
16 A. That's correct.
17 Q. Did Hope endorse these checks?
18 A. I'm sure she did.
19 Q. Again from a joint tax return?
20 A. Yes, sir. I believe -- Well, what's the
21    date on that one? '99? '99?
22 Q. It's the December of '99 tax return. I
23    don't know the date.

Deposition of Michael Harbin (Vol. II)                                April 2, 2002

Page 194

1    A.  Okay. I don't know.
2    Q.  It had to be sometime around May of 2000
3        because the other check is issued at the
4        same time.
5    A.  Uh-huh (positive response).
6    Q.  And that is a check -- And the other check
7        is check number 1481 from Harbin-Stern
8        Brothers, L.L.C. --
9    A.  Uh-huh (positive response).
10   Q.  -- to AmSouth Bank. And it's for what?
11   A.  American Express refund.
12   Q.  Tell me the nature of that.
13   A.  Evidently I charged something on my personal
14       card for the company.
15   Q.  Harbin-Stern Brothers is writing Michael
16       Harbin a check for $3,323 and some-odd
17       cents.
18   A.  Uh-huh (positive response).
19   Q.  And it's for reimbursement of what?
20   A.  A security system that I purchased for the
21       company.
22   Q.  Harbin-Stern Brothers, April 3rd of '01, is
23       reimbursing you on a loan repayment --

Page 195

1    A.  Yes, sir.
2    Q.  -- for $3,500?
3    A.  Yes, sir.
4    Q.  Harbin-Stern Brothers is paying the AmSouth
5        payment again. It says loan repayment in
6        the amount of 6,000?
7    A.  Yes, sir.
8    Q.  Is this a personal loan that you made to
9        Harbin-Stern Brothers?
10   A.  Yes, sir.
11   Q.  Do you have a note to evidence that?
12   A.  (Witness nodded in the negative). No, I
13       don't.
14   Q.  No note?
15       Tell me what evidence there is that
16       Harbin-Stern Brothers owed you that money.
17   A.  Let's see. There was a check in here, the
18       Principal Financial Group, for $48,000, and
19       I deposited 43,000 into Harbin-Stern
20       Brothers.
21   Q.  How much does Harbin-Stern Brothers owe you
22       today?
23   A.  That's a good question.

Page 196

1    Q.  What do you contend that they owe you?
2    A.  On the balance sheet it shows I have a
3        credit due to me of 14,000, but there's a
4        receivable that's been put in place showing
5        where Harbin-Stern Brothers paid the cable
6        TV, my gas, long distance -- telephone
7        charges that are billed back to me, so
8        that's a good question. I don't know if I'm
9        responsible for the TV that people watch
10       throughout the facility and as a business
11       person am I responsible --
12   Q.  What do you contend that Harbin-Stern
13       Brothers owes you personally?
14   A.  I don't know.
15   Q.  The 14,000?
16   A.  14,000 right now is on the books.
17   Q.  Okay. So there's an asset there of a note
18       payable to you or a debt payable to you of
19       $14,000, correct?
20   A.  Yes, sir.
21   Q.  Who is Crystal Hill?
22   A.  She's a former employee.
23   Q.  Are these payments that I will see from

Page 197

1        Harbin-Stern Brothers to AmSouth Bank that
2        are deposited into your account repayment of
3        that 40-something thousand dollars that you
4        advanced Harbin-Stern Brothers?
5    A.  Yes, sir.
6    Q.  The check from USAA Insurance in the amount
7        of $4,703, what type claim was that?
8    A.  That was when Windstorm was it Barry that
9        came through, that came through last summer.
10   Q.  Where were the damages?
11   A.  At the beach home in Seagrove, Florida.
12   Q.  Is the beach house account also with
13       AmSouth?
14   A.  Yes, sir.
15   Q.  Do you know what the current balance in it
16       is?
17   A.  $72, I believe.
18   Q.  There's a check here, check number 150.
19       Earlier we were on check number 144, I
20       believe --
21   A.  Uh-huh (positive response).
22   Q.  -- out of the home equity. This is a
23       SouthTrust Bank check written to Michael

Haislip, Ragan, Green, Starkie & Watson, P.C.                (334) 263-4455

Deposition of Michael Harbin    I. II)                                    April 2, 2002

## Page 198

1    Harbin in the amount of $10,000.

2  A.   Yes, sir.

3  Q.   And what was that for, please?

4  A.   I needed money to pay the bills around the

5       house.

6  Q.   That's your testimony as to the reason for

7       drawing it August the 28th of '01?

8  A.   I'm reasonably sure.  You have my bank

9       statements, so without being able to

10      compare, I can't give you a definitive

11      answer.

12 Q.   Mr. Harbin, explain the deposit on September

13      the 5th of '01 to me, please.

14 A.   $5,000, payment on 401(k) note, cash in of

15      2,400, total of 7,400.

16 Q.   What is the payment on the 401(k) note?

17 A.   That's the 401(k) money that I borrowed to

18      put into the company.

19 Q.   From whom did you borrow it?

20 A.   My 401(k), my retirement money.

21 Q.   So Harbin's, Inc., which in September of '01

22      was a dormant corporation, correct --

23 A.   Explain dormant.

## Page 199

1  Q.   I mean, it had no activity, no business

2       activity whatsoever, Harbin's, Inc.

3  A.   That's correct.

4  Q.   -- had a bank account that had at least

5       $5,000 in it.

6  A.   That's correct.

7  Q.   Do you know what the bank balance is in

8       Harbin's, Inc., today?

9  A.   I do not.  This account has been -- This

10      account has been renamed Harbin-Stern

11      Brothers.  I think we're just still using

12      the same checks.

13 Q.   With Sterling Bank?

14 A.   That's correct.

15      The -- Our credit card charges from

16      American Express for the company goes into

17      Sterling Bank.

18 Q.   All right.  But why is Harbin's, Inc.,

19      writing Michael Harbin a check for $5,000?

20 A.   Like I said, Harbin's, Inc. -- this account

21      has been renamed Harbin-Stern Brothers, and

22      we're still using the old checks without

23      buying new ones.

## Page 200

1  Q.   Even if it was Harbin-Stern Brothers, why

2       would they be repaying you?

3  A.   For the money that I put into the company.

4  Q.   Again, this is part of the repayment of the

5       43,000?

6  A.   Yes, sir.  Payment on 401(k) note.

7  Q.   Okay.  And the cash, $2,400 cash.

8  A.   That was a refund of a -- of a -- for lack

9       of a better word, of a pyramid scheme that

10      was brought up from Mobile to Montgomery.

11      And I had given 2,400 or $2,500 to an

12      individual, and subsequently the thing went

13      bust, but we were able to refund all our

14      money.

15 Q.   Is that Jackie Parks' stepfather or the guy

16      who's married to Jackie Parks' mother?

17 A.   Huh?

18 Q.   Is he involved in this?

19 A.   No.  Winton Blount got me involved in this.

20 Q.   Winton Blount.

21      Did Winton Blount hand you $2,400 in

22      cash?

23 A.   No.

## Page 201

1  Q.   Who handed you $2,400 in cash?

2  A.   It came out of Texas.  The name of the

3       organization was Life Without Debt, and it

4       was headquartered in Texas.  And the money

5       came to me from Life Without Debt in Texas

6       in cash.

7  Q.   Twenty-four $100 bills?

8  A.   Exactly, taped and wrapped.

9  Q.   Through the U.S. Mail?

10 A.   Through the U.S. Express Mail.

11 Q.   Okay.  The next check is a deposit.  The

12      check is from Alfa Financial Corporation, a

13      check in the amount of 147,000 some-odd

14      dollars that's deposited into your personal

15      bank account.

16 A.   Uh-huh (positive response).

17 Q.   The check is made to Harbin's.  Is that a

18      check that is in payment of a debt from Alfa

19      to Harbin's-Stern Brothers?

20 A.   Yes, sir.

21 Q.   And it's deposited into your personal

22      account?

23 A.   That's correct.

*Did you read us income?*

Deposition of Michael Harbin (Vol. II)                         April 2, 2002

### Page 202

1  Q.  And for what purpose was that?
2  A.  This money was to be earmarked for a
3      $300,000 project we had, and we stuck
4      it in a separate account, my account, so
5      that we wouldn't have the money in our
6      operating account so that we would spend it.
7      It had to be -- We segregated it.
8  Q.  "We" deposited it into your account. Who is
9      the we that deposited it into your account?
10 A.  Well, me. I did.
11 Q.  Okay. So we is you.
12 A.  We, me.
13 Q.  Did you discuss depositing it into this
14     personal account with anybody at
15     Harbin's-Stern Brothers?
16 A.  Yes.
17 Q.  With whom?
18 A.  Mike Behrman.
19 Q.  And he approved that.
20 A.  Sure.
21 Q.  And your AmSouth account is an account that
22     earns interest, does it not?
23 A.  Yes, sir.

### Page 203

1  Q.  When you wrote the check back out, did you
2      repay Harbin-Stern Brothers the interest
3      that was earned on the money while it was in
4      your account?
5  A.  No, I did not calculate that.
6  Q.  That was a deposit at a posting date of June
7      the 8th. Again on July the 20th, the next
8      month, there appears to be another deposit
9      of 147,700 and some-odd dollars again drawn
10     on an Alfa check to Harbin's; is that
11     correct?
12 A.  Yes, sir.
13 Q.  And is that a --
14 A.  Yes, sir.
15 Q.  -- the same explanation as before?
16 A.  Yes, sir.
17 Q.  And is that a check that you discussed with
18     Michael Behrman before depositing it into
19     your personal account?
20 A.  Yes, sir.
21 Q.  And had his approval and understanding.
22 A.  Correct.
23 Q.  And did you again just pay back to

### Page 204

1      Harbin-Stern Brothers the exact amount and
2      not calculate the interest that was earned
3      on it?
4  A.  That's correct.
5  Q.  What is this cash in that occurred with the
6      same deposit?
7  A.  I don't think that's mine because up here
8      you can see there's no cash in.
9  Q.  Right.
10 A.  That's somebody else's.
11 Q.  Okay. That's not part of your account.
12 A.  No, sir.
13 Q.  Again, Harbin-Stern Brothers in December of
14     '01 is writing you a check in the amount of
15     4,452, and I assume -- and this time it's
16     some-odd cents. Is this again repayment of
17     the monies you advanced Harbin-Stern
18     Brothers?
19 A.  No, sir, that's a gross payroll check.
20 Q.  Okay. This is a check from a Fred Winham or
21     Winharm, d/b/a Florida Antique Mall.
22 A.  Yes, sir.
23 Q.  What is he purchasing from you?

### Page 205

1  A.  He purchased a player piano.
2  Q.  Was this part of the antiques that was in
3      the separate business or was this --
4  A.  No, sir. That was a player piano that I
5      acquired ten, twelve years ago, and I sold
6      it on eBay.
7  Q.  Tell me of this check from Richard and
8      Margaret Brown.
9  A.  That was for furniture from that Eclectic
10     Imports.
11 Q.  And the next check is from John Goodwyn
12     Gallion to Hope Harbin.
13 A.  Yes, sir.
14 Q.  And it's deposited into your personal
15     account?
16 A.  Yes, sir.
17 Q.  Did Hope endorse that check?
18 A.  She would have had to. I'm --
19 Q.  Next is a check from Principal Life
20     Insurance Company to you on September 1 of
21     2000 in the amount of $45,000. Tell me of
22     that check.
23 A.  That's my 401(k) money.

| Page 206 | Page 208 |
|---|---|
| 1   Q.   That's the money you pulled out of your | 1   Q.   Again, then, why would it be deposited into |
| 2        401(k) plan and put in the company, and they | 2        your personal account and not into the |
| 3        were repaying you. | 3        corporate account? |
| 4   A.   Yes, sir. | 4   A.   Because Harbin's, Inc., was pretty much |
| 5   Q.   April 17th, 2000, there's a check from | 5        dormant in '99 -- after '99. |
| 6        Retail Enhancement Services, Inc., in the | 6   Q.   But still had some payments that it |
| 7        amount of $22,309.20, and it says a 1999 tax | 7        received. |
| 8        distribution? | 8   A.   Correct. |
| 9   A.   Yes, sir. | 9   Q.   And you used those as your own because you |
| 10   Q.   What is that? Is that a tax refund or -- | 10        were -- you and your sister were the sole |
| 11   A.   That's to cover the income tax due on the | 11        stockholders of Harbin's, Inc. |
| 12        profit. | 12   A.   Correct. |
| 13   Q.   So '99 was a profitable year for Retail | 13   Q.   And so when a check came, rather than |
| 14        Enhancement? | 14        deposit it into a dormant checking account, |
| 15   A.   Yes, sir. | 15        you just put it in your own account. |
| 16   Q.   There's a SouthTrust Bank check dated | 16   A.   It would appear so. |
| 17        February the 8th of 2000 in the amount of | 17   Q.   Do you know how it was treated for income |
| 18        $8,000. Are those loan proceeds? | 18        tax purposes? |
| 19   A.   I don't recall. | 19   A.   I don't. |
| 20   Q.   Is there any other reason that SouthTrust | 20   Q.   Do you know whether or not it's reflected on |
| 21        Bank would have been writing a check to the | 21        your personal income tax return? |
| 22        order of Michael G. Harbin, Jr., $8,000? | 22   A.   I don't. |
| 23   A.   Does that say name of remitter? I can't | 23   Q.   Do you have any recollection of having |

| Page 207 | Page 209 |
|---|---|
| 1        read it. | 1        reflected it on your personal return? |
| 2   Q.   I think it might, but I can't read it | 2   A.   I don't. |
| 3        either. That's why I asked you what it | 3   Q.   That's all part of a transaction dated March |
| 4        could be. | 4        9th of 2000, correct? |
| 5   A.   I don't recall. I had a -- I don't recall. | 5   A.   Yes, sir. |
| 6   Q.   There's a check here from Matt Rainer. Is | 6   Q.   On February the 17th of 2000, Retail |
| 7        that a rental check? | 7        Enhancement Services, Inc., is writing you a |
| 8   A.   Yes, sir. | 8        check for $10,000. |
| 9   Q.   Who is Revest? | 9   A.   Yes, sir. |
| 10   A.   They're a company in Atlanta. | 10   Q.   And what was that for? |
| 11   Q.   What do they do? | 11   A.   I believe that was just an advance. |
| 12   A.   They buy and sell Steelcase furniture. | 12   Q.   Do you recall ever repaying it? |
| 13   Q.   Why would their check made payable to | 13   A.   I don't. |
| 14        Harbin's, Inc., be deposited into your | 14   Q.   Did you ever treat that as income? |
| 15        account, your personal account? | 15   A.   I don't recall. |
| 16   A.   I believe that was a refund for work that we | 16   Q.   You don't recall whether or not you treated |
| 17        did with them in '99. | 17        it as income or whether or not you did not |
| 18   Q.   Which Harbin's, Inc., did. | 18        treat it as income? Which is it? |
| 19   A.   Yes, sir. | 19   A.   I didn't handle the payroll processing of |
| 20   Q.   And it was income that Harbin's, Inc., had | 20        our company, so -- and without my tax |
| 21        earned in '99. | 21        returns in front of me, I wouldn't -- |
| 22   A.   Correct. Well, I guess you could classify | 22   Q.   Well, let me ask you this, Mr. Harbin. |
| 23        it as income. | 23   A.   All right. |

Deposition of Michael Harbin (Vol. II)                           April 2, 2002

---

Page 210

1 Q. Did Retail Enhancement Services, Inc., pay
2    you a salary?
3 A. No, sir.
4 Q. Then it wouldn't matter who handled the
5    payroll. That wouldn't be payroll, would
6    it?
7 A. Well, if it was an advance.
8 Q. An advance on what? If you're not paid a
9    salary and it's a Subchapter S Corporation
10   where everything flows through to you, is
11   there any reason other than part of the
12   profits being paid to you that Retail
13   Enhancement Services, Inc., would be writing
14   you a check?
15 A. Consulting fee?
16 Q. Did you charge a consulting fee to Retail
17   Enhancement Services at any time?
18 A. Not on an official paper or anything, no,
19   sir.
20 Q. Okay. Well, you asked that as though it
21   were a question, not a statement. When you
22   said consulting fee, it was more of an
23   inquiry. You weren't testifying that you

---

Page 211

1    received a consulting fee, were you?
2 A. No.
3 Q. Check number 142 on Michael G. Harbin,
4    SouthTrust Bank, is a payment to you of
5    $10,000. I think earlier we looked at check
6    number 144, didn't we?
7 A. Yes, sir.
8 Q. Is this the same bank account?
9 A. I believe so.
10 Q. And is this a withdrawal on your --
11 A. Equity line.
12 Q. -- equity line?
13 A. Yes, sir.
14 Q. Which is a second mortgage, as I recall your
15   testimony earlier, on a home that is owned
16   by your wife only.
17 A. It's deeded in her name; that's correct.
18 Q. Okay. Titled in her name only.
19 A. Yes, sir.
20 Q. Do you know what you did with this $10,000?
21 A. I would have to go back to my bank
22   statements. That's my AmSouth checking
23   number.

---

Page 212

1 Q. Right. March the 15th, check number 137 on
2    the same equity line account, $3,000
3    deposited into your personal account. Do
4    you know what happened there?
5 A. No, sir.
6 Q. Interestingly enough, there was a $3,000
7    check written but only $2,500 that was
8    actually deposited. Do you remember what
9    you did with the $500 cash?
10 A. I don't recall.
11 Q. March 8th of 2000, again on the same -- this
12   is check number 136. You deposited
13   $10,000 -- You wrote a check for $10,000 to
14   your -- to AmSouth, but then the total
15   deposit amount was only $3,700, and you had
16   a cash-out ticket. What did you do with the
17   $7,000 in cash?
18 A. I didn't have $7,000 in cash.
19 Q. Well, now, you follow it with me, and you
20   tell me if I've said anything wrong. Matt
21   Rainer wrote you a rent check for $600.
22 A. Uh-huh (positive response).
23 Q. There was a $10,000 check that you wrote on

---

Page 213

1    your equity line.
2 A. Uh-huh (positive response).
3 Q. Check number 136. And then there's a
4    cash-out ticket that's not clear. But it
5    shows the amount of the deposit on March the
6    9th as being $3,737.53 --
7 A. Yes, sir.
8 Q. -- which is some $7,000 less than those two
9    checks.
10    Did you pay to Winton Blount cash for
11   your investment in --
12 A. I did.
13 Q. How much cash did you actually pay?
14 A. 2,500.
15 Q. Would that have been -- Would March 9th of
16   2000 have been about the time that you paid
17   that $2,500 cash?
18 A. I -- I don't know.
19 Q. Well, let me ask you this. Would drawing
20   out some 68, 6900, $7,000 in cash be an
21   unusual event --
22 A. Yes, sir.
23 Q. -- for Michael Harbin to --

---

Haislip, Ragan, Green, Starkie & Watson, P.C.                    (334) 263-4455

Page 214

1   A.   Yes, sir.
2            MR. MINOR:  Object to the form.
3            There's been no testimony he
4            drew that amount of money out.
5            MR. HENIG:  Well, we're looking at
6            the deposit slips, and we're
7            looking at the checks that made
8            up the deposit.  And there was
9            a cash out --
10           MR. MINOR:  He would have probably
11           deposited it and paid on
12           something else the rest of it.
13           There's been no -- He hasn't
14           testified he took 7 grand cash
15           out.
16  Q.   Can you explain, other than the taking of
17       $7,000 cash or approximately that amount,
18       why there would not have been a $10,600
19       deposit made on March the 9th?
20  A.   This cash out does not reflect I took cash
21       out, so I can't -- I don't know.
22  Q.   It doesn't reflect the amount.  It does
23       reflect that cash was taken out.  That's the

Page 215

1        reason for a cash-out ticket, isn't it?
2   A.   Does it reflect it came out of my deposit?
3   Q.   You tell me.  I'm looking at the documents
4        you've provided.
5   A.   I see a 600 and a 10,000, and I see a
6        partially blanked out cash out.
7   Q.   And do you see at the very top of the page
8        an amount that was deposited into the
9        account?
10  A.   That's correct.
11  Q.   And what amount is shown as being deposited
12       into that account on March the 9th?
13  A.   3,737.53.
14  Q.   Okay.  How much is the total of the two
15       checks that are reflected here?
16  A.   10,600.
17  Q.   So you would agree with me there is some
18       difference there in what's shown as
19       deposited and what the two checks that are
20       shown that are made up as part of that
21       deposit.
22  A.   Yes, sir.  It's a discrepancy in this paper.
23  Q.   Would you ask the bank to furnish you with a

Page 216

1        clearer copy of the deposit that is made on
2        March the 9th of 2000 --
3   A.   Yes, sir.
4   Q.   -- so that we can go ahead and get that
5        clear?
6   A.   Yes, sir.
7   Q.   Do you need anything else from it?
8   A.   I need this --
9   Q.   The account number.  Serial number is blank.
10       Date, case, date and time was March 27th of
11       '01 at 7:41.
12  A.   Let me just write that down.
13  Q.   Sure.  Write down anything you want to so we
14       can get it squared away.
15  A.   That's fine.
16  Q.   And obviously -- They were able --
17       Interestingly enough, they were able to
18       xerox the entire page, but when it came to
19       this cash memo, something had covered up
20       that and it didn't xerox, so I'm sure
21       they'll give you a clean page there.
22  A.   Yes, sir.
23  Q.   And it also appears that these checks --

Page 217

1        Let's see.  On the next page there's another
2        check from Mark Phillips for 615 and a
3        cash-out ticket of 100, but it doesn't show
4        what check made up the $1,933.  Do you know
5        what check that was?
6   A.   No, sir.
7   Q.   Do you see what I'm talking about?
8   A.   Yes, sir.  And this may not be in order.  If
9        we keep going, we may find it.
10  Q.   Those are just rent checks and then a
11       Harbin-Stern Brothers check to you.
12  A.   It's for Christmas social function.
13  Q.   A $2,000 check from Fidelity Investments,
14       but there appears to be two other checks,
15       one for 1,050 and one for 1,074 that make up
16       this deposit.
17  A.   There are.
18  Q.   Here's the 1,074 and the 1,050.  One is
19       AmSouth, travel expenses, paid to you by
20       Jackie Parks?
21  A.   That's correct.
22  Q.   On what account?
23  A.   This is the Eclectic Imports account.

Deposition of Michael Harbin (Vol. II)                    April 2, 2002

## Page 218

1  Q. And she was also making a payment to you of
2     1,074. Do you know what that was for? It
3     says reimbursement.
4  A. Inventory reimbursement.
5  Q. S.P. Richards & Company wrote Harbin's a
6     check for $18,204 payable on March the 15th
7     of 2000 that was deposited into your
8     personal account.
9  A. Yes, sir.
10 Q. Again, was that a debt owed to Harbin's,
11    Inc.?
12 A. A debt?
13 Q. Yeah. I mean, did S.P. Richards & Company
14    owe Harbin's, Inc., $18,204?
15 A. This was a refund, so to speak, for the
16    work, the cumulative total of the sales that
17    Harbin's, Inc., did in '99. It was like a
18    rebate.
19 Q. Okay. But it's a rebate that Harbin's, Inc.
20    earned.
21 A. Correct.
22 Q. And S.P. Richards is a supplier of Harbin's,
23    Inc.

## Page 219

1  A. Yes, sir.
2  Q. And then at the end of the year, they
3     calculate how much business you've done with
4     them and they make a refund to you.
5  A. Yes, sir.
6  Q. Okay. And Harbin's, Inc., was a
7     corporation, correct?
8  A. Yes, sir.
9  Q. And you did not deposit this rebate of March
10    15th, 2000 into Harbin's, Inc.
11 A. No. That's correct.
12 Q. You deposited it into your own personal
13    account.
14 A. Yes, sir.
15 Q. Did you declare it as income in 2000?
16 A. I asked my accountants yesterday to look
17    into that.
18 Q. What other inquiries did you ask your
19    accountants to make as to whether or not you
20    declared something as income that appears in
21    these deposit slips?
22 A. That was it other than the rent checks.
23 Q. Let me ask you this so that we can be clear

## Page 220

1     on this. This S.P. Richards Company --
2  A. Yes, sir.
3  Q. -- are they rebating to you for the
4     materials that Harbin's purchased from them
5     in 1999?
6  A. Yes, sir.
7  Q. All right. So this is a year-end rebate,
8     correct?
9  A. Yes, sir.
10 Q. Harbin's, Inc., had no business activity in
11    1999.
12 A. Yes, we did.
13 Q. What did Harbin's, Inc., have in 1999? Not
14    Harbin-Stern Brothers but Harbin's, Inc.
15 A. Over $3,000,000 plus in revenue.
16 Q. In 1999?
17 A. Yes, sir.
18 Q. Okay. When were the two companies merged?
19    I'm sorry.
20 A. October of '99.
21 Q. October of '99.
22    For accounting purposes, when would
23    Harbin's, Inc., book a rebate on its books

## Page 221

1     and records?
2  A. That's something I'd have to ask my people
3     that book them.
4  Q. Were you on a cash basis where you would
5     book them upon receipt?
6  A. Is there another basis?
7  Q. Accrual.
8  A. Accrual?
9  Q. Yeah.
10 A. I'm --
11 Q. Well, you're asking me accounting questions.
12    That's not quite fair.
13 A. I am. Well, I'm sorry. I'm not an
14    accountant. I'd have to ask and find out.
15 Q. You don't know whether you were on a cash or
16    an accrual basis?
17 A. That's correct.
18 Q. So you don't know whether this check from
19    S.P. Richards Company, Inc., would have been
20    reflected in the Harbin's, Inc., books and
21    records at the end of 1999.
22 A. That's correct.
23 Q. But you've asked your accountant to look

Haislip, Ragan, Green, Starkie & Watson, P.C.                    (334) 263-4455

## Page 222

1      into this.
2   A.  That's correct.
3   Q.  SouthTrust Bank check dated November 9th,
4      2001, for $20,000.
5   A.  Uh-huh (positive response).
6   Q.  Is that a draw on the second mortgage at the
7      condominium at the beach?
8   A.  I believe so.
9   Q.  Okay.  Now, when did you and Hope start
10      having marital difficulties?
11  A.  Back in '96 --
12  Q.  When did you first --
13  A.  -- '95.
14  Q.  When did you first go to see a lawyer about
15      a divorce?
16  A.  I'd have to ask Floyd.
17  Q.  I think your earlier testimony, if it will
18      help refresh your recollection, was that
19      sometime in March or April of 2000 or 2001,
20      which was it, that you went to see
21      Mr. Minor?
22  A.  I would have to check my -- If that's what I
23      said in my deposition, the dates, I -- I did

## Page 223

1      not keep a record of it.
2   Q.  Is it fair to say that -- When did you
3      decide you wanted a divorce?  Let me
4      rephrase that question.
5   A.  Hope and I had discussed it I believe it was
6      in 1997, and we had discussed the
7      possibility of divorce then.
8   Q.  Did you go and meet with a lawyer in 1997?
9   A.  No, sir.
10  Q.  What act or actions or occurrence
11      precipitated your meeting with Mr. Minor in
12      2001?
13  A.  It had reached a point between Hope and I
14      that I felt like for the betterment of the
15      children, Hope, and myself that we would
16      proceed with the divorce.  And the action
17      that occurred to me personally is when I had
18      asked Hope to come help me work and she said
19      no.
20  Q.  At the time you went to see Mr. Minor about
21      a divorce, there was no second mortgage on
22      the beach house at Seagrove.
23  A.  That's correct.

## Page 224

1   Q.  All of the debt on the second mortgage,
2      which I believe -- You've said it was a
3      second mortgage, and I've asked to see a
4      copy of the mortgage.  Have you ever been
5      able to find a copy of that mortgage?
6   A.  Yeah.  Yeah.
7   Q.  You furnished me a note from SouthTrust but
8      not an actual mortgage that was signed.
9   A.  Is the note signed by me?
10  Q.  The note -- I believe the copy of the note,
11      I'm not sure whether it's signed, but it's
12      not -- it doesn't show that it's ever been
13      recorded.
14      Have you ever seen a copy of a recorded
15      second mortgage on the beach house?
16  A.  I'm sure I have.
17  Q.  Where did you see it?
18  A.  At the closing office in Florida.
19  Q.  It wouldn't have been recorded at that time.
20      You may have signed a mortgage.
21  A.  Okay.
22  Q.  Do you recall actually signing a mortgage?
23      Because earlier you said you didn't go to

## Page 225

1      Florida for a closing; it was all handled
2      here in Montgomery.
3   A.  The paperwork was handled here in
4      Montgomery.  It was transferred to Florida.
5   Q.  Okay.  Did you go to Florida and sign some
6      additional paperwork?
7   A.  I did.
8   Q.  All right.  When was that?
9   A.  Whatever the date is on the note, I believe.
10  Q.  June, July, August of 2001?
11  A.  I'd have to look at the document to give you
12      an actual date.
13  Q.  You don't recall.
14      Did Hope go to Florida and sign the
15      second mortgage?
16  A.  No.
17  Q.  And as I recall, you took some of the money
18      and paid Mr. Minor's retainer with it from
19      the second mortgage; is that correct?
20  A.  I paid Mr. Minor with some of the money from
21      the second mortgage; that's correct.
22  Q.  And this draw on the second mortgage of
23      $20,000 would have been in November of 2001;

Deposition of Michael Harbin (Vol. II)                    April 2, 2002

---

**Page 226**

1    is that correct?
2  A.  That's the date of the check, yes.
3  Q.  Okay.  Well, you certainly couldn't have
4    spent this $20,000 until you received the
5    check, could you?
6  A.  That's correct.
7  Q.  And Hope had already filed a petition for
8    divorce at the time you received this
9    $20,000 check, had she not?
10  A.  When was the date that y'all filed it?
11  Q.  October, I believe.
12  A.  All right.  The mortgage or the note was in
13    place prior to the filing.
14  Q.  But the check dated November 9th, 2001 --
15        MR. HENIG:  Floyd, look at this.
16        (Brief recess.)
17  Q.  (Mr. Henig continuing)  Mr. Harbin, we've
18    looked, and I believe we filed or the
19    divorce documents were filed on October the
20    31st, and Mr. Minor accepted service around
21    November the 8th.
22  A.  Okay.
23  Q.  And you made a withdrawal of $20,000 on the

---

**Page 227**

1    second mortgage on the condominium on
2    November the 9th.  Do you recall what you
3    did with that $20,000?
4  A.  It was deposited into my checking account.
5  Q.  And do you know what checks you wrote with
6    it?
7  A.  I do not.
8  Q.  Don't recall.
9        There's also a payment here of $150
10    from Regions Bank, pay to the order of
11    Office Plus.
12  A.  Uh-huh (positive response).
13  Q.  What was that?
14  A.  This man right here (indicating) stole a
15    computer.  He was an employee.  And this is
16    restitution that comes from Ellen Brooks'
17    office.
18  Q.  Alvin Hall?
19  A.  Right.
20  Q.  By whom was Mr. Hall employed at the time he
21    stole the computer?
22  A.  By me.
23  Q.  In what business?

---

**Page 228**

1  A.  Office Plus.
2  Q.  Okay.  So his paycheck came from Office
3    Plus, not from Michael Harbin, correct?
4  A.  Correct.
5  Q.  And this was restitution to Office Plus,
6    correct?
7  A.  That's correct.
8  Q.  And did you write Office Plus a check for
9    $150 out of your account?
10  A.  No, it was closed.
11  Q.  Did you declare this as income?
12  A.  I don't believe I did on that.
13  Q.  Did you ask your accountants to check into
14    that?
15  A.  They will be checking into all of this.
16  Q.  The next deposits there are two checks,
17    again from Matt Rainer and from Eric Moore.
18        Who is Eric Moore?
19  A.  He was an employee at Stern Brothers.
20  Q.  Why was Mr. Moore paying you $50?
21  A.  I loaned him $50.
22  Q.  Another restitution check in the amount of
23    $150, Regions Bank, on Alvin Hall, correct?

---

**Page 229**

1  A.  Yes, sir.
2  Q.  How many restitution checks did you receive?
3  A.  I'm not sure.  I believe he pays them on his
4    ability to pay.
5  Q.  That's what most people do.  But do you
6    remember how many checks you --
7  A.  I'm not sure.
8  Q.  Do you keep a ledger on Mr. Hall's
9    repayments?
10  A.  I do not.
11  Q.  How much did Mr. Hall steal from Office
12    Plus?
13  A.  Gosh, it was -- I believe it was valued
14    maybe around 2,100.
15  Q.  2,100?
16        So his restitution would have been at
17    least that much?
18  A.  I believe.  I don't know for sure.
19  Q.  There is another check in the amount of $331
20    from S.P. Richards made payable to Harbin's,
21    Inc., and dated July 9th, 2001.
22        What is that check?
23  A.  I believe that's a rebate check for being

---

Haislip, Ragan, Green, Starkie & Watson, P.C.                (334) 263-4455

Page 230

1    some type of dealer, being in some type of
2    dealer program.  I'm not sure.
3  Q.  Harbin's, Inc., again, July the 9th of 2001
4    was a dormant corporation with no activities
5    whatsoever; is that correct?
6  A.  That's correct.
7  Q.  And you deposited that into your personal
8    account.
9  A.  That's correct.
10  Q.  Now, didn't you tell me, however, that
11    Harbin's, Inc., owned a percent of the
12    Harbin's building?
13  A.  Yes, sir.
14  Q.  Did you declare this check that you
15    deposited into your personal account as
16    income?
17  A.  I have not filed my 2001 return yet.
18  Q.  Do you consider it income to you personally?
19  A.  Yes, sir.
20  Q.  Who are the stockholders of Harbin's, Inc.?
21  A.  Myself and my sister.
22  Q.  Did you give your sister any portion of this
23    check?

Page 231

1  A.  No, sir.
2  Q.  Check number 146, that's another withdrawal
3    on SouthTrust Bank on the home equity dated
4    August the 3rd of '01 in the amount of
5    $10,000.
6      Do you remember what you did with that
7    check?
8  A.  No, sir.  Well, I deposited it into my
9    checking account at AmSouth.
10  Q.  Do you know the reason for making a draw
11    against the second mortgage on your wife's
12    home?
13  A.  I would have to look at my bank statements
14    to see where the --
15  Q.  What is DirectCare?
16  A.  That was an insure -- That was our major
17    medical insurance carrier.
18  Q.  What is Revest?
19  A.  That's that company in Atlanta.
20  Q.  Is this like a rebate check?
21  A.  I believe so, yes, sir.
22  Q.  Again made payable to Harbin's, Inc., March
23    24th of 2000, in the amount of $1,598?

Page 232

1  A.  Yes, sir.
2  Q.  Or is that 90?  It's either 90 or 98.
3  A.  I think it's 98.
4  Q.  Did you declare that as income?
5  A.  I don't know.  I don't think so.
6  Q.  Again, a check payable to Harbin's, Inc.
7  A.  Yes, sir.
8  Q.  Do you remember giving your sister any
9    portion of this check?
10  A.  No, I don't recall.
11  Q.  April 25th of 2000, another S.P. Richards
12    check, this time in the amount of $2,189.36.
13    Is that a rebate check?
14  A.  Yes, sir.
15  Q.  Again, it's made payable to Harbin's.  Is
16    that Harbin's, Inc., or is that
17    Harbin's-Stern Brothers?
18  A.  I believe that's Harbin's, Inc.  And I
19    believe this is the -- what is called a
20    sub-column account for Office Plus.  That's
21    why the check is smaller than the others.
22      COURT REPORTER:  Excuse me.  What
23      type account?

Page 233

1  A.  I believe it's a rebate check for Office
2    Plus.
3  Q.  Office Plus activity?
4  A.  Right.
5  Q.  Office Plus in April of 2000 had debts, did
6    it not?
7  A.  Yes.
8  Q.  And did you apply any of this $2,189 toward
9    any of the debts of Office Plus?
10  A.  I don't know.  I'd have to look at my bank
11    statements.
12  Q.  Do you recall having done that?
13  A.  I don't recall.
14  Q.  Mr. Harbin, do you take any prescription
15    drugs on a regular basis?
16  A.  I do.
17  Q.  What prescription drugs do you take?
18  A.  I take the generic for Xanax.
19  Q.  Okay.  What's the name of that generic?  Do
20    you recall?
21  A.  I can't -- It's Alapalaza [sic] or
22    something.  I can't pronounce it.
23  Q.  Who prescribes Xanax for you?  Which

Deposition of Michael Harbin (Vol. II)                                                            April 2, 2002

Page 234

1       physician?
2   A.  Dr. Schaffer.
3   Q.  Where is Dr. Schaffer's office?
4   A.  He's out in, is it Fain Park?
5   Q.  Fain Park?
6   A.  Yeah.  Over there across from Fain Park.
7   Q.  What type doctor is Dr. Schaffer?
8   A.  He is a --
9   Q.  Endocrinologist?
10  A.  No, sir.  He's a psychologist, I believe.
11      D.O., something.  Ph.DO.
12  Q.  Doctor of psychology.
13      Do you recall his first name?
14  A.  David.
15  Q.  When did he first prescribe Xanax for you?
16  A.  Maybe two years ago.
17  Q.  And how often do you take it?
18  A.  My prescription is three times a day or --
19      Three times a day is my prescription, but
20      typically maybe a half a pill to one a day,
21      if needed.
22  Q.  What milligram dosage are you prescribed?
23  A.  .5.

Page 235

1   Q.  And for what condition is this Xanax?
2   A.  General anxiety.
3   Q.  Have you seen any other physicians for
4       general anxiety?
5   A.  I have.
6   Q.  What other physicians have you seen?
7   A.  Dr. Ed Givhan.
8   Q.  Anyone else?
9   A.  There was -- Before Ed retired, there's
10      another doctor.  I think her name was
11      Wiskett or Wishett.  I don't recall her
12      name.
13  Q.  Do you remember her first name?
14  A.  Linda, maybe.
15  Q.  And what did you see Dr. Wishett for?
16  A.  Just general anxiety.
17  Q.  Did she subsequently retire?
18  A.  I believe she moved.
19  Q.  Do you remember what kind of a physician
20      Dr. Wishett was?
21  A.  I think she was a psychologist.
22  Q.  Ph.D. rather than M.D.?
23  A.  I believe she might have been an M.D.

Page 236

1   Q.  So would have been a psychiatrist?
2           MR. MINOR:  Don't guess if you
3           don't know.
4   A.  I don't know.
5   Q.  You don't know.
6   A.  Something D.O.  I don't know what that
7       means.
8   Q.  Any other physicians other than Dr. Givhan,
9       Dr. Wishett, and Dr. Schaffer?
10  A.  Before that I was -- did see a psychiatrist,
11      Dr. Claude Holland.
12  Q.  For what condition?
13  A.  Just anxiety.
14  Q.  When did you first see Dr. Holland?
15  A.  That's when I lived in Birmingham, and it
16      was in '88, maybe, '89.
17  Q.  This is a condition that you've had before
18      your marriage, then, to Hope Harbin.
19  A.  That's correct.
20  Q.  Were you taking Xanax at the time of your
21      marriage to Hope Harbin?
22  A.  I was.
23  Q.  And is Dr. Holland's practice in Birmingham?

Page 237

1   A.  He's retired.  He's no longer in practice.
2   Q.  Was it in Birmingham?
3   A.  Yes, sir.
4   Q.  Who is the first physician you saw regarding
5       your general anxiety in Montgomery, Alabama?
6   A.  I believe it was Linda Wishett.
7   Q.  Who recommended her to you or who referred
8       her to you or you to her?
9   A.  I believe she was on our -- not DirectCare
10      at the time, but we had another medical
11      carrier that had a list of doctors, and I
12      just picked her out of them.
13  Q.  Okay.  Other than Ed Givhan, Linda Wishett,
14      and David Schaffer, have you seen any other
15      physicians in Montgomery, Alabama for
16      anxiety?
17  A.  No, sir.
18  Q.  Have you seen any other physicians for any
19      other medical condition since your --
20          MR. MINOR:  At any time?
21  Q.  -- marriage to Hope Harbin?  I don't want to
22      know about childhood diseases.
23          MR. MINOR:  You're not talking

Haislip, Ragan, Green, Starkie & Watson, P.C.                                        (334) 263-4455

| Page 238 | Page 240 |
|---|---|
| 1         about colds and that sort of | 1   Q.   Do you pay cash or do you charge your |
| 2         thing? | 2      alcohol purchases at the ABC store? |
| 3     MR. HENIG: No. | 3   A.   I have done both, but mostly it's cash. |
| 4   Q.   Well, we could talk about colds. Who does | 4   Q.   Do you write a check for cash or do you |
| 5      your general physicals, your annual | 5      withdraw cash from the ATM and then go |
| 6      physicals? | 6      purchase alcohol? |
| 7   A.   Well, it was Ed up until he retired six | 7   A.   I think if I have cash on me, I would pay |
| 8      months ago. | 8      from my wallet. If I don't, I would go to |
| 9   Q.   Have you been to anybody since Ed Givhan? | 9      the ATM. |
| 10   A.   I have not. I have not. | 10   Q.   Do you go to the ATM for any purpose other |
| 11   Q.   Other than Ed Givhan, have you seen any | 11      than to withdraw cash to purchase alcohol? |
| 12      other physicians for any condition | 12   A.   Do I go to the ATM for any other purpose -- |
| 13      whatsoever or has Ed Givhan referred you to | 13   Q.   Right. |
| 14      any other physicians? | 14   A.   -- other than to purchase alcohol? |
| 15   A.   He has. | 15   Q.   Right, to withdraw cash with which to |
| 16   Q.   What physicians and for what? | 16      purchase alcohol. |
| 17   A.   My son and I were roughhousing and he kicked | 17   A.   I go to the ATM to withdraw cash, yes. |
| 18      me in my back, and I had to go get a CAT | 18   Q.   To purchase alcohol. |
| 19      scan. And there was some doctor over at | 19   Q.   Not just to purchase alcohol, no. |
| 20      Jackson that looked at the thing. | 20   Q.   And you use the cash for other purposes? |
| 21   Q.   A radiologist? | 21   A.   Yes. |
| 22   A.   A radiologist, but I don't recall his name. | 22   Q.   Which ATM do you go to? |
| 23   Q.   Were you ever referred to any other -- to an | 23   A.   Whatever is convenient. |

| Page 239 | Page 241 |
|---|---|
| 1      orthopedic surgeon or a neurosurgeon? | 1   Q.   Which store do you purchase -- Which ABC |
| 2   A.   I am flatfooted and I do see a podiatrist in | 2      store do you purchase alcohol? |
| 3      Birmingham, Dr. Calcatera. | 3   A.   It depends. If there is one closed or open, |
| 4   Q.   Anybody else? | 4      what's most convenient for me wherever I am. |
| 5   A.   Off the top of my head, I don't recall. | 5   Q.   Which one is generally most convenient for |
| 6   Q.   Do you consume alcoholic beverages? | 6      you? |
| 7   A.   I do. | 7   A.   I would say either the one on Zelda or the |
| 8   Q.   How often do you consume alcoholic | 8      one on Decatur. |
| 9      beverages? | 9   Q.   There was one on Decatur. It's since |
| 10   A.   Several times throughout the course of a | 10      closed, I believe. |
| 11      week. | 11   A.   The one across from Jim Massey. |
| 12   Q.   What types of alcohol do you drink? | 12   Q.   Oh, from Jim Massey. Okay. All right. |
| 13   A.   Wine occasionally, very little beer and | 13   A.   Yeah. |
| 14      either scotch or bourbon. | 14   Q.   And the one on Zelda, is that located in the |
| 15   Q.   Do you drink vodka? | 15      same proximity as an ATM? |
| 16   A.   I have. | 16   A.   It's -- Yes, it's surrounded by ATMs. |
| 17   Q.   How often do you go to the Alcoholic | 17   Q.   How much alcohol have you purchased in the |
| 18      Beverage Control store to purchase alcohol? | 18      last two weeks? |
| 19   A.   It depends on the size of alcohol I | 19   A.   I don't know. |
| 20      purchase. If I buy a handle, it could be a | 20   Q.   How much have you purchased this week? |
| 21      week or two. If I go in there and buy a | 21      Today is Tuesday. |
| 22      little pint, it could be a couple of times a | 22   A.   None. |
| 23      week. | 23   Q.   Do you recall making any purchases from the |

Deposition of Michael Harbin (Vol. II)                                      April 2, 2002

| Page 242 | Page 244 |
|---|---|

**Page 242**

1    ABC store last week?
2  A.  I might have.  I don't keep track of when I
3      go into the ABC store.
4  Q.  Now, Mr. Harbin, you have admitted to your
5      wife to having an affair with Jackie Parks;
6      is that correct?
7  A.  That's correct.
8  Q.  When did your sexual relations with Jackie
9      Parks first begin?
10 A.  In 2000.
11          MR. HENRY:  John, do you foresee
12          any more questions on the
13          financial stuff?
14          MR. HENIG:  No, Mitch, I'm done
15          with that.
16          MR. HENRY:  All right.
17          MR. HENIG:  I'm going to ask him
18          about Jackie Parks and I'm
19          going to ask him about some
20          physical altercations and I'm
21          going to ask him about the use
22          of the beach house and I'm
23          going to ask him about some

**Page 243**

1          pornographic materials on his
2          computers and I'm going to ask
3          him about Frequent Flyer miles.
4          If you want to sit through any
5          of those, you're certainly
6          welcome to do so.
7          MR. HENRY:  I'll pass.  If y'all
8          have to get back with financial
9          stuff, these are my numbers
10         there, my cell phone,
11         et cetera.
12         MR. HENIG:  I'll remember, and
13         we'll put you on the speaker
14         phone if it's necessary.
15         MR. HENRY:  Hopefully we won't
16         have to.  Thank y'all for
17         letting me sit in.
18         MR. HENIG:  You're quite welcome.
19         (Discussion held off the Record.)
20         (Mr. Henry no longer present.)
21 Q.  (Mr. Henig continuing)  Let's go back to the
22     last question I had asked, and I think it
23     was when in the year 2000 did your sexual

**Page 244**

1      affair with Jackie Parks begin?
2  A.  Summertime maybe.
3  Q.  Where did it begin?
4  A.  At my office.
5  Q.  Do you have a bedroom in your office?
6  A.  No, sir.
7  Q.  Where in your office did it begin?
8  A.  I believe in our showroom.
9  Q.  Now, Jackie at the time was married to Lee
10     Parks; is that correct?
11 A.  That's correct.
12 Q.  And Jackie in May of 2000 had a child, Lee
13     Chapman.
14 A.  That's correct.
15 Q.  Did your affair with Jackie begin before Lee
16     Chapman's birth or after Lee Chapman's
17     birth?
18 A.  It was after.
19 Q.  Tell me the circumstances that caused the
20     affair to begin.
21 A.  It's unfortunate, but it's sad, and I know
22     how those things now occur.  We were -- Hope
23     and I were not getting along.  Lee and

**Page 245**

1      Jackie were not getting along.  Jackie and I
2      were working closely together at work.  At
3      the time, she was the only college-educated
4      person I had down there with the same
5      socioeconomic background.  I would hear
6      about her problems with Lee.  I shared my
7      problems with her about Hope.  Hope and I
8      continued to drift apart.  I think Jackie
9      and Lee continued to drift apart.  Jackie
10     was working very hard for Harbin's, and both
11     of us were unhappy, and one thing led to
12     another.
13 Q.  When did you tell Hope of this affair?
14     Assume that she filed the petition for
15     divorce October 31st, 2001, if that will
16     help you with a time frame.
17 A.  Yeah.  And I'm sorry if I'm slow on times.
18     I've been, as you can imagine, trying to put
19     all this stuff together.
20 Q.  You can only testify as to what you recall.
21 A.  Right.
22 Q.  And that's all I want.
23 A.  And if I'm wrong on some of these dates, I'm

Haislip, Ragan, Green, Starkie & Watson, P.C.                    (334) 263-4455

**Page 246**

1  wrong.
2  Q.  That's why I'm trying to give you the time
3      frame.
4  A.  Okay.  What was your question again?
5  Q.  We have an affair that started in the summer
6      of 2000.
7          MR. MINOR:  When did you tell Hope
8      it started.
9  A.  Oh, Hope had -- Was it in July 2001?
10 Q.  So it had been going on for about twelve
11     months at the time you were confronted by
12     your wife and said, yeah, I hate it, but
13     it's true.
14 A.  Correct.
15 Q.  Tell me of being confronted by Hope.
16 A.  She came into my office, and we were going
17     out to eat.  And she was acting very nervous
18     and very upset.  And she was sitting in my
19     office on my sofa, and I was sitting in my
20     chair at my desk.  And she said that she
21     knew that there was something going on and
22     if I would just admit it, we would get a
23     divorce and go on about our lives.  And I

**Page 247**

1  said -- I can't recall what I said.  I asked
2  her to please tell me what you know or what
3  you may think, and she said I just know -- I
4  know you're having an affair with Jackie.
5  Would you just -- If you would admit it, we
6  can go on.
7      So I sat back at my desk and I slammed
8  my hand down on my (indicating) -- sat back
9  in my chair and I slammed my hand down
10 (indicating) on the table and I said, Hope,
11 you're right, I've had an affair with Jackie
12 Parks.  And I said, I'm sorry, but it
13 occurred.  And right then Hope got up,
14 walked behind my desk, got on the phone and
15 called Laurie and Skip Parks, had them on
16 the speaker phone.  And Hope went on to tell
17 them that I had made an admission or I had
18 admitted to the affair.  And I told that to
19 Laurie and Skip Parks.  And Haygood
20 Poundstone actually answered the phone, and
21 I told Haygood.  And I apologized both to
22 Skip and Laurie and told them I was very
23 sorry that it had occurred.

**Page 248**

1          Hope then said she had taped the call
2      and she was running out the door because she
3      was afraid something may happen.  And then
4      she ran out the door.
5  Q.  Did y'all attempt marriage counseling?
6  A.  We did.
7  Q.  With whom?
8  A.  Don Hill.
9  Q.  Okay.  When did your marriage counseling
10     begin with Don Hill?
11 A.  Prior to the admission and afterwards, we
12     continued to go.
13 Q.  Sometime within a few weeks or days of the
14     admission --
15 A.  Yes, sir.
16 Q.  -- to sometime after?
17 A.  Yes, sir.
18 Q.  When did you decide you actually wanted a
19     divorce and that you couldn't reconcile with
20     Hope?
21 A.  Jackie and I had spoken after it all had
22     come out on the table, and she felt like she
23     had an obligation to her child to try to

**Page 249**

1  reconcile with Lee.  I felt like I had an
2  obligation with my children to try to
3  reconcile with Hope.  Hope and I continued
4  to go to counseling, but the situation in
5  the household for me had become very, very
6  tense.  I feel like the element of trust was
7  completely gone, and it would be very hard
8  to rebuild.  We --
9  Q.  Well, let me ask you this, Mr. Harbin.
10 A.  Okay.
11 Q.  During the time that you were going to
12     counseling with Hope, were you still having
13     sexual intercourse with Jackie Parks?
14 A.  No, sir.
15 Q.  When did your sexual relationship with
16     Jackie Parks resume?  If it was stopped in
17     July when you were confronted by Hope, when
18     did you and Jackie resume your sexual
19     intercourse?
20 A.  I don't recall.  Months.
21 Q.  By October of 2001, had your relationship
22     with Jackie resumed?
23 A.  I don't know the exact date.

Deposition of Michael Harbin (Vol. II)                    April 2, 2002

Page 250

1  Q.  Well, by Thanksgiving 2001, had your sexual
2      relationship with Jackie Parks resumed?
3  A.  Thanksgiving, yes.
4  Q.  And does it continue to today?
5  A.  Yes.
6  Q.  Now, your first sexual intercourse with
7      Jackie Parks was in the summer of 2000, I
8      believe you testified, at Harbin's, Inc.
9      Have you had sexual intercourse with Jackie
10     Parks or did you have sexual intercourse
11     with Jackie Parks in 2000 at the beach
12     condominium in Seagrove, Florida?
13 A.  In 2000?
14 Q.  Yes, in the year 2000.
15 A.  I don't think so.
16 Q.  Did you have sexual intercourse with Jackie
17     Parks while your wife and children were
18     staying at the condominium in Florida?  I'm
19     talking about that you and Jackie Parks --
20     do you remember -- Let me back up.  That was
21     a horrible question.
22         MR. MINOR:  Have we ended it?
23         MR. HENIG:  We've ended that

Page 251

1          conglomeration, and we're going
2          to start a new one.
3          THE WITNESS:  Okay.
4  Q.  Do you recall Jackie Parks baby-sitting for
5      your children in the year 2000 when you and
6      Hope Harbin were vacationing at your
7      condominium at Seagrove?
8  A.  No.
9  Q.  You do not remember Jackie Parks --
10 A.  No, she didn't baby-sit in 2000.
11 Q.  When did she baby-sit?
12 A.  Sometime prior to that.
13 Q.  Were you having sexual intercourse with her
14     at the time that she baby-sat for your
15     children?
16 A.  No, sir.
17 Q.  You remember which time I'm talking about at
18     Seagrove, Florida.
19 A.  I believe that was in '99.
20 Q.  In '99.
21         And your testimony is that there was no
22     sexual relationship between the two of you
23     in 1999.

Page 252

1  A.  Not that I recall.
2  Q.  Let me ask you this.  Is there any reason
3      you wouldn't be able to recall having had
4      sexual intercourse with Jackie Parks?
5  A.  Other than I don't keep dates, times.
6          MR. MINOR:  He's already testified
7          it first started in 2000.
8          MR. HENIG:  I understand that.
9          But now he says he doesn't
10         recall as to whether or not it
11         may have happened in '99, and
12         I'm just trying to --
13         MR. MINOR:  No.
14 Q.  Wasn't that your testimony just two seconds
15     ago, that you don't recall whether or not it
16     may have occurred in 1999?
17 A.  You asked me if I had intercourse in '99,
18     and I said I don't recall.
19 Q.  With Jackie Parks.
20 A.  Right.
21 Q.  You cannot recall whether or not in 1999 you
22     had sexual intercourse with Jackie Parks.
23 A.  Again, I don't recall.

Page 253

1  Q.  Okay.  So is the answer to my question, yes,
2      you were correct, I cannot recall whether --
3  A.  Yes, I cannot recall.  I do not recall.  I
4      don't know.
5  Q.  You're not testifying that you did not.
6  A.  I'm saying I don't know.
7  Q.  During your marriage to Hope Harbin, have
8      you had sexual intercourse with anyone other
9      than Jackie Parks?
10 A.  No.
11 Q.  Have you purchased any gifts for Jackie
12     Parks?
13 A.  Yes.
14 Q.  Tell me the gifts that you recall having
15     purchased for Jackie Parks.
16 A.  A West Bend coffee percolator and a set of
17     earrings.
18 Q.  What type earrings?
19 A.  Platinum earrings.
20 Q.  Did they have any stones or gems?
21 A.  They had some diamonds in them, very small
22     ones.
23 Q.  From whom did you purchase these diamond

Haislip, Ragan, Green, Starkie & Watson, P.C.                (334) 263-4455

**Page 254**

1    earrings?
2 A.  It was a company in Atlanta.
3 Q.  Do you remember the price of those diamond
4    earrings?
5 A.  I think they were $190.
6 Q.  Do you remember for what purpose, what
7    occasion?
8 A.  A Christmas gift.
9 Q.  Christmas of what year?
10 A.  This year.
11        MS. HARBIN:  I'm going to have to
12        take a break.
13        MR. HENIG:  Okay.  Take a break.
14        We'll take a short break.
15        MR. MINOR:  Okay.
16        (Brief recess.)
17 Q.  (Mr. Henig continuing)  Let me ask you one
18    thing I forgot to ask earlier.
19 A.  Okay.
20 Q.  And I don't know if you brought it or not
21    because I was marking things.
22 A.  Yes, sir.
23 Q.  I asked you for an inventory of the assets

**Page 255**

1    from your father's estate --
2 A.  I don't have it.
3 Q.  -- that you received.
4 A.  Yes.  I don't have it.
5 Q.  Who has that?  There has to be an inventory.
6 A.  Is it not in the will?
7 Q.  No.
8 A.  Let me call --
9 Q.  Write it down.
10 A.  Let me call the people that did the stuff.
11 Q.  The estate taxes.  I don't want to subpoena
12    this stuff if I can possibly avoid having to
13    do that.
14 A.  Right.
15 Q.  But as Mr. Minor will tell you, I've got to
16    give notice of the intent to subpoena if
17    I'm -- I really don't want to have everybody
18    digging through your stuff if you can ask
19    them.
20 A.  Let me make a call.
21 Q.  Would you please let me know by Monday
22    whether or not you've gotten that and the
23    other documents.

**Page 256**

1 A.  I'll try to do that sooner.
2 Q.  Thank you.  I'm sorry.  That was just one
3    other thing I -- I know I covered it --
4        MR. MINOR:  He's looked.  He
5        doesn't have it.  He's going to
6        try to get it.
7        MR. HENIG:  I understand.  But as
8        you know and we've explained to
9        clients before, it doesn't
10        matter whether you've got it if
11        you've got the ability to get
12        it.
13        MR. MINOR:  Was the will probated
14        here?
15        THE WITNESS:  Yes.
16        MR. HENIG:  It was.
17        MR. MINOR:  There ought to be one
18        in the probate file.
19        MR. HENIG:  Not necessarily.
20        There might be an inventory of
21        the assets in the probate file
22        but not necessarily how they
23        were ultimately distributed

**Page 257**

1    because Mary Ann agreed that
2    certain of the assets would be
3    given to Michael.  They worked
4    out something, and I'll ask him
5    about it on the Record.  That's
6    fine, you know, if he'll get me
7    the inventory.
8        THE WITNESS:  Sure.
9 Q.  But under the terms of your father's will,
10    the bulk of your father's estate was left to
11    your sister, wasn't it?
12 A.  That's correct.
13 Q.  And he said in the preamble or the beginning
14    of his will it was because you had already
15    received the stock in Harbin's, Inc., and he
16    was trying to equal out his estate between
17    you and your sister.
18 A.  That's correct, in the preamble.
19 Q.  But, in fact, you and your sister reached
20    some agreement to divide the assets of your
21    father's at the time of his death.
22 A.  That's correct.
23 Q.  And y'all divided them on basically a 50-50

Deposition of Michael Harbin (Vol. II)                    April 2, 2002

| Page 258 | Page 260 |
|---|---|

**Page 258**

1    basis.
2  A.  That's correct.
3  Q.  And you then received more than you would
4      have under the will and she received less
5      than she would have under the terms of your
6      father's will.
7  A.  Yes, depending on how liquid you would call
8      Harbin's at the time.
9  Q.  Exactly. But you did receive some assets.
10 A.  Right.
11 Q.  About $425,000 worth of assets is my
12     recollection.
13 A.  Best --
14 Q.  Is that about right?
15 A.  Yes.
16         MR. MINOR: In addition to the
17         Harbin's stock or --
18         MR. HENIG: Yes.
19         THE WITNESS: The Harbin's stock I
20         purchased.
21         MR. HENIG: He had already
22         purchased it.
23         MR. MINOR: I know, but I'm just

**Page 259**

1          trying to clarify what you
2          actually received.
3          MR. HENIG: Right. I believe
4          there was some insurance
5          proceeds --
6          THE WITNESS: Policies.
7          MR. HENIG: -- and policies, and
8          there was some cash that
9          Michael received.
10 Q.  Do you remember how much actual cash you
11     received from your father's estate?
12 A.  John, I don't. Maybe 300,000.
13 Q.  Have you since -- And that was in 1998,
14     1999?
15 A.  No, sir. He died in '97.
16 Q.  Right. But you didn't actually receive the
17     monies until sometime later.
18 A.  We did. I believe we received some in '97,
19     and he died in June of '97. So during that
20     seven-month period, we received cash
21     proceeds from the life insurance policies.
22     And it probably did spill over into '98. I
23     don't know. I'd have to look at it. I

**Page 260**

1    don't know if the return --
2  Q.  During '98, '99, 2000, 2001, you've spent
3      whatever you received.
4  A.  Yes. Not the whole entire amount, but, yes,
5      I've spent it.
6  Q.  The balance of it, I assume, is in the
7      Fidelity account.
8  A.  That's correct.
9  Q.  Which is now 60, $70,000?
10 A.  It's less than that. It's --
11 Q.  Okay. And at the time of your father's
12     death, what was the debt on the Harbin's
13     building, the mortgage on it?
14 A.  I'd have to go back --
15 Q.  Wasn't it about 200,000?
16 A.  On the Harbin building?
17 Q.  Yes.
18 A.  No, sir. It was close to 700 and something
19     thousand.
20 Q.  It was 200,000 at the time you acquired the
21     Harbin's, Inc., stock, and you had to
22     leverage it, I believe, as part of the
23     buyout to the family. Is that fair?

**Page 261**

1  A.  There was no debt on the property at the
2      time I acquired the stock.
3  Q.  And you acquired the stock when?
4  A.  March of '90.
5  Q.  All right. I think we had discussed -- we
6      were discussing gifts, I believe the
7      Christmas gift to Jackie. Wasn't that the
8      last question that I had asked?
9          Mr. Harbin, have you and Jackie Parks
10     discussed marriage, your marriage to each
11     other?
12 A.  We have.
13 Q.  And tell me of those discussions.
14 A.  Just maybe one day, but there's no immediate
15     plans or anything right now.
16 Q.  You know, when a divorce is going on,
17     lawyers hear all sorts of things from all
18     sorts of different people when people who
19     love to talk find out that we're
20     representing one party or another.
21 A.  Uh-huh (positive response).
22 Q.  And I hate to use the surname of "someone,"
23     but someone told me that you and Jackie

**Page 262**

1     Parks had looked at some real estate
2     together, a home.
3 A.  Uh-huh (positive response).
4 Q.  Have you?
5 A.  Not together, no.
6 Q.  Did you look at a home and then ask Jackie
7     to go look at it afterwards or vice versa?
8     Did she look at one and ask you to go look
9     at it?
10 A.  I think those occasions -- both of those
11     occasions occurred.
12 Q.  Tell me what real estate those occasions
13     occurred.
14 A.  It's been a while. I looked at a house in
15     McGehee Estates, and then I looked at that
16     house on Myrtlewood.
17 Q.  Both of those houses either Jackie had
18     looked at first and then asked you to go
19     look at or you had looked at and asked
20     Jackie to go look at the home?
21 A.  I was looking at trying to get a new home
22     for myself.
23 Q.  I understand.

**Page 263**

1 A.  And I believe I went and looked, and she
2     might have -- I haven't looked at anything
3     really in a while, but she said, hey,
4     there's a house in McGehee Estates that may
5     be suitable for you and your children, so I
6     looked at it. I've looked at it.
7 Q.  Did she ever tell you there was a house that
8     might be suitable for us after we get
9     married for you to go look at?
10 A.  We in the past have talked about if we were
11     to get married, the need for a house would
12     not be that big.
13 Q.  Has Jackie looked at any houses that she
14     told you would be suitable for you and
15     Jackie?
16 A.  No, sir.
17 Q.  Okay. Mr. Harbin, have you on occasions
18     been in possession of pornographic
19     materials?
20 A.  Yes, sir.
21 Q.  Have you acquired pornographic materials or
22     viewed pornographic materials over the
23     Internet?

**Page 264**

1 A.  I have.
2 Q.  And are there certain Internet sites that
3     are pornographic in nature that you have
4     visited on the Internet?
5 A.  There have been, yes.
6 Q.  What sites are those?
7 A.  I -- John, every time I sign online, there's
8     some junk pornography, random e-mail that
9     you get and you click on.
10 Q.  Well, I don't know how you got on their list
11     because they don't send me anything.
12 A.  Well, my friends float that stuff around.
13 Q.  So you have friends that e-mail pornographic
14     materials to you.
15 A.  No, they e-mail you a link to a site.
16 Q.  Okay.
17 A.  Some of Hope's friends have done it, my
18     friends.
19 Q.  Have you ever gone to any specific
20     pornographic sites on a regular basis?
21 A.  Yes, I have.
22 Q.  What sites are those, please, sir?
23 A.  I'm trying to remember the names of them.

**Page 265**

1     One a friend of mine told me about is called
2     like Voyeur Web.
3 Q.  Okay. Any others?
4 A.  God, I mean, you just --
5 Q.  Well, let me ask you this question and see
6     if I can help you with it a little bit.
7 A.  Okay.
8 Q.  Does your software -- your computer software
9     for your Internet Explorer have a favorites
10     section where you can visit a site, add it
11     to your favorites, and then all you have to
12     do is mash favorites and go to that
13     location?
14 A.  Yes, sir.
15 Q.  Have you listed any pornographic sites in
16     the favorites section of yours?
17 A.  No, sir.
18 Q.  Not at any time.
19 A.  Not at any time that I recall, no, sir.
20 Q.  Would you recall if you had, in fact, listed
21     in your favorites section a pornographic
22     site?
23 A.  If I recalled, yes, but I don't recall.

Deposition of Michael Harbin (Vol. II)                    April 2, 2002

**Page 266**

1  Q.  No, no.  My question was, if you had listed
2      such a site, would you recall that?
3  A.  If I had listed a site, I would think I'd be
4      able to recall it.
5  Q.  And it's your testimony that you have --
6      that you just -- to your knowledge, you've
7      never listed any sites in your favorites
8      section.
9  A.  Not that I recall, no.
10 Q.  And if you can't recall one, you certainly
11     would be able to recall multiple
12     pornographic sites listed in your favorites
13     section, would you not?
14 A.  Say that again, please.
15 Q.  You would be able, would you not, to recall
16     if you had multiple pornographic sites under
17     your favorites category?
18 A.  If I had recorded multiple sites, would I be
19     able to recall that.
20 Q.  Yes.
21 A.  In my favorites section.
22 Q.  Right.
23 A.  If I recorded those.

**Page 267**

1  Q.  Yes.
2  A.  Yes, I would be able to recall that.
3  Q.  Okay.  And you have no recollection of ever
4      having done so.
5  A.  No, sir.
6  Q.  What sites are currently listed in your
7      favorites on your computer?
8  A.  Fidelity, AmSouth, Colonial, Bloomberg, CNN,
9      eBay, BellSouth, Delta.com, Detroit Hummer,
10     Allan's Red Hummer Page, Colonial Web Biz,
11     Monster.com -- excuse me, Movingmonster.
12     That's to follow mortgage rates.
13     Theweatherchannel.com, Garrett Realty.com.
14 Q.  Excuse me.  Garrett Realty, those are the
15     people who handle the condominium rentals
16     for you at the beach?
17 A.  Yes, sir.
18         That's the primary ones that come off
19     the top of my head.  My finance ones are at
20     the top.
21 Q.  Right.
22 A.  Steelcase.com.
23 Q.  That's your business?

**Page 268**

1  A.  Business.
2  Q.  Steelcase is your main line.
3  A.  Line.
4  Q.  Do you have a franchise for Steelcase?
5  A.  No, sir.  They don't have franchises, just
6      to answer that.
7  Q.  They don't have them.  Okay.  That was
8      almost a business question for which we
9      needed to call Henry, but --
10 A.  Those are the immediate ones that pop out in
11     my head.
12 Q.  And those are because those -- you keep on
13     your favorites section sites that you go to
14     and visit on a regular basis.
15 A.  That's correct.
16 Q.  That are either business related or with the
17     weather --
18 A.  Right.
19 Q.  -- or things that you have a direct interest
20     in; i.e., Hummers.
21 A.  Correct.
22 Q.  And those would be the only sites that you
23     would have under your favorites heading on

**Page 269**

1      the Internet?
2  A.  Those are all that I recall right now.  I
3      have some more, but I don't -- There are
4      some more Hummer sites.  I think there's
5      Humvee.net.
6  Q.  But all related to things that you have a
7      personal and daily interest in.
8  A.  That's correct.
9  Q.  And a very keen interest in, otherwise you
10     wouldn't save them, correct?
11 A.  Some are keen, yes.
12 Q.  Have you ever on occasion -- on any occasion
13     printed out pornographic material from the
14     Internet?
15 A.  No, sir, not that I recall.  I have a
16     printer.
17 Q.  Now, the pornographic sites that you have
18     visited on the Internet, what type
19     pornography is found on those sites?
20 A.  Adult, like Playboy-type stuff.
21 Q.  Well, it is females primarily or is it male
22     and female or what type sites are these?
23 A.  It's female.

Page 270

1   Q.   Have you shown Hope any of these sites?
2   A.   No, but she's shown me.
3   Q.   What did she show you?
4   A.   She typed in some web site one night and
5        pulled it up that I could not recognize and
6        said that I had been there.
7   Q.   So she showed you a site that she said you
8        had visited on the Internet before.
9   A.   That's correct.
10  Q.   And you had no recollection of having been
11       there.
12  A.   That's correct.
13  Q.   What did that site have on it?
14  A.   I'm not sure.  I saw it only briefly till
15       the computer hit the floor.
16  Q.   In other words, Hope was not happy with your
17       actions at that time.
18  A.   She was not happy, I guess, with my
19       explanation when I said I don't --
20  Q.   I don't recall?
21  A.   -- I don't know of this site.
22  Q.   Do you remember when this occurred?
23  A.   I think I was still living in the house at

Page 271

1        the time.
2   Q.   When did you move out of the house?
3   A.   Labor Day weekend.
4   Q.   September 2001?
5   A.   Yes, sir.
6   Q.   Mr. Harbin, is it fair to say that you and
7        Hope over the last five or six years have
8        had arguments over your viewing pornographic
9        materials?
10  A.   No.
11  Q.   This is it?  What you've just discussed with
12       us is the only time that Hope has ever shown
13       you a pornographic site and expressed
14       knowledge that you had visited that site?
15  A.   The only time Hope has ever even mentioned
16       me looking at Internet sites --
17  Q.   Uh-huh (positive response).
18  A.   -- is when our divorce started coming up,
19       and she was saying I was doing it in front
20       of the children.
21  Q.   Okay.  And you deny having done that in
22       front of the children.
23  A.   I've never done that in front of the

Page 272

1        children.
2   Q.   And you would agree that that is totally
3        inappropriate behavior.
4   A.   It most certainly is.
5   Q.   Now, have you and Hope ever had an argument
6        over your alcohol use?
7   A.   No, sir.
8   Q.   Has she ever suggested that you abused
9        alcohol?
10  A.   Yes, sir.
11  Q.   Okay.  When did she suggest that you abused
12       alcohol?
13  A.   Well, now I'm a raging drunk during our
14       proceedings, you understand.
15  Q.   I'm -- I understand that after the filing of
16       the divorce, you have had many discussions
17       about your use --
18  A.   Right.
19  Q.   -- or abuse -- her belief that you have
20       abused alcohol.
21  A.   Correct.
22  Q.   I'm talking about at the time that you were
23       still living under the same roof.  From the

Page 273

1        time you got married until the time of your
2        separation, Labor Day 2001, did you and Hope
3        ever have any discussions where she
4        expressed her concern over your alcohol
5        intake?
6   A.   No, sir.  Just quite the opposite.
7   Q.   What do you mean by that?
8   A.   Well, for Christmas she would give me
9        decanters that you would -- decorative
10       decanters that you would put scotch or
11       bourbon in.  For my birthday she gave me a
12       wine rack that you stock full of wine.  One
13       Christmas she gave me a wine opener, and it
14       was one of these real fancy, easy pop-up
15       things.
16  Q.   Anything else?
17  A.   She used to give me -- I think for my
18       birthday she bought a bunch of scotch that
19       we took to the beach, so --
20  Q.   Do you remember your birthday of what year?
21  A.   When I turned forty.
22  Q.   Turned forty?
23       Anything else?

Deposition of Michael Harbin (Vol. II)                                    April 2, 2002

**Page 274**

1   A.   You know, those gifts are alcohol related.
2        I just -- No, I don't recall.
3   Q.   Did Hope ever have any conversations with
4        you where she expressed her concern over
5        your use of Xanax and intake of alcohol as a
6        combination?
7   A.   Yes, I think so.
8   Q.   Tell me of those conversations, please.
9   A.   She said I snored at night.
10  Q.   Anything else?
11  A.   No, sir.
12  Q.   Did any of your physicians ever warn you
13       against taking Xanax and drinking alcoholic
14       beverages?
15  A.   No, sir.
16  Q.   Have you ever read any literature that
17       indicates one way or another whether you
18       should take Xanax and intake alcoholic
19       beverages?
20  A.   Other than what's on the label.
21  Q.   And what does that label say?
22  A.   I think it says it can cause drowsiness.
23  Q.   So there is a warning related to Xanax and

**Page 275**

1        the consumption of alcoholic beverages.
2   A.   If that's what the label says. I don't
3        recall the exact verbiage.
4   Q.   Well, you have been taking Xanax since 1988;
5        is that correct?
6   A.   That's approximate, I would say.
7   Q.   And there are warning labels attached to
8        pill bottles on a regular basis, are there
9        not?
10  A.   There are.
11  Q.   Have you ever noticed a warning label
12       warning against the consumption of alcoholic
13       beverages while taking Xanax?
14  A.   I believe I have.
15  Q.   Have you ever discussed with any of your
16       physicians your habits with regard to
17       alcohol or alcoholic beverages?
18  A.   Habits or --
19  Q.   Yes.
20  A.   -- or my consumption of alcohol?
21  Q.   Your consumption, either one.
22  A.   No, sir.
23  Q.   Have you during your marriage to Hope Harbin

**Page 276**

1        consumed marijuana?
2   A.   Yes.
3   Q.   Okay. When was the last time that you used
4        marijuana?
5   A.   I was with Hope when I was still living at
6        the house.
7   Q.   Summer of 2001?
8   A.   That's correct.
9   Q.   Sometime before Labor Day 2001?
10  A.   Yes, sir.
11  Q.   And it's your testimony under oath that you
12       have not used marijuana since September of
13       2001.
14  A.   Yes, sir.
15  Q.   Before September of 2001, how frequently did
16       you use marijuana?
17  A.   Maybe once in a -- two, three, four, five
18       years. I don't know. Very, very, very,
19       very, very rare.
20  Q.   Had you ever been warned or received any
21       warning of the use of Xanax, the intake of
22       alcohol, the consumption of alcohol and the
23       use of marijuana?

**Page 277**

1   A.   No, sir.
2   Q.   You've never read any literature in that
3        regard?
4   A.   No, sir.
5   Q.   Mr. Harbin, during your marriage to Hope
6        Harbin and before your separation, because I
7        recognize you are still married, but before
8        your separation in September, Labor Day of
9        2001, did you and Hope have ever any
10       physical altercations?
11  A.   Before our separation?
12  Q.   Yes.
13  A.   Yes.
14  Q.   Tell me of each one of those that you recall
15       and the circumstances surrounding the
16       altercation.
17  A.   The first time was before we were married.
18       And we were at a party, and there were some
19       people smoking marijuana, and I smoked some
20       marijuana. I think I was twenty-eight,
21       twenty-nine. And I came inside from the
22       party and bent over Hope and asked her if
23       she'd like for me to get her a drink, and

Haislip, Ragan, Green, Starkie & Watson, P.C.                    (334) 263-4455

## Page 278

1    she turned around and cold-cocked me in the
2    face and laid me out on the floor.
3  Q.  And did you take that as her displeasure
4    with your intake of marijuana?
5  A.  I took that as what the hell is this girl
6    hitting me in front of these people.
7  Q.  Did you ask her for an explanation of why
8    she had struck you?
9  A.  I did after about ten minutes.
10  Q.  And what did she say?  What do you recall
11    her having said?  How about that.
12  A.  I don't know.  My nose was bleeding and my
13    eyes were all running and the guys had run
14    out the door, and I don't -- I don't recall
15    other than the fact, yeah, don't do that
16    around me.
17  Q.  Okay.  What happened next?  When was the
18    next altercation that you recall?
19  A.  The next time, it was Thanksgiving.  What
20    year -- Michael was young.  He was still in
21    a car seat.  And Hope was very adamant about
22    going to Tuscaloosa to have Thanksgiving
23    dinner like at six o'clock at night, and I

## Page 279

1    was saying that that's a lot of traveling to
2    do in one night with a small child just to
3    go have dinner with your sister.  And we
4    were going up I-65 and I was madder than
5    hell, and I was not talking to Hope.  And we
6    turned onto 459, and she said, well, are you
7    not going to talk to me.  And I said, Hope,
8    this is -- Little Michael was maybe six
9    months old at the time.  And I said, this is
10    crazy, and she went off and turned around
11    and knocked the hell out of me while I was
12    driving the car.  And I slammed on the
13    brakes slowly.  Well, I slowed down.
14  Q.  Slammed on the brakes slowly.
15  A.  I slowed the car down, got off on the exit,
16    and turned around and drove back to
17    Montgomery and told her don't ever -- And I
18    picked up my car phone, and I said, don't
19    ever, ever, ever hit me again, because that
20    was the second time she had punched me, and
21    Hope has got a mean right hook.
22  Q.  Obviously.
23        Any other occasions?

## Page 280

1  A.  Yes.  When we were going through the divorce
2    or were in the environment that we're in
3    now, Hope had called me one day --
4  Q.  That is after your separation now?  I want
5    to get everything before your separation,
6    Labor Day 2001.
7  A.  Right.  Let's see.
8  Q.  You've told us of two occasions.  Anything
9    else?
10  A.  She has charged at me a couple of times but
11    hasn't actually hit me.  I've been able to
12    back away.
13  Q.  Any other altercations?
14  A.  Physical or --
15  Q.  Physical altercations.  I assume you have
16    had your yelling and screaming.
17  A.  Yeah.  But as far as any -- any more punches
18    in the face other than those two times, no.
19  Q.  Now, you said that you and Hope had started
20    having marital difficulties sometime in the
21    past and that you were angry with Hope not
22    working and contributing financially to the
23    family.

## Page 281

1  A.  Correct.
2  Q.  And that that had precipitated some of your
3    disagreements and had led to your problems
4    with regard to the marriage.  Is that a fair
5    summation?
6  A.  That's part of it, yes.
7  Q.  Okay.  Tell me what else makes y'all or made
8    y'all incompatible and broke down your
9    marital relationship.
10  A.  John, when Hope and I got married, she was
11    three months pregnant.
12  Q.  And you had lived together for how many
13    years or how long a period of time?
14  A.  Maybe a year.
15  Q.  Okay.  And had planned to get married.
16  A.  We never had any definite plans.
17  Q.  Okay.
18  A.  And I did what I thought was the right thing
19    to do and took Hope off to Rome, got married
20    in St. Peter's Basilica and came back, was
21    going to try to live a happy and wonderful
22    life.  And the product of our marriage was a
23    beautiful son, Michael.  And Anna came

Page 282

1  along, another wonderful product of our
2  relationship. Not a product, but just a
3  wonderful gift.
4      And as the years developed after Anna
5  was born -- and I'm leading up to your
6  question or to answering your question --
7  Hope was very emphatic about staying at home
8  and raising the children. And at the time I
9  was financially -- financially could afford
10 to have a nanny, so to speak, come into our
11 house four days out of the week to keep the
12 children while Hope worked on a limited,
13 part-time basis down at Harbin's.
14     As the finances grew a little bit
15 tighter and the children got older and they
16 got into school, I asked Hope, all right,
17 we've got this private education that's
18 going to be coming down the pipe pretty
19 soon, and I'm going to need you to do some
20 more help on the financial side. And she
21 was very, very, very, and still is, emphatic
22 about being home for the children at three
23 o'clock or four o'clock, whenever they get

Page 283

1  out of school.
2      And as these bills began to mount --
3  And you know what the costs are in these
4  schools. In February I wrote a check to the
5  Academy for $21,000. And, yes, I began to
6  resent her not willing to help. I was
7  carrying the burden of the business --
8  Q.  And is that --
9  A.  -- the household, the beach property,
10    private school, the whole nine yards. And
11    that was one of the contributing -- main
12    contributing factors was helping.
13 Q.  Anything else?
14 A.  Bringing on the demise of our relationship.
15 Q.  Anything else?
16 A.  Other than just continued somewhat breakdown
17    of our personal agendas. Hope has a very
18    strong social agenda. I don't. She likes
19    to go to balls and stuff, which nothing is
20    wrong with that. People -- I grew up in
21    Montgomery, and, you know, there's a ball
22    about every other week in this town, but
23    personally I'm just totally --

Page 284

1  Q.  Are they that spaced out?
2  A.  I'm just personally out of that scene
3     nowadays. I don't like to do that anymore
4     and haven't in several years. And I think
5     because Hope would like to continue to do
6     that and I did not, that was another wedge
7     within our relationship.
8  Q.  You have filed a counterpetition for
9     divorce, and you have alleged in your
10    counterpetition that y'all are incompatible
11    and that further attempts at reconciliation
12    are futile and not in the best interest of
13    either of you. There's been a breakdown in
14    the marital relationship.
15        Have you told me all of the facts that
16    led you to the conclusion that you swore to
17    in your counterpetition?
18 A.  Yes.
19 Q.  Okay. That's the reason -- What you've just
20    expressed is why y'all are incompatible and
21    why you want a divorce, correct?
22 A.  Yes. We're incompatible.
23 Q.  And you would agree with me that's a

Page 285

1     conclusion, and the facts that led to that
2     conclusion are what you've testified to
3     earlier today, correct?
4  A.  You lost me on that. What do you mean?
5         MR. MINOR: He's asking are there
6            any other facts.
7  Q.  Yeah. Is there anything else? I don't want
8     to hear something for the first time from
9     the witness stand.
10        MR. MINOR: Any other facts that's
11           caused the breakdown of this
12           marriage. Anything else that's
13           a problem between you and Hope
14           that you haven't told him
15           about.
16 A.  Well, just prior to me moving out, going
17    back to the physical stuff.
18 Q.  We discussed those two occasions. I'm going
19    to now discuss after your separation. I'm
20    going to now ask you questions after the
21    separation.
22 A.  Okay. Well --
23 Q.  Is there anything else, though, that you

Page 286

1    want to tell me that occurred --
2 A.  Before I --
3 Q.  -- before Labor Day 2001 that gives rise to
4    your conclusion that you're incompatible and
5    that there's been an irretrievable breakdown
6    of this marital relation?
7 A.  Prior to me moving out, Hope was very
8    animated, violent, and one night Hope just
9    went wild within the house.  She was
10   throwing stuff at me, screaming profanity,
11   trying to call Jackie, leaving messages on
12   her cell phone, throwing telephones at me.
13   Hope has got a great arm to break a cordless
14   phone.
15 Q.  Was she accusing you at that time of having
16   an affair with Jackie?
17 A.  I had already admitted it.
18 Q.  Oh, okay.  So this was after you admitted to
19   the affair.
20 A.  Right.  Right.  And --
21 Q.  Okay.  But before you moved from the home.
22 A.  Right.
23 Q.  Okay.

Page 287

1 A.  And Hope was going to go to Jackie's house,
2    I believe, and -- I believe that's what
3    happened.  Anyway, she jumped in her car,
4    took off.  I ran upstairs and grabbed the
5    children because they were in my daughter's
6    bedroom crying.  And I said Anna, Michael,
7    pack your little -- we're going to pack your
8    little suitcases and we're going to spend
9    the night with my mother tonight.  And so I
10   grabbed the children, and we left the house.
11 Q.  You took them to your mother's house?
12 A.  Took them to my mother's house.
13 Q.  Okay.
14 A.  And I had tried to call Hope on her cell
15   phone and was unable to get her to tell her
16   where we were, and she never did call till I
17   think it was the next day.
18 Q.  Do you remember when this was?
19 A.  I don't recall the exact date.
20 Q.  Weeks before you actually -- or days before
21   you actually moved out Labor Day?
22 A.  I think it was maybe a couple of weeks.
23 Q.  Any other occasions during that what I'll

Page 288

1    call a stressful period from when you
2    admitted to having an affair until you
3    actually vacated the home?
4 A.  Every day was very stressful.
5 Q.  Right.  That's what I said, I'll call that a
6    stressful period.
7 A.  Yeah.
8 Q.  I didn't want to even leave that to you to
9    call it that.
10 A.  Okay.
11 Q.  But from mid --
12      MR. MINOR:  He's saying any other
13        violence --
14 Q.  Any other violence or --
15      MR. MINOR:  -- during that period
16        from the time you told her till
17        you moved out.
18 Q.  All right.  I recognize that there were
19   constant arguments like --
20 A.  Well, there was another time when she had --
21   And I can't recall if this was before or
22   after my admission.  It might have been
23   after.  She had tried to take my car and go

Page 289

1    see Jackie at her house.  And I said, Hope,
2    you're upset.  This was in the morning time,
3    and the children were at my sister's house.
4    And I said, Hope, please don't go, just calm
5    down.  And she jumped in her car and backed
6    out of the driveway at a high rate of speed,
7    parked her car on the street, and then came
8    in and grabbed my car keys and tried to take
9    my car.  I said, Hope, calm down.  And she
10   was in the car, in the driver's side of the
11   car -- my car in the driver's seat, and she
12   was trying to crank the car up to leave.
13   And I said, Hope, don't go, just calm down.
14   And I reached in to get the key and try to
15   remove it from the ignition, and she bit me
16   on the elbow.  I pulled my arm back, and she
17   slammed the door.  I had the key.  And she
18   called 911 and called the police and said I
19   was restraining her.
20 Q.  Anything else?
21 A.  We were at the beach.  She had come back
22   from training down in Orlando or Miami or
23   something like that.  And we had -- I had

Deposition of Michael Harbin (Vol. II)                    April 2, 2002

Page 290

1    had the children while she was training, and
2    we had gone to Panama City to pick her up at
3    the airport. And she came back and became
4    very agitated and -- while the children were
5    asleep, thank goodness. And we were sitting
6    by the pool, and Hope had a glass in her
7    hand and I was sitting in a chair, and she
8    threw the glass at me, and it shattered on
9    the deck of the pool.
10   Q.   Anything else?
11   A.   I think that's about it.
12   Q.   To say that she was emotionally upset by
13        your affair with Jackie Parks would be
14        somewhat of an understatement, would it not?
15   A.   To that extent, yes.
16   Q.   Now, since your separation, have you had
17        physical altercations?
18   A.   Yes.
19   Q.   Tell me those in chronological order, the
20        order beginning at the time of your
21        separation, Labor Day 2001, going to now.
22   A.   The first time, she had called me -- she
23        called me at work and said she had a flat

Page 291

1    tire and would I come help her because she
2    had groceries in the car and she was at Big
3    10 on Zelda Road. And I said, yes, I would.
4    So I left the office and met her at Big 10
5    Tire, put the groceries in the car. I took
6    her to her house. We went inside. She
7    asked me to try to help her get a computer
8    program working where she could fax from her
9    computer. I poked around on it a little bit
10   trying to get it to work, and I really
11   couldn't do anything. And as I was going
12   downstairs, we started getting into a little
13   conversation about everything that was going
14   on. And the next thing I know, I'm standing
15   at the back door about to leave and Hope and
16   I are yelling at each other, and she reaches
17   out and grabs me by the face and yanks me
18   like that (indicating).
19   Q.   Did you have to have any medical attention?
20   A.   I stayed there for about another thirty
21        minutes because I was bleeding and I had to
22        go back to work. And I didn't go to a
23        doctor or anything, no, but I sat there with

Page 292

1    paper towels and Bactine trying to keep --
2    stop the bleeding.
3    Q.   Okay. Anything else?
4    A.   The next time, Hope came over to my house,
5        and I let her inside. And she was charging
6        at me. Jackie had called the house. Hope
7        had spoken to her on the phone for two
8        seconds. She threw the phone down and then
9        lunged at me. I grabbed Hope's arms. I
10       said, stop it and leave. We were in my
11       living room. I guess that's what you'd call
12       it. I don't know what -- But we were
13       standing in there. I told her to leave.
14       And Hope was like that (indicating), coming
15       at me, and I grabbed her arms, and we swung
16       up that way to keep her from coming for my
17       face.
18            I have a rug down that has no pad. The
19       rug slipped. We fell on the floor. She was
20       spitting, cussing. She got her key, and she
21       was -- in her hand. Do you see that scar
22       right there (indicating)? She was able to
23       get me across the neck with her key. I was

Page 293

1    holding her arms down trying to get her to
2    drop the key, her Suburban key. I mean, it
3    was just like something you see on MPD. She
4    was wrestling with me.
5    Q.   That was at your home on Fairview.
6    A.   On Fairview.
7            I held her down. I kept saying, stop
8        this, stop this, we -- this is just awful.
9        She was spitting, trying to kick me in the
10       groin. Finally she -- after about ten
11       minutes and every bit of energy I had, she
12       finally calmed down and she left the house.
13   Q.   Okay. Did you have to have medical
14       attention?
15   A.   No.
16   Q.   Next?
17   A.   Next was just last week or two weeks ago.
18       My dog was missing. Hope had gone down
19       to -- had gone to the lake to a birthday
20       party. And I was -- I had called the house
21       to see if they were there before I came home
22       to see if my -- I had a black lab that's
23       been missing -- that was missing. Nobody

Haislip, Ragan, Green, Starkie & Watson, P.C.                    (334) 263-4455

**Page 294**

1  answered. So I went by the house to see if
2  he had possibly -- possibly had shown back
3  up.
4      Hope -- I turned in the driveway, and
5  when I turned in the driveway, I saw Hope's
6  car there. There were no lights on in the
7  house, and they had just pulled up. So I
8  went down the driveway and rolled down the
9  window and asked her if the dog was there,
10 and she said no. I said, has anybody
11 called, and she said no. She goes, but I'll
12 go inside and check.
13     She went inside and came back down and
14 said no one had called about the dog but
15 that she had another interesting call. And
16 that interesting call led to Hope grabbing
17 me on the side of the face here
18 (indicating) --
19 Q.  Who was the interesting call from? I'm
20 sorry. I don't mean to interrupt you.
21 A.  It was from Jackie. Hope had been calling
22 her and Jackie had returned her call, and
23 unfortunately I was there when Hope had

**Page 295**

1  checked her messages. And I was standing on
2  the patio, and I said -- she goes, but I had
3  another interesting call. And I said, from?
4  And then (indicating). She came down,
5  grabbed me here (indicating). I pulled
6  away.
7  Q.  This was outside of the home on Augusta?
8  A.  This was outside on the patio.
9  Q.  Okay.
10 A.  The children ran inside. Hope said, get off
11 my property. I'm calling 911 right now. I
12 said, I'm leaving; don't call anybody.
13 And --
14 Q.  Well, did you leave?
15 A.  I left. I got in the car and I left. And I
16 called the police --
17 Q.  So each of those --
18     You did call the police?
19 A.  -- and had an incident report done.
20 Q.  Any others?
21 A.  Not since then, no.
22 Q.  All of these post-separation occurrences
23 immediately follow either a conversation or

**Page 296**

1  a message from Jackie Parks, do they not?
2      MR. MINOR: Huh-uh (negative
3      response).
4  A.  No.
5  Q.  They do not?
6      MR. MINOR: The first one she had
7      a flat tire, and he went and
8      helped her.
9      MR. HENIG: All right. I know
10     that.
11 Q.  All right. Other than that first one, the
12 one at your home on Fairview was as a result
13 of a call from Jackie Parks.
14 A.  That's correct, a call to me.
15 Q.  Right.
16 A.  Okay.
17 Q.  And the next one just a couple of weeks ago
18 was a result of a message on Hope's phone
19 from Jackie.
20 A.  Right.
21 Q.  All right. And those are the three that
22 have occurred, the flat tire, the
23 occasion --

**Page 297**

1  A.  At my house and then checking on the dog.
2  Q.  Okay. Any others?
3  A.  Huh-uh (negative response). And I hope not
4  to have any others.
5      MR. HENIG: I want to switch
6      gears. I'm going to try to get
7      everything wrapped up by --
8      THE WITNESS: I can stay up --
9      well, you know, if we have to,
10     but at least maybe till twenty
11     till one.
12     MR. HENIG: I'm going to get you
13     done quicker than that, I hope.
14     THE WITNESS: Okay.
15 Q.  Let me ask you about these Frequent Flyer
16 miles. And you're certainly aware that Hope
17 had taken some of your Frequent Flyer miles
18 or some of the Frequent Flyer miles and
19 purchased a round-trip ticket to Europe --
20 A.  That's correct.
21 Q.  -- which was delivered, I assume, to your
22 home.
23 A.  That's correct.

Deposition of Michael Harbin (Vol. II)                                    April 2, 2002

---

Page 298

1  Q.  And that you kept and did not give to Hope.
2  A.  The ticket was delivered to my house.
3  Q.  Right.
4  A.  When I opened up the envelope, I thought it
5      was my Frequent Flyer statement.  And I saw
6      the ticket, and it was made to Hope to
7      Paris.  And so I was a little surprised that
8      I was unaware of this trip to Paris and
9      certainly how could she afford a trip to
10     Paris.  So I called Delta and found out that
11     the ticket had been issued based on my
12     Frequent Flyer account.
13 Q.  Now, where did that Frequent Flyer account
14     originate?
15 A.  I -- Dannelly Field, Montgomery, Alabama.  I
16     signed the --
17 Q.  No, no.  The Frequent Flyer points.  How did
18     you originate that account that had Frequent
19     Flyer points in it?
20 A.  Through travel and then through a Delta
21     SkyMiles card.
22 Q.  Okay.  Use of a credit card?
23 A.  Uh-huh (positive response).

---

Page 299

1  Q.  Was that a joint credit card?
2  A.  She had a credit card and I had a credit
3      card.
4  Q.  So some of those miles were generated from
5      purchases Hope had made?
6  A.  Some of those miles probably were generated
7      from purchases that she made.
8  Q.  Okay.  But regardless of who paid for the
9      card, there was a card in her name and a
10     card in your name; is that correct?
11 A.  That's correct.
12 Q.  And you paid the household bills?
13 A.  That's correct.
14 Q.  Now, were those Frequent Flyer miles all in
15     a single account once the credit card was
16     closed?
17 A.  What do you mean?  She's got a Frequent
18     Flyer account, as do I too.
19 Q.  That's separate and distinct from yours.
20 A.  Right, as our two children do, as well.
21 Q.  Okay.  And your Frequent Flyer account is
22     made up of miles that you acquired through
23     travel on Delta Airlines --

---

Page 300

1  A.  Correct.
2  Q.  -- and through purchases on a Delta SkyMiles
3      MasterCard or Visa, one or the other.
4  A.  American Express.
5  Q.  American Express.
6          Is that an American Express card that
7      was in both of your names or in your name
8      only?
9  A.  She was -- The account was in my name, and
10     you're able to have what, a joint
11     cardholder?
12 Q.  Right.
13          MR. MINOR:  Authorized user.
14 A.  Authorized user.  And she had a card in her
15     name.
16 Q.  Okay.  And the SkyMiles that were used to
17     purchase the round-trip ticket to Paris, did
18     that come from an account that was made up
19     of Frequent Flyer points that were acquired
20     through travel on Delta Airlines and through
21     use of the American Express card?
22 A.  My Frequent Flyer account was made up of
23     miles traveled on Delta Airlines and related

---

Page 301

1      airlines and purchases -- points made --
2      points credited to the account from
3      purchases on the Delta American Express
4      SkyMiles card.
5  Q.  Okay.  Now, how many Frequent Flyer points
6      do you currently have?
7  A.  I believe it's maybe 80,000.
8  Q.  Okay.  How many points were used to purchase
9      the round-trip ticket?
10 A.  50,000.
11 Q.  Is that part of the 80 or is that in
12     addition to the 80?
13 A.  No, I had 100 and something.
14 Q.  Okay.  And you know that the ticket was not
15     used.
16 A.  That's correct.  Mr. Minor still has the
17     ticket.
18 Q.  When you received the ticket, did you give
19     it to Mr. Minor?
20 A.  I did.
21 Q.  Did you give Mr. Minor any instructions with
22     regard to the ticket?
23 A.  I said hold it.

---

Page 302

1  Q.  Until what occurs?
2  A.  Until we can try to settle this thing.
3  Q.  So you would not release the ticket unless
4       this entire case was settled; is that
5       correct?
6  A.  That is correct.
7  Q.  And we didn't settle it, did we?
8  A.  No, we did not.
9  Q.  As part of the pendente lite order, you had
10      use of the beach home?
11 A.  That's correct.
12 Q.  Which is a duplex in Florida?
13 A.  That's correct.
14 Q.  Has Hope used the home since your
15      separation, Labor Day 2001?
16 A.  No.
17 Q.  Have you allowed her to use the home?
18 A.  Not right now, no.
19 Q.  And why would you or have you not allowed
20      Hope to use the beach home?
21 A.  Pursuant to our agreement, she has the full
22      and exclusive use of the home on Augusta and
23      the contents and I have full, exclusive use

Page 303

1       of the house in Seagrove.
2  Q.  The house in Seagrove is a duplex with two
3       separate and distinct dwellings attached by
4       a single roof, is it not?
5  A.  It is.
6  Q.  Describe for me side one and side two of the
7       duplex.
8  A.  Each side has three bedrooms, two baths.
9  Q.  Any other rooms other than the three
10      bedrooms and two baths on each side?
11 A.  There's a common area.  There's a
12      combination den/living room, and there's a
13      kitchen.
14 Q.  Are both sides of equal size square footage?
15 A.  I believe so.
16 Q.  Do you rent both sides?
17 A.  I do.
18 Q.  And if I'm not mistaken, you are
19      depreciating both sides on your personal
20      income tax return as though they are
21      separate dwellings and separate rental
22      properties; is that correct?
23 A.  I'd have to look at my schedule.  I don't

Page 304

1       know.
2  Q.  The rental company is reporting the income
3       to you on the units separately, is it not?
4  A.  Yes, they are.
5  Q.  How do they designate the separate units?
6  A.  As far as what they name them or --
7  Q.  Yeah.  Side A and B or one and two or --
8  A.  East and West.
9  Q.  East and West.  Okay.
10      So if I looked on your depreciation
11      schedule on your personal income tax and
12      under rental property there was an East and
13      a West, then you would agree that they're
14      being treated as two separate and distinct
15      properties for depreciation purposes on your
16      federal income tax returns.
17 A.  You're asking me an accounting question
18      that -- That's how they do it.
19 Q.  I'm asking you about your return.
20 A.  That's how they do it.  That's why I pay
21      them to set it up.
22 Q.  Do they have separate entrances?
23 A.  They have separate entrances inside -- to

Page 305

1       gain access inside.  They have a common gate
2       to go to the pool.  And up till a year ago,
3       they had common decks with one stair down to
4       the pool.
5  Q.  But they now have separate decks.
6  A.  Separate stairs.  I added another set of
7       stairs on the east side.
8  Q.  Excuse me.  Are the decks divided by any
9       structure?
10 A.  Each deck has a gate going out onto the
11      common deck that goes down to the pool.
12 Q.  Okay.  Are there any interior walls that
13      join the two structures, the two dwellings?
14 A.  That join them?
15 Q.  Yeah, interior doorways.  I'm sorry.  I said
16      wall.  I know they have a common interior
17      wall.  Is there a common interior doorway?
18 A.  There's a common interior storage shed
19      doorway that connects the two storage sheds
20      and which falls under the same roof, but as
21      far as moving from one living quarters to
22      the next, no.
23 Q.  You have to go outside to do that.  You

| Page 306 | Page 308 |
|---|---|
| 1   cannot do that from inside. | 1  A.  Yes, sir. |
| 2  A.  That's correct. | 2  Q.  Did you have any offers to purchase it? |
| 3  Q.  Okay. Do they both have fully equipped | 3  A.  One semi. It was if owner would finance, |
| 4   kitchens? | 4   and I said no. |
| 5  A.  They do. | 5  Q.  Now, you said there was a second mortgage on |
| 6  Q.  Both have refrigerators, dishwashers? | 6   that unit that was placed on the unit in |
| 7  A.  They do. | 7   September of 2001 or thereabouts? |
| 8  Q.  Stoves? | 8  A.  Yes, sir. |
| 9  A.  They do. | 9  Q.  And there was an appraisal done at that |
| 10  Q.  Do they have separate air-conditioning | 10   time; is that correct? |
| 11   units? | 11  A.  I believe the appraisal was done in May. |
| 12  A.  They do. | 12  Q.  In May? |
| 13  Q.  Do you receive separate power bills for the | 13   But it was in anticipation of financing |
| 14   two units? | 14   a second mortgage or the second mortgage? |
| 15  A.  Separate -- Totally separate utilities for | 15  A.  Yes, sir. |
| 16   both of them. | 16  Q.  I'm asking the question. |
| 17  Q.  Separate water, power, cable television? | 17  A.  Yeah. Yeah. |
| 18  A.  Water is not separate. | 18  Q.  Is that why the appraisal was performed? |
| 19  Q.  One single water bill. | 19  A.  Yes, sir. |
| 20  A.  One single water bill for both units. | 20  Q.  Do you agree with the appraised value? |
| 21  Q.  Okay. Any gas appliances? | 21  A.  You know, everything down there is -- I |
| 22  A.  Uh-huh (positive response), a pool heater. | 22   agree with it. |
| 23  Q.  Is there a single gas bill? | 23  Q.  Okay. Is it high or low in your opinion as |

| Page 307 | Page 309 |
|---|---|
| 1  A.  There is. | 1   an owner? |
| 2  Q.  So you have a single water bill and a single | 2  A.  Based on the land value, I think it's |
| 3   gas bill. | 3   probably dead on the money. Based on the |
| 4  A.  Correct. | 4   income level, it's probably too high. |
| 5  Q.  But everything else is totally separate. | 5  Q.  And do you think it's appreciated -- the |
| 6  A.  Separate phone and separate power. | 6   duplex has appreciated in value since the |
| 7  Q.  Okay. Television, separate cable? | 7   appraisal in May of 2001? |
| 8  A.  Separate cable; that's correct. | 8  A.  I -- Based on what's happened in the economy |
| 9  Q.  Two separate bills. | 9   since then, I don't know. It might have |
| 10  A.  Correct. | 10   even dipped a little bit. |
| 11  Q.  During the year 2001, was that unit for | 11  Q.  So your opinion is that the appraisal would |
| 12   sale, listed for sale? | 12   certainly be no higher if it was |
| 13  A.  I don't believe so. I -- It might have been | 13   re-appraised today. |
| 14   partially, but the listing agreement had | 14  A.  I wouldn't think it would be. |
| 15   expired. | 15  Q.  Okay. |
| 16  Q.  When was it listed for sale? | 16   MR. HENIG: Let me talk with Hope |
| 17  A.  The day I closed on it. | 17   for just a second. That may be |
| 18  Q.  Which was? I'll take the month and year. | 18   all of the questions that I |
| 19  A.  '97. | 19   have. |
| 20  Q.  Okay. And so you listed it for sale | 20   (Brief recess.) |
| 21   immediately? | 21  Q.  (Mr. Henig continuing) Mr. Harbin, let me |
| 22  A.  Uh-huh (positive response). | 22   ask you just a couple of brief follow-up |
| 23  Q.  That's a yes? | 23   questions. |

**Page 310**

1      Mr. Harbin, you recognize that Hope has
2      exclusive use of the home on Augusta; is
3      that correct?
4  A.  That's correct.
5  Q.  Have you since September of 2001 removed any
6      mail from the Augusta mailbox?
7  A.  No.
8  Q.  You understand you're under oath.
9  A.  My son did the other day, but I did not.
10  Q.  What did your son remove from the mailbox
11     and give to you?
12  A.  Anna's soccer schedule.
13  Q.  And gave it to you?
14  A.  He gave it to Anna, I believe. I was not
15     even out of the car, I don't think. Well, I
16     was out of the car because they went and fed
17     the cat and I stood there and watched them.
18     But he got the mail out, stuck it under the
19     porch, and he was going through it, and he
20     goes, Anna, you've got a letter, I believe.
21     I mean, it's insignificant. And he opened
22     it or Anna opened it or Anna gave it to me
23     and I opened it, and it was the soccer

**Page 311**

1      schedule for Anna's soccer stuff.
2  Q.  What was the occasion for you to be with the
3      children at the Augusta house the other day?
4  A.  Hope was in Paris.
5  Q.  And what was the occasion for you being at
6      the house with the children?
7  A.  She had left no instructions on who was
8      going to feed the cat, Willow. And I told
9      the children we needed to go by there and
10     check on the cat because when they were in
11     West Palm Beach the week before that, my
12     mother and I went by to check on the cat,
13     and both occasions that I was there, there
14     was no food for the cat or water. And we
15     fed the cat, and on the occasion that my mom
16     was there, she pulled the mail out and stuck
17     it on the porch for Hope.
18  Q.  Have you removed any other mail from
19     Hope's -- any mail at all from Hope's
20     mailbox?
21         MR. MINOR: Object to the form.
22  Q.  Strike the word "other."
23         Have you personally removed any mail

**Page 312**

1      from Hope Harbin's mailbox since your
2      separation, since you left that home Labor
3      Day 2001?
4          MR. MINOR: He's already testified
5          he has not.
6          MR. HENIG: I know. I want to
7          make absolutely certain he
8          understands my question. If
9          his testimony is no, then he
10         can say no, and we'll move on
11         to the next question.
12  A.  Well, I'm trying to make absolutely sure.
13  Q.  That's what I want you to do.
14  A.  Soccer schedule came out. And there was an
15     occasion when Hope was out of town, and I
16     went by to check on the animals. And I
17     checked her mail to see if anybody was
18     putting it up, and there wasn't. And she
19     thought I was down in Florida, and I said,
20     no, I've been in town. I said, I saw your
21     mail and no one has been getting it. I
22     can't recall if there was something in there
23     for me or not. I'm going to say no, I

**Page 313**

1      don't -- I know the soccer schedule came
2      out.
3  Q.  Do you have the soccer schedule at your
4      home?
5  A.  My office.
6  Q.  Okay.
7  A.  And I've offered to give her copies of it,
8      but she refuses to take it from me. She
9      says she's going to call the coaches and get
10     those.
11  Q.  If you would be kind enough to give
12     Mr. Minor or just fax me a copy of the
13     soccer schedule and I'll make sure she gets
14     it.
15  A.  Well, I'm going to a soccer thing tonight.
16     As an adult, don't you think I can just hand
17     it to her?
18  Q.  Be fine with me.
19         MR. MINOR: Just get it to me.
20         Just get it to me and I'll get
21         it to John.
22  Q.  Is Jackie Parks currently employed at
23     Harbin's or working at Harbin's?

Page 314

1 A. She's working at Harbin's, yes.
2 Q. What job does she have at Harbin's?
3 A. She does design work for the company.
4 Q. And what is her current salary?
5 A. She's not being paid. She's reducing her
6     indebtedness to the company.
7 Q. How much does Jackie Parks owe
8     Harbin's-Stern Brothers? Or is it Harbin's,
9     Inc.? You tell me who she owes and how
10    much.
11 A. Harbin-Stern Brothers. And it was roughly a
12    couple of thousand, and we're keeping track
13    of her time and we're debiting it from her
14    balance.
15 Q. And her time is being debited at what rate
16    per hour?
17 A. I think it's $35 an hour. I think it is.
18 Q. Have you represented to anyone that you are
19    a resident of the state of Florida?
20 A. I have.
21 Q. When did you become a resident of the state
22    of Florida?
23 A. I'm not. I said I had applied to be a

Page 315

1     resident of the state of Florida.
2 Q. When did you apply for residency in the
3     state of Florida?
4 A. I haven't.
5 Q. Do you know how in the world you would even
6     go about applying for residency?
7 A. Yeah.
8 Q. How would you do that?
9       MR. MINOR: That's the fourth
10        question. You said you only
11        had three.
12       MR. HENIG: I understand.
13 A. I know where you're going with this.
14 Q. He's intrigued me with this, and I'm just
15    going to need to follow this a little bit.
16    I want to make sure we've --
17 A. You go to the Walton County Courthouse. You
18    tell them how many times you stay in the
19    state of Florida. You apply for a Walton
20    County -- You apply for a Florida driver's
21    license. If you don't have a primary
22    residence elsewhere, you can consider that a
23    homestead in Florida. But have I done that?

Page 316

1     No.
2 Q. Okay. Have you told people that you have?
3 A. One person.
4 Q. Did you tell your wife, Hope Harbin, that
5     you did?
6 A. I told Hope that.
7 Q. And why did you tell Hope that you had
8     become a Florida resident?
9 A. I didn't tell her I had become a Florida
10    resident. I said, I'm almost on the verge
11    of becoming a Florida resident and applying
12    to become a Florida resident because I've
13    been going down there so much. On weekends
14    that I don't have the children, I go to the
15    beach. On weekends I do have the children
16    that they would like to go, I go to the
17    beach. Sitting in a two-bedroom cottage on
18    Fairview with fire trucks going by every day
19    is a little unnerving.
20 Q. But you have taken no steps to apply for
21    residency in the state of Florida?
22 A. No, not yet.
23 Q. Do you still have an Alabama driver's

Page 317

1     license?
2 A. I do.
3 Q. Have you applied for a Florida driver's
4     license?
5 A. No, sir.
6 Q. Do you intend to move to the state of
7     Florida after this divorce is completed?
8 A. No.
9       MR. HENIG: That's all the
10       questions I have. You can
11       answer any of Mr. Minor's
12       questions.
13       THE WITNESS: Okay.
14       MR. MINOR: I don't have any.
15
16
17      * * * * * * * * * * *
18     FURTHER DEPONENT SAITH NOT
19      * * * * * * * * * * *
20
21
22      REPORTER'S CERTIFICATE
23 STATE OF ALABAMA:

Page 318

1  MONTGOMERY COUNTY:

2        I, Gina L. Haislip, Registered

3  Professional Reporter and Commissioner for the

4  State of Alabama at Large, do hereby certify that I

5  reported Volume II of the deposition of:

6        MICHAEL G. HARBIN, JR.

7  who was first duly sworn by me to speak the truth,

8  the whole truth and nothing but the truth, in the

9  matter of:

10        The marriage of

11        HOPE DUNCAN HARBIN

12        and

13        MICHAEL G. HARBIN, JR.,

14        Husband & Wife.

15        In the Circuit Court for

16        Montgomery County, Alabama

17        Domestic Relations Division

18        Civil Action Number

19        DR-2001-1310

20  on Tuesday, April 2, 2002.

21        The foregoing 144 computer printed pages

22  contain a true and correct transcript of the

23  examination of said witness by counsel for the

Page 319

1  parties set out herein.  The reading and signing of

2  same is hereby waived.

3        I further certify that I am neither of

4  kin nor of counsel to the parties to said cause,

5  nor in any manner interested in the results

6  thereof.

7        This 11th day of April 2002.

8

9

10        ---------------------------

        Gina L. Haislip, Registered

11        Professional Reporter and

        Commissioner for the State

12        of Alabama at Large.

13

14

15

16

17

18

19

20

21

22

23