IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
DOMESTIC RELATIONS DIVISION

In Re The Marriage of        )
                             )
HOPE DUNCAN HARBIN           )
                             )
    and                      )   CASE NO. DR-2001-1310
                             )
MICHAEL G. HARBIN, JR.       )
                             )
Formerly Husband and Wife    )

12-11-02

2ND ORDER ORIGINAL W/SEAL

<u>O R D E R</u> 12-11-2002

Mr. and Mrs. Harbin were divorced on August 2nd. The Court reserved jurisdiction to determine property, custody, support, and visitation. The Court heard those issues on October 17th and 18th.

The public policy of this state favors joint custody. Article 7 of Title 30 of our Code sets out certain considerations relating to whether joint custody should be ordered. Mr. Harbin wants joint custody. Mrs. Harbin does not. This Court prefers to order joint legal custody in most cases. In this case, it does not appear to be in the best interest of the children to do so.

Section 30-3-152 requires the Court to consider:

"(1) The agreement or lack of agreement of the parents on joint custody." There is no agreement.

"(2) The past and present ability of the parents to cooperate with each other and make decisions jointly." They have not been able to agree, even having difficulty when mediating through Dr.

FILED
DEC 11 2002
Fran Cycmanick
Deputy Register

Attachment A

Kirkland.

"(3) The ability of the parents to encourage the sharing of love, affection, and contact between the child and the other parent." It seems as if Mrs. Harbin has more difficulty with this than Mr. Harbin.

"(4) Any history of or potential for child abuse, spouse abuse, or kidnapping." The Court sees none by either party.

"(5) The geographic proximity of the parents to each other as this relates to the practical considerations of joint physical custody." At present, both parents live in Montgomery and this is not a factor.

It is the Court's conclusion, therefore, that neither joint legal custody nor joint physical custody would work. The Court does not doubt Mr. Harbin's love for his children but it is satisfied that Mrs. Harbin has been their primary care giver since their birth and that she should receive sole legal and physical custody.

The evidence indicates that there is a strong possibility that Mrs. Harbin may move to Atlanta. Much of her financial evidence is premised upon the costs in that city. The Court understands that such a move appears to offer a means of escape for Mrs. Harbin from unhappy memories and a difficult social situation. Nevertheless, even though the Court will not interfere at this point with any such plans, it believes that Mrs. Harbin should

2

think long and hard before "bailing out" of Montgomery and depriving her children of the roots which they have put down here. The short-term relief from such a move may not compensate for the long-term damage and difficulties.

Living at a distance of 175 miles or so will cause increased difficulty and increased expense related to visitation. It will engender more conflict between the parties and may result in more litigation, something to which neither party should subject themselves or their children, if it can be avoided. There has been time and tension and anguish enough, already.

Mrs. Harbin has presented some convincing evidence that Mr. Harbin suffers from certain problems which, for his own good, he needs to get under control. They do not seem, however, to pose any threat to health and welfare of the children, at least at this time.

These children need both parents. Dr. Kirkland, at the Court's request, submitted his recommendation in early September. It does not provide as much _specified_ time for Mr. Harbin as he has been enjoying under the *pendente lite* arrangement. What the Court provides is not intended to be a maximum but a minimum.

As to regular visitation, he shall have the children on alternate weekends from the close of the school day on Friday and he shall return them to school on Monday morning. During the weeks from the start of school sometime in August until it lets out in

May or June, he shall have them on Wednesdays from the close of school until 7:30 p.m. During the weeks of the summer holidays, this Wednesday visit shall be overnight from 5:00 p.m. until 8:30 a.m. on Thursday morning.

He shall have thirty days during the summer, to be agreed upon by the parents. If they cannot agree, he shall have fifteen days beginning at 6:00 p.m. on June 15th and a second fifteen days beginning at 6:00 p.m. on July 15th.

He shall have Thanksgiving in odd-numbered years from the close of school on the day school lets out until 6:00 p.m. on the day before classes resume.

He shall have Christmas holidays in even-numbered years from the close of school on the day school lets out until 2:00 p.m. on Christmas Day. In odd-numbered years, his Christmas visitation shall run from 2:00 p.m. on Christmas Day until 6:00 p.m. on New Years Day.

He shall have Spring holidays in even-numbered years from the close of school on the day school lets out until 6:00 p.m. on the day before classes resume.

Each party shall have reasonable telephone access to the children while in the actual custody of the other parent and each parent shall keep the other informed of any overnight out-of-town trips involving the children.

Each parent should allow the other to keep the children in

lieu of a baby-sitter but this shall not be taken to the extreme. Grandparents shall not be considered baby-sitters.

If Mrs. Harbin should move, all of these visitation arrangements will have to be reconsidered and adjusted. Such a move would be considered a change in circumstances.

Moving on to property issues, Mrs. Harbin should receive the marital home. For her own protection, she should have the responsibility of making the mortgage payments. The first mortgage ($148,000) is a legitimate debt of both parties. The second mortgage ($65,000) appears to have produced funds used by Mr. Harbin for his own purposes, yet her (and the children's) home is at risk if he fails to pay it. Hence, until that mortgage is paid off, she should receive sufficient periodic alimony to assure its payment.

Mr. Harbin owns interests in several other properties but the only one that needs the Court's consideration is the Seagrove Beach house, titled in his name alone. That was appraised for $520,000 in June 2001. Mrs. Harbin believes the first mortgage to be about $270,000 (her exhibit 107). There is a second mortgage of about $80,000. This would leave an equity of about $170,000. Mrs. Harbin wants this duplex. It has produced some income but it is questionable as to whether she has the time or expertise to manage it. Mr. Harbin says that he needs the equity to raise cash to reinvigorate his business. The best solution would seem to be to

award him the beach duplex but dedicate half of the equity to Mrs. Harbin. If he paid off the $65,000 owed on the home second mortgage, and gave her another $20,000 in cash, he still would have at least $85,000 for his business purposes. That also would reduce his periodic alimony by $500.00 per month.

Mr. Harbin has substantial financial assets and liabilities related to Harbins, Inc., and other business related to his family's company. Mrs. Harbin wants a share of this. The Court does not believe that such an award would be of any value to her whereas it would cause considerable difficulties to Mr. Harbin and would be cause for further disagreement between the parties. Consequently, Mrs. Harbin will be awarded no interest in those business properties.

Passing on to her financial needs, she has submitted a budget of $6,741.00 (her Exhibit 68). The Court is satisfied that she easily can spend this much. Whether this much is reasonable and necessary is another issue. As recognized earlier, some of these expenses are based upon Atlanta costs. For instance, she shows a mortgage payment of $1,800 whereas her Montgomery payment (1st mortgage only) is about $1,200. She has over $950 per month in the "personal expenses" category; about $700 per month for food for herself and two children, when the children will be spending a good bit of time eating with their father. The Court could "nickel and dime" her about many other items ($59 for internet service when

6

att.net is available for $10.95, etc.) but some things are not included, such as the second mortgage payment and private school tuition.

Mrs. Harbin and the children should not be subjected to a radical reduction in their standard of living because Mr. Harbin decided to leave home and take up with someone else. All things considered, disregarding the second mortgage, $6,000 per month is not an unreasonable amount for the support of her and the children in a manner relatively near to what they have known during the marriage. Where is the money to come from?

According to Mrs. Harbin's CS-41, she has a gross monthly income of about $1,900. Although she has made much more (at least on paper) at Harbin's, it will be difficult for her, with two dependent children to earn significantly more than she is earning now. Hence, there is about a $4,000.00 shortfall between what she can earn and what they need.

Mr. Harbin's CS-41 shows a gross monthly income in excess of $5,900.00. He, too, has made a lot more in the past. He has run through a large sum of capital since the death of his father, even since the filing of these proceedings. Mrs. Harbin believes that he is not disclosing his actual income. His business has suffered over the last year and is suffocated by almost unmanageable debt, if he is to be believed. If his figures are accepted, under the Guidelines, child support should be at $968.00 per month with his

7

paying the health insurance on the children. Mrs. Harbin still would be over $3,000 short of what she needs to maintain reasonably the same standard of living she and the children have enjoyed.

If the Court accepts the parties' proffered incomes, she is earning about $24,000 per year and he is earning about $72,000 per year. Their $96,000 total income works out to $8,000 per month for four people. Spreading that among the four of them gives $2,000 each, with the share of Mrs. Harbin and the children being three-fourths, i.e. $6,000, further confirmation of her estimated needs.

Mr. Harbin has a far greater capability to restore his income to the $120,000 or so that he once earned than Mrs. Harbin has to increase her income appreciably. The Court is satisfied that he can pay periodic alimony of $3,000.00 per month.

It is, therefore, **ORDERED, ADJUDGED AND DECREED** as follows:

1. That Mrs. Harbin is granted sole legal and physical custody of the children, subject to Mr. Harbin's reasonable rights of visitation as set out below.

2. That, beginning January 1, 2003, Mr. Harbin shall pay child support to Mrs. Harbin of $1,000.00 per month for the support of the children.

3. That reference is hereby made to a separate Order entitled **"Order of Continuing Income Withholding for Support"**, the entry of which is required of this Court by the provisions of Section 30-3-

8

61 of the Code of Alabama and which is specifically incorporated herein as a part of this Decree.

4. That Mr. Harbin shall maintain health insurance coverage on the children. Any non-covered medical, dental, orthodontic, ophthalmic, or counseling expenses shall be paid 75% by Mr. Harbin and 25% by Mrs. Harbin.

5. That Mrs. Harbin is awarded the former marital home at 1236 Augusta Avenue in Montgomery, subject to the present first and second mortgages on said home. Mr. Harbin shall be responsible for all mortgage payments coming due on or before December 31, 2002, and shall hold Mrs. Harbin harmless from any liability for them. Mrs. Harbin shall be responsible for all mortgage payments coming due on or after January 1, 2003, and shall hold Mr. Harbin harmless from any liability for them. Within thirty days of the date of this Order, Mr. Harbin shall execute a quit-claim deed (to be prepared by Mr. Henig) conveying his interest in the Augusta Avenue home to Mrs. Harbin. If he should fail to do so, the Deputy Register shall issue a Register's Deed conveying his interest to her.

6. That Mrs. Harbin is awarded a one-half interest in the beach home at Seagrove Beach, Florida. Upon payment of the sum of $85,000.00, however, she shall convey her interest in the property to Mr. Harbin and, if she should fail to do so, the Deputy Register is authorized to execute a Register's deed conveying her interest

to him. Mrs. Harbin shall cooperate with Mr. Harbin in the execution of any documents necessary for him to withdraw sufficient funds from the equity in the beach home so as to pay the $85,000.00 to Mrs. Harbin. Mr. Harbin shall be responsible for all mortgage payments, insurance, taxes, maintenance and repairs on said property and shall hold Mrs. Harbin harmless from any further liability thereon.

7. That, beginning January 1, 2002, Mr. Harbin shall pay periodic alimony to Mrs. Harbin of $3,000.00 per month, which payment shall continue until her death, remarriage or otherwise terminated by law. On the first day of the month following the payment of the $85,000.00 awarded in paragraph 6, however, the amount of such payment shall be reduced to $2,500.00 per month.

8. That Mr. Harbin is awarded all of his stock and other interest in Harbin's Inc., and his related business enterprises and Mrs. Harbin is divested of any interest in any of them.

9. That if Mrs. Harbin, after consultation with Mr. Harbin, determines that it is in the best interest of the children for them to attend private school for the 2003-4 or any succeeding school year, the parties shall divide the cost of such private school education, with Mr. Harbin paying 75% and Mrs. Harbin paying 25%.

10. That, so long as Mrs. Harbin resides with the children in the Montgomery area, Mr. Harbin shall be entitled to the following minimum visitation:

A. On alternate weekends from the close of the school day on Friday until he returns them to school on Monday morning.

B. During the weeks from the start of school sometime in August until it lets out in May or June, he shall have the children on Wednesdays from the close of school until 7:30 p.m. During the weeks of the summer holidays, this Wednesday visit shall be overnight from 5:00 p.m. until 8:30 a.m. on Thursday morning.

C. For thirty days during the summer, to be agreed upon by the parents. If they cannot agree, he shall have fifteen days beginning at 6:00 p.m. on June 15th and a second fifteen days beginning at 6:00 p.m. on July 15th.

D. For Thanksgiving in odd-numbered years from the close of school on the day school lets out until 6:00 p.m. on the day before classes resume.

E. For the Christmas holidays in even-numbered years from the close of school on the day school lets out until 2:00 p.m. on Christmas Day. In odd-numbered years, his Christmas visitation shall run from 2:00 p.m. on Christmas Day until 6:00 p.m. on New Years Day.

F. For the Spring holidays in even-numbered years from the close of school on the day school lets out until 6:00 p.m. on the day before classes resume.

11

G. When a Monday holiday (Lee/King Day, Presidents Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day) follows a normal visitation weekend, visitation shall continue until 6:00 p.m. on that holiday.

11. That each parent shall have reasonable telephone access to the children while in the actual custody of the other parent and each parent shall keep the other informed of any overnight out-of-town trips involving the children.

12. That each parent shall allow the other to keep the children in lieu of a baby-sitter when reasonably convenient to both parents. Grandparents shall not be considered baby-sitters.

13. That if Mrs. Harbin should move, all of these visitation arrangements will have to be reconsidered and adjusted. Such a move would be considered a change in circumstances.

14. That each parent will be allowed to spend some time with each child on that child's birthday and on that parent's birthday. If Mother's Day falls on a regular visitation weekend, the children shall be returned to Mrs. Harbin at 8:00 p.m. on that Saturday. If Father's Day falls on a day other than during Mr. Harbin's summer visitation or other than on a regular visitation weekend, he shall have the children from 9:00 a.m. until 6:00 p.m. on that day.

15. That neither party shall allow any adult person, male or female, to whom the children are not related by blood or marriage,

to remain overnight, or into the late hours of the night, in his residence or in any other place where he is staying, while any of the children are present.

16. That each party shall be responsible for the payment of any debts is that party's name not specifically assigned to the other party.

17. That Mr. Harbin shall be responsible for the payment of any joint debts not specifically assigned to Mrs. Harbin and shall hold her harmless from any liability thereon.

18. That each party shall receive whatever motor vehicles and other personal property now is in such party's possession, not specifically awarded to the other party.

19. That Mr. Harbin shall be entitled to claim the older child as a dependent for federal and State income tax purposes. Mrs. Harbin shall execute whatever documentation is necessary for him to do so and, if she should fail to do so upon demand, the Deputy Register specifically is authorized to do so on her behalf.

20. That neither party shall hereafter harass or otherwise bother the other and each shall be entitled to life, liberty and the pursuit of happiness without interference from the other.

21. That Mrs. Harbin is awarded a judgment against Mr. Harbin in the amount of $35,000.00 in compensation for her attorney's fees and expenses.

22. That the Court reserves the issue of post-minority support for the children's college education until that issue becomes mature.

23. That Mr. Harbin is awarded the following personal property from the former marital home: His tools, the old John Deere lawn mower, any remaining clothing or personal effects, his golf clubs, his bicycle, the picture of the first home in Montgomery, his books, his video tapes and movies, the restored Coca-cola box, the armoire owned by him before the marriage, the Christmas ornaments which he made as a child, the Cannon 35mm camera, one-half of any Mose T paintings, and the Cutco cutlery. He also shall be entitled to copy any of the children's pictures, home movies or videos as he may desire.

24. That Mr. Harbin shall maintain in effect at least $500,000.00 in insurance on his life, with the children as beneficiaries. This insurance shall not be borrowed against or other wise encumbered. Proof of insurance shall be furnished to Mrs. Harbin within thirty days of Mr. Harbin's birthday each year.

25. That each party is awarded any financial or retirement accounts in that party's name. Any joint accounts shall be divided equally by a Qualified Domestic Relations Order so as to avoid or minimize any current income tax liability.

26. That Mrs. Harbin shall be sole custodian of any savings

accounts or other financial assets in the children's names.

27. That any remaining costs are assessed against Mr. Harbin.

28. That copies of this Order be furnished to Mr. Henig and to Mr. Minor.

**DONE** this 11th day of December, 2002.

                                                  _____
                                                  W. MARK ANDERSON, III
                                                  Circuit Judge

Floyd Minor

John Henig

STATE OF ALABAMA
MONTGOMERY COUNTY

I, as Deputy Register, Montgomery County Circuit Court, do hereby certify that the within is a complete, true and correct copy of the Order on file in said office.
Witness my hand and the seal of said Court is hereto affixed, this the 19 day of March, 2003

_____
DEPUTY REGISTER

15