# EXHIBIT 1

**Steelcase**

Memorandum

To  Rich Cocos

Date  July 24, 2003

From  James M. Van Dyk , Manager,       Fax  616.698.3863
Corporate Credit

                                   Voice  508.478.4974

Subject  Harbins, Inc. Dealer Termination Memo

This memo is to provide background information for the purpose of moving to terminate Harbins, Inc. of Montgomery, AL. Harbins has been and remains in default of their credit agreements with Steelcase for nonpayment of their trade account. At present, Steelcase is owed $368m, with nearly all of it over 90 days past due. Numerous attempts to resolve this issue have been unsuccessful and we believe legal action will be required to affect a recovery.

**Background:**
- Harbins was founded 1949 in Montgomery, AL by Charles T. Harbin.
- Harbins is one of two dealers covering the Montgomery market, the other is Kyser Officeworks.
- Harbins was incorporated in AL in 1990.
- Ownership is held by Michael G. Harbin, Jr., 75% and Michael G Harbin, Sr., 25%

**Performance Summary:**
- Harbins showed a profit of $101m the fiscal year ending 12/31/2001 had stockholders equity of $5m.
- Financial Information for the fiscal year ending 12/31/2002 has not been provided to Steelcase, but it is believed that Harbins suffered significant loses to the point where the company has now become insolvent.
- Harbins has been on maximum credit hold since November, 2002 and we have been requesting financial information and a plan on how Harbins will repay the amounts owed to Steelcase since that time.
- In February, 2003 Steelcase retained Quarles & Brady to send a demand letter to Harbins for the amount owed and a plan for repayment. Michael Harbin agreed to send a partial payment and provide a plan but failed to do so.
- Jim Van Dyk spoke with Michael in May and offered to forebear on legal action for an additional three months (to give Harbins time to repay Steelcase) provided Michael would sign a Personal Guaranty for the amount owed to Steelcase and a Forbearance Agreement. Michael originally agreed to sign the documents but never returned them.
- To our knowledge, Harbins has not entered any orders since May, 2003.



DEFENDANT'S
EXHIBIT
1

**Steelcase**

Based on the above information, we feel that Harbins is incapable of satisfying
Steelcase customer needs in the Montgomery, AL market. We further believe that it
is in the best interest of Steelcase to terminate its relationship with Harbins and
immediately commence legal action to recover the amounts owed.

Please feel free to contact me with any questions or comments about the above.

James M. Van Dyk

SC 000288

# EXHIBIT 2



Departmental Correspondence

To    Credit File           Date   February 5, 1991

From    Marvis James

Subject   Harbins, Inc.

---

Received call from Michael Harbin regarding three big projects totalling approximately $3Million. Two are for Herbert AFB and Steelcase has already been specified. The remaining one is for State of Alabama, Economic Development Board (bidding against Hayworth).

Advised Michael that SFSI would be the route to consider for these, but since we do not have a secured position, currently we would need to send him documents for 2nd position and also SFSI forms. I informed him that since change in ownership, we would need new dealer application and secured position which is required. He said had sent dealer application to G.R. already ( I later verified with Linda Huene that he had, and she said she sent it to Atlanta Office 1/23/91). Michael was not favorable toward giving us security although I explained to him the reason. He asked that I send him the documentation.


MJ:jj
DRAFT 4

DEFENDANT'S EXHIBIT 2

PENGAD-Bayonne, N.J.

SC 000238

From: Marvis James
Subject: Harbins, Inc., Montgomery, AL

We discussed our need for a secondary security position as a result of the change in ownership with Joel.  Our position remains that we should insist on getting the secured position at this time as a matter of company policy for new dealerships or changes in ownership.  Michael should be advised that we will hold his dealership application in our department and not continue the approval process until he executes and returns the documents that I sent to him.  You can also refer to the fact that he agreed in writing on the credit application to give Steelcase a secured position.

Please call me if you have further questions.

Thanks,

```
        $$$$|$$$$$$$$$$$$$$$$$$$$$$$$$$$$$|$$$$
        $$$$|Marvis James - Credit Dept.|$$$$
        $$$$|Ex: 7-2102      CH-3E-14   |$$$$
        $$$$|$$$$$$$$$$$$$$$$$$$$$$$$$$$$$|$$$$
```

SC 000235

To: JERBA   --GRNDRPDS
: MJAMES   --GRNDRPDS James, Marvis

Subject: Harbins

Marvis, yesterday I met with Michael Harbin and discussed among a number
of things our requirement of his signature on the security documents sent.

Although Michael is receptive to signing something, he has some problems
with the terms of our agreement. Specifically, he is not interested in
providing personal guarantees (i.e. pledging his personal property) as he
states is a condition of the agreement. His point is that his organization
is chartered as an corporation and has sufficient assets to support the
credit requirements.

Also, he states that there has always been some sort of credit agreement in
place and that we just can't locate our records. Also, he states that al-
though the ownership percentages have changed, the corporation that has been
operating for 43 years has not. Since our arrangement is with the corporation
and not Michael Harbin, personally, we should be satisfied.

Marvis, I don't agree with all of Michaels's points or positions and he is
aware of that. But frankly, since Michael is well-schooled in the points of
law & contracts from his educational and banking experience background, I am
not able to provide a strong argument. Unfortunately, I am going to have to
hand this issue back to you and Joel and if need be our legal dept to
handle.

Again, he's willing to discuss and do something. Also, be aware that Michael
had seemingly very specific and confidential info on  a number of our dealers
and their UCC(?) info. He knew that certain dealers didnot have similar
security agreements with Steelcase (i.e. IACO) and recited some specific info
about our arrangement with Lander's (i.e. what he has pledged etc., etc.)
Don't have the faintest ideas how he got that info.
Let me know.

: JVANDERW--GRNDRPDS VanderWall, Joel M

SC 000231

Steelcase Inc.
The Office Environment Company

Grand Rapids, MI 49501-1967

March 21, 1991

Mr. Michael G. Harbin, President
Harbin's Incorporated
300 South Perry Street
Montgomery, AL  36104

Dear Michael:

Since talking with you on March 18, I have conferenced with
our Credit Manager, Joel Vanderwall and Joe Erba regarding
your refusal to provide Steelcase with a security interest in
the accounts receivable and inventory of Harbin's.  We have
also presented this situation to our senior management.

Based upon your past payment history and tenure as a Steelcase
dealer, we have decided to approve your dealership application
and continue to extend to you an open line of credit.  The
line of credit extended will be in the amount of $75,000, and
is contingent upon your continuing to take advantage of the
cash discount on a monthly basis.  This line also assumes that
no significant adverse changes will take place in the financial
condition of Harbin's Inc.  In order to evaluate your continu-
ing credit requirements, we may from time to time request that
your provide interim financial statements in addition to our
normal request for fiscal statements.  In the event your credit
requirements exceed this line of credit, we will request that
you provide appropriate credit arrangements.

Please call me at (616)247-2102 if you have any questions.

Sincerely,

Marvis James
Regional Credit Manager

MJ:jj



cc:    Joel Vanderwall, Joe Erba

---

Printed for: Marvis.James          Dept: Credit                    11/08/02 11:54 AM

From: Marvis.James@STC001
  To: Steven.Waugh
Sent: 11/8/02 at 11:53am
Subject: RE:(no subject)

Steve,

Fyi....this is a dealer that Randy was credit managing and that I am now
handling during our transition until we decide on our structure.  When I
reviewed the file and became familiar with the status of the account via Doug
Wilson, it became obvious that there were issues that Randy should have
addressed on our end much sooner.  This is a potentially very risky situation
as we do not have a security agreement with Harbins and Michael Harbin from a
historical perspective has been very obstinate and difficult to work with.  We
may need to consider reserving this account just in case we end up with a
serious collection problem.  Please let me know if you want to discuss in more
detail.  (please see my other e-mail also sent to you today for additional
info.)

Marvis James
Manager, Dealer Financial Accounts
(616) 247-2102 (phone)
(616) 246-4989 (fax)
MJames@steelcase.com

<-------------------- Forwarded letter follows---------------------->
Date: 11/7/02 at 5:46pm
To: ROOK321@aol.com
Cc: Rich.Cocos
From: Marvis.James@STC001
Subject: RE:(no subject)

Michael,

You will find the following items attached:

1)  Credit control letter
2)  Itemized listing of the past due items
3)  Itemized listing of orders on credit control

It is very important that you contact me immediately with you plan for
repayment of the past due items.  Please contact me if you have any questions.

Marvis James
Manager, Dealer Financial Accounts
(616) 247-2102 (phone)
(616) 246-4989 (fax)
MJames@steelcase.com

<-------------------- Forwarded letter follows---------------------->
Date: 11/6/02 at 12:14pm
To: MJAMES
From: ROOK321@aol.com
Subject: (no subject)

Well, we wasted a whole day going down your spread sheet. Turns out all the
nickel and dime amounts are service charges. Send me a CLEAN statement with
just what you show open. We Show only maybe half of what you show open at the
most. But we have gathered all of our remitted amounts and will compare to
the Clean report. Looks like there are amounts not posted to the account.

---

Marvis James
Manager, Dealer Financial Accounts
(616) 247-2102

SC 000024

# EXHIBIT 3

| | |
|---|---|
| 1 A Correct. | 1 had mentioned myofficeproducts.com also purchased? |
| 2 Q Okay. And then Retail Enhancement Services, that was | 2 Does that sound right? |
| 3 an LLC? | 3 A It was seven weeks prior -- |
| 4 A I believe it was, or an "S" corporation. I don't | 4 Q Prior to April 30th? |
| 5 really remember. | 5 A No, that doesn't sound right. I think I said January |
| 6 Q And who all had an ownership interest in that? | 6 '04 -- |
| 7 A Myself, an individual named John Doody, and Tom | 7 Q Okay. |
| 8 Methvin, I believe. | 8 A -- on a particular date is when myofficeproducts charge |
| 9 Q Metham (ph.)? | 9 customers went to myofficeproducts. |
| 10 A Methvin, M-e-t-h-v-i-n. | 10 Q Okay. And so seven weeks prior to April 30th you had |
| 11 Q Is that still operating? | 11 your asset sale? |
| 12 A No. | 12 A The sale was seven weeks in duration, so take April |
| 13 Q And when did that end? | 13 30th and back up seven weeks and that's when we |
| 14 A I believe in '99 or whatever the last date I had told | 14 started. |
| 15 you. | 15 Q That helps. I was wondering. I thought how do you |
| 16 Q I think you said 1998. | 16 keep remembering seven weeks prior. Okay. Do you have |
| 17 A '98, '99. I don't know. | 17 any records of that sale? |
| 18 Q And what kind of business was that? | 18 A No. |
| 19 A It was a stand-alone kind of mini Office Depot. | 19 Q Did you bring in any revenue at that sale? |
| 20 Q I'll ask you about that in a minute, but I just don't | 20 A We did. |
| 21 want to lose my train of thought. I was just thinking, | 21 Q Didn't you need those records for your taxes this year? |
| 22 we were just talking about your sale of your future | 22 A We filed a final tax return at the end of that sale. |
| 23 interest to myofficeproducts.com. | 23 Q Where did all the proceeds from that sale go? |
| 24 A Um-hmm. | 24 A The bank came in at that time and had taken the |
| 25 Q What happened to all the other assets? | 25 business over when I explained to them what we were |
| Page 63 | Page 65 |

DEFENDANT'S EXHIBIT 3

| | |
|---|---|
| 1 A What assets? | 1 trying to do, so every day the bank would come in, |
| 2 Q Everything that you used to -- | 2 which was fine with me because I wanted them to know |
| 3 A As I stated earlier, no assets left Harbin's, | 3 what we were doing was on the up and up. |
| 4 Incorporated. | 4 They took in all the cash receipts, the |
| 5 Q Okay. | 5 charge receipts, the count of the money, the authorized |
| 6 A Future revenue, whether that be a dollar or ten | 6 payment of any vendor or any check that we wrote. So |
| 7 trillion dollars, went to myofficeproducts. | 7 the bank came in and essentially took over the company |
| 8 Q Did you sell your -- all the other assets at another | 8 at that time. And they would take the money out every |
| 9 time? | 9 day and then they'd come back the next day and count |
| 10 A The only time we sold our assets, meaning furniture, | 10 the cash drawer and check on our A.R.'s and the mail |
| 11 fixtures, inventory, is when a cash-paying customer | 11 that would come in, and they'd post it to the lock box |
| 12 would come in and say, "I want to buy this piece of | 12 they set up and so forth. They collected all the |
| 13 paper." All right. Then we'd say, "All right. It's | 13 receipts and they essentially handled it. We just |
| 14 $2." And that would go into Harbin's, Incorporated. | 14 handled the sale. |
| 15 If you walked in and wanted to charge, that went to | 15 Q So they checked all the receipts. Do they have those |
| 16 myofficeproducts. | 16 records? |
| 17 Q Right. But aside from myofficeproducts.com -- | 17 A They might. |
| 18 A And then when we had our sale, that's when we sold | 18 Q Just for clarification, any proceeds from that sale |
| 19 fixtures, furniture and all that kind of stuff. | 19 went to the bank? |
| 20 Q When was that? | 20 A Every proceed from that sale went to Colonial Bank. |
| 21 A Seven weeks prior to April 30th, or it was a seven-week | 21 Q Okay. That was a detour. So back to -- what was it? |
| 22 sale that ended on April 30th. | 22 Retail Enhancement? |
| 23 Q Of what year? | 23 A Um-hmm. I guess. |
| 24 A 2004. | 24 Q Retail Enhancement Services? You said that was a |
| 25 Q Now, seven weeks prior, that's the same date that you | 25 stand-alone mini Office Depot, and I think you were |
| Page 64 | Page 66 |

# EXHIBIT 4

**Page 47**

1 A  Okay.
2 Q  At what banks did Harbin's have bank accounts?
3 A  South Trust Bank and Colonial Bank.
4 Q  Do they have lines of credit at either of those?
5 A  Just at Colonial Bank.
6 Q  And at what banks did Harbins-Stern Brothers have bank
7    accounts?
8 A  Colonial Bank, Aliant Bank, and that's all I can think
9    that we had.
10 Q  Okay.  So they didn't have one at -- Harbins-Stern
11    Brothers did not have one at South Trust?
12 A  No, I don't think we did.
13 Q  The account at Colonial, did Harbin's have a separate
14    account from Harbins-Stern Brothers?
15 A  No.
16 Q  So Harbin's and the Harbins-Stern Brothers account at
17    Colonial was the same?
18 A  Correct.
19 Q  Okay.  Did Harbins-Stern Brothers have a line of credit
20    at Colonial as well, then?
21 A  Harbins-Stern Brothers had a line of credit.
22 Q  Was that the same line of credit as Harbin's?
23 A  Correct.
24 Q  Did Harbins-Stern Brothers have lines of credit
25    anywhere else?

**Page 48**

1 A  No.
2 Q  And they didn't bank with South Trust?
3 A  No.
4 Q  The check stubs that you provided Bob Smith, were those
5    for Harbin's or Harbins-Stern Brothers or both?
6 A  I think they were a combination of both.
7 Q  Is there any way to tell which are from which business?
8 A  Yes.  There's some unused checks still in the register
9    -- or still in the book, the checkbook.  So the name on
10    it would denote --
11 Q  But if it's just the stub, how do you know?
12 A  I don't.
13 Q  Okay.  So as I'm going through those books and looking
14    through those records, if I see stubs -- a stub, it
15    could be from Harbin's or it could be from Harbins-
16    Stern Brothers?
17 A  That's correct.
18 Q  And there's no way of knowing unless there's still a
19    copy of the check in there?
20 A  That's correct.
21 Q  Were the books, the way that you gave them to Bob, is
22    that how they were as the business was running?
23 A  Explain that.
24 Q  Sorry.  You gave Bob three large books of stubs.  As
25    those stubs came in, they were just put together

**Page 49**

1    regardless of whether they were from Harbin's or
2    Harbins-Stern Brothers?
3 A  What I gave to Bob was a checkbook, the check that was
4    written out, who it was for and the stub, and that's
5    what he has.
6 Q  I'm going to ask you questions about -- well, first let
7    me ask you about an asset sale.  Did you have an asset
8    sale of all the assets of Harbin's at any point?
9 A  Yes.
10 Q  When did you decide to have that sale?
11 A  Seven weeks prior to April 30th.  No, I take that back.
12    Months before that.  I don't know the exact date.
13 Q  Prior to April 30th what year?
14 A  2004.
15 Q  Why did you decide to have an asset sale?
16 A  To pay back our vendors, and Harbin's, Inc., book of
17    business had been sold to another company.
18 Q  What company did you sell it to?
19 A  Myofficeproducts.com.
20 Q  Who owns that?
21 A  It's a corporation out of Tennessee.
22 Q  And they just purchased your book of business?  They
23    didn't actually purchase Harbin's?
24 A  Correct.  They purchased no assets other than future
25    revenue.

**Page 50**

1 Q  Weren't you already in some financial struggles at that
2    point with Harbin's?
3 A  At what point?
4 Q  Well, you had said months -- several months prior to
5    April 30, 2004, and you had mentioned before that you
6    were having some economic struggles in that period; is
7    that correct?
8 A  I believe so.
9 Q  And so even though your business was suffering, --
10 A  Um-hmm.
11 Q  -- they purchased it for future revenue?
12 A  They did.
13 Q  And they only purchased your book of business?
14 A  They purchased future revenue.  Whether it was a
15    million dollars in revenue or a dollar, that's what
16    they purchased.
17 Q  How do you purchase that?  Sorry to sound naive.
18 A  That's a good question.  How do you purchase the
19    unknown?
20 Q  Well, I mean, what did they actually buy?  What did you
21    hand over to them?
22 A  Nothing.
23 Q  So they -- sorry.  I'm struggling to understand.  They
24    paid you and you gave them -- I mean I understand
25    future revenue --

DEFENDANT'S
EXHIBIT
4

# EXHIBIT 5

**Page 123**

1 Q Did it happen more than once?

2 A A couple of times it did. Exactly when, normally

3     through the course of my divorce, as you know, and the

4     information Hope has supplied you all. When I was not

5     making the income to satisfy -- excuse me. Strike

6     that. When I was not able to provide in the way that

7     some think I should when the business was struggling

8     after the events of 9-11, as I attested to earlier, so,

9     yes. But do these amounts -- were they significant?

10     No. Is there an amount that the corporation still owes

11     me? Yes. Will I receive it? No. So --

12 Q You said that Harbin's rented space on Perry Street?

13 A I did not.

14 Q Because it owned that 1 percent of M&M Properties?

15 A Harbin's was a member of M&M Properties, LLC, and they

16     were a 1-percent member.

17 Q Okay.

18 A Harbin's never did pay rent above the mortgage and the

19     interest payment to the bank.

20 Q Oh. So Harbin's paid the mortgage payment?

21 A Right.

22 Q Okay. And that was sort of an informal rental

23     situation so that Harbin's could occupy that building?

24 A Yeah. The building was held by the corporation. We

25     pulled it out of the corporation and put it in this

**Page 124**

1     LLC, but we never did formally juice up the rent to

2     what other owners were doing, what my former business

3     partner was doing. We never tacked on the extra

4     thousand dollars in rent.

5          We just strictly paid the mortgage and the

6     interest, and then the K-1's flew through myself and my

7     sister each year and we unfortunately had to pay the

8     tax on that K-1, but we never even, quote, bonused that

9     money out to cover the tax, even though we were told to

10     do so by our accountants.

11          But we just -- I tried very hard to keep as

12     much cash and capital in the corporation, because this

13     was a small company, as much as I could.

14 Q Did M&M Properties -- I apologize if you've already

15     answered this -- did they own any other properties?

16 A No.

17 Q So they just owned Harbin's space on South Perry

18     Street?

19 A That's correct. And South Perry was an entire city

20     block. They owned that one parcel of property and

21     that's it, which the bank has subsequently foreclosed

22     on.

23 Q So there was no formal rental agreement between M&M

24     Properties and Harbin's?

25 A There might have been when it was first created, but

**Page 125**

1     there -- like an annual renewal that we pulled out or a

2     five-year lease or anything like that?

3 Q We are getting close to the end. I'm sure everybody's

4     bellies are rumbling. Do you remember when Harbin's,

5     Incorporated -- and I know we have talked about this,

6     but I just want to get it --

7 A Okay.

8 Q -- firm so that I can --

9 A I understand.

10 Q -- understand fully. I'm trying to understand when

11     Harbin's, Incorporated, stopped paying their debts to

12     Steelcase particularly. Do you remember when that was?

13 A I think it was right after Steelcase -- well, no. My

14     understanding was just flat refused to send that stupid

15     $200 keyboard tray that held up a $12,000 check payment

16     from the insurance company that I was going to

17     overnight to Marvis to keep the flow of business in.

18     2002, I think.

19 Q 2002?

20 A They would have records of that, their last open P.O.

21     date or ship order date when I was on super credit,

22     double secret management control with Marvis and

23     everybody else.

24 Q Right.

25 A Which was unfortunate, but, you know, that happened.

**Page 126**

1 Q And do you think in 2002 that the assets of Harbin's,

2     Incorporated, were greater than their liabilities and

3     debts?

4 A Again, I'd have to look at a balance sheet. I was

5     going through that divorce and I think if he hadn't

6     spoken to my ex-wife, I know other people have, and

7     trying to run that business, trying to maintain a

8     relationship with my children, and fighting an economy

9     that was in the tank for this industry was very

10     difficult.

11          So if I could tell you off the top of my

12     head, you know, I think you could tell by my testimony

13     today, I certainly would. I would have to look and

14     see. I don't have those records. I walked out of that

15     building on April 30th with bad memories and nightmares

16     and I didn't look back, and so if there's -- if you

17     have a record somewhere that I can look at, I'll be

18     happy to and then I can tell you yes, they exceeded, or

19     no, they did not. But I don't know off the top of my

20     head.

21 Q Are your records generally -- such records as this

22     (pointing to Exhibit 9), would that accurately reflect

23     -- that's a 2002 record. Would that accurately reflect

24     your assets and liabilities during 2002? I'm sorry.

25     When I said "that," that was Exhibit 9.

DEFENDANT'S
EXHIBIT
5

# EXHIBIT 6

（

这

## GUARANTY

1.   In consideration of any credit heretofore or
hereafter extended to HARBIN'S, INCORPORATED,
an Alabama corporation, whose address is 300 S. Perry Street ,
Montogomery, Alabama 36104 ("Debtor"), by STEELCASE INC., a
Michigan corporation, whose address is 901 - 44th Street S.E.,
Grand Rapids, Michigan 49508, or any Steelcase subsidiary now
existing or hereafter acquired or formed by Steelcase, including,
but not limited to, those listed on the attached Exhibit A
(hereinafter collectively referred to as "Creditor"), the under-
signed hereby absolutely and unconditionally guarantee(s) prompt
payment when due and at all times thereafter of any and all
existing and future indebtedness and liabilities of every nature
and kind, including all renewals, extensions and modifications
thereof, now or hereafter owing from Debtor to Creditor, however
and whenever created, arising, evidenced or acquired, and all
interest accrued thereon (hereinafter collectively called the
"Indebtedness"), in connection with Debtor's Purchase Order
Number(s) P00000396, P00000405, P00000406, P00000413, P00000422,
and P00000443 to Steelcase, including all renewals, extensions,
and modifications thereof, and the undersigned further agrees to
reimburse Creditor for all costs, attorneys' fees and other
expenses at any time expended or incurred by Creditor in the
collection or attempted collection of the Indebtedness, or in the
enforcement of this Guaranty.

2.   The undersigned warrants and represents to
Creditor that all financial statements and other information
concerning the Debtor or the undersigned or both now or hereafter
furnished to Creditor are and will be true and correct in all
material respects; that the execution, delivery and performance
of this Guaranty by the undersigned will not violate any law,
rule, judgment, order, agreement or instrument binding upon the
undersigned, nor require the approval of any public authority or
other third party; and that this Guaranty constitutes the valid
and binding obligation of the undersigned, enforceable in accord-
ance with the terms hereof.

3.   The undersigned waives notice of the acceptance of
this Guaranty and of all extensions of credit hereunder. The
undersigned further waives presentment, protest, notice, demand
or action of any nature on any delinquency with respect to the
Indebtedness, including the right to require Creditor to sue or
otherwise to enforce payment thereof or to enforce any other
security or other guaranty given therefor, unless creditor fails
to perform in delivery of product and transfer of title.
Delivery of goods to common carrier constitutes delivery to
Debtor.  The undersigned waives any and all claims and rights
(whether arising in equity, at common law, or under a statute or
contract) that arise from or relate to the undersigned's
execution, delivery or performance of this Guaranty. This wiaver

EXHIBIT B            1 of 5                    6/93



DEFENDANT'S
EXHIBIT
6

includes, but is not limited to, any right of reimbursement, subrogation, contribution, indemnity and exeneration, and any right to participate in any claim or remedy that Creditor at any time has against the Debtor or with respect to any security for the Indebtedness.

4. This Guaranty is made and shall continue as to any and all Indebtedness incurred or arising prior to receipt by Creditor of written notice of the termination hereof from the undersigned, including any and all extensions, renewals and modifications thereof made at any time thereafter. Any such notice shall be effective only as to the person giving the same, and this Guaranty shall continue in full force and effect as to any of the undersigned not giving such notice.

5. The liability of the undersigned hereunder is joint and several. The liability of the undersigned hereunder is independent of, and may be exercised regardless of, the existence of any other security or guaranty at any time in effect with respect to all or any part of the Indebtedness and regardless of any failure of Creditor to perfect or secure any priority of its rights with respect to any security at any time given, or agreed to be given, by Debtor or by the undersigned or any other guarantor or third party, for the Indebtedness or for the obligations of the undersigned hereunder.

6. Creditor is authorized from time to time, and without notice to the undersigned, to give and make such extensions, renewals, modifications, indulgences, settlements, and compromises as it may choose with respect to the Indebtedness, including the taking, releasing, surrender, exchange, settlement, compromise, waiver, subordination or modification of any security or guaranty, with or without consideration, on such terms or conditions as may be acceptable to Creditor, without in any manner affecting or impairing the liability of the undersigned hereunder. Creditor is authorized to release or modify the obligations of or surrender any security given by or waive any rights against any of the undersigned, without in any manner affecting or impairing the liability of the other undersigned.

7. Failure of Creditor to insist in any one or more instances upon strict performance of any one or more of the provisions of this Guaranty or to exercise any rights hereunder shall not be construed as a waiver of any such provision or provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.

8. This Guaranty embodies the entire agreement between the undersigned and Creditor with respect to the subject matter hereof. There are no promises, terms, conditions or obligations other than those contained herein. This Guaranty may not be modified except by writing signed by the party to be charged.

9.   This Guaranty shall be construed according to the laws of the State of Michigan, in which state it shall be performed by the undersigned.  The undersigned agrees that any action against the undersigned for the enforcement of this Guaranty may be brought by Creditor in any municipal, state or federal court in Kent County, Michigan, having jurisdiction of the subject matter, and the undersigned consents that any such court shall have personal jurisdiction over the undersigned with respect to any such action.

10.  This Guaranty shall be binding upon the undersigned, ~~executors~~, administrators, legal representatives, successors and assigns, and each of them respectively, and shall inure to the benefit of Creditor, its successors and assigns.

11.  The undersigned represents and warrants that they have entered into no other guaranties whatsoever, except as specifically set forth below:

| Date of Guaranty | Terms of Guaranty | Party Guaranteed | Amount of Guaranty | Guarantor(s) |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

The undersigned agrees that they will not enter into any other guaranties without the written consent of Creditor.

12.  If any payment by (i) the Debtor or (ii) any of the undersigned to Creditor (a "Payment") is held to constitute a "preference" or the like under the Bankruptcy laws, or if for any other reason Creditor is required to refund any Payment or pay the amount thereof to any other party, such Payment shall not release any of the undersigned from any liability hereunder. Instead, the undersigned shall remain fully liable to Creditor for the amount of the Payment and shall pay the amount of any such Payment to Creditor upon demand.  This Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such Payment, Payments, preference or disgorgement.

13.  The Guarantor shall not be deemed a "creditor" of the Debtor with respect to the Indebtedness as said term "creditor" is defined in the U.S. Bankruptcy Code, as amended.

14. Whenever in this Guaranty words, including pro-
nouns, are used in the masculine, they shall be read in the
feminine or neuter whenever such a gender would apply, and vice
versa, and words in this Guaranty that are singular shall be read
as plural whenever the latter would so apply and vice versa. The
word "undersigned" when used herein shall include each and every
person executing this Guaranty, whether such persons are corpora-
tions, partnerships, natural persons or any other person of
recognized legal capacity.

15. THE UNDERSIGNED ACKNOWLEDGES HAVING READ ALL OF
THE PROVISIONS OF THIS GUARANTY.

Dated: 6-10 , 19 93

Witnesses:

_____          _____
                                  Michael G. Harbin

_____          _____
                                  Hope D. Harbin

as/W6/MJ060201

4 of 5                                      6/93

EXHIBIT A

Steelcase Financial Services Inc.
901 - 44th Street S.E.
Grand Rapids, Michigan 49508

Stow Davis Furniture Incorporated
67742 County Road 23
New Paris, Indiana  46553

Stow Davis Architectural Woodwork Incorporated
850 Elkton Drive
Colorado Springs, Colorado  80907

# EXHIBIT 7

## GUARANTY

1.  In consideration of any credit heretofore or hereafter extended to HARBIN'S, INCORPORATED, an Alabama corporation, whose address is 300 S. Perry Street , Montogomery, Alabama 36104 ("Debtor"), by STEELCASE INC., a Michigan corporation, whose address is 901 - 44th Street S.E., Grand Rapids, Michigan 49508, or any Steelcase subsidiary now existing or hereafter acquired or formed by Steelcase, including, but not limited to, those listed on the attached Exhibit A (hereinafter collectively referred to as "Creditor"), the undersigned hereby absolutely and unconditionally guarantee(s) prompt payment when due and at all times thereafter of any and all existing and future indebtedness and liabilities of every nature and kind, including all renewals, extensions and modifications thereof, now or hereafter owing from Debtor to Creditor, however and whenever created, arising, evidenced or acquired, and all interest accrued thereon (hereinafter collectively called the "Indebtedness"), in connection with Debtor's Purchase Order Number(s) P00000568, P00000521-B, P00000532, P00000557, and P00000558 to Steelcase, including all renewals, extensions, and modifications thereof, and the undersigned further agrees to reimburse Creditor for all costs, attorneys' fees and other expenses at any time expended or incurred by Creditor in the collection or attempted collection of the Indebtedness, or in the enforcement of this Guaranty.

2.  The undersigned warrants and represents to Creditor that all financial statements and other information concerning the Debtor or the undersigned or both now or hereafter furnished to Creditor are and will be true and correct in all material respects; that the execution, delivery and performance of this Guaranty by the undersigned will not violate any law, rule, judgment, order, agreement or instrument binding upon the undersigned, nor require the approval of any public authority or other third party; and that this Guaranty constitutes the valid and binding obligation of the undersigned, enforceable in accordance with the terms hereof.

3.  The undersigned waives notice of the acceptance of this Guaranty and of all extensions of credit hereunder. The undersigned further waives presentment, protest, notice, demand or action of any nature on any delinquency with respect to the Indebtedness, including the right to require Creditor to sue or otherwise to enforce payment thereof or to enforce any other security or other guaranty given therefor, unless creditor fails to perform in delivery of product and transfer of title. Delivery of goods to common carrier constitutes delivery to Debtor. The undersigned waives any and all claims and rights (whether arising in equity, at common law, or under a statute or contract) that arise from or relate to the undersigned's execution, delivery or performance of this Guaranty. This wiaver

**EXHIBIT C**          1 of 5                    6/93

DEFENDANT'S EXHIBIT 7

PENGAD-Bayonne, N.J.

includes, but is not limited to, any right of reimbursement, subrogation, contribution, indemnity and exeneration, and any right to participate in any claim or remedy that Creditor at any time has against the Debtor or with respect to any security for the Indebtedness.

4.    This Guaranty is made and shall continue as to any and all Indebtedness incurred or arising prior to receipt by Creditor of written notice of the termination hereof from the undersigned, including any and all extensions, renewals and modifications thereof made at any time thereafter. Any such notice shall be effective only as to the person giving the same, and this Guaranty shall continue in full force and effect as to any of the undersigned not giving such notice.

5.    The liability of the undersigned hereunder is joint and several. The liability of the undersigned hereunder is independent of, and may be exercised regardless of, the existence of any other security or guaranty at any time in effect with respect to all or any part of the Indebtedness and regardless of any failure of Creditor to perfect or secure any priority of its rights with respect to any security at any time given, or agreed to be given, by Debtor or by the undersigned or any other guarantor or third party, for the Indebtedness or for the obligations of the undersigned hereunder.

6.    Creditor is authorized from time to time, and without notice to the undersigned, to give and make such extensions, renewals, modifications, indulgences, settlements, and compromises as it may choose with respect to the Indebtedness, including the taking, releasing, surrender, exchange, settlement, compromise, waiver, subordination or modification of any security or guaranty, with or without consideration, on such terms or conditions as may be acceptable to Creditor, without in any manner affecting or impairing the liability of the undersigned hereunder. Creditor is authorized to release or modify the obligations of or surrender any security given by or waive any rights against any of the undersigned, without in any manner affecting or impairing the liability of the other undersigned.

7.    Failure of Creditor to insist in any one or more instances upon strict performance of any one or more of the provisions of this Guaranty or to exercise any rights hereunder shall not be construed as a waiver of any such provision or provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.

8.    This Guaranty embodies the entire agreement between the undersigned and Creditor with respect to the subject matter hereof. There are no promises, terms, conditions or obligations other than those contained herein. This Guaranty may not be modified except by writing signed by the party to be charged.

6/93

9.   This Guaranty shall be construed according to the laws of the State of Michigan, in which state it shall be performed by the undersigned.   The undersigned agrees that any action against the undersigned for the enforcement of this Guaranty may be brought by Creditor in any municipal, state or federal court in Kent County, Michigan, having jurisdiction of the subject matter, and the undersigned consents that any such court shall have personal jurisdiction over the undersigned with respect to any such action.

10.   This Guaranty shall be binding upon the undersigned, administrators, legal representatives, successors and assigns, and each of them respectively, and shall inure to the benefit of Creditor, its successors and assigns.

11.   The undersigned represents and warrants that they have entered into no other guaranties whatsoever, except as specifically set forth below:

| Date of Guaranty | Terms of Guaranty | Party Guaranteed | Amount of Guaranty | Guarantor(s) |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

The undersigned agrees that they will not enter into any other guaranties without the written consent of Creditor.

12.   If any payment by (i) the Debtor or (ii) any of the undersigned to Creditor (a "Payment") is held to constitute a "preference" or the like under the Bankruptcy laws, or if for any other reason Creditor is required to refund any Payment or pay the amount thereof to any other party, such Payment shall not release any of the undersigned from any liability hereunder. Instead, the undersigned shall remain fully liable to Creditor for the amount of the Payment and shall pay the amount of any such Payment to Creditor upon demand.   This Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of any such Payment, Payments, preference or disgorgement.

13.   The Guarantor shall not be deemed a "creditor" of the Debtor with respect to the Indebtedness as said term "creditor" is defined in the U.S. Bankruptcy Code, as amended.

6/93

14. Whenever in this Guaranty words, including pro-
nouns, are used in the masculine, they shall be read in the
feminine or neuter whenever such a gender would apply, and vice
versa, and words in this Guaranty that are singular shall be read
as plural whenever the latter would so apply and vice versa. The
word "undersigned" when used herein shall include each and every
person executing this Guaranty, whether such persons are corpora-
tions, partnerships, natural persons or any other person of
recognized legal capacity.

15. THE UNDERSIGNED ACKNOWLEDGES HAVING READ ALL OF
THE PROVISIONS OF THIS GUARANTY.

Dated: _8 - 4_____, 19_93_

Witnesses:

_____          _____
                                                       Michael G. Harbin

_____          _____
                                                       Hope D. Harbin

as/W6/MJ072901

EXHIBIT A

Steelcase Financial Services Inc.
901 - 44th Street S.E.
Grand Rapids, Michigan 49508

Stow Davis Furniture Incorporated
67742 County Road 23
New Paris, Indiana  46553

Stow Davis Architectural Woodwork Incorporated
850 Elkton Drive
Colorado Springs, Colorado  80907

6/93

# EXHIBIT 8

**Page 43**

```
 1   continue in full force and effect as to any of the
 2   undersigned not giving such notice."
 3 Q Have you ever provided written notice to terminate the
 4   guaranty?
 5 A Yes.
 6 Q Do you have any documentation of that?
 7 A Eleven, twelve years later?  No, I do not.
 8 Q When was that written termination sent?
 9 A After these P.O.'s were paid by -- to Steelcase.
10 Q Do you remember who you sent it to?
11 A I believe it was Marvis.
12 Q Did anybody else know about the correspondence?
13 A My secretary who typed it did.
14 Q Who was that?
15 A I can't remember her name.  The receptionist.  It might
16   have been Lynn Summer.
17 Q Because she's the one who you mentioned --
18 A Witnessed it.
19 Q -- witnessed it, and she was your secretary at that
20   time?
21 A Yes.
22 Q On the second one, this 8-4-93, that has a different
23   name as a witness.
24 A Yes.
25 Q Who's that person?
```

**Page 44**

```
 1 A He was with the installation company that was
 2   installing the furniture that these specific P.O.'s or
 3   this guaranty relate to.
 4 Q You think that Lynn Summer was your secretary at the
 5   time that you signed this guaranty?
 6 A I believe she was, but I can't be -- I'm not a hundred
 7   percent sure.
 8 Q Did you send written termination of this guaranty?
 9 A I did.
10 Q And who would have known about that?
11 A Myself because I signed the letter, and then if Lynn
12   was the receptionist/secretary at the time, which I
13   believe she was, she would have typed it for me.
14 Q Have you ever talked to anybody about sending written
15   termination?
16 A Explain.
17 Q Did you talk to Hope about sending written termination?
18 A I might have.  I don't recall.
19 Q Did you talk to Marvis James on the telephone about it
20   prior to sending it?
21 A I believe I might have spoken to Marvis and told him
22   that it was coming, or, you know, I mailed in with the
23   last check for the last P.O.  But again, you're talking
24   so many years ago.
25 Q And you don't have any records of that?
```

**Page 45**

```
 1 A Of that letter?  No, I do not.
 2 Q Do you know if Hope ever sent a termination letter?
 3 A No, not that I'm aware of.
 4 Q On either guaranty?
 5 A Not that I'm aware of.
 6 Q This is your answer to our complaint.
 7        (At 10:28 a.m., Exhibit 3 marked.)
 8 BY MS. LACHMAN:
 9 Q Pretty far down, I think it might even be the last page
10   or the second to last, you state your affirmative
11   defenses.  I think we talked about this before, but
12   just to make sure we have it on the record, do you have
13   any evidence to support any of these affirmative
14   defenses?
15 A If I'm not mistaken, I believe Bob showed me where
16   Steelcase admitted that they had been paid on these
17   P.O.'s is one of you all's answers.  Am I looking at
18   Page 7?  Is that what we're talking about?
19 Q Yes.
20 A And the rest is -- I'd have to defer to my counsel to
21   answer those -- your question on that.
22 Q Did you give personal guaranties to other distributors?
23 A No.
24 Q Banks?
25 A One.
```

**Page 46**

```
 1        MS. LACHMAN:  Anybody need a break?
 2        THE WITNESS:  We can take one if you want.
 3        MS. LACHMAN:  Yeah, let's do it.  We're going
 4   to change gears, --
 5        THE WITNESS:  Okay.
 6        MS. LACHMAN:  -- so maybe this is a good
 7   place to stop.  So we'll just be off the record.
 8        THE WITNESS:  Okay.
 9        (From 10:30 a.m. to 10:36 a.m., deposition in
10   recess.)
11 BY MS. LACHMAN:
12 Q I'm going to shift topics here.  You are aware that
13   Steelcase has a judgment against Harbin's, Inc.?
14 A I'm aware that they have applied for a default
15   judgment, but I don't know if I've found out whether it
16   was issued.
17 Q And the amount of the judgment is $385,275.79 with
18   interest accruing after November 23, 2004?
19 A (witness shrugs)
20 Q Well --
21        MR. SMITH:  You have to give a verbal
22   response.
23 BY MS. LACHMAN:
24 Q Well, regarding that I'd like to talk to you a little
25   bit about corporate assets, where they've gone.
```

DEFENDANT'S EXHIBIT 8  PENGAD-Bayonne, N.J.

**Page 151**

1 Q Harbin's, Inc.; is that right?
2 A That's correct.
3 Q It was their income?
4 A Correct.
5 Q Now, at some point in time you, I think -- and I can't
6 remember the exact date, but it may have been 2003 --
7 you made a personal -- several personal loans to the
8 corporation and paid yourself back; right?
9 A I don't think I was ever paid back a hundred percent,
10 but, yes, I did make --
11 Q Okay.
12 A -- many loans to the corporation.
13 Q And were those loans that you made for the purpose of
14 keeping the business open and paying your business's
15 debts?
16 A That's correct.
17 Q So when money did come in, you paid yourself back?
18 A I tried to.
19 Q So it was like a line of credit you would have gotten
20 from a bank, except you were the bank?
21 A I was the bank.
22 Q These profit-sharing -- or what you thought might have
23 been stubs from payment to a profit-sharing account,
24 and that showed a payment to FFBO Stern Brothers, --
25 A (coughing) Excuse me.

**Page 152**

1 Q I'm sorry. -- FFBO Harbins-Stern Brothers, did that
2 profit-sharing -- was that an actual profit-sharing
3 account or was that a 401(k) contribution?
4 A That would have been the monies that was withheld from
5 the employees.
6 Q 401(k)?
7 A 401(k). Their portion of the contribution. In the
8 last three years, we never made a matching
9 contribution.
10 Q Did you change the name on the 401(k) account?
11 A We did.
12 Q At what point in time did you change it back to
13 Harbin's, Inc.? Do you know?
14 A I don't.
15 Q But it could be that that -- those checks that might
16 have gone to a profit -- or a 401(k) account, you
17 simply retained the name profit -- or Harbins-Stern
18 Brothers?
19 A (witness nods)
20 Q Is that a yes?
21 A That's correct. Yes.
22 Q Now, you testified that you don't have any evidence to
23 support affirmative defenses. You do understand that
24 testimony is evidence; correct?
25 A Correct.

**Page 153**

1 Q And you've already testified that you sent out a
2 termination letter to Steelcase that you believed that
3 those P.O.'s were all paid up; is that right?
4 A That's correct. I know I sent that letter. (coughing)
5 Excuse me.
6 Q I show you what's been marked as Exhibit Number 1. Was
7 it your understanding that the debt that you were
8 guarantying them was limited to --
9 A (coughing)
10 MR. SMITH: Want to take a break?
11 THE WITNESS: Just let her get me some water.
12 BY MR. SMITH:
13 Q -- was limited to certain purchase orders?
14 A Yes. It was emphatically explained to me numerous
15 times that this was limited -- this guaranty was
16 limited strictly to these P.O.'s, and they even went so
17 far as to tell me that the language that -- a specific
18 override to the general language. They had been --
19 "general language" meaning paragraph number 4.
20 But having worked at a commercial bank, I
21 knew to send them a termination letter and I did. And
22 it clearly states that this purchase -- or this
23 guaranty is limited to these purchase orders.
24 Q And when you say "these purchase orders," referring to
25 Exhibit Number 1, are you referring to the purchase

**Page 154**

1 order numbers in the first paragraph?
2 A I am.
3 Q And did those -- each of those purchase orders have a
4 particular amount of money associated with them?
5 A They did.
6 Q And they were identified to a particular order that you
7 made from Steelcase?
8 A Excuse me. They are -- or were.
9 Q When I say "you," I mean Harbin's, Inc.
10 A Harbin's, Inc. Correct.
11 Q And so those purchase orders -- and this was dated
12 1993; correct?
13 A That's correct.
14 Q And were all of those purchase orders in Exhibit Number
15 1 paid by Harbin's, Inc.?
16 A They were.
17 Q And you never heard Steelcase -- Steelcase never
18 complained to you that these purchase orders haven't
19 been paid in full, did they?
20 A Never.
21 Q I'll show you again Exhibit Number 1 and refer you to
22 paragraph number 4. The word "indebtedness" in the
23 second line is with a capital "I". What indebtedness
24 did you understand that to refer to?
25 A Just those specific purchase orders.

# EXHIBIT 9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEELCASE, INC. a Michigan
corporation,

        Plaintiff,                    Case No.: 1:04cv0026
                                             Hon. Robert Holmes Bell
v                                        Chief, U. S. District Judge

HARBIN'S INC., an Alabama
corporation, MICHAEL G. HARBIN
and HOPE D. HARBIN PATTERSON (now
HOPE DUNCAN PATTERSON),

        Defendants.

---

| MILLER, JOHNSON, SNELL & CUMMISKEY, P. L. C. | SILVERMAN, SMITH, BINGEN & RICE, P.C. |
|---|---|
| Jon G. March  (P17065) | Robert W. Smith (P31192) |
| Attorneys for Plaintiff | Attorneys for Defendant Michael G. Harbin |
| 250 Monroe Avenue, N. W. - Ste 800 | 151 S. Rose Street |
| P. O. Box 306 | 707 Comerica Building |
| Grand Rapids, MI 49501-0306 | Kalamazoo, MI 49007 |
| (616) 831-1700 | (269) 381-2090 |

HOPE D. HARBIN - PATTERSON (now
HOPE DUNCAN PATTERSON)
Defendant in Pro Per
4514 Chamblee Dunwoody Rd., 238
Atlanta, GA 30338-6202

---

**AFFIDAVIT OF MICHAEL G. HARBIN, JR. IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT,
OR ALTERNATIVELY, TRANSFER OF VENUE**

       Defendant Michael G. Harbin, Jr. deposes and says as follows:

1.      I have been the President of Harbin's, Inc., an Alabama corporation, since March

1990, and I have been its Chief Executive Officer from March 1990 until April 2004. I am

a Defendant in the above captioned matter.



DEFENDANT'S
EXHIBIT
9

2. If called upon to testify I can testify truthfully and accurately as to all those matters contained herein.

3. In March of 1990, I acquired controlling interest in Harbin's, Inc., an Alabama corporation engaged in business as Harbin's Office Supply & Furniture.

4. Harbin's, Inc. had been a Steelcase dealer since long before I acquired controlling interest in Harbin's, Inc.

5. When I obtained controlling interest in Harbin's, Inc., employees of Plaintiff Steelcase, Inc. ("Steelcase") asked me to sign a continuing personal guaranty of the Harbin's, Inc. account. I refused to do so.

6. In spite of my refusal to sign a continuing personal guaranty in 1990, Steelcase continued doing business with Harbin's, Inc. after I acquired controlling interest in it.

7. In 1993, Harbin's, Inc. placed a large order with Steelcase for materials ordered by ALFA Insurance Company. At that time, Steelcase renewed its request for me to sign a continuing personal guaranty. I again refused. Steelcase then advised me that it would not ship the large order without a personal guaranty. I advised Steelcase that ALFA was looking at other manufacturers anyway and that I would place ALFA's business elsewhere. Shortly thereafter, the Steelcase credit manager called me back to ask if I would sign a personal guaranty **limited to the ALFA project only.** I agreed and the Guaranty attached to Steelcase's Complaint in this matter as Exhibit B, as prepared by Steelcase, was signed after several changes were made to it. My ex-wife signed it as well.

8. When I subsequently placed a second large order on behalf of Harbin's, Inc. for ALFA Insurance Company, Steelcase asked me to sign another personal guaranty limited to the second large order. I agreed. Steelcase prepared the Guaranty which is attached

Steelcase, Inc. v Harbin, et. al.
Affidavit of Michael G. Harbin in Support of Motion for
Summary Judgment, or Alternatively, Change of Venue      Page 2      Case No.: 1:04cv0026

to its Complaint and marked as Exhibit C. I signed that as well as my ex-wife. That guaranty was **limited to the second ALFA project only.**

9.      Upon completion of both ALFA projects, Harbin's Inc. paid in full all of the invoices corresponding to the purchase orders identified in the two limited guaranty agreements and I confirmed, in a separate letter to Steelcase, that the two limited guaranty agreements were terminated. I did that only to clarify that the purchase orders referenced in these two guaranties had been paid in full.

10.     In June of 1999, Harbin's, Inc., in conjunction with Stern Brothers, Inc. formed a new entity known as Harbin's-Stern Brothers, LLC. Stern Brothers was in the used office furniture sales and furniture repair business. Harbin's, Inc. owned 51% of the membership interest of the new LLC. Stern Brothers, Inc. owned the other 49%. From approximately July of 1999 through May 31, 2002, Harbin's, Inc. only conducted business as a member of Harbin's-Stern Brothers, LLC. May 31, 2002 is the last day that Harbin's-Stern Brothers, LLC did business.

11.     On June 1, 2002, Harbin's, Inc. began to conduct business on its own just as it had before the formation of Harbin's-Stern Brothers, LLC.

12.     Harbin's, Inc. did not keep a separate bank account, after the formation of Harbin's-Stern Brothers, LLC. Accordingly, income attributable to Harbin's, Inc. received after Harbin's-Stern Brothers, LLC began to conduct business, was deposited into my personal checking account as the sole shareholder of Harbin's, Inc. Income was accounted for as income of Harbin's, Inc. in the federal and state tax returns of Harbin's, Inc.

Steelcase, Inc. v Harbin, et. al.
Affidavit of Michael G. Harbin in Support of Motion for
Summary Judgment, or Alternatively, Change of Venue                    Page 3                              Case No.: 1:04cv0026

13.     With regard to the allegations in the Complaint that I intermingled personal assets with corporate assets, <u>in all such instances it was done for the benefit of the corporation,</u> not me personally.  Those instances were as follows:

a.     Harbin's, Inc. issued a non-sufficient funds check to one of its vendors, SP Richards.  That vendor then insisted on a certified check payment upon delivery.  The Harbin's, Inc. corporate account charged a $10 processing fee for each certified check.  Harbin's, Inc. had a delivery from SP Richards almost every day.  My personal bank account had free certified checking privileges.  In order to save the $10 processing fee I would have Harbin's, Inc. write me a check for the amount of the delivery from SP Richards, I would go to my personal bank and deposit that check into my personal account. I would then have a certified check issued on my personal account for the same amount made payable to SP Richards.  I would then exchange that certified check for the goods delivered.  I did this for a period of about two weeks in September of 2003.  Finally I told SP Richards if it was going to continue to insist upon certified funds, Harbin's, Inc. would take its business elsewhere.  SP Richards then relented.

b.     In 2001, I used my personal account to temporarily place Harbin's-Stern Brothers, LLC money that was earmarked for a large payment to Steelcase. I was concerned that if it was left in the Harbin's, Inc. general account, it might be spent for something else and I wanted it used to pay Steelcase in full for a large order.  Steelcase was paid in full for that order out of my personal checking account from those same earmarked funds.

c.     There were a number of instances when Harbin's, Inc. did not have sufficient funds in its payroll account to pay all the employees and myself.  On those occasions, I told the payroll company that we used, Paymaxx, not to issue me a paycheck.  On those occasions, I was paid later when the corporation had money to pay me.

d.     During the last two years that Harbin's, Inc. was in operation, I used my own personal funds to make loans to Harbin's, Inc.  When Harbin's, Inc. had the money available to pay those loans back, some of it was paid back.  I do not believe I was ever paid in full for all of the personal loans I made to Harbin's, Inc.

14.     My total income from Harbin's, Inc. in 2004 (January 1st to April 40th) was $4,286.35 (Exhibit A to this Affidavit).

Steelcase, Inc. v Harbin, et. al.
Affidavit of Michael G. Harbin in Support of Motion for
Summary Judgment, or Alternatively, Change of Venue                    Page 4                                    Case No.: 1:04cv0028

15.    My total income from Harbin's. Inc. in 2003 was $55,748.00 (Exhibit B to this Affidavit).

16.    As a result of the allegations in the Second Amended Complaint now alleging that the corporate veil of Harbin's. Inc. should be pierced and that I should be personally liable, I will need to call some, or all, of the following witnesses to testify in defense of the allegations in the Second Amended Complaint regarding the piercing of the corporate veil claim:

    a.    Janie Gililand:    She is the attorney that I consulted during the last approximately six months that Harbin's. Inc. was going out of business. She has knowledge of the corporation's business and financial operations and the maintenance of the corporate form by Harbin's, Inc. She is located in Montgomery, Alabama.

    b.    Tommy Sisson: He is the CPA that Harbin's. Inc. used to prepare corporate tax returns. He also prepared my personal tax returns. He has knowledge of financial and accounting aspects of Harbin's. Inc. He is located in Birmingham, Alabama.

    c.    Charlotte Thorpe: She was the bookkeeper for Harbin's. Inc. She has intimate knowledge of the accounting and financial operations of Harbin's. Inc. She is located in Montgomery, Alabama.

    d.    Gloria Blackwell: She was the previous bookkeeper for Harbin's. Inc. and she also has knowledge of the accounting and financial records and operations of Harbin's. Inc. She is located in Montgomery, Alabama.

    e.    Courtney Harbin: She worked in accounts receivable, acted as my assistant, and also as the assistant bookkeeper. She has knowledge of the accounting and financial operations of Harbin's. Inc. She is located in Santa Rosa Beach, Florida.

    f.    Keeper of the records of Amsouth Bank: I did all of my personal checking at Amsouth Bank in Montgomery, Alabama. My personal banking records would be important evidence in defending the Steelcase claims and I would think those records, and the keeper of the records, are located in Montgomery, Alabama.

    g.    Ray Petty: He works for Southtrust Bank in Montgomery, Alabama. Southtrust Bank had the mortgage on the property where Harbin's. Inc. did

Steelcase, Inc. v Harbin, et. al.
Affidavit of Michael G. Harbin In Support of Motion for
Summary Judgment, or Alternatively, Change of Venue          Page 5          Case No.: 1:04cv0026

business. I negotiated a deed in lieu of foreclosure with Mr. Petty and Southtrust Bank took over that property the day Harbin's closed it doors. He can testify regarding the corporate records of Harbin's. Inc. which were left behind. He also has knowledge of the accounting and financial operations of Harbin's. Inc.

h.    Keeper of the records of Southtrust Bank: I believe the records of Southtrust Bank as they pertain to the deed in lieu of foreclosure are located in Montgomery, Alabama. Moreover, Harbin's. Inc. used Southtrust Bank as its banking institution prior to doing business with Colonial Bank. Some of the records of Southtrust Bank may be pertinent with respect to my defense of the piercing claim.

I.    John Cooper: He is an employee of Colonial Bank of Montgomery Alabama. Colonial Bank had a secured position in all of the assets of Harbin's. Inc. The going out of business sale by Harbin's. Inc. was conducted under the auspices of John Cooper and Colonial Bank. John Cooper is located in Montgomery, Alabama. He has knowledge of the accounting and financial operations of Harbin's. Inc. and the going out of business sale. He also has knowledge of my personal finances and the absence of any claims against me for misusing corporate funds inasmuch as I signed a personal guaranty with Colonial Bank.

j.    Jay Wolfe: He is a minister at First Baptist of Montgomery, Alabama. I negotiated with him regarding the sale of the building in which Harbin's. Inc. was located in an attempt to sell that building directly to the First Baptist Church. We did not negotiate a direct sale, however, the First Baptist Church bought the building from Southtrust Bank. As the purchaser of the building, he would have knowledge of the whereabouts of the corporate records of Harbin's. Inc. that were left behind.

k.    John Frisk: He is an employee of Partners in Business, Inc. I negotiated an agreement with him whereby Partners in Business, Inc. purchased the book of business of Harbin's. Inc. He is located in Orlando, Florida. He would have knowledge regarding the disposition of some of the assets of Harbin's. Inc.

l.    Mark Campbell: He is an employee of ALFA Insurance Company located in Montgomery, Alabama. ALFA was the largest customer of Harbin's. Inc. He can testify regarding various transactions between Harbin's. Inc. and ALFA Insurance Company which may become issues in the piercing claim.

m.    Employees of Paymaxx: Paymaxx was the payroll company used by Harbin's. Inc. It is located in Tennessee, but has a connection with Tommy Sisson, Harbin's. Inc.'s CPA. It may be necessary to call on employees of Paymaxx to testify regarding several of the transactions mentioned above.

Steelcase, Inc. v Harbin, et. al.
Affidavit of Michael G. Harbin in Support of Motion for
Summary Judgment, or Alternatively, Change of Venue    Page 6    Case No.: 1:04cv0026

n.  Sarah Spear: She is the Montgomery County Revenue Commissioner. She can testify regarding the method by which Harbin's. Inc. paid its taxes after it went out of business.

o.  Michael Behrman: He is located in Montgomery, Alabama. He is my former business partner. He will have information regarding the formation and disposition of Harbin's-Stern Brother, LLC and its assets.

p.  Tom Methvin: He is an attorney in Montgomery, Alabama. His law firm was a large customer of Harbin's. Inc. He is also a personal friend and former business partner. He may be used as a witness regarding proper utilization of Harbin's. Inc. as a corporate form.

q.  Nick Parnell: He was the attorney who represented Colonial Bank during the going out of business sale, and the litigation against Harbin's. Inc. and me personally by Colonial Bank that followed. He is located in Montgomery, Alabama. He has knowledge of the accounting and financial operations of Harbin's. Inc., my personal financial affairs, and the disposition of assets of Harbin's. Inc.

17.  I can think of a number of other people associated with Harbin's. Inc. who may be considered as witnesses with respect to the piercing claim, or have information that may be pertinent to defending it. I can think of no one in Michigan who would have such information.

18.  Further your affiant sayeth not.

Dated: April 27, 2005

/s/ _Michael G. Harbin_
Michael G. Harbin, Jr.

STATE OF FLORIDA      )
                      >
WALTON COUNTY         )

SUBSCRIBED and SWORN to before me, a Notary Public, on this 27 day of April, 2005, by Michael G. Harbin.

/s/ _Cherie L McDaniel_
(signature)
_Cherie L McDaniel_
(print/type name)
Acting in Walton County, Florida
My Commission Expires: 11/28/2006

CHERIE L. MCDANIEL
MY COMMISSION EXPIRES
November 28, 2006
#DD 168020
Bonded thru
Notary Public Underwriters
NOTARY PUBLIC, STATE OF FLORIDA

Steelcase, Inc. v Harbin, et. al.
Affidavit of Michael G. Harbin in Support of Motion for
Summary Judgment, or Alternatively, Change of Venue          Page 7          Case No.: 1:04cv0026

# EXHIBIT 10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEELCASE INC., a Michigan
corporation,

        Plaintiff,

v

HARBIN'S INC., an Alabama
corporation, MICHAEL G. HARBIN,
and HOPE D. HARBIN PATTERSON,

        Defendants.

_____/

Case No. 1:04CV0026

Honorable Robert Holmes Bell
Chief, U.S. District Judge

## PLAINTIFF STEELCASE INC.'S RESPONSE TO DEFENDANT MICHAEL G. HARBIN'S REQUEST TO ADMIT FACTS DIRECTED TO PLAINTIFF STEELCASE INC.

Plaintiff, Steelcase Inc., by its attorneys, Miller, Johnson, Snell & Cummiskey, P.L.C., answers Defendant Michael G. Harbin's Request to Admit Facts Directed to Plaintiff Steelcase Inc., filed February 3, 2005 as follows.

### REQUESTS TO ADMIT

1.    Admit that Exhibit B to Plaintiffs Complaint was a personal Guaranty, dated June 6, 1993, by Defendants Michael G. Harbin and Hope D. Harbin-Patterson which was limited solely to those Purchase Orders (P00000405, P00000406, P00000413, P00000422, P00000433) identified therein.

**ANSWER:**    Plaintiff admits that Exhibit B was and is a personal guaranty dated June 6, 1993 by Michael G. Harbin and Hope D. Harbin (now Patterson). Plaintiff denies that the Guaranty was limited solely to the Purchase Orders listed because it is untrue. Paragraph 4 of the Guaranty expressly makes it applicable to all indebtedness incurred or arising prior to



receipt by Steelcase of a written termination. No written termination has ever been received by Steelcase.

    2.    Admit that the Purchase Orders identified in Request to Admit 1 were paid in full prior to the year 2000.

    **ANSWER:**   Admitted.

    3.    Admit that Exhibit C to Plaintiff's Complaint was a personal Guaranty, dated August 4, 1993, by Defendants Michael G. Harbin and Hope D. Harbin-Patterson which was limited solely to those Purchase Orders (P00000568, P00000521 P00000532, P00000557, P00000558) identified therein.

    **ANSWER:**   Plaintiff admits that Exhibit B was and is a personal guaranty dated August 4, 1993 by Michael G. Harbin and Hope D. Harbin (now Patterson). Plaintiff denies that the Guaranty was limited solely to the Purchase Orders listed because it is untrue. Paragraph 4 of the Guaranty expressly makes it applicable to all indebtedness incurred or arising prior to receipt by Steelcase of a written termination. No written termination has ever been received by Steelcase.

    4.    Admit that the Purchase Orders identified in Request to Admit 3 were paid in full prior to the year 2000.

    **ANSWER:**   Admitted.

MILLER, JOHNSON, SNELL & CUMMISKEY, P.L.C
Attorneys for Plaintiff Steelcase Inc.

Dated: February 23, 2005    By _____
    Jon G. March (P17065)
    Sara G. Lachman (P67523)

2

# EXHIBIT 11

Page 35

1    BY MR. SMITH:
2    Q  Paragraph number 12, this language that I've referred to
3       indicates that the indebtedness lasts -- survives for one
4       year; correct?
5    A  It says the guaranty shall survive final payment in full.
6    Q  For one year?
7    A  For a period of one year.
8    Q  With a contingency; right?
9    A  Yes; correct.
10   Q  Paragraph number 4 says it lasts, basically, it continues
11      into infinity without a termination statement; right?
12         MR. MARCH:  Same objection.  You may answer.
13         THE WITNESS:  Paragraph 4 appears to indicate that.
14   BY MR. SMITH:
15   Q  Wouldn't you agree with me that those, read together, this
16      document is ambiguous as to when it's supposed to end?
17   A  I can't render an opinion on that.  As I stated before --
18   Q  I'm not asking for a legal opinion, I'm just asking for a lay
19      opinion.
20   A  I can't say that conclusively.
21   Q  You don't want to answer that question?
22   A  I can't render an assessment of that based upon the fact that
23      you're looking at two different parts of the document, and
24      the document language that surrounds the paragraph, there may
25      be some other language that supports that.  I can't say

Page 36

1       conclusively.
2    Q  Take a look at paragraph number 1.  Read paragraph 1 to
3       yourself.
4    A  Okay.
5    Q  What is the indebtedness, just based on your lay
6       understanding, that Mr. Harbin was guaranteeing when you
7       asked him to sign this agreement?
8          MR. MARCH:  Your question is pertaining to
9       paragraph 1?
10         MR. SMITH:  Yes.
11         THE WITNESS:  My understanding of that is it's
12      saying that the guarantor is guaranteeing the payment
13      for the purchase orders as referenced when due and at
14      all times thereafter of purchase orders.
15   BY MR. SMITH:
16   Q  Just those purchase orders; is that right?
17   A  That's my understanding, yes.
18         (Exhibit 9 marked for identification.)
19   BY MR. SMITH:
20   Q  I show you what's been marked as Deposition Exhibit Number 9
21      and ask you if you can identify that.
22   A  It appears to be the same type of document as Exhibit 8.
23   Q  Compare it to number 8 and take a look and see if you can
24      determine whether Exhibit Number 9 is a fully executed
25      document, as opposed to a non-executed document.

Page 37

1    A  I would agree with that.
2    Q  And based on your understanding of Exhibit Number 9, is this
3       the document that was finally, basically, the same document
4       as Exhibit Number 8 with some changes to it, but this is a
5       document that was finally negotiated with Michael and Hope
6       Harbin; is that right?
7    A  That's correct.
8    Q  And if you look at paragraph number 12, would it be fair to
9       say that the language that Mr. Harbin wanted taken out has
10      been taken out?
11   A  Yes.  I would agree with that.
12   Q  Do you have an independent recollection of whether that was
13      your decision or somebody else's decision?
14   A  I don't recall whose decision it was.
15   Q  Typically, when you're negotiating documents with one of the
16      dealers and the dealer says I want to change this paragraph
17      or that paragraph, is that going to be, typically, your
18      decision, or somebody else's?
19   A  It could be someone else's decision.
20   Q  I'm sorry?
21   A  It could be someone else's decision.
22   Q  Is that your boss, or the Legal Department, or somebody else?
23   A  Generally, it's a combination of my boss and our Legal
24      Department's decision.
25   Q  As I understand it, you don't have any specific recollection

Page 38

1       of having deleted that particular paragraph.  What would be
2       the process under which that would be accomplished?
3    A  Well, you know, I can't recall specifically at that
4       particular time, but in today's environment we would have
5       referred, or sent the document with the changes requested to
6       our Legal Department to review, and would thus receive back
7       their opinion as to what could be changed and what could not
8       be changed.
9    Q  You don't know when that process was put into place, do you?
10   A  I'm not saying that it wasn't in place at that time.  It
11      could have been the process that was used at that time.
12   Q  Would there be an exchange of correspondence between the
13      Legal Department and the Credit Department which would
14      indicate I need some help with this particular document, the
15      dealer wants it changed, and the Legal Department responds in
16      some fashion?
17   A  That's the typical way, is that we would either send a
18      document to the Legal Department, they would mark it
19      accordingly, or send us an e-mail one way or the other to
20      give their assessment of the document, what changes they were
21      recommending.
22   Q  I didn't see anything in the files that Steelcase has
23      provided in this case which indicated any sort of interchange
24      between the Credit Department and the Legal Department.  Do
25      you know why that is?

DEFENDANT'S EXHIBIT 11

PENGAD-Bayonne, N. J.

Moretti & Murphy, Inc.

# EXHIBIT 12

Page 39

1  A  I really don't know why that is.  That's not to say they
2     weren't, but I can't say specifically why you weren't able to
3     have -- why there were not such copies of correspondence.
4  Q  Would you think that that there should have been some documents
5     that would indicate correspondence between yourself and the
6     Legal Department regarding this particular document?
7  A  I would think that there would have been some correspondence.
8  Q  Would that have been, in 1993, in the form of a memorandum or
9     an e-mail?
10 A  It could have been either.
11 Q  Do you have any knowledge as to how Steelcase keeps credit
12    file records?  In other words, do you have a credit file for
13    each dealership?
14 A  Yes, we do.
15 Q  Do you keep everything in one file with regard to that
16    dealership and the credit for that dealership, or do you
17    split it up into correspondence and into some other --
18 A  Usually the credit -- well, the credit files are separated by
19    sections, where we have a legal documents section, we have a
20    section for correspondence, we have a section for financial
21    statements.
22 Q  So it's three sections; correspondence, legal documents and
23    financial statements?
24 A  Basically, yes.
25 Q  Do you make hard copies of all your e-mails?

Page 40

1  A  Well, not all of them.  It depends upon the importance of the
2     e-mail as to whether or not we would print a copy of it or
3     not.
4  Q  So that's just sort of done randomly based on somebody's
5     decision that this is important, I'm going to make a hard
6     copy of it?
7  A  Yes.
8  Q  And if somebody just didn't either think it was important or
9     just didn't get around to making a hard copy of it, the file
10    wouldn't reflect the e-mail exchange; is that right?
11 A  I guess I wouldn't characterize it as being something that
12    someone would think not important, you know.  It's something
13    that could have gotten misfiled.  There could be other
14    reasons why there's no record of that.
15 Q  Do you know if there is e-mail information, whether you keep
16    a record of the e-mail exchanges, an electronic record that
17    is hard copied?
18         MR. MARCH:  Object for lack of foundation.  You may
19    answer.
20         THE WITNESS:  Are you asking me, specifically?
21 BY MR. SMITH:
22 Q  Yeah.
23 A  Just in general, or pertaining to this situation?
24 Q  Pertaining to this, or any situation in the Credit
25    Department, if you keep electronic records of e-mail

Page 41

1     exchanges.
2          MR. MARCH:  Same objection.
3  BY MR. SMITH:
4  Q  Back in 1993, which is what we're talking about now.
5  A  You know, we have different systems today than we had then.
6     I can't recall in '93 if we had the capability to do that or
7     not.
8  Q  Probably changed all the computers by this time; is that
9     right?
10 A  I'm quite sure we -- well, obviously, we do have different
11    equipment today than we had then.
12         (Exhibit 10 marked for identification.)
13 Q  These got a little out of place.
14         (Exhibit 11 marked for identification.)
15 Q  Mr. James, I've handed you a copy of Exhibit Number 11, and
16    briefly, would you review that and compare it with Exhibit
17    Number 9, and then describe it for me as best you can.
18 A  From all indications, it's the same document as Exhibit
19    Number 9, with the exception of the purchase order numbers
20    are different.
21 Q  Do you have any independent recollection of this particular
22    exhibit?
23 A  No, not at this time, other than just seeing it here.
24 Q  Exhibit Number 9, would it be fair to say that that was
25    executed by the Harbins on June 10, 1993?

Page 42

1  A  Exhibit Number?  I'm sorry.
2  Q  Exhibit Number 9.
3  A  Number 9?  It shows executed June 10, 1993.
4  Q  And Exhibit Number 11 was executed on August 4, 1993; is that
5     correct?
6  A  That's correct.
7  Q  And Exhibit Number 11 references a completely different set
8     of purchase orders than Exhibit Number 9; is that right?
9  A  That's correct.
10 Q  As you sit here today, can you recall why this second
11    guaranty was requested?
12 A  It would have been a case where these were different
13    shipments that we're making at a different point in time.
14 Q  And is it correct that you had Exhibit Number 9 executed
15    because you were concerned about getting paid and you wanted
16    to make sure that you had a personal guaranty for those
17    specific purchase orders?
18 A  Yes.
19 Q  And would the same be true with Exhibit Number 11?
20 A  The same would be true.
21         (Exhibit 12 marked for identification.)
22 Q  I show you what's been marked as Exhibit Number 12 and ask
23    you if you could identify that.
24 A  This is an individual guaranty.
25 Q  And what's the date at the top of that document?

DEFENDANT'S
EXHIBIT
12
ENGAD-Bayonne, N. J.

# EXHIBIT 13

**Page 47**

1  A  I don't recall a specific conversation concerning that, no.
2  Q  Do you recall any general, just generally, do you recall any
3     conversation with Mr. Harbin where that issue was raised?
4  A  I again can't recall any specific conversation with Michael
5     Harbin about that.
6  Q  Without dealing in specifics, are you aware that he was
7     making that complaint?
8  A  I'm aware that was a concern of his, yes.
9  Q  How did you become aware of that?
10 A  I believe it might have been, you know, from maybe a market
11    manager, you know, at the time.  Issues of pricing generally
12    were not directed to the Credit Department because we had
13    nothing to do with the pricing.
14 Q  Well, I understand that, but I'm sure that you heard those
15    complaints from dealers, didn't you; pricing complaints?
16       MR. MARCH:  Object to the form of the question.
17    This is way too broad.
18       THE WITNESS:  Yeah, I can't specifically recall any
19    particular conversations like that.
20 BY MR. SMITH:
21 Q  So that never entered into any of your conversations with any
22    dealers, complaints about pricing?
23 A  I can't say if it did or didn't, you know.  It very well
24    could have, but I can't sit here and say specifically yes, I
25    recall this incident or that incident.

**Page 48**

1  Q  What would you do with those complaints if a dealer made it
2     to you?  Who would you pass it along to?
3  A  We would generally probably pass it on, if it was material,
4     to the market manager, because that was their area they dealt
5     with.  We didn't deal with that.
6        (Exhibit 13 marked for identification.)
7  Q  I show you what's been marked as Deposition Exhibit Number 13
8     and ask if you can identify that.
9  A  Okay.
10 Q  That's a letter from you to Michael Harbin dated November 7,
11    2002; is that accurate?
12 A  That is correct.
13 Q  And you're concerned about Harbin's, Inc. owing Steelcase
14    over $400,000 dollars?
15 A  Yes.
16 Q  It looks like over $30,000 dollars is 90 days past due; is
17    that accurate?
18 A  That's accurate.
19 Q  And if you were to compare this to other dealers, would you
20    characterize this as a seriously delinquent account?
21 A  Yes, I would.
22 Q  And at some point you have to reach a decision what you're
23    going to do about collecting the account; right?  That's
24    that's your decision as a credit manager; is that right?
25 A  Yes.  We would at some point make a recommendation.

**Page 49**

1  Q  The recommendation --
2  A  To management.
3  Q  -- goes where?
4  A  It would go to my immediate boss.
5  Q  Now if he makes a decision we have to do something, we've got
6     to do something more drastic about this account, does he go
7     to the Legal Department then?
8  A  Generally speaking, yes, he would certainly get the Legal
9     Department involved.
10 Q  Now is it ever your place to notify dealers that if they
11    don't act within a certain period of time, you're going to
12    have to file a lawsuit?
13 A  I would not communicate that to the dealer, no.
14 Q  At this time, November 7, 2002, when you sent this letter,
15    Steelcase was not secured; correct?
16       MR. MARCH:  Just a moment.  I object to the form of
17    the question.
18 BY MR. SMITH:
19 Q  You can go ahead and answer the question.
20 A  What type of security are you referring to?
21 Q  Any security.
22 A  We did not have a security interest at this time, no.
23 Q  Was it your understanding in November of 2002 that Mr. Harbin
24    was personally responsible on a personal guaranty?
25 A  My understanding at this time was that he was not.

**Page 50**

1  Q  And as I understand your testimony, it wouldn't have been
2     your place, anyway, to remind Mr. Harbin that he had a
3     personal guaranty if you thought he had one; is that accurate
4     or not?
5  A  Could you -- I'm not quite understanding your question.
6  Q  Well, one of the things -- you're trying to get an account
7     paid, and you testified that you wouldn't threaten a lawsuit,
8     but would it ever be your place to remind a dealer that if he
9     doesn't pay, there's some personal liability involved if
10    perhaps the dealer had a personal guaranty?
11 A  If we had a personal guaranty on an account and the debt was
12    covered under a personal guaranty, yes, I could have
13    communicated that information to the dealer, yes.
14 Q  You didn't do that in this case?
15 A  No, I didn't.
16       (Exhibit 14 marked for identification.)
17 Q  I show you what's been marked as Exhibit Number 14.  Take a
18    moment to read that, if you would.
19 A  Okay.
20 Q  This is an e-mail from you to Steven Waugh; is that correct?
21 A  That's right.
22 Q  At the top of the page anyway, and it's dated November 8th of
23    2002; is that right?
24 A  That's correct.
25 Q  Who was Steven Waugh?

DEFENDANT'S EXHIBIT 13  PENGAD-Bayonne, N. J.

# EXHIBIT 14

## Page 51

1  A  He's my manager.  He's the Director of Corporate Credit.
2  Q  He was your boss at that time?
3  A  That's right.
4  Q  And who is Rich Cocos?
5  A  Rich Cocos is the Dealer Transition -- was the Dealer
6     Transition Manager for that region at the time.
7  Q  You were transitioning that dealership, or that region over
8     to Rich Cocos?
9  A  No, that was just his title.  It was pretty much the same as
10    the Dealer Alliance that I mentioned earlier.  They changed
11    the title to that Dealer Transition Manager.
12       (Exhibit 15 marked for identification.)
13  Q  I show you what's been marked as Deposition Exhibit Number
14    15.  Can you identify that?
15  A  Okay.
16  Q  This is a letter from your boss, basically, on November 27,
17    2002 to Michael Harbin; is that correct?
18  A  Yes.
19  Q  And it appears that Steven Waugh had taken over the account,
20    or taken over, been involved more personally in this
21    particular account at that point; is that accurate?
22  A  Well, he had gotten involved with the account, yes.
23  Q  Because it was delinquent?
24  A  Yes.
25  Q  At what point, as a credit manager, do you start asking, or

## Page 52

1     do you start asking the dealer for personal financial
2     statements?
3  A  We would only ask for a personal financial statement if we
4     had a personal guaranty.
5  Q  And I didn't see any correspondence from anybody in the file,
6     yourself, or Mr. Waugh, or anybody else, requesting from Mr.
7     Harbin a personal financial statement.  Do you, as you sit
8     here, have any independent recollection of asking for one?
9  A  No, I do not.
10  Q  Would it be your place to ask for a personal guaranty, or not
11    personal guaranty, but personal financial statement, would
12    it be somebody else's --
13  A  That would be part of what I would do, yes.
14       (Exhibit 16 marked for identification.)
15  Q  I show you what's been marked as Deposition Exhibit 16 and
16    ask if you can identify that for the record.
17  A  Well, this is a security agreement log, log sheet that we
18    would place in the credit file just as a quick reference to
19    any documents that we had on the deal.
20  Q  Is this a form that you use in every credit file?
21  A  At that time we used them in any credit file we had security
22    type agreements or guaranties, or documents of that sort.
23  Q  So correct me if I'm wrong, but you keep this at the front of
24    the credit file so you can go into the file quickly to
25    determine whether or not there are personal guaranties or

## Page 53

1     security agreements; is that right?
2  A  Yes, that's right.
3  Q  At some point did you stop using this record?
4  A  Yes.
5  Q  When was that?
6  A  I don't have a photographic memory.  I can only think it
7     would have been somewhere between 2001 and 2002.
8  Q  Did you keep them in the file?
9  A  It was kept in a credit file, in the credit file, yes.
10  Q  I mean, you stopped using the documents, or you stopped
11    adding it to the file, you didn't go through all the files
12    and purge them, I take it?
13       MR. MARCH:  You're talking about Exhibit 16?
14       MR. SMITH:  Right.
15       MR. MARCH:  Or, more accurately, the form?
16       MR. SMITH:  I'm talking about the form, actually.
17       THE WITNESS:  This form?
18  BY MR. SMITH:
19  Q  Yeah.
20  A  Yeah, it wasn't a high priority thing for us to go through
21    the files and purge documents, or a log sheet, you know, that
22    was no longer effective, or whatever.
23  Q  I'm just curious about this particular document that says at
24    the top, that security log as of June 17, 1993, and it refers
25    to a guaranty signed August 4, 1993 after the date of the

## Page 54

1     log.  Maybe that doesn't mean anything.  I was just curious.
2     Do you have any explanation for that?
3  A  Other than -- nothing other than the fact that this was
4     added, you know.
5  Q  So it's something that you add to?
6  A  Right.
7  Q  Not pull it out and type it at some point, or back in '93 you
8     would have pulled it out typed it, new information?
9  A  Right; correct.
10  Q  Mr. James, I'm looking at the privilege log which was filled
11    out by your attorney, so you may not have any knowledge of
12    it, but I just want to go through some of these names and ask
13    if you can identify who they are; James O'Connor?
14  A  James O'Connor.  Jim O'Connor, he's on our legal staff.
15  Q  Legal staff?  Okay.  Daniel Brondyk?
16  A  He's on our legal staff.
17  Q  Elizabeth Orelup?
18  A  She's an outside attorney.
19  Q  Patrick Schoen?
20  A  He's an outside attorney.
21  Q  Gary Malburg?
22  A  He's our Vice President and Treasurer of Steelcase.
23  Q  Is he on the Board of Directors; do you know?
24  A  No.
25  Q  Who is his boss?

DEFENDANT'S EXHIBIT 14   PENGAD-Bayonne, N. J.

Moretti & Murphy, Inc.                    269-343-0118   800-536-0804

# EXHIBIT 15

**Page 87**

1 that you produced, you retained the copies of those
2 checks as well as you might have retained the stubs of
3 those checks. What I'm asking is sometimes there are
4 checks and sometimes there aren't. What does it mean
5 if the checks are present?
6 A If the checks were present and stapled to the stubs,
7 they were voided out.
8 Q Okay. So even if they don't say "void," it just means
9 that they were voided out?
10 A Well, obviously you can't use a check if it was stapled
11 to the -- if Check No. 2116 was stapled right here in
12 the register, which many were, that check wasn't used.
13 Q Okay. I had to ask because I got the copies of the
14 records. Somebody from our Kalamazoo office came down.
15 A Okay.
16 Q So I just wanted to make sure I was understanding.
17 A Okay.
18 Q So thanks for your patience on it.
19 A Okay.
20 Q Well, I'll say thank you in advance for being patient
21 while I surf through these. There were a lot of these
22 check registers, and I wanted to make sure I -- So
23 then throughout Exhibit 5 there are check stubs that
24 say "Pay to the order FAFBO Harbins-Stern Brothers."
25 Do you see that there are multiple of these throughout

**Page 88**

1 the exhibit?
2 A May, June, July. Yes.
3 Q Okay. And so all of those are stubs, and because the
4 checks weren't there, that means the checks went out;
5 is that correct?
6 A I can only say that because the check is there -- not
7 there, it was not stapled to the stub, which I don't
8 have in front of me, I'm assuming they went out.
9 Q Okay. And you believe that was for profit-sharing for
10 employees?
11 A I believe it was.
12 Q And we don't remember what "FAFBO" meant?
13 A I don't.
14 Q Okay. That's all I have on that exhibit.
15 A Okay.
16 Q You testified earlier that you did write checks to
17 yourself personally sometimes?
18 A Occasionally.
19 Q And you said that those were for payroll?
20 A Correct.
21 Q How much was your income from Harbin's or Harbins-Stern
22 Brothers? You were just paid once; is that correct?
23 A No. We were paid every two weeks.
24 Q I guess I meant you weren't paid from both Harbins-
25 Stern Brothers and Harbin's?

**Page 89**

1 A No.
2 Q One income?
3 A Correct.
4 Q And how much was that income?
5 MR. SMITH: During what time period are you
6 talking about?
7 THE WITNESS: Yeah. I don't --
8 BY MS. LACHMAN:
9 Q In a year, what was your annual salary?
10 A When?
11 Q How about in 2000?
12 A I don't know. 98,000 maybe.
13 Q Okay. And in 2001?
14 A I'd have to pull my tax records. I don't recall.
15 Q But you think that your annual income was somewhere
16 around 98,000?
17 A No. That number just comes to my head. I think that
18 was one of the years, but I don't know which one. And
19 then it started going down dramatically.
20 Q Okay. So in 2003, approximately what would your salary
21 be annually?
22 A Forty thousand maybe, 45,000.
23 Q Okay.
24 (At 11:42 a.m., Exhibit 6 marked.)
25 BY MS. LACHMAN:

**Page 90**

1 Q I'd like to submit this as Exhibit 6. This is another
2 packet of the stubs that you provided. On page 1 of
3 Exhibit 6 you have a pay stub to M. Harbin. Is that
4 assumably you?
5 A That's not a pay stub.
6 Q Or a check stub.
7 A Check stub.
8 Q A check stub to M. Harbin. Is that assumably you?
9 A That's correct.
10 Q And in the amount of $9,500?
11 A That's correct.
12 Q On page 2 of Exhibit 6 --
13 A For the record, though, let's go back to --
14 Q Okay.
15 A -- Stub 9520. It says "certified check S.P."
16 Q Um-hmm.
17 A "S.P. Richards" was one of our vendors.
18 Q Okay. And so the check was made out to you?
19 A I would take the check to the bank and get a certified
20 check because there was no charge to me, and then we
21 would have to get certified funds to S.P. Richards.
22 Q Did they require certified funds?
23 A Yes.
24 Q And so they always required a certified check?
25 A They did for a period of time.

Q And why wouldn't the -- couldn't the check have just been written for a cashier's -- for a certified check? Did it have to be written to you personally?
A If we took a Harbin's check and took it to the bank and, say, debit the account, there was like a $10 charge for that check. With my checking account at AmSouth, I got free certified checks.
So I would take the Harbin's check, put it in my account, write out the check right there and hand it to the teller and say, "I need certified funds all payable to S.P. Richards." And so this is what all these are going to be for.
Q Okay. So, to avoid the $10 service charge --
A Right.
Q -- you would have checks written to your personal account from Harbin's or Harbins-Stern Brothers, whichever, and then you --
A Um-hmm. Harbin's.
Q You said Harbin's. How did you know it was from Harbin's versus Harbins-Stern Brothers?
A Because I think I said earlier Harbins-Stern Brothers closed in 2000, 2001.
Q Oh, so you're looking at the date.
A I'm looking at the date.
Q Okay. And so, to go back, to avoid the $10 fee you

would write a check from your Harbin's, Incorporated, account to your personal account, and then you would write a cashier's check?
A I would write a check off my personal account and hand it to the bank and say I would need a certified cashier's check, and they did it. And they did it for a period of a couple weeks.
And then finally -- and I called S.P. Richards. I said, "Either you're going to lose our business or, you know, it'll go to United Stationers, because I'm going to quit running to the damn bank every day." And that's what I was doing.
And they were making the checks -- they were trying to average them out on our daily purchases. That's why they're all like 4,300, 4,200 and 4,200. And so they were -- 4,300, 4,200. They tried to make it an average on a daily basis, and then finally I got tired of going to the bank and said, "Either take our check, we would hand it to the driver the next morning, or, you know, we won't have your wholesale business." And so they stopped.
Q Okay. Do you have any records to show that those certified checks were actually drawn from your account?
MR. SMITH: Does he have any records?
BY MS. LACHMAN:

Q You wrote checks from your personal account, certified checks to S&P Richards, is what you're saying?
A No. I didn't write a certified check. I would take a check from Harbin's, --
Q Um-hmm.
A -- take it to my bank, --
Q Um-hmm.
A -- and then I would deposit it in my bank account. And then at the same time I would write a check out for 9,500 to AmSouth Bank, and I would say, "Please make this payable to S.P. Richards." They in turn would make a certified check --
Q Right.
A -- payable to S.P. Richards.
Q Right.
A So the same time I credited my account 9,500, they debited my account 9,500, handed me a check payable to S.P. Richards, and saved me the $10 service charge, or 15 or whatever it was to get a certified check from Colonial or whoever we were banking with.
Q So you didn't keep any records of that?
A I don't have any records of that, no. The little pink copies and stuff that they gave me every day? We probably kept them for a while. If you'll look through those check registers, they may be stuck down in there.

But, no, I didn't keep them personally. I didn't -- the transaction was done.
Q Okay. And so that was the page 1 with the 9500's.
A Certified check to S.P.
Q Right.
A Okay.
Q And if we go to page 2, Check Stub No. 9523 --
A Certified check, S.P.
Q Um-hmm. In the amount of --
A Eighty-four hundred.
Q Okay. And then right below it, it's to Michael Harbin --
A Um-hmm.
Q -- but it doesn't say "S.P. certified check."
A It was S.P. certified check.
Q And you know that because?
A Because I did it.
Q But you don't have any record of it?
A There will be a corresponding debit on my personal account where 4,200 went in and 4,200 went out payable to AmSouth Bank, and then they would probably denote on that check, the official check that went to S.P. Richards. So to go back and follow the trail, you would have to probably get that number off the check that the bank cashed from me to write the certified

**Page 95**

1  check.
2 Q  Okay. So you personally were operating as sort of the
3  middleman in the financial end between Harbin's,
4  Incorporated, and S.P. Richards?
5 A  All I was doing was saving Harbin's, Incorporated, $10
6  a day for a certified check.
7 Q  Right. And you were doing that by having the money go
8  through your personal account and --
9 A  Correct.
10 Q  -- onward to S.P. Richards? Okay. So then I think we
11  just spoke about 9524. 9525, that's the same thing?
12 A  9525?
13 Q  Um-hmm.
14 A  That's correct.
15 Q  Okay. That's in the amount of 4,200.
16 A  Correct.
17 Q  On the next page, that's page 3 of Exhibit 6, 9527.
18  That's to M. Harbin for 4,200 with no note of S.P.
19  Richards.
20 A  Correct.
21 Q  And that's your same explanation as before?
22 A  Yes.
23 Q  Just got to get it all on the record.
24 A  I understand.
25     THE WITNESS: Can we stop for one second?

**Page 96**

1  I'd like to go to the restroom.
2     MR. SMITH: Sure.
3     (From 11:49 a.m. to 11:52 a.m., deposition in
4     recess.)
5 BY MS. LACHMAN:
6 Q  Okay. So I think we were in the middle of Exhibit 6 on
7  page 4, and this is Check Stub 9530 and that's from
8  September 11, 2003 in the amount of 4,200, and that's
9  again to Michael Harbin. And so that was money from
10  Harbin's to your personal account; correct?
11 A  Correct.
12 Q  Okay. And you say that it goes on to S.P. Richards?
13 A  Correct. The company would write me a check, I would
14  take the check, deposit it into my account, and then
15  immediately write a check out of my account payable to
16  the bank, and they would issue me a certified check
17  payable to S.P. Richards.
18 Q  Okay. And then page 5, one on September 12, 2003 to
19  Michael Harbin in the amount of 4,200. That's Check
20  Stub 9533.
21 A  It says "S.P." underneath that.
22 Q  Okay. So that is again to your personal account and
23  then on to S.P. Richards?
24 A  Correct.
25 Q  Next one, 9534, September 18, 2003 to Michael Harbin,

**Page 97**

1  $4,200, and that's the same thing?
2 A  (witness nods)
3     MR. SMITH: Answer verbally.
4     THE WITNESS: Yes.
5 BY MS. LACHMAN:
6 Q  Okay. And the next page which is page 6 of Exhibit 6,
7  at the top 9541, and that is September 16, 2003 for
8  $5,200 to Michael Harbin.
9 A  Correct.
10 Q  And it says "certified/S.P."
11 A  Correct.
12 Q  Okay. And again that's the same explanation?
13 A  Yes.
14 Q  Okay. And so what I saw just in that, my numbers
15  roughly added up to, I think, $52,000 approximately
16  over about a 14-day period that entered your personal
17  account?
18 A  (witness nods)
19 Q  And you're saying that then it left your personal
20  account -- oh, can you give verbal responses, please?
21 A  Yes.
22 Q  So just to make sure we have it on the record, that's
23  approximately $52,000 from Harbin's into your personal
24  account over a 14-day period?
25 A  I haven't added it up, but if that's what you say, I'll

**Page 98**

1  trust what your calculations are.
2 Q  And you say that that money then went on to another
3  vendor?
4 A  That money went payable to S.P. Richards.
5 Q  Okay. But you don't -- you personally don't have any
6  records of that?
7 A  No.
8     MS. LACHMAN: Just one moment. Okay. Then
9  here, I don't know Karen if you'd like these submitted
10  as a packet or individually. I take it it doesn't
11  matter which way we do it. Which is easiest for you?
12     REPORTER: Makes no difference to me.
13     MS. LACHMAN: I think there are about four
14  pages. How about we just do it as a packet?
15  Is that easiest for you?
16     MR. SMITH: Any way you want to do it is fine
17  with me.
18     MS. LACHMAN: Well, I'll just do it as a
19  packet, then. But I'll hand them to you first and then
20  we'll staple them, if that's okay. Okay. So that's
21  going to be page 1. Here's going to be page 2.
22     MR. SMITH: Do you need a stapler?
23     REPORTER: Got one.
24     MS. LACHMAN: She's got one right here.
25  Totally prepared. That's going to be page 3.