UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

STEELCASE INC., a Michigan
corporation,

          Plaintiff,                                   Case No. 1:04CV0026

v.                                           Honorable Robert Holmes Bell
                                               Chief, U.S. District Judge

HARBIN'S, INC., an Alabama
corporation, MICHAEL G. HARBIN,
and HOPE D. HARBIN PATTERSON,

          Defendants.

_____/

**PLAINTIFF STEELCASE INC.'S RESPONSE TO DEFENDANT MICHAEL G.
HARBIN'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

Page

Index of Authorities .......................................................................................... iii

Introduction ........................................................................................................1

Statement of Facts .............................................................................................2

Law & Argument ...............................................................................................2

I.      STANDARD OF REVIEW. ....................................................................2

II.     THE GUARANTIES ARE ENFORCEABLE AND REMAIN IN EFFECT
        UNTIL THEY ARE TERMINATED BY WRITTEN NOTICE, AND
        TESTIMONY REGARDING SUBJECTIVE BELIEF ON THE LEGAL EFFECT
        OF THE GUARANTIES IS INADMISSIBLE TO PROVE THEIR
        ENFOCEABLE SCOPE. ...........................................................................4

III.    LEGAL PRINCIPLES APPLICABLE TO PIERCING THE CORPORATE
        VEIL. .......................................................................................................5

        A.      The Test to Pierce the Corporate Veil: The Essential Considerations Are
                Shareholder Abuse of the Corporate Form Accomplished Through Unity
                of Interests and Injustice or Fundamental Unfairness. ...........................5

        B.      Factors Supporting Piercing Claims Include Commingling of Funds,
                Siphoning Off of Corporate Funds, Personal Loans by Shareholders to the
                Corporation, Disregard of Corporate Formalities, Unchecked Inter-
                corporate Asset Transfers, Personal Guaranties by Dominant
                Shareholders, Undercapitalization, Fraud, and Complete Unity of Interest
                Between Dominant Shareholders and the Corporation. .........................7

        C.      Fraud Is Not A Required Finding. .......................................................9

IV.     THE SOURCE OF STEELCASE'S FACTUAL BASIS FOR ITS CLAIM OF
        PIERCING THE CORPORATE VEIL IS MICHAEL HARBIN'S SWORN
        TESTIMONY. THERE ARE FEW CORPORATE RECORDS BECAUSE MR.
        HARBIN ABANDONED THEM. ...............................................................10

V.      APPLYING THE LEGAL PRINCIPLES OF PIERCING THE CORPORATE
        VEIL TO THE CORPORATION AT ISSUE HERE, IT IS CLEAR THAT
        THERE IS AN ABUNDANCE OF EVIDENCE SUPPORTING PLAINTIFF'S
        CLAIM TO PIERCE THE CORPORATE VEIL. ........................................13

A.     The Various Entities Controlled By Michael Harbin.............................................13

B.     Mr. Harbin Admits to Commingling Personal and Corporate Funds. .................14

C.     Michael Harbin Admits That He Siphoned Off Corporate Funds For Personal Use. ................................................................................................16

D.     Mr. Harbin Admits to Having Made Personal Loans to Harbin's, Inc., and Circumstances Indicate They Were Made Without Formal Agreements of Repayment.......................................................................................................19

E.     Mr. Harbin Transferred Assets To or From Another Business In Which He Had a Controlling Interest Without Adequate Consideration. .............................20

F.     Mr. Harbin Executed Personal Guaranties on Behalf of Harbin's, Inc.................21

G.     Mr. Harbin and Harbin's, Inc. Had a Complete Unity of Interests......................22

H.     Mr. Harbin Disregarded Corporate Formalities...................................................22

I.      Harbin Admitted That Harbin's, Inc. Was Undercapitalized. .............................22

J.     The Corporate Veil of Harbin's, Inc. Should Be Pierced Because There Is Evidence of the Presence of Nearly Every Factor Courts Consider To Justify Piercing Corporate Veils. ........................................................................23

K.     There Is Ample Evidence Of Wrongdoing By Michael Harbin And Harm To Steelcase................................................................................................23

Conclusion .........................................................................................................................25

## Index of Authorities

Page

CASES

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242; 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ..............3

*Bandit Industries v Hobbs International Inc.,* 463 Mich. 504; 620 N.W. 2d 531 (2001)...........4, 5

*Berkey v. Third Ave. Ry Co.,* 244 N.Y. 84; 155 N.E. 58 (1926)....................................................6

*Bodenhamer Building Corp. v. Architectural Research Corp.,* 873 F.2d 109 (6th Cir. 1989)..........................................................................................................3, 6, 7, 8

*Celotex Corp. v. Catrett,* 477 U.S. 317; 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)........................3

*Concept One Int'l, Inc. v. Nippecraft Ltd.,* No. 1:96-CV-565, 1997 WL 483248, at *5 (W.D. Mich. Feb. 14, 1997) (unpublished)....................................................................6, 9

*Hamann v. Ridge Tool Co.,* 213 Mich. App. 252; 539 N.W.2d 753 (1995) ...............................12

*Hanover Ins. Co. v. American Engineering Co.,* 33 F.3d 727 (6th Cir.1994)..............................3

*Herman v. Mobile Homes Corp.,* 317 Mich. 233; 26 N.W.2d 757 (1947) ...................................7

*House of Koscot Dev. Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64 (5th Cir. 1972)..................................................................................................................................8

*In re RCS Engineered Products Co., Inc.,* 102 F.3d 223, 226 (6th Cir. 1996).............................6

*Industrial Maxfreight Services, L.L.C. v. Tenneco Automotive Operating Co.,* 182 F.Supp.2d 630 (W.D. Mich. 2002)..................................................................................3

*Klager v. Robert Meyer Co.,* 415 Mich. 402; 329 NW2d 721 (1982) ..........................................7

*Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459; 663 N.W.2d 447 (2003)....................5

*Labadie Coal Co. v. Black,* 672 F.2d 92 (D.C. Cir. 1984)......................................... 7, 8, 9, 22, 23

*Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.,* 872 F.2d 702 (6th Cir. 1988)................................................................................................4, 7, 8, 9, 19, 21, 23

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574; 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).......................................................................................................3

*Michigan Chandelier Co. v. Morse,* 297 Mich. 41; 297 N.W. 64 (1941).....................................5

*Mid America Mgmt. Corp. v. Dep't of Treasury*, 152 Mich. App. 446; 395 N.W.2d 702 (1986)...................................................................................................................................3

*Morley v. Automobile Club of Michigan*, 458 Mich. 459; 581 N.W.2d 237 (1998)......................3

*N.L.R.B. v. Allocoast Transfer, Inc.*, 780 F.2d 576 (6th Cir. 1986)...................................................9

*N.L.R.B. v. Fullerton Transfer 7 Storage Ltd., Inc.*, 910 F.2d 331 (6th Cir. 1990).........................9

*Oren v. U.S.*, No. 1:90-CV-558, 1992 WL 79110, at *2 (W.D. Mich. Jan.7, 1992) .................6, 7

*Parrett v. American Ship Building Co.*, 990 F.2d 854 (6th Cir. 1993) ............................................3

*Potter v. Michigan Bell Telephone Co.*, 246 Mich. 198; 224 N.W. 438 (1929)...........................10

*Roosevelt Park Protestant Reformed Church v. London*, 293 Mich. 547; 292 N.W. 486 (1940)..................................................................................................................................5

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989) ........................................................3

*U.S. v. W.R.W. Corp.*, 986 F.2d 138 (6th Cir. 1993)...........................................................8, 9, 22

*Wilcox v. U.S.*, No. 91-2193, 1992 WL 393581, at *2 (6th Cir. Dec. 31, 1992).......................6, 7

OTHER AUTHORITIES

Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 CORNELL L. REV. 1036 (1991) ...............................................................................................................6

RULES

Fed. R. Civ. P. 56(c)..........................................................................................................................2

## **Introduction**

Plaintiff Steelcase Inc. has obtained a Default Judgment against Harbin's, Inc. in the amount of $385,275.79.

Steelcase now seeks to enforce the written personal Guaranties executed in its favor by defendants Michael Harbin, the President and sole shareholder of Harbin's, Inc., and his former wife, Hope Harbin Patterson.

In addition, based on facts learned by Steelcase after the start of this litigation, nearly all of which come from the sworn testimony of Michael Harbin, Steelcase seeks to pierce the corporate veil and hold Mr. Harbin personally liable for the obligations of Harbin's, Inc.

Steelcase has filed a Motion for Partial Summary Judgment and a supporting brief, seeking the ruling of this Court that as a matter of law the personal Guaranties apply to the Harbin's, Inc. indebtedness reflected in the Default Judgment.

Defendant Michael Harbin has also filed a Motion for Summary Judgment on both Steelcase claims. Mr. Harbin asks the Court to find as a matter of law that his personal Guaranties do not apply to the default judgment indebtedness of Harbin's, Inc. In addition, he seeks summary judgment of Steelcase's claim for piercing the corporate veil, and in support he has submitted an affidavit which in fact helps support Steelcase's claim.

This response by Steelcase will only briefly address its claim on the personal Guaranties, because Steelcase's argument and authority is fully set forth in its initial brief.

This response does address and support Steelcase's claim to pierce the corporate veil, a claim which was not addressed in its original brief. Michael Harbin's motion in regard to that claim should be denied because, as evidenced by Michael Harbin's own sworn deposition testimony and his Affidavit in support of his Motion for Summary Judgment, Mr. Harbin wrongly abused the corporate form, resulting in harm to Steelcase. Mr. Harbin admits to

commingling his personal funds with funds of the corporation; siphoning off corporate funds for his own personal use; making personal loans to the corporation without documentation; casually transferring assets between Harbin's, Inc. and other businesses in which he had a controlling interest; and executing personal guaranties.  Mr. Harbin also admits the corporation was undercapitalized, and there is evidentiary support to find Mr. Harbin disregarded corporate formalities and that there was a complete unity of interest between Mr. Harbin and the corporation.  The above occurrences, when combined, comprise nearly every single factor courts look to in justifying a decision to pierce the corporate veil.  Based solely on Mr. Harbin's own admissions, it would be unfair and unjust to allow him to hide behind the corporate form which he so often ignored.

## Statement of Facts

Steelcase incorporates the Statement of Facts from its initial Summary Judgment Brief.  The only fact relevant to interpreting the personal Guaranties is the inclusive language of the Guaranties themselves.

In regard to the facts relevant to Steelcase's claim to pierce the corporate veil, nearly all of which come from Michael Harbin's own sworn statements, those facts will be discussed in detail in the argument section of this brief.

## Law & Argument

### I.  STANDARD OF REVIEW.

This Court has explained that under FED. R. CIV. P. 56(c):

. . . summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita*

>*Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106
>S.Ct. 1348, 89 L.Ed.2d 538 (1986).  If Defendant carries its burden
>of showing there is an absence of evidence to support a claim then
>Plaintiff must demonstrate by affidavits, depositions, answers to
>interrogatories, and admissions on file, that there is a genuine issue
>of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317,
>324-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
>
>On summary judgment, all reasonable inferences drawn from the
>evidence must be viewed in the light most favorable to the parties
>opposing the motion."  *Hanover Ins. Co. v. American Engineering
>Co.,* 33 F.3d 727, 730 (6th Cir.1994) (citing *Matsushita*, 475 U.S.
>at 586-88, 106 S.Ct. 1348).  Nevertheless, the mere existence of a
>scintilla of evidence in support of Plaintiff's position is not
>sufficient to create a genuine issue of material fact.  *Anderson v.
>Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d
>202 (1986).  The proper inquiry is whether the evidence is such
>that a reasonable jury could return a verdict for Plaintiff.  *Id. See
>generally*, *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476-80
>(6th Cir.1989).
>
>*Industrial Maxfreight Services, L.L.C. v. Tenneco Automotive Operating Co.,* 182

F. Supp. 2d 630, 634 (W.D. Mich. 2002) (Bell, J.).

Here there are two issues before the Court.  The first issue is the interpretation of

an unambiguous contract, which is a question of law.  *Parrett v. American Ship Building Co.,*

990 F.2d 854, 858 (6th Cir. 1993); *Morley v. Automobile Club of Michigan,* 458 Mich. 459, 465;

581 N.W.2d 237 (1998).  It is only where the language is ambiguous or incomplete that the

substance of the parties' agreement is a question of fact for determination of the fact finder at

trial.  *Mid America Mgmt. Corp. v. Dep't of Treasury,* 153 Mich. App. 446, 459; 395 N.W.2d

702 (1986).  Where a contract is unambiguous, summary judgment is appropriate.  *See Parrett*,

990 F.2d at 858.

The second issue is that of piercing the corporate veil, which is a question of fact.

*See Bodenhamer Bldg. Corp. v. Architectural Research,* 873 F.2d 109, 111-112 (6th Cir. 1989).

Where an issue of material fact remains as to whether the requisite showing has been made to

pierce the corporate veil, summary judgment should not be granted. *See id., Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704-705 (6th Cir. 1988).

**II.**   **THE GUARANTIES ARE ENFORCEABLE AND REMAIN IN EFFECT UNTIL THEY ARE TERMINATED BY WRITTEN NOTICE, AND TESTIMONY REGARDING SUBJECTIVE BELIEF ON THE LEGAL EFFECT OF THE GUARANTIES IS INADMISSIBLE TO PROVE THEIR ENFOCEABLE SCOPE.**

Both Steelcase and Michael Harbin have filed cross-motions for summary judgment on the question of the proper interpretation of the contract language found in the Guaranties. Accordingly, the arguments and legal authority cited by Steelcase in its original brief provide most of its response to Michael Harbin's motion, but a few points need to be stressed.

First, Mr. Harbin is simply flat out wrong when he says that the term "Indebtedness" as used in the Guaranties, ". . . is defined as limited to that indebtedness **in connection with** specifically identified purchase order numbers." (Michael Harbin's Summary Judgment Brief, p. 7, emphasis in original.) Paragraph 1 of each Guaranty expressly and expansively defines the term "Indebtedness" before it adds the limiting phrase "in connection with" specified purchase orders. (For ease of reference, the Guaranties are attached as **Exhibit A**.) Therefore, when the capitalized term "Indebtedness" is used in paragraph 4 of the Guaranty, there is no reference or limitation whatsoever to any purchase order. As noted in Steelcase's initial brief, that expansive definition of "Indebtedness" was carefully crafted and intended, and it allows paragraph 4 to be read consistently with paragraph 1. Paragraph 1 is limited in its application; paragraph 4 is not. The obligations of paragraph 4 can be terminated by notice; those of paragraph 1 cannot.

Second, Mr. Harbin cites *Bandit Industries v. Hobbs International Inc.*, 463 Mich. 504, 511; 620 N.W. 2d 531 (2001) for the proposition that a surety (and by analogy, a guarantor)

". . . has a right to stand on the very terms of the contract. To the extent and in the manner and under the circumstances pointed out in his obligation, the surety is bound, and no further." (*Id.* at 511.) Steelcase agrees. Here, the "very terms" of paragraph 4 of the Guaranties obligate Mr. Harbin on all "Indebtedness" unless and until he gives written notice of termination.

Finally, any testimony, whether the affidavit of Mr. Harbin or the deposition testimony of Steelcase employee Marvis James cited by Harbin, regarding subjective beliefs concerning the legal effect of the Guaranties should not be considered in determining the enforceable scope of the Guaranties. As stated in Steelcase's initial brief, because the Guaranties are fully integrated by their express terms and unambiguous, parol evidence regarding the meaning of the Guaranties is simply <u>inadmissible</u> under Michigan law. *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 470; 663 N.W.2d 447 (2003); *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 48; 297 N.W. 64 (1941); *Roosevelt Park Protestant Reformed Church v. London*, 293 Mich. 547, 553; 292 N.W. 486 (1940).

The Guaranties are of a continuing nature, extending to all existing and future indebtedness, including the debt currently owed by Harbin's, Inc. to Steelcase. This continuing obligation should be found as a matter of law, and Steelcase's motion granted and Mr. Harbin's motion denied. Those rulings will leave as fact issues to be decided at trial whether Mr. Harbin in fact gave written notice of termination and whether he was fraudulently induced to enter the Guaranties.

## III.   **LEGAL PRINCIPLES APPLICABLE TO PIERCING THE CORPORATE VEIL.**

### A.   **The Test to Pierce the Corporate Veil: The Essential Considerations Are Shareholder Abuse of the Corporate Form Accomplished Through Unity of Interests and Injustice or Fundamental Unfairness.**

The doctrine of piercing the corporate veil is often touted as one of the least understood areas of corporate law. *See Berkey v. Third Ave. Ry Co.*, 244 N.Y. 84, 94; 155 N.E.

58 (1926) (Cardozo, C.J., describing the doctrine as being "enveloped in the mists of metaphor");
Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 CORNELL L. REV.
1036, 1036 (1991). Thus, no clear and consistent test has emerged to determine when piercing is
appropriate. *Compare Bodenhamer Building Corp. v. Architectural Research Corp.*, 873 F.2d
109, 112 (6th Cir. 1989); *Wilcox v. U.S.*, No. 91-2193, 1992 WL 393581 (6th Cir. Dec. 31, 1992);
*Concept One Int'l, Inc. v. Nippecraft Ltd.*, No. 1:96-CV-565, 1997 WL 483248, at *5 (W.D.
Mich. Feb. 14, 1997) (unpublished); .

In *Bodenhamer Bldg. Corp.*, 873 F.2d at 112, and in *In re RCS Engineered
Products Co., Inc.,* 102 F.3d 223, 226 (6th Cir. 1996), the test articulated by the Sixth Circuit
applying Michigan law was as follows: "first, the corporate entity must be a mere instrumentality
of another entity or individual; second, the corporate entity must be used to commit a fraud or
wrong; third, there must have been an unjust loss or injury to the plaintiff." Yet, more recently,
in an unpublished opinion for the Western District of Michigan, in *Concept One Int'l, Inc.*, 1997
WL 483248, at *5, Judge Douglas Hillman held that Michigan law required "such a complete
identity between the defendant and the corporation as to suggest that one was simply the alter
ego of the other." Similarly, in *Oren v. U.S.*, No. 1:90-CV-558, 1992 WL 79110, at *2 (W.D.
Mich. Jan.7, 1992)(Bell, J.), that under Michigan law was held to support piercing when: "(a) a
corporation and shareholders have complete identity of interests; (b) the corporation is a mere
instrumentality of the shareholders; (c) the corporation is a device to avoid a legal obligation; or
(d) the corporation is used to defeat public convenience, justify a wrong, protect fraud or defend
a crime." (Quoting *Bodenhamer Bldg. Corp.*, 873 F.2d at 112.)

The struggle to articulate a firm test may be a reflection of the fact-intensive and
equitable nature of the piercing doctrine. In fact, it has been stated that it is not possible to

fashion a "mechanical rule" for piercing. *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 245-246; 26 N.W.2d 757 (1947). But rather, "the alter ego analysis should be flexible: all relevant factors should be considered." *Oren v. U.S.*, No. 1:90-CV-558, 1992 WL 79110, at *2 (Bell, J.); *see Klager v. Robert Meyer Co.*, 415 Mich. 402, 411-412; 329 NW2d 721 (1982) (holding the "entire spectrum of relevant fact forms the background for such an inquiry.") Whatever the form or phrasing of the test, the goal of the analysis is to enforce this notion: an "individual businessman hiding from the normal consequences of carefree entrepreneuring by doing so through a corporate shell." *Labadie Coal Co. v. Black*, 672 F.2d 92, 100 (D.C. Cir. 1984); ***see Herman v. Mobile Homes Corp.***, 317 Mich. 233, 245-246; 26 N.W.2d 757 (1947) (holding the piercing doctrine "comes down to a question of good faith and honesty in the use of the corporate privilege for legitimate ends.") Thus, "[e]ssentially, the question becomes: based on all relevant factors, would the protection normally offered by the legal entity's distinct status unfairly cloak an individual actor?" *Wilcox v. U.S.*, No. 91-2193, 1992 WL 393581, at *2 (6th Cir. Dec. 31, 1992).

Regardless of the variations in phrasing courts have used, what can be consistently found at the core of all piercing tests is the evaluation and weighing of several factors that consider shareholder abuse of the corporate form through unity of interest and the equities of each individual case. *See also Bodenhamer Building Corp*, 873 F.2d at 112; *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704-705 (6th Cir. 1988); *Oren*, No. 1:90-CV-558, 1992 WL 79110, at *2 (enumerating factors applicable to the piercing analysis.). These factors are described in the section that follows.

**B.**  **Factors Supporting Piercing Claims Include Commingling of Funds, Siphoning Off of Corporate Funds, Personal Loans by Shareholders to the Corporation, Disregard of Corporate Formalities, Unchecked Inter-corporate Asset Transfers, Personal Guaranties by Dominant**

**Shareholders, Undercapitalization, Fraud, and Complete Unity of Interest Between Dominant Shareholders and the Corporation.**

Courts, in determining whether shareholders have abused the corporate form review the existence of several factors, "none" of which is a "pre-requisite to a finding that the corporate form has been violated." *Laborers' Pension Trust Fund, Inc.*, 872 F.2d at 704-705; *Oren*, No. 1:90-CV-558, 1992 WL 79110, at *2 (Bell, J.). These factors include:

(1) commingling of personal funds with assets of the corporation;

(2) siphoning off of corporate funds by dominant shareholders;

(3) personal loans by shareholders to the corporation;

(4) acquisitions made without adequate consideration by or from other businesses owned by dominant shareholders;

(5) dominant shareholders having personally guaranteed corporate liabilities;

(6) disregard of corporate formalities, including a failure to maintain adequate corporate records or corporate minutes;

(7) complete unity of interest between dominant shareholders and the corporation;

(8) use of the corporate form to support fraud or illegality;

(9) undercapitalization; and

(10) nonpayment or overpayment of dividends.

For cases where some or all of these factors are enumerated *see U.S. v. W.R.W. Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) (interpreting Kentucky law); *Bodenhamer Bldg. Corp.*, 873 F.2d at 112; *Laborers' Pension Trust Fund*, 872 F.2d at 704-705; *Labadie Coal Co. v. Black*, 672 F.2d 92, 97-99 (D.C. Cir. 1984); *House of Koscot Dev. Corp. v. American Line Cosmetics, Inc.*, 468 F.2d 64, 73-74 (5th Cir. 1972).

Again, no one of these factors is dispositive. *Laborers' Pension Trust Fund, Inc.*, 872 F.2d at 704-705. For example, a showing of undercapitalization may suffice even where

8

there is no showing of fraud. *See Labadie Coal, Co. v. Black*, 672 F.2d 92, 97-99 (D.C. Cir. 1984). In *Labadie Coal, Co.*, the D.C. Circuit, in defining what that court termed the "inequitable result" prong, held that sufficient injustice was found due to the shareholder's failure to "adequately capitalize the corporation for the reasonable risks of the corporate undertaking." ***See also*** *U.S. v WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) (holding piercing was appropriate on the basis that the shareholders and the corporation were one and that the corporation was undercapitalized despite the fact that there was no evidence of fraud or siphoning off of funds). Also, in *Laborers' Pension Trust Fund, Inc.*, 872 F.2d at 703-705, interpreting federal common law, the Sixth Circuit upheld the District Court's decision to pierce the corporate veil. There the court cited the following findings to be critical to its ruling: (1) the corporation was unprofitable; (2) the dominant shareholder made personal loans to the corporation without any oral or written contract setting out amount of repayment or interest; (3) the dominant shareholder used corporate assets to pay personal expenses; (4) the corporation loaned money to or was loaned money by other corporations in which the dominant shareholder had an interest; (5) assets were transferred from the corporation to the dominant shareholder after the corporation faced inevitable failure but while two creditors remained unpaid; and (6) the dominant shareholder had full, unchecked authority to decide to transfer assets.

### C. Fraud Is Not A Required Finding.

Piercing is not predicated on a showing of fraud. *N.L.R.B. v. Allocoast Transfer, Inc.*, 780 F.2d 576 (6th Cir. 1986) (rejecting a test that would require unlawful intent or motive); *N.L.R.B. v. Fullerton Transfer 7 Storage Ltd., Inc.*, 910 F.2d 331 (6th Cir. 1990). In ***Concept One Int'l, Inc. v. Nippecraft Ltd.***, No. 1:96-CV-565, 1997 WL 483248, at *5 n. 2 (W.D. Mich. Feb. 14, 1997), Judge Douglas Hillman, in an unpublished opinion, writing for the Western District of Michigan, stated that "[c]ontrary to defendant's assertions, <u>Michigan law does not require a</u>

showing of fraud or illegality before the corporate form will be disregarded." (Emphasis added.)

Judge Hillman further stated that "[w]hile there is no question that fraud justifies piercing the

corporate veil, there is ample authority under Michigan law for finding parent corporation

liability through veil piercing for less egregious unjustified use of the corporate form." *Id.*

(numerous internal citations supporting this principle omitted); *see Potter v. Michigan Bell

Telephone Co.*, 246 Mich. 198, 201; 224 N.W. 438 (1929) (holding the corporate form should be

disregarded despite recognizing that "fraud [wa]s expressly disclaimed.") Judge Hillman's

perspective was confirmed in this litigation by Magistrate Judge Scoville who held that

"defendant [Harbin] incorrectly argues that Michigan law requires a showing of fraud in order to

pierce the corporate veil. Although Michigan courts will pierce the corporate veil to prevent

fraud, a showing of fraud is not the exclusive means of doing so." (Order Granting Motion for

Leave to File Second Amended Complaint, p. 2.)

## IV. THE SOURCE OF STEELCASE'S FACTUAL BASIS FOR ITS CLAIM OF PIERCING THE CORPORATE VEIL IS MICHAEL HARBIN'S SWORN TESTIMONY. THERE ARE FEW CORPORATE RECORDS BECAUSE MR. HARBIN ABANDONED THEM.

The factual basis for Steelcase's claim of piercing the corporate veil comes almost

exclusively from the sworn testimony of Michael Harbin himself, based on the following

sources:

– Michael Harbin was deposed in this lawsuit on January 27, 2005,

and copies of the relevant portions of the deposition transcript are attached as **Exhibit B**

and are cited as Michael Harbin Dep, Ex B at 7-12; 14-16; 21; 23; 26; 31; 67-70; 72-74;

90-98; 105-106; 122-123; 128-129; 131-133; and 194-195.

– On April 2, 2002 Michael Harbin was deposed in an Alabama

divorce action brought by his former wife, co-defendant Hope D. Harbin Patterson. Ms.

Harbin Patterson attached portions of Michael Harbin's deposition transcript to her Answer filed in this lawsuit. Michael Harbin affirmed the truth of much of his deposition testimony in the divorce action in his deposition testimony in the present lawsuit. (Michael Harbin Dep, Ex B at 130, *et seq.*) Excerpts from the divorce deposition are attached as **Exhibit C** and referenced as Michael Harbin Divorce Dep, Ex C at 182; 194-199; 207-208; 218-219; and 229-232.

– Michael Harbin has submitted an Affidavit in support of his summary judgment motion, in which he admits to but attempts to explain or justify some of his actions which support a piercing claim. References to that Affidavit are cited as Michael Harbin Aff, ¶ 1; 3; 12; 13(a),(b), (d); 16(i); and 20-24.

Steelcase also submitted document requests seeking corporate and financial records that would illuminate Michael Harbin's dealings with his corporation. (The request for documents is attached as Ex D.) While some documents were produced, most were not because, according to Mr. Harbin, it is his belief that "they're in the Montgomery County [Alabama] landfill." (Michael Harbin Dep, Ex B at 7-12, 14-16, 121.)

Steelcase contends that Mr. Harbin's failure to produce corporate records relevant to the piercing claim raises a presumption that the records would not support his position. *See Long v. Earle,* 277 Mich. 505, 516; 269 N.W. 577 (1936), holding that the "[f]ailure to produce evidence within a party's control raises the presumption that, if produced, it would operate against him; and every intendment will be in favor of the opposite party." Mr. Harbin argues that he did not personally destroy the records, he simply abandoned them and that he had no duty to preserve any corporate records since he had not been requested to maintain them. (Michael Harbin's Summary Judgment Brief at 16.) But Mr. Harbin admits that this lawsuit was pending

11

against Harbin's, Inc. at the time its bank foreclosed and when Mr. Harbin abandoned the records. (*Id.*) And at a time before any documents were ever destroyed, Harbin's, Inc.'s attorneys were arguing to this Court that "all of the documents necessary for determination of the issues raised by Steelcase's complaint are located in Alabama." (Harbin's, Inc.'s Brief In Support Of Its Motion To Dismiss For Lack Of Personal Jurisdiction And For Improper Venue Pursuant To Fed. R. Civ. P. 12(b)(2) and (3) Or In The Alternative For Transfer Of Venue at p. 6.) Thus, Mr. Harbin had some understanding that his corporation's records were relevant to and could be used in this litigation. At a minimum, Mr. Harbin cannot be heard to claim that his records would show compliance with corporate formalities when it was his own conscious decision to abandon them that led to their destruction. As held by the Fifth Circuit, in *Labadie Coal Co.*, 672 F.2d at 97:

> The failure of defendant to produce any corporate records, such as minutes, bylaws, articles of incorporation, lists of directors, and so on, creates a <u>strong inference that these records do not exist. That they may have existed at one time is of no consequence</u>. We are concerned here with how defendant has in fact treated the corporation. <u>If [the corporation] has been viewed as a separate and distinct entity, one would expect appropriate records to be kept</u>. If it is merely a separately-named business conduit for defendant's own activities, a "d/b/a" in all practicality, such records would not be as important and therefore might not be as carefully maintained.

(Emphasis added); *See also Hamann v. Ridge Tool Co.*, 213 Mich. App. 252, 255; 539 N.W.2d 753 (1995) (holding the presumption applied because "[i]t would be unfair to permit the negligent party to benefit from his own error. Whether the evidence was destroyed or lost accidentally or in bad faith is irrelevant. . . .")

## V. APPLYING THE LEGAL PRINCIPLES OF PIERCING THE CORPORATE VEIL TO THE CORPORATION AT ISSUE HERE, IT IS CLEAR THAT THERE IS AN ABUNDANCE OF EVIDENCE SUPPORTING PLAINTIFF'S CLAIM TO PIERCE THE CORPORATE VEIL.

### A. The Various Entities Controlled By Michael Harbin.

In order for the Court to fully understand and appreciate the facts significant to Steelcase's piercing the corporate veil claim, it is first necessary to describe the facts disclosed through discovery regarding the entities through which Michael Harbin did business.

Steelcase always believed that the entity with whom it was doing business was Harbin's, Inc., the defendant in this lawsuit against whom Steelcase has a Default Judgment for unpaid product. Michael Harbin was Harbin's, Inc.'s President, CEO, and sole shareholder. (Michael Harbin Affidavit, ¶¶ 1, 3, and 12.)

Michael Harbin testified that sometime in 1999 he formed Harbin's-Stern Brothers, L.L.C, which merged the business functions of Harbin's, Inc. and a company called Stern Brothers. (Michael Harbin Dep, Ex B at 72-74.) Harbin's, Inc. had a controlling interest in Harbin's-Stern Brothers. (Michael Harbin Dep, Ex B at 74.) According to Mr. Harbin's deposition testimony in the divorce action, by July, 1999, Harbin's, Inc. was a "dormant corporation with no activities whatsoever." (Michael Harbin Divorce Dep, Ex C at 230.) By use of the word "dormant," Mr. Harbin testified that he meant "… it had no activity, no business activity whatsoever, Harbin's, Inc." (Michael Harbin Divorce Dep, Ex C at 198-199.) Mr. Harbin used this "fact" of Harbin's "dormancy" as the reason that he was depositing <u>checks made payable to Harbin's, Inc. into his own personal bank account</u>. (Michael Harbin's Divorce Dep, Ex C at 207-208.) According to Mr. Harbin, the relationship between Harbin's, Inc. and Stern Brothers broke down sometime in 2001 or 2002. (Michael Harbin Dep, Ex B at 74.) It will be a disputed factual issue whether Steelcase ever knew about Harbin's Stern Brothers, but it

was certainly a surprise to Steelcase to learn in this lawsuit that Harbin's, Inc. was "dormant" as of mid-1999.

Mr. Harbin was also the majority shareholder in another company called Retail Enhancement Services, Inc., the significance of which will be discussed below.  (Michael Harbin Divorce Dep, Ex C at 182.)

**B.** **Mr. Harbin Admits to Commingling Personal and Corporate Funds.**

Mr. Harbin has admitted that he did in fact commingle corporate funds with his personal funds on numerous occasions.

In his Affidavit filed in this case, Mr. Harbin states in paragraph 12 that:

> Harbin's, Inc. **did not keep a separate bank account**, after the formation of Harbin's-Stern Brothers, LLC.  Accordingly, **income attributable to Harbin's, Inc**. received after  Harbin's-Stern Brothers, LLC began to conduct business, was **deposited into my personal checking account** as the **sole shareholder of Harbin's, Inc.**  Income was accounted for as **income of Harbin's, Inc.** in the federal and state tax returns of Harbin's, Inc.  (Emphasis added.)

Significantly, in his divorce case deposition, Mr. Harbin testified under oath that at the time of these deposits of Harbin's, Inc. checks into his personal bank account, his <u>sister</u> was <u>also a shareholder</u> of Harbin's, Inc., he considered at least one such deposit of a Harbin's, Inc. check to be <u>income to him personally</u>, and he did not share it with his sister.  (Michael Harbin Divorce Dep, Ex C at 230-231.)  This sworn testimony directly contradicts his Affidavit.

Mr. Harbin then detailed in his Affidavit to this Court another example of commingling corporate funds from a specific vendor, S.P. Richards, into his own personal account, attempting to justify the commingling by the desire to save a $10.00 check processing fee.  He stated:

> Harbin's, Inc. issued a non-sufficient funds check to one of its vendors, SP Richards.  That vendor then insisted on a certified check payment upon delivery.   The Harbin's, Inc. corporate

14

account charged a $10 processing fee for each certified check. Harbin's, Inc. had a delivery from SP Richards almost every day. My personal bank account had free certified checking privileges. In order to save the $10 processing fee **I would have Harbin's, Inc. write me a check for the amount** of the delivery from SP Richards, I would **go to my personal bank and deposit that check into my personal account**. I would then have a **certified check issued on my personal account** for the same amount made **payable to SP Richards**. I would then exchange that certified check for the goods delivered. . . . (Michael Harbin Affidavit, ¶ 13a.)

During his deposition in this case, Mr. Harbin admitted that he ran approximately $52,000 of Harbin's, Inc.'s checks through is own personal account for the purpose of paying S.P. Richards via certified check, but that he personally lacks any records to show the payments were made as he testified. (Michael Harbin Dep, Ex B at 97-98.)

The Court can decide for itself whether Mr. Harbin has provided a sufficient justification for commingling the Harbin's, Inc. funds which he says went to S.P. Richards into his own personal checking account. Significantly, however, Mr. Harbin did not mention in his Affidavit, let alone attempt to justify, the several instances where he deposited S.P. Richards rebate checks made payable to Harbin's, Inc. in amounts from several hundred to over eighteen thousand dollars into his own personal checking account. (Michael Harbin Divorce Dep, Ex C at 218-219; 229-230; 231-232.) The significance of all these transactions, whether they involve checks coming in or going out, is that they show, by Mr. Harbin's own testimony, that he commingled his corporate and personal checking accounts and corporate and personal funds as suited his needs.

Mr. Harbin's use of his personal bank account as a channel for corporate funds was not limited to payments for Harbin's, Inc.'s creditor, S.P. Richards. Harbin's testified to routing corporate funds through his personal bank account to pay for an employee insurance plan as well. (Michael Harbin Dep, Ex B at 105-106.)

Mr. Harbin also admitted to having routed large amounts of corporate funds, intended to be paid to Steelcase, through his personal bank account. In Mr. Harbin's Affidavit, paragraph 13(b), he states:

> In 2001, I used **my personal account** to temporarily place Harbin's-Stern Brothers, LLC money that was **earmarked for a large payment to Steelcase**. I was concerned that if it was left in the Harbin's, Inc. general account, it might be spent for something else and I wanted it used to pay Steelcase in full for a large order. Steelcase was paid in full for that order **out of my personal checking account** from those same earmarked funds. (Emphasis added.)

The amount to be paid to Steelcase that was channeled through Harbin's personal account exceeded $147,000. (Michael Harbin Dep, Ex B at 128-129; 132-133.)

Mr. Harbin says that he used his own personal checking account to deposit a check payable to Harbin's, Inc. from a customer and then to write a personal check to Steelcase. Such an excuse rings hollow when it is remembered that Mr. Harbin had control over both Harbin's, Inc. and Harbin's Stern Brothers. He could have easily deposited a check from a customer into the corporate account and then have immediately written a check to Steelcase for whatever was owed Steelcase. His explanation also fails to address the fact that presumably the check from the customer included an amount for Harbin's, Inc.'s services as a distributor over and above the cost due to Steelcase for the product. What happened to that amount? The point again, however, is that Mr. Harbin felt comfortable in commingling his personal and corporate funds and accounts and in fact did so.

**C.   Michael Harbin Admits That He Siphoned Off Corporate Funds For Personal Use.**

As noted above, discovery has revealed numerous incidents where Michael Harbin commingled corporate and personal funds, including numerous instances where what were clearly corporate funds came into his personal checking account.

We also know that there were instances that Mr. Harbin used corporate funds for his own personal requirements. As noted earlier, on at least three occasions Mr. Harbin deposited rebate checks from S.P. Richards into his own personal account and used the money himself. According to Mr. Harbin's testimony in his divorce deposition, those rebate checks, made payable to Harbin's, Inc., were in the amounts of $18,204; $331; and $2,189. (Michael Harbin Divorce Dep, Ex C at 218; 229-230; 232.)

Mr. Harbin admitted to taking these rebate checks in his deposition, but seeking to justify his actions because it did not involve "hundreds of thousands of dollars." He testified as follows:

> Q: Did you have money from the corporation that went to your personal accounts for any reason other than your income/payroll or, as you described earlier, to create certified checks?
>
> * * * *
>
> Q: So it's possible.
>
> A: Yes. There's been times when I've taken money from Harbin's, Inc., and deposited it in my checking account. $58,000 to pay a vendor on certified funds. Another time was to wire some money to Steelcase. I know Marvis wanted certified funds via wire transfer.
>
> Yes, there's been times when rebate checks came in to the company that I took in lieu of payment when I was not on the payroll so I could pay the employees. But to take money—if you're inferring that <u>did I take hundreds of thousands of dollars and stick it into my personal checking account? No, that did not happen.</u>
>
> Q: But it did happen that sometimes you would get rebate checks that were to Harbin's, [Inc.] that went into your personal bank accounts?
>
> A: There were occasions, yes.
>
> * * * *

17

Q:    Did it happen more than once?

A:    A couple of times it did.  Exactly when, normally through the course of my divorce, as you know, and the information Hope has supplied you all.  When I was not making the income to satisfy – excuse me.  Strike that.  When I was not able to provide in the way that some think I should when the business was struggling after the events of 9-11, as I attested to earlier, so, yes.  But do these amounts – were they significant?  No.  Is there an amount the corporation still owes me?  Yes.  Will I receive it?  No.  So—

(Michael Harbin Dep, Ex B at 121.)  Mr. Harbin also confirmed this testimony at a later point in his deposition.  (See Michael Harbin Dep, Ex B at 128.)

Similarly, Mr. Harbin admitted that he deposited into his own personal account rebate checks from a company named Revest payable to Harbin's, Inc. for income the corporation had earned and then used the proceeds as his own.  (Michael Harbin Divorce Dep, Ex C at 207; 231.)

In his divorce deposition, Mr. Harbin testified that he had received $10,000 written on a Harbin's, Inc. account to pay for his personal needs:

Q:    This is a South Trust Bank check written to Michael Harbin in the amount of $10,000.

A:    Yes, sir.

Q:    And what was that for, please?

A:    I needed money to pay the bills around the house.

(Michael Harbin Divorce Dep, Ex C at 197-198.)  In his deposition for this case, Mr. Harbin confirmed that the South Trust Bank account, from which the $10,000 was taken to "pay bills around the house," was a Harbin's, Inc. account.  (Michael Harbin Dep, Ex B at 131-132.)

Finally, Steelcase requested Mr. Harbin produce personal bank statements to verify that the funds deposited in Mr. Harbin's personal bank account intended for delivery to

corporate creditors such as S.P. Richards (discussed above) were only commingled rather than taken for personal use. (See **Exhibit D**, Plaintiff Steelcase Inc.'s First Discovery Requests and Proof of Service.) Harbin <u>failed to produce</u> any personal banking records that would corroborate his testimony that the corporate funds deposited into his personal accounts were actually paid out to the intended creditors. Rather, Mr. Harbin testified that he has no documents to prove that the corporate funds that went into his personal accounts were actually properly routed to creditors. (Michael Harbin Dep, Ex B at 93-94; 98.)

> **D.** **Mr. Harbin Admits to Having Made Personal Loans to Harbin's, Inc., and Circumstances Indicate They Were Made Without Formal Agreements of Repayment.**

Again in his Affidavit, Mr. Harbin admits to having made personal loans to Harbin's, Inc., stating:

> During the last two years that Harbin's, Inc. was in operation, **I used my own personal funds to make loans to Harbin's, Inc**. When Harbin's, Inc. had the money available to pay those loans back, some of it was paid back. I do not believe I was ever paid in full for all of the personal loans I made to Harbin's, Inc. (Michael Harbin Aff, ¶ 13(d)) (emphasis added.)

It can be inferred from Mr. Harbin's uncertainty as to whether or not he was ever paid that no written or oral agreement was ever made to establish repayment terms, interest, and due dates – a factor cited to support decisions to pierce. *See Laborers' Pension Trust Fund*, 872 F.2d at 705.

The lack of proper loan documentation between Michael Harbin and his companies was confirmed by Mr. Harbin in his divorce deposition:

> Q.    Harbin-Stern Brothers, April 3rd of '01, is reimbursing you on a loan repayment –
>
> A.    Yes, sir.
>
> Q.    -- for $3,500?
>
> A.    Yes, sir.

Q.     Harbin-Stern Brothers is paying the AmSouth payment again.  It says loan repayment in the amount of 6,000?

A.     Yes, sir.

Q.     Is this a personal loan that you made to Harbin-Stern Brothers?

A.     Yes, sir.

Q.     Do you have a note to evidence that?

A.     (Witness nodded in the negative).  No, I don't.

Q.     No note?  Tell me what evidence there is that Harbin-Stern Brothers owed you that money.

A.     Let's see.   There was a check in here, the Principal Financial Group, for $48,000, and I deposited 43,000 into Harbin-Stern brothers.

Q.     How much does Harbin Stern Brothers owe you today?

A.     That's a good question.

(Michael Harbin Divorce Dep, Ex C at 194-195.)

### E.    Mr. Harbin Transferred Assets To or From Another Business In Which He Had a Controlling Interest Without Adequate Consideration.

Mr. Harbin testified that he regularly transferred assets between Harbin's, Inc. and another corporation, Retail Enhancement Services, a company in which he was a 54% shareholder.  (Michael Harbin Dep, Ex B at 67-70; Michael Harbin Divorce Dep, Ex C at 182.) Mr. Harbin confirmed that Harbin's, Inc. never purchased products from Retail Enhancements or loaned money to Retail Enhancements; however, a Harbin's, Inc. balance sheet from 1999 showed an account receivable entry for Retail Enhancements for $297,413.50.  The balance sheet is attached as **Exhibit E**.  Harbin then testified that Retail Enhancements and Harbin's, Inc. regularly had "[i]nter-company transfers."  (Michael Harbin Dep, Ex B at 67-70.)

> Q:    If [Retail Enhancements] didn't borrow money from Harbin's [Inc.], and [Retail Enhancements] didn't purchase product, what's that near $300,000 amount?
>
> A:    I don't remember. Inter-company transfers, and there might have been the same type of entry on Retail Enhancement's balance sheet.
>
> * * * *
>
> Q:    Are there balance sheets for –
>
> A:    No.
>
> Q:    Retail Enhancements? Where'd those go?
>
> A:    Well, let's see. 1999, so what's that? Six years ago? You know, that company's been closed. I don't know.
>
> * * * *
>
> Q:    So it looks like from this balance sheet Retail Enhancements owed Harbin's Inc. – the year that [Retail Enhancements] went under or approximately, --
>
> A:    Um-hmm.
>
> Q:    They owed Harbin's [Inc.] about $300,000.
>
> A:    I can't attest to that. This could just be – and I don't even know who was doing our bookkeeping back then.

Mr. Harbin was unable to provide a clear indication of why nearly $300,000 was moved from one of his corporations to another. However, what is evident from his testimony is that the inter-company asset shifts were not arm-length transactions between his two corporations – there were no purchases of products nor were any formal loans executed. Such casual movement of assets from one controlled corporation to another is impermissible and a factor for piercing. *See Laborers' Pension Trust Fund, Inc.*, 872 F.2d at 704-705.

### F.    Mr. Harbin Executed Personal Guaranties on Behalf of Harbin's, Inc.

It is undisputed that Mr. Harbin signed personal guaranties with both Steelcase and Colonial Bank to secure extensions of credit to Harbin's, Inc. (Michael Harbin Aff, ¶ 16(i).)

21

The use of personal guaranties, while not determinative, is a factor that weighs in favor of piercing. *See WRW Corp.*, 986 F.2d at 143.

### G. Mr. Harbin and Harbin's, Inc. Had a Complete Unity of Interests.

Mr. Harbin, in his Affidavit (¶¶ 1, 3, 12), states that he was Harbin's, Inc.'s President, Chief Executive Officer, and sole shareholder. He testified that he ran and oversaw the corporation in all respects; that he was the person in "primary control." (Michael Harbin Dep, Ex B at 21; 23; 26.)

### H. Mr. Harbin Disregarded Corporate Formalities.

Because whatever corporate records of Harbin's, Inc. that ever existed have now apparently been destroyed, it is difficult for Steelcase to determine whether Harbin's, Inc. followed or ignored compliance with corporate formalities which is a recognized factor in piercing the corporate veil. As set forth above, Steelcase believes that the lack of corporate records should in this case lead to a presumption that those corporate formalities were ignored. *See Labadie Coal Co.*, 672 F.2d at 97.

Furthermore, there is some indication that corporate and accounting formalities were ignored as a rule. As shown earlier, alleged loans from Michael Harbin to Harbin's, Inc. were not documented. When asked how much Harbin's Stern Brothers owed him, Mr. Harbin responded that he did not know. (Michael Harbin Divorce Dep, Ex C at 195-196.)

### I. Harbin Admitted That Harbin's, Inc. Was Undercapitalized.

In his deposition, Harbin articulated the reasons that Harbin's, Inc. as a business collapsed, which included undercapitalization. Mr. Harbin stated that Harbin's, Inc. had a "lack of profitability, [in] a weak economy, [and was a] small under-capitalized company going though a three-year period of a downturn in the economy [which] caused the business to collapse." (Michael Harbin Dep, Ex B at 31.)

Undercapitalization alone has been deemed sufficient by courts to pierce the corporate veil. *See Labadie Coal, Co.*, 672 F.2d at 97-99.

**J.** **The Corporate Veil of Harbin's, Inc. Should Be Pierced Because There Is Evidence of the Presence of Nearly Every Factor Courts Consider To Justify Piercing Corporate Veils.**

As shown above, nearly every factor that courts consider, no one of which is a pre-requisite to pierce, is supported with evidence in favor of Steelcase. The present facts are much like those in *Laborers' Pension Trust Fund, Inc.*, 872 F.2d at 704-705, where the Sixth Circuit upheld the District Court's ruling to pierce the corporate veil. There the Court found piercing was justified because (1) the corporation was unprofitable; (2) the dominant shareholder made personal loans to the corporation without any oral or written contract setting out the amount of repayment or interest; (3) the dominant shareholder used corporate assets for personal obligations; (4) the corporation loaned money to or was loaned money by other corporations in which he had an interest; (5) assets were transferred from the corporation to the dominant shareholder after the corporation faced inevitable failure but while creditors remained unpaid; and (6) the dominant shareholder had unchecked authority to make the decision to transfer assets to himself. *See id.* These factors are present under the undisputed facts here; therefore, sufficient evidence has been shown for the trier of fact to find the corporate veil of Harbin's, Inc. should be pierced through to its sole shareholder. *See Laborers' Pension Trust Fund, Inc.*, 872 F.2d at 704-705.

**K.** **There Is Ample Evidence Of Wrongdoing By Michael Harbin And Harm To Steelcase.**

Mr. Harbin asserts that Steelcase's claim for piercing the corporate veil is "bereft of any allegations of wrongdoing." (Michael Harbin's Summary Judgment Brief, 17.) Quite to

the contrary, Mr. Harbin himself has admitted to numerous acts of wrongdoing.  If a person intends to seek legal refuge behind a corporate shell, it is <u>wrong</u> to:

- commingle corporate and personal assets;

- take monies rightfully due to the corporation and spend them for personal needs;

- make undocumented personal loans to the corporation, so that it is impossible to tell whether a payment is legitimate or not;

- transfer funds and assets between controlled corporations without either a business reason or for valid consideration;

- do any one or all of the above when the corporation is undercapitalized.

These are not merely allegations of wrongdoing, they are facts admitted by Michael Harbin.

Mr. Harbin next argues that the wrongdoing did not cause Steelcase's loss.  First, it is undisputed that Steelcase suffered a loss.  Michael Harbin has admitted that Harbin's, Inc. owed Steelcase $385,275.79 for unpaid product and interest.  (Answer of Michael Harbin, ¶¶ 20-24.)  There was no counterclaim, no affirmative defense that the money was not owing.  What that means is that Harbin's, Inc. received quality Steelcase product, sold it to customers, got paid for it, and never paid Steelcase.  If Harbin's, Inc. was legitimately run as a corporation, so be it.  But the evidence says it was not.

Can Steelcase now prove that Michael Harbin personally pocketed customer payments for Steelcase product, that he converted those specific funds?  No (although in one very significant instance we know he put such a payment in his own personal checking account.)  But Steelcase does not have to provide such proof.  Michael Harbin is lawfully entitled to hide beyond the corporate form <u>only</u> if he in fact respected and honored that form.  It is abundantly clear he did not.  He used Harbin's, Inc. as his tool, taking its assets as he chose, placing them where he chose, transferring them between his companies as he chose.  But having done so,

having taken the corporation's assets, he must now take the corporation's liabilities, specifically Steelcase's default judgment.

What is his defense?  Essentially this:  "Well, I took corporate assets but I didn't take as much as you're owed."  There are two responses.  First, a valid claim of piercing the corporate veil has no such limitation.  If the corporate form is to be ignored, it is ignored totally, not in fragments.  Second, how can Steelcase, how can the Court, know how much Mr. Harbin took, when the corporate records that might answer that question are, thanks to him, in the Montgomery County landfill?

## Conclusion

For the reasons stated above, Steelcase respectfully requests that this Court deny Defendant Michael Harbin's Motion for Summary Judgment because:  (1) the Guaranties expressly and unambiguously state that the obligations of the defendants are of a continuing nature and, therefore, as a matter of law extend to the debt owed by Harbin's, Inc. to Steelcase, and (2) there is sufficient evidence to support the claim that Michael Harbin abused the corporate form and that injustice and a fundamentally unfair result would occur without piercing the corporate veil.

MILLER JOHNSON
Attorneys for Plaintiff, Steelcase Inc.


Dated:  May 27, 2005                    By _____/s/ Sara G. Lachman_____
                                                    Jon G. March (P17065)
                                                    Sara G. Lachman (P67523)
                                            Business Address:
                                                    250 Monroe Avenue, N.W., Suite 800
                                                    PO Box 306
                                                    Grand Rapids, Michigan  49501-0306
                                            Telephone:  (616) 831-1700