# EXHIBIT B

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

COPY

STEELCASE, INC., a Michigan
corporation,

        Plaintiff,

vs.

HARBIN'S, INC., an Alabama
corporation, **MICHAEL G.
HARBIN**, and **HOPE D. HARBIN
PATTERSON**,

        Defendants.

_____/

Case No. 1:04-CV-0026

HON. ROBERT HOLMES BELL
Chief U.S. District Judge

## DEPOSITION OF MICHAEL G. HARBIN

Taken by Plaintiff on the 27th day of January, 2005, at the offices of Silverman, Smith,

Bingen & Rice, P.C., 707 Comerica Building, 151 South Rose Street, Kalamazoo,

Michigan, before Karen L. Banks, Notary Public and Certified Electronic Recorder in

and for the State of Michigan, commencing at 9:28 a.m.

**APPEARANCES:**

For Plaintiff:

    **SARA G. LACHMAN** (P67423)
    Miller, Johnson, Snell & Cummiskey, PLC
    250 Monroe Avenue, N.W., Suite 800
    P.O. Box 306
    Grand Rapids, Michigan 49501-0306
    Telephone: (616) 831-1700

For Defendants:

    **ROBERT W. SMITH** (P31192)
    Silverman, Smith, Bingen & Rice, P.C.
    151 South Rose Street, Suite 707
    Kalamazoo, Michigan 49007
    Telephone: (269) 381-2090

Also Present:

    **Ms. Courtney Williams**

**RECORDED BY: Karen L. Banks, CER 3592**

**Page 7**

1  questions, but know that I object.
2  MS. LACHMAN: It's noted.
3 BY MS. LACHMAN:
4 Q  We asked for you to produce all the documents that
5  evidence, support and/or pertain to your affirmative
6  defenses. You listed as your affirmative defenses:
7  the indebtedness to which the guaranties apply have
8  been discharged by payment; plaintiff has failed to
9  state a claim on which relief can be granted; there is
10  no genuine issue as to any material fact and defendant
11  Michael G. Harbin is entitled to judgment as a matter
12  of law; defendant Michael G. Harbin reserves the right
13  to allege additional affirmative defenses learned
14  during the course of discovery. Have you provided all
15  those documents to support your affirmative defenses?
16 A  Yes.
17 Q  We asked for you to produce the last three fiscal year end
18  and the most recent financial statements and
19  accountings of Harbin's, Incorporated, and of Harbins-
20  Stern Brothers, LLC, including but not limited to:
21  income statements; records of all payments and receipts
22  of payments; corporate ledgers; bank statements;
23  balance sheets; accounts receivable listings; inventory
24  accounting and listing; bank records, including banking
25  records for checking and deposit and/or savings

**Page 8**

1  accounts; corporate tax returns. Have you produced all
2  those?
3 A  Not all of those.
4 Q  Income statements. Did you produce those?
5 A  I believe Bob has one or two of them.
6 Q  Where are the others?
7 A  I have no idea.
8 Q  And what about records of all payments and receipts of
9  payments?
10 A  Bob has the check registers.
11 Q  Are those complete check registers?
12 A  Yes.
13 Q  And corporate ledgers?
14 A  Define "corporate ledger."
15 Q  Corporate ledgers that show payments coming in,
16  payments going out, balances owed.
17 A  I think there's accounts payable information I gave
18  him, and accounts receivable.
19 Q  Are those complete?
20 A  They are, for that period of time.
21 Q  Those are all the records that you have regarding those
22  years from July 2000 to --
23 A  They're not the entire years, but it's -- what I have
24  is complete for that period of that month or that year.
25 Q  Where are the records for other months that weren't

**Page 9**

1  provided?
2 A  I think they're in the Montgomery County landfill.
3 Q  Why were they put there?
4 A  The bank foreclosed on the property and sold it to
5  another party, and they cleaned the building out.
6 Q  Okay. Bank statements?
7 A  The ones I have Bob has.
8 Q  And the others are --
9 A  I don't know. I have none in my possession.
10 Q  Balance sheets?
11 A  The ones I have Bob has.
12 Q  And where are the others?
13 A  They were left in the building when I vacated the
14  building.
15 Q  And accounts receivable listing?
16 A  Again, Bob has those, the accounts payable and accounts
17  receivable and a couple income statements.
18 Q  Okay. And the ones that you don't have are --
19 A  I don't know.
20 Q  You don't know because they were left in the building?
21 A  They were left in the building, the bank foreclosed on
22  the building, the property was sold to another party,
23  and they cleaned the building out.
24 Q  Why would you leave all those records there?
25 A  Why would I?

**Page 10**

1 Q  Um-hmm.
2 A  Well, probably 20 years or a 44-year-old business with
3  a room triple this size of old check stubs and stuff
4  like that and me leaving the state, there's no room for
5  me to store that information.
6 Q  The business had a lot of debt when you left the
7  business; right?
8 A  Correct.
9 Q  Did you anticipate litigation coming out of Harbin's,
10  Inc.?
11 A  Not necessarily, no.
12 Q  Did you owe money to multiple debtors?
13 A  I did.
14 Q  Did you owe large sums of money to multiple debtors?
15 A  Not to multiple debtors, no.
16 Q  But you did owe large sums to some debtors?
17 A  I owed large -- the corporation owed large sums of
18  money --
19 Q  Sorry. Right.
20 A  -- to a couple debtors.
21 Q  Okay. So the corporation owed large sums of money to
22  one or more debtors --
23 A  Um-hmm.
24 Q  -- and you didn't anticipate any litigation coming from
25  it?

**Page 11**

1  A  No, I did not.
2  Q  And so you just left the records and walked away?
3  A  Again, the bank foreclosed on the property, the
4     business ceased operation, and I gave the keys and the
5     deed to the bank and left.  Correct.
6  Q  Were you concerned about taxes?  Wouldn't you need your
7     records to produce --
8  A  We had already filed our final tax return.
9  Q  The last few were inventory and account listings.  I
10    think you answered that.
11 A  Yes.  Bob has that.
12 Q  And bank records, including banking records for
13    checking and deposit and/or saving accounts.
14 A  For the company?
15 Q  For the company.
16 A  What I have in possession Bob has.
17 Q  Okay.  So, the same answer?  The rest is you don't
18    know?
19 A  Right.
20 Q  Could be the landfill?
21 A  Right.
22 Q  Okay.  And corporate tax returns?
23 A  Without having the documents I sent Bob in front of me,
24    everything I had was in a small box.  That was up to
25    the last day of business, which I thought would need to

**Page 12**

1     be kept for a final return, which we did.  He has all
2     that information in his possession.
3  Q  Okay.  And so everything that you did keep, you kept
4     for the purposes of doing a final tax return?
5  A  Correct.
6  Q  Everything else, if it wasn't for the tax return, you
7     didn't keep it?
8  A  Correct.
9  Q  Okay.  The next thing we asked for was regarding your
10    personal records.
11 A  Um-hmm.
12 Q  We asked for -- and these are for the period between
13    July 2002 to current.  Personal bank, savings or
14    checking accounts.
15 A  I've ordered that information.
16 Q  Statements from money market accounts?
17 A  I have no money market accounts.
18 Q  Did you have any during this period?
19 A  No.
20 Q  And certificates of deposit?
21 A  No.
22 Q  No?  Does that mean you never had them during July 2002
23    --
24 A  No, I've never had a certificate of deposit.
25 Q  Okay.  Retirement accounts?

**Page 13**

1  A  Yes.
2  Q  Yes, you have them?
3  A  I had them during that period of time.
4  Q  Okay.  Did you produce records on those?
5  A  No.
6  Q  Why not?
7  A  I've had to order them.
8  Q  Have you ordered them?
9  A  I have.
10 Q  Of brokerage accounts?
11 A  Yes.
12 Q  Yes, meaning you have them and you ordered them?
13 A  Correct.
14 A  Sorry.  Just trying to be clear for the record.
15 A  I understand.
16 Q  IRA accounts?
17 A  Yes, and ordered.
18 Q  Mutual fund accounts?
19 A  Yes, and ordered.
20 Q  See?  We're getting quick at this.  Individual stocks
21    and/or bonds?
22 A  That information would be in a brokerage account.
23 Q  Okay.  And any other source of banking or investment
24    account?
25 A  None.

**Page 14**

1  Q  And you mean none as in you didn't have anything other
2     than what we already covered?
3  A  Correct.
4  Q  Okay.  The next thing we asked was for you to produce
5     all documents that evidence support and/or pertain to
6     the transfer of assets from Harbin's, Inc., and or
7     Harbins-Stern Brothers, LLC, to individuals and/or to
8     individuals' personal accounts from July 2002 to
9     current.  Did you provide any documents on that?
10 A  I don't think so.
11 Q  Okay.  Why not?
12 A  I don't think there's any records that I have that show
13    any of that information.
14 Q  Were there records that did show that?
15 A  There were at one time.
16 Q  Where did those records go?
17 A  I believe they're gone with all the other old records.
18 Q  Okay.  Next we asked for you to produce all documents
19    that evidence, support and/or pertain to the transfer
20    of assets from Harbin's, Inc., or Harbins-Stern
21    Brothers, LLC, to any other business entity owned in
22    whole or in part by you from July 1, 2000 to current.
23    Was that provided?
24 A  No.
25 Q  And, because?

**Page 15**

1  A  There is no other entity.
2  Q  There's no other entity that you owned in whole or in
3     part --
4  A  No.
5  Q  -- between July 1, 2002 --
6  A  No.
7  Q  Okay.  Next, produce all documents that evidence,
8     support and/or pertain to receipts of payment for or
9     statements of account relating to payments by customers
10    of Harbin, Inc. or Harbins-Stern Brothers, LLC, for
11    Steelcase, Inc. product from July 1, 2002 to current.
12 A  No.
13 Q  And by "no," do you mean there never was record of
14    payment or --
15 A  There are records of payments, but I don't have those
16    in my possession.
17 Q  Don't know where they are?  Landfill --
18 A  Don't know where they are.
19 Q  Okay.  And we asked for you to produce all of your
20    individual federal and state income tax returns from
21    July 1, 2002 to current.  Were those provided?
22 A  No.
23 Q  Why not?
24 A  I have to find them.
25 Q  Do you have any thoughts on where they might be?

**Page 16**

1  A  Somewhere in Alabama.
2  Q  So you kept the corporate tax returns, but not your
3     personal tax returns?
4  A  You just asked me did I provide my personal tax
5     returns.
6  Q  Right.  But above you did provide some of the corporate
7     tax returns.
8  A  Again, without seeing what I've given to Bob, if I had
9     those documents in front of me I could tell you what is
10    in that box.  There may be a corporate tax return in
11    there; there might not be.  I don't know.  I think
12    there are three, if my memory serves me correctly, that
13    was in that banker's box that he has.  So, yes, I think
14    he does have three years of corporate tax returns.
15 Q  Okay.  But you don't keep your personal tax returns
16    with you?
17 A  No, I do not.
18 Q  Why would they be in Alabama?
19 A  Because I used to live in Alabama.
20 Q  And so you just left them in your old residence or --
21 A  I maintain a residence in Alabama and Florida as well.
22 Q  Okay.  And we asked you to produce a copy of all
23    pleadings, orders, correspondence, settlement offers or
24    agreements and other documents related to the
25    litigation matter of Colonial Bank vs. Harbin's, Inc.,

**Page 17**

1     and Michael G. Harbin.  Was that provided?
2  A  No.
3  Q  And why not?
4  A  I believe you called the attorney that was handling
5     that and she provided that information to you, or
6     somebody did.  It might not have been you, but she said
7     somebody called.
8  Q  Okay.  So somebody called and got information, so you
9     didn't -- and that's why you didn't provide it to us?
10 A  Correct; um-hmm.
11 Q  Okay.  Now I'm just going to talk to you a little bit
12    about general stuff, just general things about you.
13 A  Okay.
14 Q  First off, where's your current residence?
15 A  Florida.
16 Q  Okay.  And the address?
17 A  Is 406 Eastern Lake Road.
18 Q  Okay.  And you said you maintain a residence in
19    Alabama, as well?
20 A  That's correct.
21 Q  Okay.  Is that half year on, half year off?
22 A  No.  I'm divorced, as you know, and when I get my
23    children on long holidays and every other weekend, I
24    drive from Florida on a Thursday, meet my former wife
25    in Georgia on Fridays, spend the weekend with my

**Page 18**

1     children in Montgomery, and then on Monday return back
2     to Florida.
3  Q  Sounds like quite a turnaround.
4  A  It is.
5  Q  This Florida house, does that -- I'm just trying to
6     understand the background.  So you were living in the
7     house that you maintain in Alabama when you were
8     running Harbin's?
9  A  That's correct.  Um-hmm.
10 Q  Okay.  That was your primary home at that time?
11 A  Correct.
12 Q  Okay.  And then your Florida home, you moved there
13    when?
14 A  After the business was closed.
15 Q  Which was?
16 A  April of 2003.  April 30, 2003.  Yeah.
17 Q  Okay.  And so you purchased your house in 2003?
18 A  Which house?
19 Q  The 406 Eastern Lake.
20 A  1997.
21 Q  Oh, okay.  And your education.  Did you go to business
22    school?
23 A  I did.
24 Q  Where'd you go?
25 A  University of Alabama.

| Page 19 | Page 21 |
|---|---|
| 1 Q And you completed? | 1 A I think it was in March of 1990. |
| 2 A I did. | 2 Q How did you become involved? |
| 3 Q When? | 3 A I bought the business. |
| 4 A 1984. | 4 Q Who'd you buy it from? |
| 5 Q I thought I saw somewhere that you went to law school. | 5 A My family. |
| 6     Did you go to law school? | 6 Q Did you become the sole owner? |
| 7 A I did. | 7 A No. |
| 8 Q Where'd you go? | 8 Q Who else was owner? |
| 9 A Birmingham School of Law. | 9 A With my father. |
| 10 Q Did you complete? | 10 Q Did you ever become sole owner? |
| 11 A No. | 11 A Technically, no. |
| 12 Q And your current form of employment? | 12 Q Technically, no? |
| 13 A Real estate sales. | 13 A My father passed away. My sister inherited his |
| 14 Q And who's your employer? | 14     percentage of ownership. |
| 15 A An independent contractor. | 15 Q What percentage was that? |
| 16 Q Do you work for one person primarily more than another | 16 A Twenty-five. |
| 17     or -- | 17 Q So from 1990 you were a 75-percent business owner. |
| 18 A I'm self-employed. | 18     That stayed true the entire time? |
| 19 Q Okay. So are you more of a broker or do you actually | 19 A That's correct. |
| 20     just go out and sell the properties? | 20 Q What was your title at Harbin's? |
| 21 A I'm an agent for a broker. | 21 A Owner, president, coach, team leader. |
| 22 Q A particular broker? | 22 Q You did it all? |
| 23 A 30-A Realty, Incorporated. | 23 A I did it all. H.R., P.R. |
| 24 Q And you don't own any part of that, do you? | 24 Q Was that your title from 1990 on? |
| 25 A No. | 25 A That's correct. |

| Page 20 | Page 22 |
|---|---|
| 1 Q And they're based out of -- | 1 Q Were you an officer? Let's see. You said president. |
| 2 A Santa Rosa Beach, Florida. | 2 A Correct. |
| 3 Q When did you start there? | 3 Q Okay. And were you also a member of the board of |
| 4 A March, April, May, June, July -- May -- March, April, | 4     directors? |
| 5     May, June, July. August somewhere of 2003 after the | 5 A Yes. |
| 6     business had closed. | 6 Q Who else was a member? |
| 7 Q August 2003. And how did you find that employment? | 7 A My father. |
| 8 A The owner of the company who sold me my house in '97, I | 8 Q So when he died, your sister also became -- |
| 9     had gone down there a couple times prior to the | 9 A No. |
| 10     business closing and I had an Alabama real estate | 10 Q So at one point it was just you on the board of |
| 11     license that I had earned 15 years prior to April 30th | 11     directors? |
| 12     of 2003 when I used to work for a development company | 12 A That's correct. |
| 13     out of Atlanta. And I was telling him about Harbin's | 13 Q Did you have any other officers? |
| 14     closing, and he suggested that I hang a shingle with | 14 A No. |
| 15     him. And Alabama and Florida have a reciprocal | 15 Q Did you have much power over the daily operations of |
| 16     agreement with -- as far as a licensee, so I | 16     Harbin's? |
| 17     transferred my license to -- from the State of Alabama | 17 A Yes. |
| 18     to the State of Florida, and that's how I got on with | 18 Q Did you decide who was hired and fired? |
| 19     him. | 19 A Yes. |
| 20 Q Okay. Now I'd like to talk to you a little bit about | 20 Q Did you decide how much employees were paid? |
| 21     Harbin's. And when I say "Harbin's," I mean Harbin's, | 21 A Yes. |
| 22     Incorporated. | 22 Q Did you sign their paychecks? |
| 23 A Okay. | 23 A No. |
| 24 Q Harbin's business history. So, when did you become | 24 Q Who did that? |
| 25     involved with Harbin's? | 25 A A payroll service outside of the company. |

**Page 23**

1 Q  And who was that?
2 A  ADP at one time, and then another company in the final
3     years of operation was called Paymaxx.
4 Q  Oh, yeah.  When customers didn't pay Harbin's, did you
5     have the power to control how those customers were
6     handled?
7 A  Yes.
8 Q  Did anybody else?
9 A  No.
10 Q  And who handled the negotiations with suppliers on
11     behalf of Harbin's?
12 A  Typically me.
13 Q  So you were a pretty hands-on president?
14 A  Small company, 25 employees, yes.  Closely-held
15     corporation, I was pretty much hands-on.
16 Q  Okay.  Did you supervise the bookkeeping?
17 A  Oversaw it, yes.
18 Q  But you didn't keep it?
19 A  No.
20 Q  Who did?
21 A  Numerous people did over a 15-year period.
22 Q  Was there any steady person after about 2000?
23 A  Let's see.  I think there were three.
24 Q  Do you remember their names?
25 A  Donna Maddox and Andrea -- and I can't remember her

**Page 24**

1     last name -- and Charlotte Thorpe.
2 Q  Were you the only one who signed checks, or did many?
3 A  I was the only one that signed checks for Harbin's,
4     Incorporated.
5 Q  Did anyone else have the power to sign checks?
6 A  No.
7 Q  Did you use personal accounts or was a corporate
8     account created?
9 A  "Corporate account" meaning did we have a corporate
10     checkbook?
11 Q  Yes.
12 A  Yes.
13 Q  That had its own bank account?
14 A  Correct.
15 Q  What was that corporate account used for?
16 A  Daily operations of the business.
17 Q  Was it used for anything else?
18 A  No.
19 Q  Was it ever used for personal use?
20 A  Not that I recall, no.
21 Q  Did you ever make payments from your personal accounts
22     on behalf of Harbin's?
23 A  Towards the end I did.
24 Q  "Towards the end"?  Can you define that?
25 A  Towards the end before Harbin's started really going

**Page 25**

1     downhill, I was using my personal assets to try to keep
2     the corporation going.
3 Q  Okay.  And what year was that, do you think?
4 A  2002, 2003.
5 Q  Did you ever deposit money from Harbin's into your
6     personal accounts?
7 A  I did.
8 Q  What for?
9 A  Payroll.
10 Q  Why wasn't that handled through ADP or Paymaxx?
11 A  Sometimes when we didn't have enough money to meet
12     payroll, I would omit myself and then I would -- we
13     would write a manual check to myself later on when we
14     had the proper funds, and then we would report that to
15     ADP or Paymaxx.
16 Q  And they have records of that?
17 A  They should.
18 Q  Did the records clearly explain how that was working?
19 A  If the records were available, I'm sure they would.
20 Q  So I just want to make sure I understand.  Sometimes
21     you would go without paying yourself?
22 A  That's correct.
23 Q  And then later, instead of sending more money to ADP or
24     Paymaxx, --
25 A  Um-hmm.

**Page 26**

1 Q  -- you would just take a check, cut it to your personal
2     accounts --
3 A  You could write a manual check and then report it to --
4     the check -- the payroll company that handled it, and
5     they would do the taxes and all that kind of stuff.
6 Q  Was there anybody else who ever was paid like that?
7 A  Not with Harbin's, Inc., no.
8 Q  Was your father involved in the daily operations of the
9     business?
10 A  On a limited basis, yes.
11 Q  But you were the person in primary control?
12 A  Yes.
13 Q  Was Hope?  And by "Hope," I mean Hope Harbin, now Hope
14     Patterson.  Was she involved in the daily running of
15     the business?
16 A  No.
17 Q  Was she aware of the -- was she generally aware of what
18     was going on?
19 A  Yes.
20 Q  Was she kept abreast of the financial situation at
21     Harbin's?
22 A  Yes.
23 Q  Did she help make business decisions?
24 A  During what period of time?
25 Q  2000.

**Page 31**

```
 1   industries in Montgomery were affected greatly by the
 2   events that happened in New York, so --
 3 Q And so it wasn't that your customers were failing to
 4   pay so much that caused the business to collapse?
 5 A The economy was shrunk.
 6 Q Go ahead. I guess I was just trying to understand.
 7   When you say the economy shrunk, less demand for
 8   furniture?
 9 A Less demand for furniture. Greater demand to get
10   quotes from competing dealers that carry the same
11   product line. Margins were compressed to the level of
12   1 and 2 percent on a sale. So, lack of profitability,
13   a weak economy, small under-capitalized company going
14   through a three-year period of a downturn in the
15   economy caused the business to collapse.
16 Q So, given that question -- this one's pretty obvious --
17   that Harbin's, Inc., is no longer operating?
18 A Harbin's, Inc., is no longer operating.
19 Q Okay. And what's the official status of that business
20   entity?
21 A The official status is the entity itself is still in
22   existence.
23 Q Um-hmm.
24 A It'll be thrown into -- or papers are prepared to file
25   a Chapter 7, and when we do that we'll be maybe a week,
```

**Page 32**

```
 1   a month. I don't know. Just whenever the attorney
 2   advises me to do so.
 3 Q Okay. Is it certain that you're going to do that?
 4 A Just to clean everything off. Yes.
 5 Q Okay. We touched on this a little bit before, but I
 6   just wanted to get as clear a picture as I could. When
 7   did Harbin's, Incorporated -- when did you know it
 8   wasn't going to survive?
 9 A Probably when the -- when Steelcase cut me off and I
10   could no longer ship to Alfa, because they were like 70
11   percent of our revenues.
12 Q When was that approximately?
13 A I don't recall.
14 Q Do you remember the year?
15 A Either 2003 or late 2002 possibly.
16 Q Was that the defining moment?
17 A I would say that was one of the defining moments.
18 Q But you mentioned before that the events of September
19   11th sort of -- had already shown you that the business
20   may not keep going?
21 A The business was still muddling along. But, yes, to
22   answer your question, yes, that was the defining
23   moment. When Steelcase wouldn't ship me a $200
24   keyboard in order for me to be paid $12,000 by Alfa,
25   that was the defining moment. That closed it right
```

**Page 33**

```
 1   there.
 2 Q But you had hints before?
 3 A About what?
 4 Q That the business probably wouldn't survive.
 5 A I would always have a hint. You never know day to day.
 6   Steelcase may blow up tomorrow. Herman Miller may take
 7   them over. A nuclear attack may happen in Iraq and the
 8   whole U.S. will be turned upside-down.
 9 Q Well, sure, but I guess I meant more specifically --
10 A Looking into a crystal ball, I can't answer that
11   question. Yes, there were strong times for the
12   corporation. Yes, there were weak times. Our weakest
13   moment was when the U.S. was in a downturn in the
14   economy, and probably the most defining moment, to
15   answer your question again, was when Steelcase refused
16   to ship me product.
17 Q Okay. Have you ever considered that the corporation
18   was maybe -- well, strike that question. I was getting
19   confused. When did the corporation become dormant?
20 A April 30, 2003.
21 Q Okay.
22     MR. SMITH: You're sure you mean 2003?
23     THE WITNESS: That was our -- or 2004. 2004.
24   April 30, 2004.
25     MR. SMITH: And when you said late 2002,
```

**Page 34**

```
 1   early 2003 when Steelcase shut off the product, did you
 2   mean 2003, 2004?
 3     THE WITNESS: 2003 or 2004. I said 2002,
 4   didn't I?
 5 BY MS. LACHMAN:
 6 Q You did.
 7 A Okay. 2003 or 2004.
 8 Q So, whenever they stopped shipping product --
 9 A Correct.
10 Q -- for you is when there was no question about it. The
11   business was struggling considerably before that point,
12   though, wasn't it, before Steelcase stopped shipping
13   you furniture?
14 A We were struggling, but I did not see that it was in
15   imminent danger of closing.
16 Q What was Harbin's financial health like in 2000?
17 A I don't recall. I believe at that time that was
18   Harbins-Stern Brothers.
19 Q So we got a little out of order, so I might jump around
20   a bit.
21 A Okay.
22 Q But since you mentioned it, what was Harbins-Stern
23   Brothers?
24 A That was an LLC that the members were Harbin's, Inc.,
25   and Stern Brothers, Incorporated.
```

Page 39

| | |
|---|---|
| 1 A | I don't recall. |
| 2 Q | Was it earlier than April 30, 2004? |
| 3 A | Some vendors, yes, but which I -- we had multiple |
| 4 | vendors, so I don't recall. |
| 5 Q | And do you know if in 2003 as you were getting bills in |
| 6 | each month, whether you -- whether Harbin's was able to |
| 7 | pay those bills in full? |
| 8 A | We pretty much were able to pay things in full, yes. |
| 9 Q | What about in 2002? |
| 10 A | I don't recall. |
| 11 Q | Okay. I want to just talk about the guaranty for a |
| 12 | little bit and do -- well, before I get into that, did |
| 13 | you ever provide a UCC security interest to Steelcase? |
| 14 A | No. |
| 15 Q | Not in anything? |
| 16 A | Nothing. |
| 17 Q | Did Steelcase ever ask you for one? |
| 18 A | They did. |
| 19 Q | Did they ask you more than once? |
| 20 A | No. |
| 21 Q | They only asked you one time for a security interest? |
| 22 A | As best as I can recall is when I bought the dealership |
| 23 | from the family, and they asked at that time for a UCC- |
| 24 | 1. |
| 25 Q | Who was your main contact person at Steelcase? |

Page 39

Page 41

| | |
|---|---|
| 1 Q | And below that, is that Hope Harbin, now Hope |
| 2 | Patterson's signature? |
| 3 A | That's correct. |
| 4 Q | And the date? Can you read that for me? |
| 5 A | June 10, 1993. |
| 6 Q | Okay. And did you and Hope sign that together? |
| 7 A | We did. |
| 8 Q | Who else was present when you signed it? |
| 9 A | Lynn Summer. |
| 10 Q | Who's Lynn Summer? |
| 11 A | I believe she was a receptionist at that period of |
| 12 | time. |
| 13 Q | Does the date accurately reflect the date the guaranty |
| 14 | was signed? |
| 15 A | I have no idea. |
| 16 Q | Did you read the guaranty before you signed it? |
| 17 A | I did. |
| 18 Q | Did you read all of it? |
| 19 A | I did. |
| 20 Q | Did you read -- and turn to it on page 2 -- paragraph |
| 21 | 4? Did you read that prior to signing? |
| 22 A | I did. |
| 23 Q | Did you ask for any edits or revisions to that |
| 24 | provision? |
| 25 A | No. |

Page 41

Page 40

| | |
|---|---|
| 1 A | For? |
| 2 Q | For sales. |
| 3 A | They've had multiple reps for Alabama throughout the |
| 4 | years. Brian Clark, Jack Salter, Scott Messmore, Rich |
| 5 | Cocos, George Yates, Brackett Martinstein, Jenny Crowe, |
| 6 | Keith VerHage, Rick Ginta. |
| 7 Q | What about Randy Essenberg (ph.)? |
| 8 A | He was a credit man. |
| 9 Q | Credit man. Was he your primary -- |
| 10 A | Marvis James was. |
| 11 Q | Has Marvis James been throughout? |
| 12 A | There's been multiple credit people I've dealt with |
| 13 | throughout. |
| 14 Q | And Randy Essenberg was one; right? |
| 15 A | Correct. Super nice guy. |
| 16 Q | Okay. Let's talk about these guaranties. The first |
| 17 | one -- make sure I have them in order. She's marked |
| 18 | this as Exhibit 1. You've seen this before? |
| 19 A | I have. |
| 20 Q | And this is the guaranty that this litigation is over? |
| 21 | One of the two? |
| 22 A | Correct. |
| 23 Q | Okay. And can you turn to page 5, please? Is that |
| 24 | your signature? |
| 25 A | Yes. |

Page 40

Page 42

| | |
|---|---|
| 1 Q | This next one, the second guaranty, Karen's marked that |
| 2 | as Exhibit 2. This is the second guaranty that this |
| 3 | litigation is about? |
| 4 A | Yes. |
| 5 Q | And is that your signature? |
| 6 A | Yes. |
| 7 Q | Is that Hope's signature? |
| 8 A | Yes. |
| 9 Q | Did you read the guaranty before you signed it? |
| 10 A | I did. |
| 11 Q | Did you read all of it? |
| 12 A | I did. |
| 13 Q | On page 2, paragraph 4, did you read that before you |
| 14 | signed it? |
| 15 A | I did. |
| 16 Q | And did you request any alteration of that paragraph? |
| 17 A | No. |
| 18 Q | Could you read that paragraph for me right now, please? |
| 19 A | "This Guaranty is made and shall continue as to any and |
| 20 | all Indebtedness incurred or arising prior to receipt |
| 21 | by Creditor of written notice of the termination hereof |
| 22 | from the undersigned, including any and all extensions, |
| 23 | renewals and modifications thereof made at any time |
| 24 | thereafter. Any such notice shall be effective only as |
| 25 | to the person giving the same, and this Guaranty shall |

Page 42

| | |
|---|---|
| **Page 43** | **Page 45** |

1   continue in full force and effect as to any of the
2   undersigned not giving such notice."
3 Q  Have you ever provided written notice to terminate the
4   guaranty?
5 A  Yes.
6 Q  Do you have any documentation of that?
7 A  Eleven, twelve years later? No, I do not.
8 Q  When was that written termination sent?
9 A  After these P.O.'s were paid by -- to Steelcase.
10 Q  Do you remember who you sent it to?
11 A  I believe it was Marvis.
12 Q  Did anybody else know about the correspondence?
13 A  My secretary who typed it did.
14 Q  Who was that?
15 A  I can't remember her name. The receptionist. It might
16   have been Lynn Summer.
17 Q  Because she's the one who you mentioned --
18 A  Witnessed it.
19 Q  -- witnessed it, and she was your secretary at that
20   time?
21 A  Yes.
22 Q  On the second one, this 8-4-93, that has a different
23   name as a witness?
24 A  Yes.
25 Q  Who's that person?

Page 43

1 A  He was with the installation company that was
2   installing the furniture that these specific P.O.'s to
3   this guaranty relate to.
4 Q  You think that Lynn Summer was your secretary at the
5   time that you signed this guaranty?
6 A  I believe she was, but I can't be -- I'm not a hundred
7   percent sure.
8 Q  Did you send written termination of this guaranty?
9 A  I did.
10 Q  And who would have known about that?
11 A  Myself because I signed the letter, and then if Lynn
12   was the receptionist/secretary at the time, which I
13   believe she was, she would have typed it for me.
14 Q  Have you ever talked to anybody about sending written
15   termination?
16 A  Explain.
17 Q  Did you talk to Hope about sending written termination?
18 A  I might have. I don't recall.
19 Q  Did you talk to Marvis James on the telephone about it
20   prior to sending it?
21 A  I believe I might have spoken to Marvis and told him
22   that it was coming, or, you know, I mailed it with the
23   last check for the last P.O. But again, you're talking
24   so many years ago.
25 Q  And you don't have any records of that?

Page 44

1 A  Of that letter? No, I do not.
2 Q  Do you know if Hope ever sent a termination letter?
3 A  No, not that I'm aware of.
4 Q  On either guaranty?
5 A  Not that I'm aware of.
6 Q  This is your answer to our complaint.
7     (At 10:28 a.m., Exhibit 3 marked.)
8 BY MS. LACHMAN:
9 Q  Pretty far down, I think it might even be the last page
10   or the second to last, you state your affirmative
11   defenses. I think we talked about this before, but
12   just to make sure we have it on the record, do you have
13   any evidence to support any of these affirmative
14   defenses?
15 A  If I'm not mistaken, I believe Bob showed me where
16   Steelcase admitted that they had been paid on these
17   P.O.'s is one of you all's answers. Am I looking at
18   Page 7? Is that what we're talking about?
19 Q  Yes.
20 A  And the rest is -- I'd have to defer to my counsel to
21   answer those -- your question on that.
22 Q  Did you give personal guaranties to other distributors?
23 A  No.
24 Q  Banks?
25 A  One.

Page 45

1     MS. LACHMAN: Anybody need a break?
2     THE WITNESS: We can take one if you want.
3     MS. LACHMAN: Yeah, let's do it. We're going
4  to change gears, --
5     THE WITNESS: Okay.
6     MS. LACHMAN: -- so maybe this is a good
7  place to stop. So we'll just be off the record.
8     THE WITNESS: Okay.
9     (From 10:30 a.m. to 10:36 a.m., deposition in
10     recess.)
11 BY MS. LACHMAN:
12 Q  I'm going to shift topics here. You are aware that
13   Steelcase has a judgment against Harbin's, Inc.?
14 A  I'm aware that they have applied for a default
15   judgment, but I don't know if I've found out whether it
16   was issued.
17 Q  And the amount of the judgment is $385,275.79 with
18   interest accruing after November 23, 2004?
19 A  (witness shrugs)
20 Q  Well --
21     MR. SMITH: You have to give a verbal
22   response.
23 BY MS. LACHMAN:
24 Q  Well, regarding that I'd like to talk to you a little
25   bit about corporate assets, where they've gone.

Page 46

**Page 59**

1 A  I don't have a copy of it, no.
2 Q  Did you sign an agreement?
3 A  I did.
4 Q  Are there any records of the payments from
5     myofficeproducts.com to Harbin's?
6 A  No, but there will be a 1099 issued sometime.
7 Q  Are they continuing to produce payments to Harbin's for
8     their monthly revenues?
9 A  January of this year's the last month.
10 Q  Why is that the last month?
11 A  It was a 12-month agreement.
12 Q  I'm sorry that I wasn't able to remember this because I
13     know you did answer this, but it was or was not a
14     written agreement?
15 A  There was a written consulting agreement.
16 Q  And you did sign?
17 A  I did.
18 Q  But they just didn't give you a copy?
19 A  (witness shakes head)
20 Q  Who's all on the -- you can strike that.  Before I
21     start, where was Harbin's located?
22 A  300 South Perry Street.
23 Q  And who's there now?
24 A  It's an empty building.  No one.
25 Q  Did Harbin's own that building?

**Page 60**

1 A  Yes.
2 Q  So they didn't pay rent to anybody?
3 A  They did.
4 Q  Who'd they pay rent to?
5 A  M&M Properties, LLC.
6 Q  So M&M owned the building?
7 A  It was an LLC that was formed with Harbin's, myself and
8     my sister as members.
9 Q  And what percentage did Harbin's own?
10 A  One percent.
11 Q  Just for the record, what's your sister's name?
12 A  Mary Anne.
13 Q  Harbin?
14 A  Esco, E-s-c-o.
15 Q  Does M&M still own the building?
16 A  No.
17 Q  Who owns the building now?
18 A  First Baptist Church.
19 Q  First Baptist Church?
20 A  Yes.
21 Q  Is that First Baptist Church of anything?
22 A  I think it's Montgomery.
23 Q  Okay.  How did they come to own it?
24 A  As I attested earlier, the bank foreclosed on the
25     property and I gave them a -- it was a friendly kind of

**Page 61**

1     deed in lieu of, and they held it and sold it to the
2     church.
3 Q  But Harbin's only owned that 1 percent?
4 A  Um-hmm; yes.
5 Q  So the bank foreclosure, was that related to debts that
6     Harbin's had or other debts?
7 A  There was a mortgage on the property to Harbin's, Inc.,
8     that Harbin's, Inc., was unable to pay back to the
9     bank, so the bank foreclosed on the property.
10 Q  So no one has purchased Harbin's?  It's just still
11     there and you're still the sole owner?
12 A  Harbin's, Inc., is still there.
13 Q  And is there any other pending litigation against
14     Harbin's?
15 A  Not that I'm aware of, no.
16 Q  What about the Colonial Bank vs. Harbin's?
17 A  I believe that's going to be settled.
18 Q  Okay.  But it has not settled yet?
19 A  Without going in too much detail, there's been kind of
20     a handshake, but nothing has been formalized yet.
21 Q  What were the claims under that suit?
22 A  Breach of contract.
23 Q  Was there a count against you personally?
24 A  There was.
25 Q  What for?

**Page 62**

1 A  A guaranty.
2 Q  Just kind of shift gears here again.  I'd like to talk
3     with you about businesses that you've had an ownership
4     interest in.  At the beginning of the deposition, you
5     said that you'd only had an ownership interest in
6     Harbin's.  But you just mentioned M&M Properties.  Are
7     there any others?
8 A  No.
9 Q  You never owned any -- you never had an ownership
10     interest in anything other than Harbin's or M&M
11     Properties?
12 A  Yes.  I had another business in '98, '97, called Retail
13     Enhancement Services.
14 Q  '97 through '98?
15 A  I believe that was it, or '99.
16 Q  Okay.  I'd like to ask you just a little bit about each
17     of them so I can kind of understand how things were
18     interworking and interrelated.  M&M Properties was an
19     LLC?
20 A  Correct.
21 Q  Is that still operating?
22 A  No.
23 Q  When did that stop operating?
24 A  When the bank foreclosed on the property.
25 Q  Was that the only property it owned?

**Page 63**

```
 1  A  Correct.
 2  Q  Okay.  And then Retail Enhancement Services, that was
 3     an LLC?
 4  A  I believe it was, or an "S" corporation.  I don't
 5     really remember.
 6  Q  And who all had an ownership interest in that?
 7  A  Myself, an individual named John Doody, and Tom
 8     Methvin, I believe.
 9  Q  Metham (ph.)?
10  A  Methvin, M-e-t-h-v-i-n.
11  Q  Is that still operating?
12  A  No.
13  Q  And when did that end?
14  A  I believe in '99 or whatever the last date I had told
15     you.
16  Q  I think you said 1998.
17  A  '98, '99.  I don't know.
18  Q  And what kind of business was that?
19  A  It was a stand-alone kind of mini Office Depot.
20  Q  I'll ask you about that in a minute, but I just don't
21     want to lose my train of thought.  I was just thinking,
22     we were just talking about your sale of your future
23     interest to myofficeproducts.com.
24  A  Um-hmm.
25  Q  What happened to all the other assets?
```

**Page 64**

```
 1  A  What assets?
 2  Q  Everything that you used to --
 3  A  As I stated earlier, no assets left Harbin's,
 4     Incorporated.
 5  Q  Okay.
 6  A  Future revenue, whether that be a dollar or ten
 7     trillion dollars, went to myofficeproducts.
 8  Q  Did you sell your -- all the other assets at another
 9     time?
10  A  The only time we sold our assets, meaning furniture,
11     fixtures, inventory, is when a cash-paying customer
12     would come in and say, "I want to buy this piece of
13     paper."  All right.  Then we'd say, "All right.  It's
14     $2."  And that would go into Harbin's, Incorporated.
15     If you walked in and wanted to charge, that went to
16     myofficeproducts.
17  Q  Right.  But aside from myofficeproducts.com --
18  A  And then when we had our sale, that's when we sold
19     fixtures, furniture and all that kind of stuff.
20  Q  When was that?
21  A  Seven weeks prior to April 30th, or it was a seven-week
22     sale that ended on April 30th.
23  Q  Of what year?
24  A  2004.
25  Q  Now, seven weeks prior, that's the same date that you
```

**Page 65**

```
 1     had mentioned myofficeproducts.com also purchased?
 2     Does that sound right?
 3  A  It was seven weeks prior --
 4  Q  Prior to April 30th?
 5  A  No, that doesn't sound right.  I think I said January
 6     '04 --
 7  Q  Okay.
 8  A  -- on a particular date is when myofficeproducts charge
 9     customers went to myofficeproducts.
10  Q  Okay.  And so seven weeks prior to April 30th you had
11     your asset sale?
12  A  The sale was seven weeks in duration, so take April
13     30th and back up seven weeks and that's when we
14     started.
15  Q  That helps.  I was wondering.  I thought how do you
16     keep remembering seven weeks prior.  Okay.  Do you have
17     any records of that sale?
18  A  No.
19  Q  Did you bring in any revenue at that sale?
20  A  We did.
21  Q  Didn't you need those records for your taxes this year?
22  A  We filed a final tax return at the end of that sale.
23  Q  Where did all the proceeds from that sale go?
24  A  The bank came in at that time and had taken the
25     business over when I explained to them what we were
```

**Page 66**

```
 1     trying to do, so every day the bank would come in,
 2     which was fine with me because I wanted them to know
 3     what we were doing was on the up and up.
 4        They took in all the cash receipts, the
 5     charge receipts, the count of the money, the authorized
 6     payment of any vendor or any check that we wrote.  So
 7     the bank came in and essentially took over the company
 8     at that time.  And they would take the money out every
 9     day and then they'd come back the next day and count
10     the cash drawer and check on our A.R.'s and the mail
11     that would come in, and they'd post it to the lock box
12     they set up and so forth.  They collected all the
13     receipts and they essentially handled it.  We just
14     handled the sale.
15  Q  So they checked all the receipts.  Do they have those
16     records?
17  A  They might.
18  Q  Just for clarification, any proceeds from that sale
19     went to the bank?
20  A  Every proceed from that sale went to Colonial Bank.
21  Q  Okay.  That was a detour.  So back to -- what was it?
22     Retail Enhancement?
23  A  Um-hmm.  I guess.
24  Q  Retail Enhancement Services?  You said that was a
25     stand-alone mini Office Depot, and I think you were
```

**Page 67**

1      getting ready to tell me about the ownership interests.
2      Who owned it?
3 A   I told you John Doody --
4 Q   Oh, all right.
5 A   Okay?
6 Q   Oh, yeah. There, I do have it in my notes.
7 A   Okay.
8 Q   Okay. Did Harbin's, Inc., loan money to Retail
9      Enhancement?
10 A   I don't believe we did.
11 Q   Did Retail Enhancement purchase their products from
12      Harbin's?
13 A   No.
14 Q   Did money from Harbin's ever go to Retail Enhancement
15      for any purpose?
16 A   We would buy inventory -- or we -- sometimes if Retail
17      was out of a pen, they would purchase it from Harbin's
18      and we'd book it as an A.R. on that side and vice
19      versa.
20 Q   Did they do large purchases?
21 A   I don't recall. No, not large that I -- you know, your
22      definition of "large."
23 Q   Well, do you think it would have been anything over a
24      thousand?
25 A   I don't recall. I don't think so, no.

**Page 68**

1 Q   So, Retail Enhancement Services didn't borrow money
2      from Harbin's; correct?
3 A   That's correct. They had their own line of credit.
4 Q   And they didn't purchase anything from Harbin's?
5 A   The best I can remember, that's correct.
6 Q   I'd like to ask about this, then. Need just a second
7      to find it.
8      (At 11:10 a.m., Exhibit 4 marked.)
9 BY MS. LACHMAN:
10 Q   I was just wondering about -- do you see what is a
11      marking, number 1? And it says accounts receivable,
12      Retail Enhancements, has a number of $297,413.50.
13 A   Um-hmm.
14 Q   If they didn't borrow money from Harbin's and they
15      didn't purchase product, what's that near $300,000
16      amount?
17 A   I don't remember. Inter-company transfers, and there
18      might have been the same type of entry on Retail
19      Enhancement's balance sheet.
20 Q   Okay. So, inter-company transfers. Why would you have
21      an inter-company transfer if it wasn't a loan?
22 A   If it was not a loan?
23 Q   Right. Why would you just move the money?
24 A   Again, if Retail Enhancements needed a pen -- I
25      remember we used to take it out of Harbin's inventory

**Page 69**

1      and book it as a receivable from Retail to pay Harbin's
2      back, and vice versa. There should be some type of
3      corresponding -- if there are any floating around --
4      balance sheets that show the same thing.
5 Q   Are there balance sheets for --
6 A   No.
7 Q   -- Retail Enhancements? Where'd those go?
8 A   Well, let's see. 1999, so what's that? Six years ago?
9      You know, that company's been closed. I don't know.
10 Q   Okay. And it closed in 1999?
11 A   I think I said '99 or 2000, or '98.
12 Q   I heard 1998 or 1999.
13 A   Okay.
14 Q   And so it closed, and this is a sheet for June 30th of
15      1999, Harbin's, Incorporated, balance sheet, and it has
16      a debt of almost $300,000 from Retail Enhancements; is
17      that correct?
18 A   I don't know if that's a debt or if that's, again, a
19      receivable.
20 Q   So that might just be that -- it might be receivable in
21      the sense that this is money Harbin's owed to Retail
22      Enhancements? I have that backwards, don't I?
23 A   Accounts receivable of Retail Enhancements. Harbin's
24      might have owed that to --
25 Q   It's a Harbin's, Inc., balance sheet; right?

**Page 70**

1 A   That's correct.
2 Q   And this is a listing of assets. It has many different
3      assets, and then it has the accounts receivable. My
4      understanding of accounts receivable is you've given
5      goods or done something, and this is money owed to you.
6      Is that your understanding of accounts receivable?
7 A   That's my understanding.
8 Q   So it looks like from this balance sheet Retail
9      Enhancements owed Harbin's, Inc. -- the year that they
10      went under or approximately, --
11 A   Um-hmm.
12 Q   -- they owed Harbin's about $300,000.
13 A   I can't attest to that. This could just be -- and I
14      don't even know who was doing our bookkeeping back
15      then.
16 Q   And what year was Retail Enhancements created?
17 A   I don't remember.
18 Q   Do you remember how many years it was in business?
19 A   I think three.
20 Q   Was it ever profitable?
21 A   It was.
22 Q   Why did it close, again?
23 A   We got into a dispute with the landlord over a leaky
24      roof.
25 Q   How did that close the business?

**Page 71**

1 A I quit paying rent because they wouldn't fix the roof.
2   They sued me; I sued them. Then we both said, okay,
3   we'll get out. We won't pay you and you won't pay us,
4   and we got out.
5 Q Was there actually a complaint filed?
6 A What do you mean?
7 Q Did the landlord actually file a complaint against
8   Retail Enhancements?
9 A They did, and we filed a counterclaim against them as
10  well. And so what we did was we took all -- whatever
11  the inventory at the time of Retail Enhancements -- it
12  was like -- I think it was three or four hundred
13  thousand. So what we kept in that store, we just moved
14  it all to Harbin's.
15 Q And you don't have any records of the movement of
16  assets from Retail Enhancements to Harbin's?
17 A No.
18 Q Were records made, or was it just a shift?
19 A I don't recall.
20 Q Did you usually keep records for things like that?
21 A Well, that was a one-time occurrence. I know we didn't
22  keep records of something like -- I never had to do it
23  before, so I don't -- I don't recall.
24 Q So all the assets of Retail Enhancements were moved
25  over to Harbin's, and you may or may not have made a

**Page 72**

1   record of that?
2 A There may be a journal entry somewhere. Where it is I
3   don't know, and how it was logged or booked, that's not
4   my forte, so I don't know.
5 Q Okay. Who did those kind of bookkeeping things?
6 A I had numerous bookkeepers throughout the years.
7 Q But you oversaw it?
8 A Um-hmm.
9 Q I'd like to talk to you a little bit more about the
10  Harbins-Stern Brothers. We talked about it earlier, so
11  forgive me if I ask a couple questions I've already
12  asked.
13 A That's okay.
14 Q Now, Harbin's, Inc., and Harbins-Stern Brothers --
15  Harbin's, Inc., and Stern Brothers created Harbins-
16  Stern Brothers in what year?
17 A I don't -- I think I said '99, but I'm not sure. Or
18  '98. Hope would know more about that than I would.
19 Q Why is that?
20 A Ask her.
21 Q Why did you merge? Or not merge. Why did you form
22  Harbins-Stern Brothers?
23 A At that time he kept coming to me saying, "Buy me out,
24  buy me out." But I didn't want to buy his used
25  furniture business out, or his repair furniture

**Page 73**

1   business out. And then he kept coming to me, and then
2   finally one day he said, "Why don't we merge?" And I
3   didn't want to merge with him. And he went to his
4   accountant and then he came to me and said, "Hey, we've
5   got an idea. Why don't we form an LLC?"
6       And I thought for the protection of Harbin's,
7   that would be a better thing to do instead of putting
8   my "C" corporation at risk with this "S" corporation.
9   And I did it conditionally that, you know, Harbin's had
10  51 percent, because I was five times bigger than this
11  guy. And the idea was that I had the medium- to high-
12  end furniture business. He had the used and the
13  repair, refinish, fix a broken chair. And that way we
14  could kind of cater to anybody that came in.
15 Q Where was Stern Brothers located prior to this LLC?
16 A They were and they still are on a street in Montgomery
17  called Holt Street.
18 Q Halt? H-a-l --
19 A Holt, H-o-l-t.
20 Q Did the businesses ever share the same location?
21 A Yes.
22 Q Which location was that?
23 A Well, the administrative folks were at the 300 South
24  Perry Street, and the repair place was in the Holt
25  Street building.

**Page 74**

1 Q And so all of your administrative business was at 300
2   Perry?
3 A That's correct.
4 Q And there was administration moved over to 300 South
5   Perry?
6 A He came over from his facility and set up camp in my
7   father's old office. The repair and stuff had to stay
8   in his facility because it was grandfathered in under
9   the old EPA pollution control stuff as far as paint
10  fumes and all that kind of stuff. So the painting and
11  repair stuff stayed at his facility, but he came over
12  to my facility.
13 Q Okay. So you owned 51 percent of that LLC, and Michael
14  Behrman owned 49 percent?
15 A Harbin's, Inc. --
16 Q Oh.
17 A -- owned 51 percent.
18 Q Does it still exist?
19 A No.
20 Q When did that relationship break down?
21 A Again, I believe I said it was 2001, 2002.
22 Q How were the corporate assets divided of the -- the
23  assets of the LLC divided?
24 A They weren't divided.
25 Q When the LLC was disbanded, the assets weren't divided?

Steelcase Inc. v. Harbin's, Inc. — 1/27/05
Case 1:04-cv-00832-RHC  Document MIKE — Filed 05/23/2005  Page 15 of 24
Harbin's, Inc.

**Page 75**

1 A Everything stayed with Harbin's, Incorporated. The
2 only thing asset-wise that he took, "he" being Stern
3 Brothers, Incorporated, was his office furniture that
4 he personally sat at that he brought over, and then his
5 rental income business that he brought over. But other
6 than that, all the accounts receivables, any inventory
7 that the two companies had purchased together stayed at
8 Harbin's, Incorporated.
9 Q Okay. You said the administrative offices both were at
10 300 South Perry Street. Did you use the same office
11 staff?
12 A We did.
13 Q Did you use the same payroll?
14 A We did.
15 Q And just for clarification, you used the same payroll
16 service?
17 A Correct.
18 Q So you had mutual employees. And did each business pay
19 them separately or were they just paid out of the LLC?
20 A No. They were paid out of that LLC.
21 Q Okay. So your employees weren't designated as Harbin's
22 or Harbins-Stern Brothers anymore? They were just
23 designated as LLC employees?
24 A We were all designated as employees of Harbins-Stern
25 Brothers, LLC.

**Page 76**

1 Q Okay. And so at that time Harbin's had no more
2 employees?
3 A No, other than myself.
4 Q So all of the customers from Harbin's became customers
5 of Harbins-Stern Brothers?
6 A Correct.
7 Q Were they notified of that shift?
8 A They were.
9 Q How did you notify them?
10 A We sent out a letter to everybody.
11 Q What did the letter say?
12 A I can't -- "Something great's happening in Montgomery.
13 The two oldest furniture companies are combining
14 forces. Your one-stop shop," and that kind of stuff.
15 Q And so for a company like Steelcase, did they receive
16 that same letter?
17 A I didn't send one to them, but they came down and
18 talked to me about it.
19 Q They came down and talked to you about the transition
20 to this Harbins-Stern Brothers?
21 A Right.
22 Q Now, you mentioned before, I thought, that you still
23 had separate bank accounts between Harbin's and
24 Harbins-Stern Brothers.
25 A No. I believe I said we had the same bank accounts

**Page 77**

1 with the same bank.
2 Q Right. With Colonial. But then Harbins-Stern Brothers
3 also had a bank account with Aliant, --
4 A Well --
5 Q -- and Harbin's maintained one with South Trust?
6 A Correct.
7 Q Okay. So then any other purchase orders between
8 Steelcase and Harbin's, were those now purchase orders
9 between Steelcase and Harbin's, Incorporated --
10 Harbins-Stern Brothers?
11 A I would have to look on my purchase orders. Sometimes
12 they'd come listed as Harbins-Stern Brothers from
13 Steelcase. Sometimes they'd come as Harbin's.
14 Q And it didn't really matter which way? It all sort of
15 went into the same pool of business?
16 A It mattered to me or to Steelcase?
17 Q To you.
18 A I don't quite understand what you're saying by "does it
19 matter?"
20 Q Well, I'm saying sometimes you said purchase orders
21 came in to Harbin's, sometimes they came in to Harbins-
22 Stern Brothers, and how the purchase orders were
23 received and addressed, it was seamless regardless of
24 if they came in for Harbin's or Harbins-Stern Brothers?
25 A Yeah. If it came in for Harbin's, Harbins-Stern

**Page 78**

1 Brothers would pay for it. If it came in to Harbins-
2 Stern Brothers and we had an account that just said
3 "Harbin's," Harbin's would pay for it. Do you follow
4 me?
5 Q Could you say it one more time so I make sure I do?
6 A If it came in as Harbins-Stern Brothers, --
7 Q Um-hmm.
8 A -- Harbins-Stern Brothers would pay for it. If the
9 invoice came in just for Stern Brothers, Harbins-Stern
10 Brothers would pay for it. If the invoice came in just
11 Harbin's, Harbins-Stern Brothers would pay for it.
12 Q Did Harbins-Stern Brothers ever cover the debts for
13 Harbin's, Incorporated?
14 A I don't think Harbin's, Incorporated, had debt at that
15 time.
16 Q So Harbin's, Incorporated, didn't have debt during the
17 period that Harbins-Stern Brothers was operating?
18 A I don't think we had debt at that time. I think the
19 operating line of credit was with Harbins-Stern
20 Brothers. And if I can correct myself, Harbin's, Inc.,
21 did have debt, a mortgage with Southwest Bank who later
22 foreclosed on the property.
23 Q Okay. Did sometimes Harbins-Stern Brothers pay that
24 mortgage for Harbin's?
25 A We always paid it.

**Page 87**

1  that you produced, you retained the copies of those
2  checks as well as you might have retained the stubs of
3  those checks. What I'm asking is sometimes there are
4  checks and sometimes there aren't. What does it mean
5  if the checks are present?
6  A  If the checks were present and stapled to the stubs,
7  they were voided out.
8  Q  Okay. So even if they don't say "void," it just means
9  that they were voided out?
10 A  Well, obviously you can't use a check if it was stapled
11 to the -- if Check No. 2116 was stapled right here in
12 the register, which many were, that check wasn't used.
13 Q  Okay. I had to ask because I got the copies of the
14 records. Somebody from our Kalamazoo office came down.
15 A  Okay.
16 Q  So I just wanted to make sure I was understanding.
17 A  Okay.
18 Q  So thanks for your patience on it.
19 A  Okay.
20 Q  Well, I'll say thank you in advance for being patient
21 while I surf through these. There were a lot of these
22 check registers, and I wanted to make sure I -- So
23 then throughout Exhibit 5 there are check stubs that
24 say "Pay to the order FAFBO Harbins-Stern Brothers."
25 Do you see that there are multiple of these throughout

**Page 88**

1  the exhibit?
2  A  May, June, July. Yes.
3  Q  Okay. And so all of those are stubs, and because the
4  checks weren't there, that means the checks went out;
5  is that correct?
6  A  I can only say that because the check is there -- not
7  there, it is not stapled to the stub, which I don't
8  have in front of me, I'm assuming they went out.
9  Q  Okay. And you believe that was for profit-sharing for
10 employees?
11 A  I believe it was.
12 Q  And we don't remember what "FAFBO" meant?
13 A  I don't.
14 Q  Okay. That's all I have on that exhibit.
15 A  Okay.
16 Q  You testified earlier that you did write checks to
17 yourself personally sometimes?
18 A  Occasionally.
19 Q  And you said that those were for payroll?
20 A  Correct.
21 Q  How much was your income from Harbin's or Harbins-Stern
22 Brothers? You were just paid once; is that correct?
23 A  No. We were paid every two weeks.
24 Q  I guess I meant you weren't paid from both Harbins-
25 Stern Brothers and Harbin's?

**Page 89**

1  A  No.
2  Q  One income?
3  A  Correct.
4  Q  And how much was that income?
5       MR. SMITH: During what time period are you
6  talking about?
7       THE WITNESS: Yeah. I don't --
8  BY MS. LACHMAN:
9  Q  In a year, what was your annual salary?
10 A  When?
11 Q  How about in 2000?
12 A  I don't know. 98,000 maybe.
13 Q  Okay. And in 2001?
14 A  I'd have to pull my tax records. I don't recall.
15 Q  But you think that your annual income was somewhere
16 around 98,000?
17 A  No. That number just comes to my head. I think that
18 was one of the years, but I don't know which one. And
19 then it started going down dramatically.
20 Q  Okay. So in 2003, approximately what would your salary
21 be annually?
22 A  Forty thousand maybe, 45,000.
23 Q  Okay.
24       (At 11:42 a.m., Exhibit 6 marked.)
25 BY MS. LACHMAN:

**Page 90**

1  Q  I'd like to submit this as Exhibit 6. This is another
2  packet of the stubs that you provided. On page 1 of
3  Exhibit 6 you have a pay stub to M. Harbin. Is that
4  assumably you?
5  A  That's not a pay stub.
6  Q  Or a check stub.
7  A  Check stub.
8  Q  A check stub to M. Harbin. Is that assumably you?
9  A  That's correct.
10 Q  And in the amount of $9,500?
11 A  That's correct.
12 Q  On page 2 of Exhibit 6 --
13 A  For the record, though, let's go back to --
14 Q  Okay.
15 A  -- Stub 9520. It says "certified check S.P."
16 Q  Um-hmm.
17 A  "S.P. Richards" was one of our vendors.
18 Q  Okay. And so the check was made out to you?
19 A  I would take the check to the bank and get a certified
20 check because there was no charge to me, and then we
21 would have to get certified funds to S.P. Richards.
22 Q  Did they require certified funds?
23 A  Yes.
24 Q  And so they always required a certified check?
25 A  They did for a period of time.

**Page 91**

1 Q  And why wouldn't the -- couldn't the check have just
2      been written for a cashier's -- for a certified check?
3      Did it have to be written to you personally?
4 A  If we took a Harbin's check and took it to the bank
5      and, say, debit the account, there was like a $10
6      charge for that check.  With my checking account at
7      AmSouth, I got free certified checks.
8          So I would take the Harbin's check, put it in
9      my account, write out the check right there and hand it
10     to the teller and say, "I need certified funds all
11     payable to S.P. Richards."  And so this is what all
12     these are going to be for.
13 Q  Okay.  So, to avoid the $10 service charge --
14 A  Right.
15 Q  -- you would have checks written to your personal
16     account from Harbin's or Harbins-Stern Brothers,
17     whichever, and then you --
18 A  Um-hmm.  Harbin's.
19 Q  You said Harbin's.  How did you know it was from
20     Harbin's versus Harbins-Stern Brothers?
21 A  Because I think I said earlier Harbins-Stern Brothers
22     closed in 2000, 2001.
23 Q  Oh, so you're looking at the date.
24 A  I'm looking at the date.
25 Q  Okay.  And so, to go back, to avoid the $10 fee you

**Page 92**

1      would write a check from your Harbin's, Incorporated,
2      account to your personal account, and then you would
3      write a cashier's check?
4 A  I would write a check off my personal account and hand
5      it to the bank and say I would need a certified
6      cashier's check, and they did it.  And they did it for
7      a period of a couple weeks.
8          And then finally -- and I called S.P.
9      Richards.  I said, "Either you're going to lose our
10     business or, you know, it'll go to United Stationers,
11     because I'm going to quit running to the damn bank
12     every day."  And that's what I was doing.
13         And they were making the checks -- they were
14     trying to average them out on our daily purchases.
15     That's why they're all like 4,300, 4,200 and 4,200.
16     And so they were -- 4,300, 4,200.  They tried to make
17     it an average on a daily basis, and then finally I got
18     tired of going to the bank and said, "Either take our
19     check, we would hand it to the driver the next morning,
20     or, you know, we won't have your wholesale business."
21     And so they stopped.
22 Q  Okay.  Do you have any records to show that those
23     certified checks were actually drawn from your account?
24         MR. SMITH:  Does he have any records?
25 BY MS. LACHMAN:

**Page 93**

1 Q  You wrote checks from your personal account, certified
2      checks to S&P Richards, is what you're saying?
3 A  No.  I didn't write a certified check.  I would take a
4      check from Harbin's, --
5 Q  Um-hmm.
6 A  -- take it to my bank, --
7 Q  Um-hmm.
8 A  -- and then I would deposit it in my bank account.  And
9      then at the same time I would write a check out for
10     9,500 to AmSouth Bank, and I would say, "Please make
11     this payable to S.P. Richards."  They in turn would
12     make a certified check --
13 Q  Right.
14 A  -- payable to S.P. Richards.
15 Q  Right.
16 A  So the same time I credited my account 9,500, they
17     debited my account 9,500, handed me a check payable to
18     S.P. Richards, and saved me the $10 service charge, or
19     15 or whatever it was to get a certified check from
20     Colonial or whoever we were banking with.
21 Q  So you didn't keep any records of that?
22 A  I don't have any records of that, no.  The little pink
23     copies and stuff that they gave me every day?  We
24     probably kept them for a while.  If you'll look through
25     those check registers, they may be stuck down in there.

**Page 94**

1      But, no, I didn't keep them personally.  I didn't --
2      the transaction was done.
3 Q  Okay.  And so that was the page 1 with the 9500's.
4 A  Certified check to S.P.
5 Q  Right.
6 A  Okay.
7 Q  And if we go to page 2, Check Stub No. 9523 --
8 A  Certified check, S.P.
9 Q  Um-hmm.  In the amount of --
10 A  Eighty-four hundred.
11 Q  Okay.  And then right below it, it's to Michael Harbin
12     --
13 A  Um-hmm.
14 Q  -- but it doesn't say "S.P. certified check."
15 A  It was S.P. certified check.
16 Q  And you know that because?
17 A  Because I did it.
18 Q  But you don't have any record of it?
19 A  There will be a corresponding debit on my personal
20     account where 4,200 went in and 4,200 went out payable
21     to AmSouth Bank, and then they would probably denote on
22     that check, the official check that went to S.P.
23     Richards.  So to go back and follow the trail, you
24     would have to probably get that number off the check
25     that the bank cashed from me to write the certified

**Page 95**

```
 1    check.
 2 Q  Okay.  So you personally were operating as sort of the
 3    middleman in the financial end between Harbin's,
 4    Incorporated, and S.P. Richards?
 5 A  All I was doing was saving Harbin's, Incorporated, $10
 6    a day for a certified check.
 7 Q  Right.  And you were doing that by having the money go
 8    through your personal account and --
 9 A  Correct.
10 Q  -- onward to S.P. Richards?  Okay.  So then I think we
11    just spoke about 9524.  9525, that's the same thing?
12    9525?
13 Q  Um-hmm.
14 A  That's correct.
15 Q  Okay.  That's in the amount of 4,200.
16 A  Correct.
17 Q  On the next page, that's page 3 of Exhibit 6, 9527.
18    That's to M. Harbin for 4,200 with no note of S.P.
19    Richards.
20 A  Correct.
21 Q  And that's your same explanation as before?
22 A  Yes.
23 Q  Just got to get it all on the record.
24 A  I understand.
25       THE WITNESS:  Can we stop for one second?
```

**Page 96**

```
 1    I'd like to go to the restroom.
 2       MR. SMITH:  Sure.
 3       (From 11:49 a.m. to 11:52 a.m., deposition in
 4       recess.)
 5 BY MS. LACHMAN:
 6 Q  Okay.  So I think we were in the middle of Exhibit 6 on
 7    page 4, and this is Check Stub 9530 and that's from
 8    September 11, 2003 in the amount of 4,200, and that's
 9    again to Michael Harbin.  And so that was money from
10    Harbin's to your personal account; correct?
11 A  Correct.
12 Q  Okay.  And you say that it goes on to S.P. Richards?
13 A  Correct.  The company would write me a check, I would
14    take the check, deposit it into my account, and then
15    immediately write a check out of my account payable to
16    the bank, and they would issue me a certified check
17    payable to S.P. Richards.
18 Q  Okay.  And then page 5, one on September 12, 2003 to
19    Michael Harbin in the amount of 4,200.  That's Check
20    Stub 9533.
21 A  It says "S.P." underneath that.
22 Q  Okay.  So that is again to your personal account and
23    then on to S.P. Richards?
24 A  Correct.
25 Q  Next one, 9534, September 18, 2003 to Michael Harbin,
```

**Page 97**

```
 1    $4,200, and that's the same thing?
 2 A  (witness nods)
 3       MR. SMITH:  Answer verbally.
 4       THE WITNESS:  Yes.
 5 BY MS. LACHMAN:
 6 Q  Okay.  And the next page which is page 6 of Exhibit 6,
 7    at the top 9541, and that is September 16, 2003 for
 8    $5,200 to Michael Harbin.
 9 A  Correct.
10 Q  And it says "certified/S.P."
11 A  Correct.
12 Q  Okay.  And again that's the same explanation?
13 A  Yes.
14 Q  Okay.  And so what I saw just in that, my numbers
15    roughly added up to, I think, $52,000 approximately
16    over about a 14-day period that entered your personal
17    account?
18 A  (witness nods)
19 Q  And you're saying that then it left your personal
20    account -- oh, can you give verbal responses, please?
21 A  Yes.
22 Q  So just to make sure we have it on the record, that's
23    approximately $52,000 from Harbin's into your personal
24    account over a 14-day period?
25 A  I haven't added it up, but if that's what you say, I'll
```

**Page 98**

```
 1    trust what your calculations are.
 2 Q  And you say that that money then went on to another
 3    vendor?
 4 A  That money went payable to S.P. Richards.
 5 Q  Okay.  But you don't -- you personally don't have any
 6    records of that?
 7 A  No.
 8       MS. LACHMAN:  Just one moment.  Okay.  Then
 9    here, I don't know Karen if you'd like these submitted
10    as a packet or individually.  I take it it doesn't
11    matter which way we do it.  Which is easiest for you?
12       REPORTER:  Makes no difference to me.
13       MS. LACHMAN:  I think there are about four
14    pages.  How about we just do it as a packet?
15    Is that easiest for you?
16       MR. SMITH:  Any way you want to do it is fine
17    with me.
18       MS. LACHMAN:  Well, I'll just do it as a
19    packet, then.  But I'll hand them to you first and then
20    we'll staple them, if that's okay.  Okay.  So that's
21    going to be page 1.  Here's going to be page 2.
22       MR. SMITH:  Do you need a stapler?
23       REPORTER:  Got one.
24       MS. LACHMAN:  She's got one right here.
25    Totally prepared.  That's going to be page 3.
```

**Page 103**

1 A We did.

2 Q Were the customers of Harbin's and the customers of

3 Harbins-Stern Brothers the same, then?

4 A No. They were different.

5 Q But some mutual?

6 A Some mutual, but the majority of the people, when Stern

7 Brothers came over, they were people who brought in a

8 broke chair. Harbin's sold brand-new Steelcase

9 product, brand-new pens and pencils, brand-new legal

10 pads, exhibit stickers, everything. Stern Brothers

11 didn't sell any of that. They repaired furniture and

12 sold used furniture. Harbin's, Inc., did not do that.

13 Yes, there were mutual customers in the sense

14 that Jane Doe would get her chair fixed at Stern

15 Brothers, but she would buy her office supplies at

16 Harbin's. So, yes, there were some common customers

17 there. But as far as both companies selling the same

18 product line and the same product mix to make the mass

19 customer base the same and mutual, no.

20 Q Okay. So when you said that Harbins-Stern Brothers

21 sold Steelcase products, you meant they sold used

22 Steelcase products or repaired Steelcase products?

23 A You didn't -- you just asked me if Harbins-Stern

24 Brothers sold Steelcase product. Harbin's sold --

25 Harbins-Stern Brothers or Harbin's, Inc., the majority

**Page 104**

1 owner or member of Harbins-Stern Brothers, the majority

2 of the Steelcase sales through Harbins-Stern Brothers,

3 LLC, was new Steelcase product from Steelcase. Yes, we

4 bought used Steelcase from used brokers, mostly seating

5 and filing cabinets, and then Stern Brothers or

6 Harbins-Stern Brothers would repaint and refinish and

7 resell that furniture.

8 Q And I think we touched on this briefly before, but did

9 Harbin's pay the debt -- ever pay the debts of Harbins-

10 Stern Brothers?

11 A What debt of Harbins-Stern Brothers are you referring

12 to?

13 Q No debt in particular. Was it a business practice that

14 debts were ever covered by Harbin's for Harbins-Stern

15 Brothers?

16 A The only debt I know that Harbins-Stern Brothers had

17 was an operating line of credit, and when the LLC

18 dissolved, that line of credit went with Harbin's, Inc.

19 Q And that line of credit for Harbins-Stern Brothers was

20 with Colonial Bank?

21 A That's correct.

22 Q But I thought you said that that was --

23 MR. SMITH: Can we stop for just a second? I

24 want to talk to my client outside for a second.

25 MS. LACHMAN: Fair enough.

**Page 105**

1 (From 12:07 p.m. to 12:12 p.m., deposition in

2 recess.)

3 BY MS. LACHMAN:

4 Q Okay. I'd like to go back to talking with you about

5 some check registers. Some of these might overlap with

6 what we've already talked about, but -- So this will

7 be Exhibit 8. This is another packet of check

8 registers -- or some check register stubs.

9 (At 12:13 p.m., Exhibit 8 marked.)

10 BY MS. LACHMAN:

11 Q So, on page 1 of Exhibit 8, at the bottom there's a

12 check stub for Check 2087?

13 A (no verbal response)

14 Q Just verbally reply just so on the record we see we're

15 both talking about the same thing.

16 A I see it. Yes.

17 Q Okay. Thank you. And the date is 10-28-03?

18 A That's correct.

19 Q And it says, "Pay to Michael Harbin for BC/BS certified

20 check"?

21 A That's correct.

22 Q And what does that mean?

23 A The bank returned a check to Blue Cross and Blue

24 Shield, and they were our insurance -- health insurance

25 carrier. So I had to get a certified check to keep the

**Page 106**

1 coverage in place for our employees.

2 Q And so that went through your personal account again?

3 A Yes.

4 Q On page 2 -- oh, and just for the record, that was for

5 the amount of $3,200; correct?

6 A That's correct.

7 Q And on page 2 at the bottom, Stub 2135, it's the date

8 12-1-03 and that says, "Pay to Michael Harbin" in the

9 amount of 2,500. Any idea what that might be for?

10 A I don't.

11 Q On the next page, so that's page 3 of Exhibit 8,

12 there's a Check Stub 2193, and that's for January 15,

13 2004, and that says, "Pay to Michael Harbin"; correct?

14 A Correct.

15 Q And it's for $1,500, and it says, "For payroll" as the

16 memo?

17 A That's correct.

18 Q And so why would this not come out of the payroll

19 account?

20 A As I attested earlier, numerous times towards the end

21 of the business operating I personally did not receive

22 any income. I would wait until the company had money

23 to pay me. They would write me a manual check and then

24 report it to the payroll service. The payroll service

25 actually would tell us what -- how to net the check

BY MS. LACHMAN:

2 Q This is a balance sheet from Harbins-Stern Brothers,
3 LLC; correct?

4 A That's correct.

5 Q And that's for 2002?

6 A February 28, 2002, it looks like.

7 Q It has a listing of your current assets?

8 A That's correct.

9 Q If you look about halfway down that sheet, it says,
10 "Due from Michael Harbin" and that looks like
11 $25,015.77. So was that a loan, a personal loan that
12 you took out?

13 A No.

14 Q What was it?

15 A I believe this was one of those -- one of the reasons
16 we had our personality differences with the former
17 partner that was with Stern Brothers. And he and his
18 bookkeeper were taking like -- my office was like that
19 ran through the corporation, and they were saying that
20 that was not a benefit that I should receive, even
21 though the corporation or the entity would receive it
22 upon my death. And like cellular expense and stuff
23 like that.

24      And they had beat up on one of my former
25 bookkeepers and had her -- and I don't know if it was

Page 119

1 right around this period of time or not, but had her
2 make some entries just to make it look like, you know,
3 he was receiving a benefit that he shouldn't be
4 receiving, even though he was taking the same amount of
5 income as I was. And he was receiving benefits that I
6 was receiving, but he was not putting them on the
7 balance sheets at the time.

8      So you see, "Due from Stern Brothers $575"
9 right below that, but poor little old Michael Harbin,
10 of course, I had a blind eye to a lot of this. And I'm
11 assuming this, but later on down the road I did find
12 where -- and I did talk to the bookkeeper at the time.
13 I said, "Why are you booking my cellular phone expenses
14 'due from Michael Harbin' when it's a business
15 expense?" And she said, "Well, I was told to do so by
16 your former partner."

17 Q I couldn't hear all that. What kind --

18 A "I was told to do so by your former partner."

19 Q I heard that part. It was -- now what kind of expenses
20 were these?

21 A My cellular phone expense, business expense, normal
22 business expense.

23 Q What other kind of business expenses did you have
24 personally?

25 A Not much. I mean, there was gasoline occasionally.

Page 120

1 You know, the normal course of business with a small
2 business. Cellular phone, gas, insurance, life
3 insurance mainly. I mean, off the top of my head --

4 Q Okay. So what says it's due from Michael Harbin as
5 $25,000, that $25,000 was made up of your gas bills,
6 your cell phone bills and your life insurance?

7 A I couldn't tell you what that was made up of. If I
8 could reprint the general ledger, though, and see the
9 entries that were made, that would give you a very
10 clear -- all of us an explanation. But I don't know
11 what that 25,015.77 is made up of.

12 Q Okay. But those general ledgers are in the landfill?

13 A I would -- safe to say that they are, unfortunately.

14 Q So other than the payroll advances that you spoke of
15 before, did you ever get transfers from Harbin's,
16 Incorporated, or Harbins-Stern Brothers into your
17 personal accounts?

18 A "Transfers"? What do you mean, "transfers"?

19 Q Did you have money from the corporation that went to
20 your personal accounts for any reason other than your
21 income/payroll or, as you described earlier, to create
22 certified checks?

23 A During what period of time?

24 Q At any point.

25 A Over what period of time?

Page 121

1 Q 2000.

2 A I had been there since 1990.

3 Q Okay. 2000.

4 A I would have to look.

5 Q Look at what?

6 A I would have to check my bank statements and see.

7 Q So it's possible?

8 A Yes. There's been times when I've taken money from
9 Harbin's, Inc., and deposited it in my checking
10 account. $58,000 to pay a vendor on certified funds.
11 Another time was to wire some money to Steelcase. I
12 know Marvis wanted certified funds via wire transfer.

13      Yes, there's been times when rebate checks
14 came in to the company that I took in lieu of payment
15 when I was not on the payroll so I could pay the
16 employees. But to take money -- if you're inferring
17 that did I take hundreds of thousands of dollars and
18 stick it in my personal checking account? No, that did
19 not happen.

20 Q But it did happen that sometimes you would get rebate
21 checks that were to Harbin's that went into your
22 personal bank accounts?

23 A There were occasions, yes.

24 Q What types of amounts were those?

25 A Very small. A couple of thousand at the most.

Page 122

**Page 123**

1 Q  Did it happen more than once?
2 A  A couple of times it did.  Exactly when, normally
3     through the course of my divorce, as you know, and the
4     information Hope has supplied you all.  When I was not
5     making the income to satisfy -- excuse me.  Strike
6     that.  When I was not able to provide in the way that
7     some think I should when the business was struggling
8     after the events of 9-11, as I attested to earlier, so,
9     yes.  But do these amounts -- were they significant?
10    No.  Is there an amount that the corporation still owes
11    me?  Yes.  Will I receive it?  No.  So --
12 Q  You said that Harbin's rented space on Perry Street?
13 A  I did not.
14 Q  Because it owned that 1 percent of M&M Properties?
15 A  Harbin's was a member of M&M Properties, LLC, and they
16    were a 1-percent member.
17 Q  Okay.
18 A  Harbin's never did pay rent above the mortgage and the
19    interest payment to the bank.
20 Q  Oh.  So Harbin's paid the mortgage payment?
21 A  Right.
22 Q  Okay.  And that was sort of an informal rental
23    situation so that Harbin's could occupy that building?
24 A  Yeah.  The building was held by the corporation.  We
25    pulled it out of the corporation and put it in this

**Page 124**

1     LLC, but we never did formally juice up the rent to
2     what other owners were doing, what my former business
3     partner was doing.  We never tacked on the extra
4     thousand dollars in rent.
5        We just strictly paid the mortgage and the
6     interest, and then the K-1's flew through myself and my
7     sister each year and we unfortunately had to pay the
8     tax on that K-1, but we never even, quote, bonused that
9     money out to cover the tax, even though we were told to
10    do so by our accountants.
11       But we just -- I tried very hard to keep as
12    much cash and capital in the corporation, because this
13    was a small company, as much as I could.
14 Q  Did M&M Properties -- I apologize if you've already
15    answered this -- did they own any other properties?
16 A  No.
17 Q  So they just owned Harbin's space on South Perry .
18    Street?
19 A  That's correct.  And South Perry was an entire city
20    block.  They owned that one parcel of property and
21    that's it, which the bank has subsequently foreclosed
22    on.
23 Q  So there was no formal rental agreement between M&M
24    Properties and Harbin's?
25 A  There might have been when it was first created, but

**Page 125**

1     there -- like an annual renewal that we pulled out or a
2     five-year lease or anything like that?
3 Q  We are getting close to the end.  I'm sure everybody's
4     bellies are rumbling.  Do you remember when Harbin's,
5     Incorporated -- and I know we have talked about this,
6     but I just want to get it --
7 A  Okay.
8 Q  -- firm so that I can --
9 A  I understand.
10 Q  -- understand fully.  I'm trying to understand when
11    Harbin's, Incorporated, stopped paying their debts to
12    Steelcase particularly.  Do you remember when that was?
13 A  I think it was right after Steelcase -- well, no.  My
14    understanding was just flat refused to send that stupid
15    $200 keyboard tray that held up a $12,000 check payment
16    from the insurance company that I was going to
17    overnight to Marvis to keep the flow of business in.
18    2002, I think.
19 Q  2002?
20 A  They would have records of that, their last open P.O.
21    date or ship order date when I was on super credit,
22    double secret management control with Marvis and
23    everybody else.
24 Q  Right.
25 A  Which was unfortunate, but, you know, that happened.

**Page 126**

1 Q  And do you think in 2002 that the assets of Harbin's,
2     Incorporated, were greater than their liabilities and
3     debts?
4 A  Again, I'd have to look at a balance sheet.  I was
5     going through that divorce and I think if he hadn't
6     spoken to my ex-wife, I know other people have, and
7     trying to run that business, trying to maintain a
8     relationship with my children, and fighting an economy
9     that was in the tank for this industry was very
10    difficult.
11       So if I could tell you off the top of my
12    head, you know, I think you could tell by my testimony
13    today, I certainly would.  I would have to look and
14    see.  I don't have those records.  I walked out of that
15    building on April 30th with bad memories and nightmares
16    and I didn't look back, and so if there's -- if you
17    have a record somewhere that I can look at, I'll be
18    happy to and then I can tell you yes, they exceeded, or
19    no, they did not.  But I don't know off the top of my
20    head.
21 Q  Are your records generally -- such records as this
22    (pointing to Exhibit 9), would that accurately reflect
23    -- that's a 2002 record.  Would that accurately reflect
24    your assets and liabilities during 2002?  I'm sorry.
25    When I said "that," that was Exhibit 9.

1   MR. SMITH: When you say "during 2002," you
2   mean as of February 28, 2002?
3       THE WITNESS: Would this be for Harbin's,
4   Incorporated, or Harbins-Stern Brothers for --
5   BY MS. LACHMAN:
6   Q   That is a Harbins-Stern Brothers sheet?
7   A   Yes.
8   Q   Okay. I don't believe that I have one from Harbin's
9       for that year.
10  A   Okay.
11  Q   So I don't think I have one that can help. Do you
12      remember after September 11th of 2001 -- you've
13      mentioned that you thought that was going -- that that
14      created quite a hardship for your business financially.
15      At what point after that did you think your business
16      wouldn't recover?
17  A   As I said earlier, when Marvis -- or when Steelcase
18      stopped shipping product to me and my largest customer
19      went to the other Steelcase dealer in Montgomery.
20  Q   On the -- strike that.
21      MS. LACHMAN: Can we actually take about a
22      five-minute break?
23      MR. SMITH: Sure.
24      MS. LACHMAN: Okay. For just about that or a
25      little less. Thanks. That's all.

Page 127

1       MR. SMITH: Okay.
2       (From 12:58 p.m. to 1:11 p.m., deposition in
3       recess.)
4   BY MS. LACHMAN:
5   Q   We were talking before about transfers to your personal
6       accounts from Harbin's, Incorporated, and you testified
7       that sometimes you would do that from time to time?
8   A   (no verbal response)
9   Q   Okay. Oh, I'm sorry. Can you just give verbal --
10  A   Yes.
11  Q   Okay. And that sometimes those deposits were made for
12      reasons other than payroll or to write certified checks
13      to debtors or creditors?
14  A   Correct.
15  Q   Do you remember, did that happen in 2000?
16  A   I think a -- I'd have to refer back to my -- again, to
17      my divorce hearing and all that stuff, and I had those
18      records.
19      I think they did a couple times, and I do
20      recall one big time that I did it when we had a
21      Steelcase project and the order was rather large, and I
22      got deposits from Steelcase -- excuse me -- from the
23      insurance company, and I put those monies in my
24      checking account so that they could not be spent, so
25      they would be strictly earmarked for Steelcase. And I

Page 128

1       think they stayed in there five, ten days, whenever the
2       net discount invoice was due, and I quickly paid the
3       Steelcase invoice.
4       But other than that -- that might have been
5       in 2000 or 2001. I can't recall that far back, but
6       that's the only big time I ever did that, and that was
7       strictly the make sure there was money available to pay
8       Steelcase.
9   Q   Because if it went into Harbin's, Incorporated, what
10      would have happened to the money?
11  A   I'm afraid somebody might have ran a whole series of
12      checks to pay somebody else or -- plus I wanted to take
13      the discount, and by having the money available, to
14      take the net 10 discount.
15  Q   The net 10 discount? I'm sorry.
16  A   They give you -- or I don't know if they do it anymore,
17      but if you paid your bill in 10 days, you got an extra
18      2 percent discount. It was 2 percent 10 net 30,
19      meaning you could pay in 30 days, or if you pay in 10
20      days you'd get to take an extra 2 percent off of your
21      invoice total.
22      And so since we were already operating under
23      such a thin margin because of the constant threat over
24      our head that, "We'll go to the other dealer if you
25      don't do us right," that 2 percent meant a lot.

Page 129

1   Q   And so how were you better able to make sure that
2       happened by putting the money into your personal
3       account rather than into the corporation?
4   A   Because I knew it was there and it wasn't going to go
5       anywhere but to Steelcase.
6   Q   Okay. You did testify at the beginning, though, that
7       you were the only one with authority to write checks,
8       though?
9   A   I was for Harbin's. Now, Harbins-Stern Brothers at the
10      time, Mike Behrman, the other guy, he could write
11      checks.
12      MS. LACHMAN: Okay. I'd like to have this
13      marked as Exhibit 10, please.
14      (At 1:15 p.m., Exhibit 10 marked.)
15  BY MS. LACHMAN:
16  Q   I'm handing you Exhibit 10, which is just a section of
17      your deposition testimony given on April 2, 2002,
18      regarding your divorce proceedings. Did you take a
19      deposition on April 2, 2002?
20  A   I did.
21  Q   Okay. And as you look over the pages of the testimony,
22      does this appear to be the deposition that you took
23      that day?
24  A   It does.
25  Q   I'd like to ask you -- and when I refer to page

Page 130

**Page 131**

```
 1   numbers, I'm going to refer to the page numbers that
 2   are marked within the deposition transcript.
 3 A Like 196, 197?
 4 Q Exactly.
 5 A Okay.
 6 Q So on page 197, line 22, the question is:
 7       "This is a South Trust Bank check written to
 8    Michael Harbin in the amount of $10,000."
 9       MR. SMITH: Where are you?
10       MS. LACHMAN: We're on page 197, line 22.
11       MR. SMITH: Okay.
12 BY MS. LACHMAN:
13 Q I'll just start over just --
14 A Okay.
15 Q -- for clarity's sake. So, line 22:
16       "This is a South Trust Bank check written to
17    Michael Harbin in the amount of $10,000.
18       ANSWER: Yes, sir.
19       QUESTION: And what was that for, please?
20       ANSWER: I needed money to pay the bills
21    around the house."
22   Does that accurately reflect your testimony that day?
23 A That accurately reflects the testimony of me that day.
24 Q And that South Trust Bank account, that was a Harbin's,
25   Incorporated, bank account?
```

**Page 132**

```
 1 A I'm sure it was.
 2 Q On page 201 of that same deposition transcript, --
 3 A Okay.
 4 Q -- on line 11 -- actually, just -- okay. You can
 5   strike that. Sorry. Just to go back to what you said,
 6   you said that that does accurately reflect your
 7   testimony that day?
 8 A Accurately reflect -- reflect as far as this -- that's
 9   what I said that day. Yes.
10 Q Okay. And when you took this deposition you were under
11   oath?
12 A I was.
13 Q And in that oath you promised to tell -- give all of
14   your answers truthfully?
15 A I did.
16 Q So, page 201, line 11, the question is:
17       "Okay. The next check is a deposit. The
18    check is from Alfa Financial Corporation, a check
19    in the amount of 147,000 some-odd dollars that's
20    deposited into your personal bank account.
21       ANSWER: Uh-huh.
22       QUESTION: The check is made to Harbin's. is
23    that a check that is in payment of a debt from
24    Alfa to Harbins-Stern Brothers?
25       ANSWER: Yes, sir.
```

**Page 133**

```
 1       QUESTION: And it's deposited into your
 2    personal account?
 3       ANSWER: That's correct.
 4       QUESTION: And for what purpose was that?
 5       ANSWER: This money was to be earmarked for a
 6    $300,000 project that we had, and we stuck it in a
 7    separate account, my account, so that we wouldn't
 8    have the money in our operating account so that we
 9    would spend it. It had to be -- we segregated
10    it."
11   Does that accurately reflect your testimony that day?
12 A It does.
13 Q And that's regarding the check that we just spoke of?
14 A The one that I deposited and wrote out ten days later
15    to Steelcase.
16 Q Does this transcript help you at all remember about
17    what date that check might have been?
18 A Your client will have the exact date on that. I don't
19    know off the top of my head, but they did receive the
20    money.
21       MS. LACHMAN: I'd just like to mark these as
22    Exhibit 11.
23       (At 1:20 p.m., Exhibit 11 marked.)
24 BY MS. LACHMAN:
25 Q I'm handing you Exhibit 11, and these were included in
```

**Page 134**

```
 1    Hope Harbin, now Patterson's answer to the complaint.
 2    This is a sheet, it appears, to be from the AmSouth --
 3    your personal banking statements? Does that sound
 4    correct?
 5 A Can we stop for a minute?
 6 Q Certainly.
 7 A Can we go off?
 8 Q Yes.
 9       (From 1:21 p.m. to 1:21 p.m., deposition in
10    recess.)
11 BY MS. LACHMAN:
12 Q This has a deposit into your personal account of
13    $147,736.85?
14 A Correct.
15 Q And this statement is for the period of May 11, 2001
16    through June 11, 2001?
17 A Correct.
18 Q So in this deposition testimony we were just speaking
19    of --
20 A Right.
21 Q -- which is part of Exhibit 10, is that part of that
22    money?
23 A I would think it is. On this statement here is Alfa,
24    and then I testified one-forty-seven here. So that
25    looks like that corresponds with what I said.
```

**Page 139**

1 checking accounts to Steelcase for payment of products
2 after 1999?
3       MR. SMITH: I'm going to object to your line
4 of questioning. I haven't objected to this point
5 because I wanted to get this over with, but you're
6 going into an area now prior to the July of 2002, which
7 I thought we had agreed was a relevant time period.
8 There was no debt owed to Steelcase when these
9 activities were going on, and if the purpose of your
10 inquiry is to determine whether or not you have a
11 fraudulent conveyance claim at some point in time
12 before there was continuing debt to Steelcase, I think
13 you're -- it's all irrelevant what was -- what
14 transpired.
15      So, I'm going to object to your questioning
16 to the extent that it deals with any period of time
17 prior to the time that Steelcase had an ongoing
18 accounts receivable from Harbin's.
19      THE WITNESS: So what do I do?
20      MR. SMITH: You can continue to answer
21 questions to a certain extent. I mean, I don't want to
22 --
23 BY MS. LACHMAN:
24 Q  Well, I'll just rephrase it.
25 A  Okay.

**Page 140**

1 Q  And here you've testified that Harbin's, Incorporated,
2    was dormant in 1999; yes?
3 A  Yes.
4 Q  But after the beginning of 2002, there were payments
5    made from Harbin's, Incorporated, to Steelcase for
6    payment of products out of the Harbin's, Incorporated,
7    checking account.
8 A  That's correct.
9 Q  So, was Harbin's dormant in 1999?
10 A  Harbin's, again, was a member of the -- no, Harbin's
11   was not dormant. Harbin's was an active member in the
12   LLC Harbins-Stern Brothers. It was the managing member
13   and owned 51 percent. "Dormant" might have been the
14   improper use of that terminology.
15 Q  So Harbin's was still --
16 A  Harbin's, like it is today.
17 Q  Okay. If you'll look at page 218. This is again
18    Exhibit 10, the testimony. At the top:
19      "QUESTION: And she was also making a payment
20    to you of $1,074. Do you know what it was for?
21    It says reimbursement.
22      ANSWER: Inventory reimbursement.
23      QUESTION: S.P. Richards & Company wrote
24    Harbin's a check for $18,204 payable on March the
25    15th of 2000 that was deposited into your personal

**Page 141**

1 account.
2      ANSWER: Yes, sir.
3      QUESTION: Again, what was that a debt owed
4 to Harbin's, Incorporated?
5      ANSWER: A debt?
6      QUESTION: Yeah. I mean, did S.P. Richards &
7 Company owe Harbin's, Inc., $18,204?
8      ANSWER: This was a refund, so to speak, for
9 the work, the cumulative total of the sales that
10 Harbin's, Inc., did in 1999. It was like a
11 rebate.
12      QUESTION: Okay. But it's a rebate that
13 Harbin's, Incorporated, earned?
14      ANSWER: Correct.
15      And S.P. Richards is a supplier of Harbin's,
16 Inc.?
17      ANSWER: Yes, sir.
18      QUESTION: And then at the end of the year,
19 they calculate how much business you've done with
20 them and they make a refund to you.
21      ANSWER: Yes, sir."
22 Is that an accurate reflection of your testimony that
23 day?
24 A  It is.
25 Q  And so this is another example of what you spoke of

**Page 142**

1 earlier where rebates would come in to Harbin's,
2 Incorporated, and you would put them into your personal
3 accounts?
4 A  That's correct.
5 Q  And why did you put them into your personal accounts?
6 A  Harbin's -- this was money that was -- came to
7 Harbin's, the best I can recall, and there was another
8 deposition I'm sure I can give you floating out there
9 somewhere. But this was done before the merger of
10 Harbins-Stern Brothers.
11      So, therefore, instead of putting this money
12 into Harbins-Stern Brothers as my partner was doing,
13 monies from -- prior to the merger, instead of
14 commingling the funds, he would put them in his pocket
15 and I would put them in -- not in the literal sense,
16 you know, we're taking money away from the entity
17 itself. He would take -- well, I can't prove it. All
18 I can do is tell you I saw it.
19      But this is what I said earlier. There was
20 some rebate monies that was from previous years of
21 sales and it'd take a year for them to calculate it,
22 and I got it and I put it in my checking account.
23 Q  Did those rebate checks ever come even later than a
24 year from then?
25 A  I don't recall. Yeah, they always took four or five