# EXHIBIT C

# DEPOSITION OF MICHAEL G. HARBIN, JR.

## VOLUME II

April 2, 2002

*Page 174 to Page 319*

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455

Page 182

1  Q. Let me ask you something --
2  A. Okay.
3  Q. -- real quick before I mark those,
4     Mr. Harbin. You were the principal
5     stockholder in Retail Enhancement Services,
6     Inc., were you not?
7  A. Uh-huh (positive response).
8  Q. And you owned what percent of the stock?
9     Help refresh my recollection.
10 A. I believe it was 54%. I'd have to flip
11    through there to be totally accurate with
12    that.
13 Q. This was a Subchapter S Corporation so that
14    these flowed through --
15 A. To the shareholders.
16 Q. -- to you personally.
17 A. Yes, sir.
18 Q. Were you personally guaranteed on the
19    obligations of the corporation?
20 A. I was.
21 Q. Were the other shareholders?
22 A. No.
23 Q. You were the only one who anybody

Page 183

1     required --
2  A. Correct.
3  Q. -- a personal guarantee?
4     All right. What else?
5  A. That's Harbin's '97, '98, -- '97 and 2000
6     return.
7     MR. HENIG: '97, then, we'll mark
8        as Exhibit Forty and the 2000
9        return we'll mark as Exhibit
10       Forty-one. Okay.
11       (Exhibit Numbers 40 & 41 marked
12       for identification.)
13 Q. And you did not bring with you the
14    depreciation schedules.
15 A. No. No, sir.
16 Q. You don't have those in your possession.
17 A. I don't. I asked -- No, I do not.
18 Q. And you've asked your accountants --
19 A. To furnish those.
20 Q. -- to furnish those.
21 A. Yes, sir.
22 Q. Did your accountants indicate that they had
23    those schedules?

Page 184

1  A. Last night when I was talking to them, they
2     were trying to locate them.
3  Q. Okay. They didn't tell you of any reason
4     they would have destroyed those depreciation
5     schedules, did they?
6  A. Oh, no, sir.
7  Q. Anything else that you brought with you?
8  A. Deposits.
9     MR. HENIG: I'll mark that as
10       Exhibit Forty-two.
11       (Exhibit Number 42 marked for
12       identification.)
13    MR. MINOR: Now, attached to the
14       back of that is the Fidelity
15       statement. That's in addition
16       to the deposits.
17    MR. HENIG: I'll take that out.
18    MR. MINOR: So pull that. We need
19       to make that a separate
20       exhibit. You're marking as
21       Forty-two a composite exhibit?
22    MR. HENIG: Right, that Mr. Harbin
23       has furnished indicating the

Page 185

1     deposits that we had inquired
2     about.
3  Q. I'll ask you some questions about that, but
4     let me finish marking these.
5     Mr. Harbin, your attorney furnished to
6     me a customer reprint of the Fidelity
7     Investments accounts, and I'm going to mark
8     that as Exhibit Forty-three.
9     (Exhibit Number 43 marked for
10    identification.)
11 Q. And that is -- that is a reprint that is
12    dated 9/13 of '01. So sometime in the fall
13    it was ordered. And it's for the years, I
14    believe, '98, '99, and 2000. I'll ask you
15    if you recognize what I've marked as Exhibit
16    Forty-three.
17 A. I do.
18    (Exhibit Number 44 marked for
19    identification.)
20 Q. And I had requested the 2001 information for
21    the same Fidelity account, and I'll ask you
22    if what I have marked as Exhibit Forty-four
23    is what you've furnished in response to that

Haislip, Ragan, Green, Starkie & Watson, P.C.                    (334) 263-4455

### Page 194

1  A. Okay. I don't know.
2  Q. It had to be sometime around May of 2000
3     because the other check is issued at the
4     same time.
5  A. Uh-huh (positive response).
6  Q. And that is a check -- And the other check
7     is check number 1481 from Harbin-Stern
8     Brothers, L.L.C. --
9  A. Uh-huh (positive response).
10 Q. -- to AmSouth Bank. And it's for what?
11 A. American Express refund.
12 Q. Tell me the nature of that.
13 A. Evidently I charged something on my personal
14    card for the company.
15 Q. Harbin-Stern Brothers is writing Michael
16    Harbin a check for $3,323 and some-odd
17    cents.
18 A. Uh-huh (positive response).
19 Q. And it's for reimbursement of what?
20 A. A security system that I purchased for the
21    company.
22 Q. Harbin-Stern Brothers, April 3rd of '01, is
23    reimbursing you on a loan repayment --

### Page 195

1  A. Yes, sir.
2  Q. -- for $3,500?
3  A. Yes, sir.
4  Q. Harbin-Stern Brothers is paying the AmSouth
5     payment again. It says loan repayment in
6     the amount of 6,000?
7  A. Yes, sir.
8  Q. Is this a personal loan that you made to
9     Harbin-Stern Brothers?
10 A. Yes, sir.
11 Q. Do you have a note to evidence that?
12 A. (Witness nodded in the negative). No, I
13    don't.
14 Q. No note?
15    Tell me what evidence there is that
16    Harbin-Stern Brothers owed you that money.
17 A. Let's see. There was a check in here, the
18    Principal Financial Group, for $48,000, and
19    I deposited 43,000 into Harbin-Stern
20    Brothers.
21 Q. How much does Harbin-Stern Brothers owe you
22    today?
23 A. That's a good question.

### Page 196

1  Q. What do you contend that they owe you?
2  A. On the balance sheet it shows I have a
3     credit due to me of 14,000, but there's a
4     receivable that's been put in place showing
5     where Harbin-Stern Brothers paid the cable
6     TV, my gas, long distance -- telephone
7     charges that are billed back to me, so
8     that's a good question. I don't know if I'm
9     responsible for the TV that people watch
10    throughout the facility and as a business
11    person am I responsible --
12 Q. What do you contend that Harbin-Stern
13    Brothers owes you personally?
14 A. I don't know.
15 Q. The 14,000?
16 A. 14,000 right now is on the books.
17 Q. Okay. So there's an asset there of a note
18    payable to you or a debt payable to you of
19    $14,000, correct?
20 A. Yes, sir.
21 Q. Who is Crystal Hill?
22 A. She's a former employee.
23 Q. Are these payments that I will see from

### Page 197

1     Harbin-Stern Brothers to AmSouth Bank that
2     are deposited into your account repayment of
3     that 40-something thousand dollars that you
4     advanced Harbin-Stern Brothers?
5  A. Yes, sir.
6  Q. The check from USAA Insurance in the amount
7     of $4,703, what type claim was that?
8  A. That was when Windstorm was it Barry that
9     came through, that came through last summer.
10 Q. Where were the damages?
11 A. At the beach home in Seagrove, Florida.
12 Q. Is the beach house account also with
13    AmSouth?
14 A. Yes, sir.
15 Q. Do you know what the current balance in it
16    is?
17 A. $72, I believe.
18 Q. There's a check here, check number 150.
19    Earlier we were on check number 144, I
20    believe --
21 A. Uh-huh (positive response).
22 Q. -- out of the home equity. This is a
23    SouthTrust Bank check written to Michael

Case 2:05-cv-00838-ID-CSC   Document 43-4   Filed 05/23/2005   Page 5 of 12
Case 2:04-cv-00888-MHT-CSC   Document 134-8   Filed 05/03/2005   Page 5 of 12

Deposition of Michael Harbin (II)                                         April 2, 2002

### Page 198

1  Harbin in the amount of $10,000.
2  A. Yes, sir.
3  Q. And what was that for, please?
4  A. I needed money to pay the bills around the
5     house.
6  Q. That's your testimony as to the reason for
7     drawing it August the 28th of '01.
8  A. I'm reasonably sure. You have my bank
9     statements, so without being able to
10    compare, I can't give you a definitive
11    answer.
12 Q. Mr. Harbin, explain the deposit on September
13    the 5th of '01 to me, please.
14 A. $5,000, payment on 401(k) note, cash in of
15    2,400, total of 7,400.
16 Q. What is the payment on the 401(k) note?
17 A. That's the 401(k) money that I borrowed to
18    put into the company.
19 Q. From whom did you borrow it?
20 A. My 401(k), my retirement money.
21 Q. So Harbin's, Inc., which in September of '01
22    was a dormant corporation, correct --
23 A. Explain dormant.

### Page 199

1  Q. I mean, it had no activity, no business
2     activity whatsoever, Harbin's, Inc.
3  A. That's correct.
4  Q. -- had a bank account that had at least
5     $5,000 in it.
6  A. That's correct.
7  Q. Do you know what the bank balance is in
8     Harbin's, Inc., today?
9  A. I do not. This account has been -- This
10    account has been renamed Harbin-Stern
11    Brothers. I think we're just still using
12    the same checks.
13 Q. With Sterling Bank?
14 A. That's correct.
15    The -- Our credit card charges from
16    American Express for the company goes into
17    Sterling Bank.
18 Q. All right. But why is Harbin's, Inc.,
19    writing Michael Harbin a check for $5,000?
20 A. Like I said, Harbin's, Inc. -- this account
21    has been renamed Harbin-Stern Brothers, and
22    we're still using the old checks without
23    buying new ones.

### Page 200

1  Q. Even if it was Harbin-Stern Brothers, why
2     would they be repaying you?
3  A. For the money that I put into the company.
4  Q. Again, this is part of the repayment of the
5     43,000?
6  A. Yes, sir. Payment on 401(k) note.
7  Q. Okay. And the cash, $2,400 cash.
8  A. That was a refund of a -- of a -- for lack
9     of a better word, of a pyramid scheme that
10    was brought up from Mobile to Montgomery.
11    And I had given 2,400 or $2,500 to an
12    individual, and subsequently the thing went
13    bust, but we were able to refund all our
14    money.
15 Q. Is that Jackie Parks' stepfather or the guy
16    who's married to Jackie Parks' mother?
17 A. Huh?
18 Q. Is he involved in this?
19 A. No. Winton Blount got me involved in this.
20 Q. Winton Blount.
21    Did Winton Blount hand you $2,400 in
22    cash?
23 A. No.

### Page 201

1  Q. Who handed you $2,400 in cash?
2  A. It came out of Texas. The name of the
3     organization was Life Without Debt, and it
4     was headquartered in Texas. And the money
5     came to me from Life Without Debt in Texas
6     in cash.
7  Q. Twenty-four $100 bills?
8  A. Exactly, taped and wrapped.
9  Q. Through the U.S. Mail?
10 A. Through the U.S. Express Mail.
11 Q. Okay. The next check is a deposit. The
12    check is from Alfa Financial Corporation, a
13    check in the amount of 147,000 some-odd
14    dollars that's deposited into your personal
15    bank account.
16 A. Uh-huh (positive response).
17 Q. The check is made to Harbin's. Is that a
18    check that is in payment of a debt from Alfa
19    to Harbin's-Stern Brothers?
20 A. Yes, sir.
21 Q. And it's deposited into your personal
22    account?
23 A. That's correct.

 
Page 202

1 Q. And for what purpose was that?
2 A. This money was to be earmarked for a
3    $300,000 project that we had, and we stuck
4    it in a separate account, my account, so
5    that we wouldn't have the money in our
6    operating account so that we would spend it.
7    It had to be -- We segregated it.
8 Q. "We" deposited it into your account. Who is
9    the we that deposited it into your account?
10 A. Well, me. I did.
11 Q. Okay. So we is you.
12 A. We, me.
13 Q. Did you discuss depositing it into this
14    personal account with anybody at
15    Harbin's-Stern Brothers?
16 A. Yes.
17 Q. With whom?
18 A. Mike Behrman.
19 Q. And he approved that.
20 A. Sure.
21 Q. And your AmSouth account is an account that
22    earns interest, does it not?
23 A. Yes, sir.

Page 203

1 Q. When you wrote the check back out, did you
2    repay Harbin-Stern Brothers the interest
3    that was earned on the money while it was in
4    your account?
5 A. No, I did not calculate that.
6 Q. That was a deposit at a posting date of June
7    the 8th. Again on July the 20th, the next
8    month, there appears to be another deposit
9    of 147,700 and some-odd dollars again drawn
10   on an Alfa check to Harbin's; is that
11   correct?
12 A. Yes, sir.
13 Q. And is that a --
14 A. Yes, sir.
15 Q. -- the same explanation as before?
16 A. Yes, sir.
17 Q. And is that a check that you discussed with
18   Michael Behrman before depositing it into
19   your personal account?
20 A. Yes, sir.
21 Q. And had his approval and understanding.
22 A. Correct.
23 Q. And did you again just pay back to

Page 204

1    Harbin-Stern Brothers the exact amount and
2    not calculate the interest that was earned
3    on it?
4 A. That's correct.
5 Q. What is this cash in that occurred with the
6    same deposit?
7 A. I don't think that's mine because up here
8    you can see there's no cash in.
9 Q. Right.
10 A. That's somebody else's.
11 Q. Okay. That's not part of your account.
12 A. No, sir.
13 Q. Again, Harbin-Stern Brothers in December of
14   '01 is writing you a check in the amount of
15   4,452, and I assume -- and this time it's
16   some-odd cents. Is this again repayment of
17   the monies you advanced Harbin-Stern
18   Brothers?
19 A. No, sir, that's a gross payroll check.
20 Q. Okay. This is a check from a Fred Winham or
21   Winharm, d/b/a Florida Antique Mall.
22 A. Yes, sir.
23 Q. What is he purchasing from you?

Page 205

1 A. He purchased a player piano.
2 Q. Was this part of the antiques that was in
3    the separate business or was this --
4 A. No, sir. That was a player piano that I
5    acquired ten, twelve years ago, and I sold
6    it on eBay.
7 Q. Tell me of this check from Richard and
8    Margaret Brown.
9 A. That was for furniture from that Eclectic
10   Imports.
11 Q. And the next check is from John Goodwyn
12   Gallion to Hope Harbin.
13 A. Yes, sir.
14 Q. And it's deposited into your personal
15   account?
16 A. Yes, sir.
17 Q. Did Hope endorse that check?
18 A. She would have had to. I'm --
19 Q. Next is a check from Principal Life
20   Insurance Company to you on September 1 of
21   2000 in the amount of $45,000. Tell me of
22   that check.
23 A. That's my 401(k) money.

Page 206

1  Q. That's the money you pulled out of your
2     401(k) plan and put in the company, and they
3     were repaying you.
4  A. Yes, sir.
5  Q. April 17th, 2000, there's a check from
6     Retail Enhancement Services, Inc., in the
7     amount of $22,309.20, and it says a 1999 tax
8     distribution?
9  A. Yes, sir.
10 Q. What is that? Is that a tax refund or --
11 A. That's to cover the income tax due on the
12    profit.
13 Q. So '99 was a profitable year for Retail
14    Enhancement?
15 A. Yes, sir.
16 Q. There's a SouthTrust Bank check dated
17    February the 8th of 2000 in the amount of
18    $8,000. Are those loan proceeds?
19 A. I don't recall.
20 Q. Is there any other reason that SouthTrust
21    Bank would have been writing a check to the
22    order of Michael G. Harbin, Jr., $8,000?
23 A. Does that say name of remitter? I can't

Page 207

1     read it.
2  Q. I think it might, but I can't read it
3     either. That's why I asked you what it
4     could be.
5  A. I don't recall. I had a -- I don't recall.
6  Q. There's a check here from Matt Rainer. Is
7     that a rental check?
8  A. Yes, sir.
9  Q. Who is Revest?
10 A. They're a company in Atlanta.
11 Q. What do they do?
12 A. They buy and sell Steelcase furniture.
13 Q. Why would their check made payable to
14    Harbin's, Inc., be deposited into your
15    account, your personal account?
16 A. I believe that was a refund for work that we
17    did with them in '99.
18 Q. Which Harbin's, Inc., did.
19 A. Yes, sir.
20 Q. And it was income that Harbin's, Inc., had
21    earned in '99.
22 A. Correct. Well, I guess you could classify
23    it as income.

Page 208

1  Q. Again, then, why would it be deposited into
2     your personal account and not into the
3     corporate account?
4  A. Because Harbin's, Inc., was pretty much
5     dormant in '99 -- after '99.
6  Q. But still had some payments that it
7     received.
8  A. Correct.
9  Q. And you used those as your own because you
10    were -- you and your sister were the sole
11    stockholders of Harbin's, Inc.
12 A. Correct.
13 Q. And so when a check came, rather than
14    deposit it into a dormant checking account,
15    you just put it in your own account.
16 A. It would appear so.
17 Q. Do you know how it was treated for income
18    tax purposes?
19 A. I don't.
20 Q. Do you know whether or not it's reflected on
21    your personal income tax return?
22 A. I don't.
23 Q. Do you have any recollection of having

Page 209

1     reflected it on your personal return?
2  A. I don't.
3  Q. That's all part of a transaction dated March
4     9th of 2000, correct?
5  A. Yes, sir.
6  Q. On February the 17th of 2000, Retail
7     Enhancement Services, Inc., is writing you a
8     check for $10,000.
9  A. Yes, sir.
10 Q. And what was that for?
11 A. I believe that was just an advance.
12 Q. Do you recall ever repaying it?
13 A. I don't.
14 Q. Did you ever treat that as income?
15 A. I don't recall.
16 Q. You don't recall whether or not you treated
17    it as income or whether or not you did not
18    treat it as income? Which is it?
19 A. I didn't handle the payroll processing of
20    our company, so -- and without my tax
21    returns in front of me, I wouldn't --
22 Q. Well, let me ask you this, Mr. Harbin.
23 A. All right.

 
### Page 210

1  Q. Did Retail Enhancement Services, Inc., pay
2     you a salary?
3  A. No, sir.
4  Q. Then it wouldn't matter who handled the
5     payroll. That wouldn't be payroll, would
6     it?
7  A. Well, if it was an advance.
8  Q. An advance on what? If you're not paid a
9     salary and it's a Subchapter S Corporation
10    where everything flows through to you, is
11    there any reason other than part of the
12    profits being paid to you that Retail
13    Enhancement Services, Inc., would be writing
14    you a check?
15 A. Consulting fee?
16 Q. Did you charge a consulting fee to Retail
17    Enhancement Services at any time?
18 A. Not on an official paper or anything, no,
19    sir.
20 Q. Okay. Well, you asked that as though it
21    were a question, not a statement. When you
22    said consulting fee, it was more of an
23    inquiry. You weren't testifying that you

### Page 211

1     received a consulting fee, were you?
2  A. No.
3  Q. Check number 142 on Michael G. Harbin,
4     SouthTrust Bank, is a payment to you of
5     $10,000. I think earlier we looked at check
6     number 144, didn't we?
7  A. Yes, sir.
8  Q. Is this the same bank account?
9  A. I believe so.
10 Q. And is this a withdrawal on your --
11 A. Equity line.
12 Q. -- equity line?
13 A. Yes, sir.
14 Q. Which is a second mortgage, as I recall your
15    testimony earlier, on a home that is owned
16    by your wife only.
17 A. It's deeded in her name; that's correct.
18 Q. Okay. Titled in her name only.
19 A. Yes, sir.
20 Q. Do you know what you did with this $10,000?
21 A. I would have to go back to my bank
22    statements. That's my AmSouth checking
23    number.

### Page 212

1  Q. Right. March the 15th, check number 137 on
2     the same equity line account, $3,000
3     deposited into your personal account. Do
4     you know what happened there?
5  A. No, sir.
6  Q. Interestingly enough, there was a $3,000
7     check written but only $2,500 that was
8     actually deposited. Do you remember what
9     you did with the $500 cash?
10 A. I don't recall.
11 Q. March 8th of 2000, again on the same -- this
12    is check number 136. You deposited
13    $10,000 -- You wrote a check for $10,000 to
14    your -- to AmSouth, but then the total
15    deposit amount was only $3,700, and you had
16    a cash-out ticket. What did you do with the
17    $7,000 in cash?
18 A. I didn't have $7,000 in cash.
19 Q. Well, now, you follow it with me, and you
20    tell me if I've said anything wrong. Matt
21    Rainer wrote you a rent check for $600.
22 A. Uh-huh (positive response).
23 Q. There was a $10,000 check that you wrote on

### Page 213

1     your equity line.
2  A. Uh-huh (positive response).
3  Q. Check number 136. And then there's a
4     cash-out ticket that's not clear. But it
5     shows the amount of the deposit on March the
6     9th as being $3,737.53 --
7  A. Yes, sir.
8  Q. -- which is some $7,000 less than those two
9     checks.
10        Did you pay to Winton Blount cash for
11    your investment in --
12 A. I did.
13 Q. How much cash did you actually pay?
14 A. 2,500.
15 Q. Would that have been -- Would March 9th of
16    2000 have been about the time that you paid
17    that $2,500 cash?
18 A. I -- I don't know.
19 Q. Well, let me ask you this. Would drawing
20    out some 68, 6900, $7,000 in cash be an
21    unusual event --
22 A. Yes, sir.
23 Q. -- for Michael Harbin to --

Page 214

1   A.  Yes, sir.
2       MR. MINOR: Object to the form.
3       There's been no testimony he
4       drew that amount of money out.
5       MR. HENIG: Well, we're looking at
6       the deposit slips, and we're
7       looking at the checks that made
8       up the deposit. And there was
9       a cash out --
10      MR. MINOR: He would have probably
11      deposited it and paid on
12      something else the rest of it.
13      There's been no -- He hasn't
14      testified he took 7 grand cash
15      out.
16  Q.  Can you explain, other than the taking of
17      $7,000 cash or approximately that amount,
18      why there would not have been a $10,600
19      deposit made on March the 9th?
20  A.  This cash out does not reflect I took cash
21      out, so I can't -- I don't know.
22  Q.  It doesn't reflect the amount. It does
23      reflect that cash was taken out. That's the

Page 215

1       reason for a cash-out ticket, isn't it?
2   A.  Does it reflect it came out of my deposit?
3   Q.  You tell me. I'm looking at the documents
4       you've provided.
5   A.  I see a 600 and a 10,000, and I see a
6       partially blanked out cash out.
7   Q.  And do you see at the very top of the page
8       an amount that was deposited into the
9       account?
10  A.  That's correct.
11  Q.  And what amount is shown as being deposited
12      into that account on March the 9th?
13  A.  3,737.53.
14  Q.  Okay. How much is the total of the two
15      checks that are reflected here?
16  A.  10,600.
17  Q.  So you would agree with me there is some
18      difference there in what's shown as
19      deposited and what the two checks that are
20      shown that are made up as part of that
21      deposit.
22  A.  Yes, sir. It's a discrepancy in this paper.
23  Q.  Would you ask the bank to furnish you with a

Page 216

1       clearer copy of the deposit that is made on
2       March the 9th of 2000 --
3   A.  Yes, sir.
4   Q.  -- so that we can go ahead and get that
5       clear?
6   A.  Yes, sir.
7   Q.  Do you need anything else from it?
8   A.  I need this --
9   Q.  The account number. Serial number is blank.
10      Date, case, date and time was March 27th of
11      '01 at 7:41.
12  A.  Let me just write that down.
13  Q.  Sure. Write down anything you want to so we
14      can get it squared away.
15  A.  That's fine.
16  Q.  And obviously -- They were able --
17      Interestingly enough, they were able to
18      xerox the entire page, but when it came to
19      this cash memo, something had covered up
20      that and it didn't xerox, so I'm sure
21      they'll give you a clean page there.
22  A.  Yes, sir.
23  Q.  And it also appears that these checks --

Page 217

1       Let's see. On the next page there's another
2       check from Mark Phillips for 615 and a
3       cash-out ticket of 100, but it doesn't show
4       what check made up the $1,933. Do you know
5       what check that was?
6   A.  No, sir.
7   Q.  Do you see what I'm talking about?
8   A.  Yes, sir. And this may not be in order. If
9       we keep going, we may find it.
10  Q.  Those are just rent checks and then a
11      Harbin-Stern Brothers check to you.
12  A.  It's for Christmas social function.
13  Q.  A $2,000 check from Fidelity Investments,
14      but there appears to be two other checks,
15      one for 1,050 and one for 1,074 that make up
16      this deposit.
17  A.  There are.
18  Q.  Here's the 1,074 and the 1,050. One is
19      AmSouth, travel expenses, paid to you by
20      Jackie Parks?
21  A.  That's correct.
22  Q.  On what account?
23  A.  This is the Eclectic Imports account.

Deposition of Michael Harbin (II)  April 2, 2002

### Page 218

1 Q. And she was also making a payment to you of
2   1,074. Do you know what that was for? It
3   says reimbursement.
4 A. Inventory reimbursement.
5 Q. S.P. Richards & Company wrote Harbin's a
6   check for $18,204 payable on March the 15th
7   of 2000 that was deposited into your
8   personal account.
9 A. Yes, sir.
10 Q. Again, was that a debt owed to Harbin's,
11    Inc.?
12 A. A debt?
13 Q. Yeah. I mean, did S.P. Richards & Company
14    owe Harbin's, Inc., $18,204?
15 A. This was a refund, so to speak, for the
16    work, the cumulative total of the sales that
17    Harbin's, Inc., did in '99. It was like a
18    rebate.
    Q. Okay. But it's a rebate that Harbin's, Inc.
       earned.
    A. Correct.
    Q. And S.P. Richards is a supplier of Harbin's,
       Inc.

### Page 219

   A. Yes, sir.
   Q. And then at the end of the year, they
      calculate how much business you've done with
4     them and they make a refund to you.
5  A. Yes, sir.
6  Q. Okay. And Harbin's, Inc., was a
7     corporation, correct?
8  A. Yes, sir.
9  Q. And you did not deposit this rebate of March
10    15th, 2000 into Harbin's, Inc.
11 A. No. That's correct.
12 Q. You deposited it into your own personal
13    account.
14 A. Yes, sir.
15 Q. Did you declare it as income in 2000?
16 A. I asked my accountants yesterday to look
17    into that.
18 Q. What other inquiries did you ask your
19    accountants to make as to whether or not you
20    declared something as income that appears in
21    these deposit slips?
22 A. That was it other than the rent checks.
23 Q. Let me ask you this so that we can be clear

### Page 220

1    on this. This S.P. Richards Company --
2  A. Yes, sir.
3  Q. -- are they rebating to you for the
4     materials that Harbin's purchased from them
5     in 1999?
6  A. Yes, sir.
7  Q. All right. So this is a year-end rebate,
8     correct?
9  A. Yes, sir.
10 Q. Harbin's, Inc., had no business activity in
11    1999.
12 A. Yes, we did.
13 Q. What did Harbin's, Inc., have in 1999? Not
14    Harbin-Stern Brothers but Harbin's, Inc.
15 A. Over $3,000,000 plus in revenue.
16 Q. In 1999?
17 A. Yes, sir.
18 Q. Okay. When were the two companies merged?
19    I'm sorry.
20 A. October of '99.
21 Q. October of '99.
22    For accounting purposes, when would
23    Harbin's, Inc., book a rebate on its books

### Page 221

1    and records?
2  A. That's something I'd have to ask my people
3     that book them.
4  Q. Were you on a cash basis where you would
5     book them upon receipt?
6  A. Is there another basis?
7  Q. Accrual.
8  A. Accrual?
9  Q. Yeah.
10 A. I'm --
11 Q. Well, you're asking me accounting questions.
12    That's not quite fair.
13 A. I am. Well, I'm sorry. I'm not an
14    accountant. I'd have to ask and find out.
15 Q. You don't know whether you were on a cash or
16    an accrual basis?
17 A. That's correct.
18 Q. So you don't know whether this check from
19    S.P. Richards Company, Inc., would have been
20    reflected in the Harbin's, Inc., books and
21    records at the end of 1999.
22 A. That's correct.
23 Q. But you've asked your accountant to look

Deposition of Michael Harbin  II)  April 2, 2002

Page 226

1 is that correct?
2 A. That's the date of the check, yes.
3 Q. Okay. Well, you certainly couldn't have
4    spent this $20,000 until you received the
5    check, could you?
6 A. That's correct.
7 Q. And Hope had already filed a petition for
8    divorce at the time you received this
9    $20,000 check, had she not?
10 A. When was the date that y'all filed it?
11 Q. October, I believe.
12 A. All right. The mortgage or the note was in
13    place prior to the filing.
14 Q. But the check dated November 9th, 2001 --
15    MR. HENIG: Floyd, look at this.
16    (Brief recess.)
17 Q. (Mr. Henig continuing) Mr. Harbin, we've
18    looked, and I believe we filed or the
19    divorce documents were filed on October the
20    31st, and Mr. Minor accepted service around
21    November the 8th.
22 A. Okay.
23 Q. And you made a withdrawal of $20,000 on the

Page 227

1 second mortgage on the condominium on
2 November the 9th. Do you recall what you
3 did with that $20,000?
4 A. It was deposited into my checking account.
5 Q. And do you know what checks you wrote with
6    it?
7 A. I do not.
8 Q. Don't recall.
9    There's also a payment here of $150
10    from Regions Bank, pay to the order of
11    Office Plus.
12 A. Uh-huh (positive response).
13 Q. What was that?
14 A. This man right here (indicating) stole a
15    computer. He was an employee. And this is
16    restitution that comes from Ellen Brooks'
17    office.
18 Q. Alvin Hall?
19 A. Right.
20 Q. By whom was Mr. Hall employed at the time he
21    stole the computer?
22 A. By me.
23 Q. In what business?

Page 228

1 A. Office Plus.
2 Q. Okay. So his paycheck came from Office
3    Plus, not from Michael Harbin, correct?
4 A. Correct.
5 Q. And this was restitution to Office Plus,
6    correct?
7 A. That's correct.
8 Q. And did you write Office Plus a check for
9    $150 out of your account?
10 A. No, it was closed.
11 Q. Did you declare this as income?
12 A. I don't believe I did on that.
13 Q. Did you ask your accountants to check into
14    that?
15 A. They will be checking into all of this.
16 Q. The next deposits there are two checks,
17    again from Matt Rainer and from Eric Moore.
18    Who is Eric Moore?
19 A. He was an employee at Stern Brothers.
20 Q. Why was Mr. Moore paying you $50?
21 A. I loaned him $50.
22 Q. Another restitution check in the amount of
23    $150, Regions Bank, on Alvin Hall, correct?

Page 229

1 A. Yes, sir.
2 Q. How many restitution checks did you receive?
3 A. I'm not sure. I believe he pays them on his
4    ability to pay.
5 Q. That's what most people do. But do you
6    remember how many checks you --
7 A. I'm not sure.
8 Q. Do you keep a ledger on Mr. Hall's
9    repayments?
10 A. I do not.
11 Q. How much did Mr. Hall steal from Office
12    Plus?
13 A. Gosh, it was -- I believe it was valued
14    maybe around 2,100.
15 Q. 2,100?
16    So his restitution would have been at
17    least that much?
18 A. I believe. I don't know for sure.
19 Q. There is another check in the amount of $331
20    from S.P. Richards made payable to Harbin's,
21    Inc., and dated July 9th, 2001.
22    What is that check?
23 A. I believe that's a rebate check for being

Page 230

1 some type of dealer, being in some type of
2 dealer program. I'm not sure.
3 Q. Harbin's, Inc., again, July the 9th of 2001
4 was a dormant corporation with no activities
5 whatsoever; is that correct?
6 A. That's correct.
7 Q. And you deposited that into your personal
8 account.
9 A. That's correct.
10 Q. Now, didn't you tell me, however, that
11 Harbin's, Inc., owned a percent of the
12 Harbin's building?
13 A. Yes, sir.
14 Q. Did you declare this check that you
15 deposited into your personal account as
16 income?
17 A. I have not filed my 2001 return yet.
18 Q. Do you consider it income to you personally?
19 A. Yes, sir.
20 Q. Who are the stockholders of Harbin's, Inc.?
21 A. Myself and my sister.
22 Q. Did you give your sister any portion of this
23 check?

Page 231

1 A. No, sir.
2 Q. Check number 146, that's another withdrawal
3 on SouthTrust Bank on the home equity dated
4 August the 3rd of '01 in the amount of
5 $10,000.
6 Do you remember what you did with that
7 check?
8 A. No, sir. Well, I deposited it into my
9 checking account at AmSouth.
10 Q. Do you know the reason for making a draw
11 against the second mortgage on your wife's
12 home?
13 A. I would have to look at my bank statements
14 to see where the --
15 Q. What is DirectCare?
16 A. That was an insure -- That was our major
17 medical insurance carrier.
18 Q. What is Revest?
19 A. That's that company in Atlanta.
20 Q. Is this like a rebate check?
21 A. I believe so, yes, sir.
22 Q. Again made payable to Harbin's, Inc., March
23 24th of 2000, in the amount of $1,598?

Page 232

1 A. Yes, sir.
2 Q. Or is that 90? It's either 90 or 98.
3 A. I think it's 98.
4 Q. Did you declare that as income?
5 A. I don't know. I don't think so.
6 Q. Again, a check payable to Harbin's, Inc.
7 A. Yes, sir.
8 Q. Do you remember giving your sister any
9 portion of this check?
10 A. No, I don't recall.
11 Q. April 25th of 2000, another S.P. Richards
12 check, this time in the amount of $2,189.36.
13 Is that a rebate check?
14 A. Yes, sir.
15 Q. Again, it's made payable to Harbin's. Is
16 that Harbin's, Inc., or is that
17 Harbin's-Stern Brothers?
18 A. I believe that's Harbin's, Inc. And I
19 believe this is the -- what is called a
20 sub-column account for Office Plus. That's
21 why the check is smaller than the others.
22 COURT REPORTER: Excuse me. What
23 type account?

Page 233

1 A. I believe it's a rebate check for Office
2 Plus.
3 Q. Office Plus activity?
4 A. Right.
5 Q. Office Plus in April of 2000 had debts, did
6 it not?
7 A. Yes.
8 Q. And did you apply any of this $2,189 toward
9 any of the debts of Office Plus?
10 A. I don't know. I'd have to look at my bank
11 statements.
12 Q. Do you recall having done that?
13 A. I don't recall.
14 Q. Mr. Harbin, do you take any prescription
15 drugs on a regular basis?
16 A. I do.
17 Q. What prescription drugs do you take?
18 A. I take the generic for Xanax.
19 Q. Okay. What's the name of that generic? Do
20 you recall?
21 A. I can't -- It's Alapalaza [sic] or
22 something. I can't pronounce it.
23 Q. Who prescribes Xanax for you? Which